John R. Dodd (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: john.dodd@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4695
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| ACORDA THERAPEUTICS, INC., *et al.,*[1] | Case No. 24-22284 (DSJ) |
| Debtors. | Joint Administration Requested |

_____/

**DECLARATION OF MICHAEL A. GESSER IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Michael A. Gesser, hereby declare as follows:

1.      I am the Chief Financial Officer ("**CFO**") and Treasurer of Acorda Therapeutics,

Inc. ("**Acorda**"), one of the debtors and debtors in possession (collectively, the "**Debtors**" and

together with its non-Debtor affiliates, collectively, the "**Company**") in the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**").  I have served as Acorda's CFO since November 2021,

_____

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Acorda Therapeutics, Inc. (1168), Civitas Therapeutics, Inc. (2814), Biotie Therapies, LLC (2149), Biotie Therapies AG (N/A), Neuronex, Inc. (5094), and Acorda Therapeutics Limited (N/A).  For the purposes of these chapter 11 cases, the address for the Debtors is: 2 Blue Hill Plaza, 3rd Floor, Pearl River, New York 10965.

and Treasurer since June 2022.  With respect to the other Debtor entities, I also hold the following

positions and roles: President and Treasurer of Civitas Therapeutics, Inc., Director of Biotie

Therapies, LLC, Director of Neuronex, Inc., and Director of Biotie Therapies AG.  I am a Director

of non-Debtor entity Acorda Therapeutics Ireland Limited.

2.      In addition to my roles with the Company, I have also served as a member of the

board of directors of Flow Sciences, Inc., a provider of pharmaceutical safety containment

solutions since October 2021.  Before joining the Company, from January 2020 to August 2021, I

served as CFO of Tergus Pharma, an end-to-end contract service provider for topical

pharmaceutical products.  Prior to that, from September 2017 to August 2019, I served as the CFO

and Chief Operating Officer of BioMedomics, Inc., an early-stage medical device development

company.  Between September 2011 and August 2017, I held CFO positions at several other

biopharmaceutical and medical device companies, including Osmotica Pharmaceutical Corp.,

SunTech Medical Inc., and HAP Innovations LLC.  I earned a Bachelor of Science in Economics

and Finance from the Cameron School of Business at the University of North Carolina at

Wilmington and a Master of Business Administration from the Belk School of Business at the

University of North Carolina at Charlotte.

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the

"**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of New

York (the "**Court**").  The Debtors intend to continue to operate their business and manage their

properties as debtors in possession.  To minimize any business disruption caused by the

commencement of these Chapter 11 Cases, the Debtors seek various types of relief through "first

day" applications and motions filed contemporaneously herewith (collectively, the "**First Day**

**Pleadings**").  I submit this declaration (the "**Declaration**") (i) in support of the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code, (ii) in support of the First Day Pleadings, and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 Cases.

4.      I am familiar with the day-to-day operations and business and financial affairs of the Debtors.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information provided to me by the Debtors' management team, employees, or the Debtors' advisors, and/or my opinion based on my experience and knowledge of the Debtors' operations and the pharmaceutical industry.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      This Declaration is divided into five sections:  **section I** provides an overview of these Chapter 11 Cases, **section II** describes the Debtors' business, organizational, and capital structure, **section III** describes the events leading up to these Chapter 11 Cases, **section IV** describes the Debtors' prepetition restructuring initiatives, including the execution of the Restructuring Support Agreement (as defined below), and **section V** summarizes the relief requested in the First Day Pleadings and provides the factual basis in support thereof.  Finally, **Exhibit C** through **Exhibit N** attached hereto provide certain information required by Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York.

## I.      OVERVIEW

6.      The Debtors commenced these Chapter 11 Cases to pursue the sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "**363 Sale**").  As described

in greater detail below, prior to the Petition Date, and following a competitive marketing process and comprehensive exploration of proposals from potential bidders, the Debtors, in conjunction with their advisors, determined that the offer of Merz (as defined herein), a third-party strategic acquiror, to make a "stalking horse bid" to purchase substantially all of the Debtors' assets in the 363 Sale for an aggregate purchase price of approximately $185 million plus the assumption of certain liabilities represented the best available path to maximizing the value of their estates.

7.     Simultaneous with the prepetition sales and marketing efforts, the Company engaged in negotiations with its secured-creditor constituency and entered into a Restructuring Support Agreement with the Ad Hoc Noteholder Group (as defined below).  The Restructuring Support Agreement contemplates a 363 Sale, followed by a chapter 11 plan of liquidation, which the Debtors intend to file within 21 days of the Petition Date.  The Debtors commenced these Chapter 11 Cases consistent with the terms of the Restructuring Support Agreement and will seek in these Chapter 11 Cases to close on the 363 Sale as promptly as practicable following June 15, 2024 and in no event later than December 31, 2024, and go effective on its chapter 11 plan no later than July 30, 2024.

8.     In addition, to support the Company's working capital needs during these Chapter 11 Cases, certain members of the Ad Hoc Noteholder Group (the "**Consenting Convertible Noteholders**") are also providing debtor-in-possession financing to the Company in the amount of approximately $60.0 million, consisting of (i) a term loan facility in an aggregate maximum principal amount of $10,000,000 available on the entry of the interim DIP order, (ii) a delayed draw term loan facility in an aggregate maximum principal amount of $10,000,000 available on the entry of the final DIP order, and (iii) subject to the entry of the final DIP order, a roll-up facility in the aggregate maximum principal amount of $40,000,000.

9.     The Debtors believe that an expeditious chapter 11 process is essential to preserving the value of their assets and estates for the benefit of all stakeholders.  A sale transaction and the consummation of a chapter 11 plan of liquidation in line with the end dates set forth above and more detailed series of milestones proposed herein and in the Bidding Procedures Motion (defined below) will enable the Debtors to achieve this result, while also minimizing the impact on the Debtors' current operations and ensuring a smooth transition of the business to the ultimate buyer.

## II.     BACKGROUND

### A.     The Debtors' Business

10.     Acorda is a biopharmaceutical company that has developed breakthrough products, therapies, and biotechnology to restore function and improve the lives of people with neurological disorders.  The Debtors market two main products: AMPYRA® ("**Ampyra**"), which is marketed and distributed as FAMPYRA® ("**Fampyra**") outside of the United States by Biogen International GmbH ("**Biogen**"), and INBRIJA® ("**Inbrija,**" and together with Ampyra, the "**Products**").  The Debtors sell their Products to a variety of customers, principally specialty pharmacies (the "**Specialty Pharmacies**") and an exclusive wholesale distributor (the "**Wholesaler**").  The Debtors' Products are primarily distributed in the United States through its Specialty Pharmacy customers who in turn sell the Products to patients.  For the year ended December 31, 2023, net revenue for Ampyra sales was $63.9 million and the Company recognized royalty revenue of approximately $11.3 million for Fampyra sales.  For the year ended December 31, 2023, net revenue for Inbrija sales in the United States was $33.6 million and net revenue for Inbrija sales outside of the United States was $4.8 million.

### i.     *Ampyra/Fampyra*

11.     Ampyra is an extended-release tablet, which is approved by the U.S. Food and Drug Administration ("**FDA**") as a treatment to improve walking in adults with multiple sclerosis.

Ampyra was made commercially available in the United States in March 2010 and the Company believes that Ampyra was the first FDA-approved drug indicated to improve walking in adults with multiple sclerosis. Acorda does not manufacture or distribute Ampyra itself. Instead, Acorda manages its production and distribution of Ampyra through third-party contractual relationships. Patheon, Inc. is the Company's sole manufacturer and packager of Ampyra for sales in the United States.

12.    The Company was historically dependent on sales of Ampyra in the United States for a majority of its revenue. In late 2018, the Company experienced a significant decline in Ampyra sales due to competition from several generic versions of Ampyra that began entering the United States market. Additional manufacturers may market generic versions of Ampyra, and the Company expects that Ampyra sales will continue to decline over time.

13.    With respect to Fampyra, Biogen markets Fampyra outside of the United States pursuant to a Collaboration and License Agreement entered into with Acorda on June 30, 2009 (the "**Collaboration Agreemen**t"). On January 8, 2024, Biogen terminated the Collaboration Agreement, effective January 1, 2025. As a result, Acorda will regain global commercialization rights to Fampyra. To ensure that the majority of people with multiple sclerosis currently being served continue to have access to Fampyra, Acorda has been working with Biogen on a plan to assume commercialization responsibilities as marketing authorization transfers and distribution arrangements are finalized for each applicable territory. Fampyra has been approved for use in a number of countries across Europe, Asia, and the Americas. Fampyra patents have been successfully challenged in Germany and Canada, and it is likely there will be similar challenges in other countries where Fampyra is marketed by Biogen. There is generic competition for

Fampyra in Germany and Canada. Alkermes Plc, through an arrangement with Biogen, is the sole manufacturer and packager of Fampyra for sales outside of the United States.

### ii.    *Inbrija*

14.    Inbrija is the first and *only* levodopa inhalation powder approved by the FDA in the United States for as-needed intermittent treatment for episodic motor fluctuations (or "OFF episodes") in adults with Parkinson's disease treated with a carbidopa/levodopa regimen. Inbrija utilizes the Debtors' ARCUS® ("**Arcus**") pulmonary delivery system for inhaled therapeutics. Arcus is a dry-powder pulmonary drug delivery technology designed to deliver medication through inhalation by transforming molecules into a light, porous dry powder.

15.    The Company relies on Catalent Massachusetts LLC ("**Catalent**") for the manufacture and supply of Inbrija. All commercial supply of Inbrija is currently manufactured at Catalent's Chelsea, Massachusetts facility, which was sold by the Company to Catalent in February 2021. As the Company's Inbrija supplier, Catalent is responsible for all Inbrija components other than the inhaler and levodopa, which are supplied by other third parties. Effective January 1, 2023, the Company entered into a new manufacturing services agreement with Catalent, which was subsequently amended in March 2023 (as amended in March 2023, the "**New MSA**"). Under the New MSA, Catalent will continue to manufacture Inbrija through 2030, with reduced minimum annual commitments through 2024 and significantly lower pricing thereafter. The New MSA provides for the scale-up of new spray drying equipment, which will offer expanded capacity for the long-term worldwide manufacturing requirements of Inbrija.

16.    Inbrija is approved for use outside of the United States in the European Union and the United Kingdom. The Debtors have entered into agreements to commercialize Inbrija in Spain, Germany, Latin America, and China, and are working with their partners in Latin America and

China to obtain the applicable marketing and regulatory approvals to market Inbrija in these jurisdictions.

**B.      The Debtors' Finances and Employees**

17.      For the twelve months ended December 31, 2023, the Company recorded total net revenues of approximately $117.6 million and posted a net loss of $252.9 million.  Net revenues for Inbrija were $38.4 million, which represents a year-over-year growth in sales of approximately 24.43%.  Net revenues for Ampyra were $63.9 million, continuing a year-over-year decline in sales that is largely attributable to the loss of Ampyra's patent exclusivity in 2018.  As of December 31, 2023, the Company had an accumulated deficit of approximately $1.2 billion.

18.      The Debtors currently employ a highly-skilled and dedicated workforce of 101 full-time salaried employees (the "**Employees**"),[2] 30 independent contractors (the "**Independent Contractors**"), 29 sales representatives (the "**Contracted Sales Representatives**") who are contracted through Syneos Health LLC ("**Syneos Health**"), and 13 temporary workers that are retained through certain temporary staffing agencies (the "**Temporary Workers**," and collectively with the Employees, Independent Contractors, and Contracted Sales Representatives, the "**Workforce**").  The Workforce performs a variety of functions including field sales, commercial and digital strategy, market research, drug safety, product supply, regulatory affairs, legal, analytical development, marketing, medical affairs, pharmaceutical development, quality control, trade relations, information technology, finance, administrative services, and human resources. The majority of the Workforce is critical to the Debtors' operations and their services have enabled the Debtors to continue to achieve their goals of improving patients' lives.  Many of these individuals are highly trained and/or have an essential working knowledge of the Debtors' business

---

[2] There are four (4) employees on long-term disability leave that are not included in this calculation.

that cannot easily be replicated. The Workforce is located within the United States. None of the Employees are party to collective bargaining agreements or other similar labor agreements.

## C.   The Debtors' Corporate and Capital Structure

19.    Acorda was founded on March 17, 1995, as a Delaware corporation, and is the direct or indirect parent of each of the Debtors. Acorda's principal executive offices are located in Pearl River, New York. An organizational chart illustrating the corporate structure of the Company is annexed hereto as **Exhibit A** and depicted below.



### i.     *The 6.00% Convertible Senior Secured Notes*

20.    In December 2019, the Company completed the private exchange of $276 million aggregate principal amount of its then outstanding 1.75% convertible senior notes due 2021 (the "**2021 Notes**") in exchange for a combination of approximately $207 million aggregate principal amount of newly-issued 6.00% convertible senior secured notes due 2024 (the "**2024 Notes**") and a cash payment of approximately $55.2 million to participating holders. As a result of the exchange, approximately $69 million of the 2021 Notes remained outstanding, which were repaid at maturity on June 15, 2021 using cash on hand.

21.    The 2024 Notes were issued pursuant to that certain Indenture, dated as of December 23, 2019 (as amended, supplemented, or modified from time to time, the "**Indenture**"), by and

among Acorda, as issuer, its wholly-owned subsidiary Civitas Therapeutics, Inc. ("**Civitas**"), along with any domestic subsidiaries acquired or formed after the date of issuance, as guarantors (collectively, the "**Guarantors**"),[3] and Wilmington Trust, National Association, as trustee and collateral agent.  The 2024 Notes bear interest of 6.00% per year from December 23, 2019, until they mature on December 1, 2024.  The 2024 Notes are secured by a first priority security interest in substantially all of the assets of Acorda and the Guarantors, subject to certain exceptions described in the Security Agreement, dated as of December 23, 2019 (as amended, supplemented, or modified from time to time, the "**Security Agreement**"), between the grantors party thereto and Wilmington Trust, National Association, as collateral agent.  As of the Petition Date, the principal balance outstanding under the 2024 Notes is approximately $207 million.

### ii.      Acorda's Common Stock

22.      Acorda's common stock is publicly traded on the Nasdaq Global Market under the symbol "ACOR."  As of March 27, 2024, there were approximately 1,242,098 shares of Acorda's common stock outstanding.[4]  On March 28, 2024, the closing price of Acorda's stock was $13.21/share.

### III.      EVENTS LEADING TO THE CHAPTER 11 CASES

23.      Several factors have put downward pressure on the Company's financial performance over the past several years and have necessitated a comprehensive solution for the Company's capital structure.  These factors include: (i) the acquisition of Biotie Therapies Ltd. for $363 million, which subsequently generated and continues to generate net operating losses, (ii) an adverse court ruling that invalidated certain Ampyra patents, allowing generic versions of the drug

---

[3] Civitas has not formed or acquired any domestic subsidiaries since December 23, 2019.

[4] On June 2, 2023, the Company filed an Amended and Restated Certificate of Incorporation with the Secretary of State of Delaware to effect a 1-for-20 reverse stock split and a proportionate reduction in the number of authorized shares from 61,666,666 to 3,083,333.  The common stock began trading on a split-adjusted basis on the Nasdaq Global Select Market on June 5, 2023.

to enter the United States market in late 2018, and resulting in the rapid loss of substantial revenue, (iii) slower than expected growth of Inbrija sales, due in part to prescribing challenges and the COVID-19 global pandemic, which had a material adverse effect on the Company's business; and (iv) the inability of the Company to invest in its pipeline or other development opportunities.

A.     **Acorda Acquires Biotie**

24.     In 2016, Acorda acquired Biotie Therapies Ltd. (a Finnish company that was liquidated in 2023) and its subsidiaries (including debtors Biotie Therapies, LLC and Biotie Therapies AG, collectively, "**Biotie**") for cash consideration of approximately $363 million. Through the acquisition, Acorda obtained global rights to a Phase 3 Parkinson's disease treatment ("**Tozadenant**") and additional clinical-stage assets, which were promising therapies at the time. However, in November 2017, Acorda discontinued its clinical development program for Tozadenant after serious adverse events occurred in patients during Phase 3 trials. Biotie never generated any revenue for the Company, and as of December 31, 2023, Biotie had net operating losses of $120.8 million.

B.     **Sharp Decline in Ampyra Sales**

25.     Patented pharmaceutical products enjoy a certain period of patent exclusivity, typically up to 20 years, during which generic versions of the drug may not enter the market. After a product's loss of exclusivity, generic competitors may enter the market and erode the drug's profitability. With respect to Ampyra, the Company held five patents, one of which expired on July 30, 2018. The remaining four patents were set to expire between 2025 and 2027. However, in March 2017, a United States district court issued a ruling that upheld the Ampyra patent that was set to expire on July 30, 2018, and invalidated the other four patents (the "**Patent Decision**"). In April 2017, following the Patent Decision, the Company implemented a corporate restructuring to reduce its cost structure and focus resources on other initiatives, including developing Inbrija

and maximizing the value of Ampyra. As part of this restructuring, the Company reduced headcount by 20%.

26.    The Patent Decision was ultimately upheld on appeal in September 2018 (the "**Appellate Decision**"), which led to a rapid and significant decline in Ampyra sales due to competition from several generic versions of the drug that entered the domestic market. Additional manufacturers continue to enter the market with generic versions of Ampyra, and Ampyra sales are expected to continue to decline over time. Before the Appellate Decision, the Company derived substantially all of its revenue from the sale of Ampyra, reporting net revenues of $543 million for the year ended December 31, 2017. Net revenue for Ampyra was $63.9 million for the year ended December 31, 2023. As such, maintaining brand loyalty and market access are critical to continuing to maximize the value of the Ampyra franchise because it continues to face competition from generic versions.

## C.    Inbrija Sales Failed to Meet Initial Projections

27.    In October 2014, Acorda acquired Civitas Therapeutics, Inc. for approximately $525 million. In connection with the acquisition, Acorda acquired the global rights to Inbrija (at the time, a Phase 3 treatment candidate for OFF episodes of Parkinson's disease) and the Arcus technology. Inbrija was approved by the FDA in December 2018 and became commercially available in the United States in February 2019. In October 2019, to further reduce costs and focus its resources on the commercial launch of Inbrija, which was the Company's key strategic priority for 2019 and 2020, the Company implemented a corporate restructuring and again reduced its headcount by a further 25%.

28.    When Inbrija launched, annual net revenues were projected to peak in the range of $300 to $500 million per year, and the Company structured itself accordingly. However, due to prescribing challenges and unavoidable disruptions to the healthcare system caused by the

COVID-19 global pandemic, among other factors, sales did not meet this projected level.  Indeed, shortly after the launch of Inbrija, the Company's efforts to drive the commercial success of Inbrija were significantly disrupted by COVID-19, the effects of which are discussed in more detail below. Net revenue for Inbrija for the year ended December 31, 2020, the first full year it was on the market, was $24.2 million.  Since Inbrija's release, sales have not exceeded $38.4 million per year.

**D.    Restructuring of the 2021 Notes**

29.    Due to a number of adverse factors, including the sharp decline in Ampyra sales after the Appellate Decision, the slow rise of Inbrija revenue after the product launch, and the upcoming maturity of its 2021 Notes, in December 2019, the Company completed a private exchange of $276 million of its 2021 Notes in exchange for a combination of approximately $207 million aggregate principal amount of newly-issued 2024 Notes and a cash payment of approximately $55.2 million to participating holders.  As a result of this exchange, approximately $69 million of 2021 Notes remained outstanding.

30.    In February 2021, the Company completed the sale of its Chelsea, Massachusetts manufacturing operations to Catalent, resulting in net proceeds of approximately $74 million.  The Company used the net proceeds received from the transaction for general corporate purposes, subject to compliance with the terms of the 2024 Notes, which included funding capital expenditures and payment of the outstanding 2021 Notes in June 2021.

**E.    Impacts of the COVID-19 Pandemic**

31.    The Company's business and financial condition has also been impacted by the COVID-19 global pandemic.  The travel restrictions, "shelter in place" orders, and general concerns about the spread and effects of COVID-19 disrupted the delivery of healthcare to patients and made it more difficult for some patients to visit their physician and obtain pharmaceutical prescriptions.  Further, COVID-19 caused certain patients to lessen their mobility and therefore

their apparent need for certain therapeutics, including Inbrija. These factors contributed to decreases in new Inbrija prescriptions and the Company's ability to market Inbrija to physicians and patients and expand sales outside of the United States, the impact of which continued into 2022. During this time, to further reduce costs and focus resources on Inbrija, the Company effected two further corporate restructurings in January and September of 2021 and reduced headcount by approximately 16% and 15%, respectively. The Company is still managing the indirect implications of the pandemic on the commercial growth of Inbrija and the Company continues to focus on re-engaging physicians and commercializing Inbrija outside of the United States.

**F.    The Company's Inability to Invest in New Therapies**

32.    The Company operates in a highly competitive industry in which many biotechnology and pharmaceutical companies, as well as academic laboratories, are engaged in research, development, and/or marketing of therapeutics for various neurological conditions, including Parkinson's disease and multiple sclerosis. Given the events above, the drastic decline in revenue, and the inability of the Company to generate enough cash to sustain its operations at a larger scale, the Company's ability to invest in its pipeline (including the Company's ability to retain highly qualified personnel) and pursue value-enhancing development opportunities to compete with its competitors has been constrained and all development activities have been suspended.

## IV.    PREPETITION RESTRUCTURING INITIATIVES

33.    In response to the challenges described above, the Company recognized that, given its Product mix and scale, it would be difficult to continue to support its funded debt obligations going forward and generate the cash flow needed to pay the 2024 Notes at maturity. Acorda's management team thus took proactive steps to enhance the Company's operations and cash flow.

A.    **Early Restructuring Initiatives**

34.    As set forth above, the Company implemented four corporate restructurings and reductions in its Workforce in April 2017 (following the Patent Decision), October 2019, January 2021, and September 2021, to reduce costs, more closely align operating expenses with expected revenue, and focus its resources on Inbrija.

35.    Even with these restructurings and associated organizational changes, the Company was unable to adequately reduce its expenses to generate sufficient cash flow or additional capital to drive growth.   As a result, the Company engaged Ducera Partners LLC ("**Ducera**") in the summer of 2022 and then Ernst & Young LLP ("**E&Y**") in September 2022 to assist management with its review of strategic alternatives.   Over the next several months, the Company worked with its advisors to explore appropriate solutions to support its funded debt obligations and generate cash flow.

B.    **Sale and Marketing Process**

36.    Facing the near-term maturity of the 2024 Notes, in April 2023, the Company engaged Leerink Partners ("**Leerink Partners**") as its investment banker to conduct a sale process. The Company also engaged Baker & McKenzie LLP ("**Baker McKenzie**") in July 2023 to assist management with its legal review of strategic alternatives.   Over the past several months, the Company, with the assistance of outside legal and financial advisors, has been engaged in a robust process to explore strategic alternatives and maximize value for all stakeholders in light of the upcoming maturity of the 2024 Notes.

37.    The Company has evaluated every aspect of its business, taken proactive steps to respond to the challenges outlined above, and reviewed a number of potential strategic alternatives, including (i) a restructuring or refinancing of the Debtors' liabilities, (ii) raising additional debt or

equity capital, and (iii) the sale of all or certain assets. For the reasons set forth below, the Company determined that a sale of substantially all of its assets under chapter 11 of the Bankruptcy Code would present the best path to maximize value for the benefit of the Debtors' stakeholders, while at the same time helping to ensure that the Products would continue to be provided on an uninterrupted basis to patients who benefit from these much-needed medications.

38.     As set forth in greater detail in the *Declaration of Byron Webster in Support of Motion of Debtors for Entry of Orders (i)(a) Authorizing and Approving Bidding Procedures and Stalking Horse Bid Protections, (b) Scheduling Auction and Sale Hearing, (c) Approving Form and Manner of Notice Thereof, (d) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts, and (e) Granting Related Relief; and (ii)(a) Approving the Asset Purchase Agreement, (b) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (c) Authorizing Assumption and Assignment of Executory Contracts, (d) Authorizing Distribution to the Prepetition Noteholders, and (e) Granting Related Relief*, filed contemporaneously herewith, in April 2023, the Debtors, with the assistance of Leerink Partners, commenced a comprehensive process to market the opportunity for third parties to engage in a strategic transaction with the Company.

39.     This process included the solicitation of such interest and/or receipt of inbound interest from 49 parties, comprised of 45 potential strategic and four potential financial counterparties. These strategic and financial entities represented a broad spectrum of potential counterparties including large, diversified pharmaceutical companies, small and mid-sized public specialty and generic pharmaceutical companies, privately-held specialty and generic pharmaceutical companies, foreign pharmaceutical companies, and private equity investors with experience in the pharmaceutical sector and/or healthcare bankruptcies and turnaround situations,

as well as potential counterparties that had expressed interest in the Company in the past. The Company also engaged in discussions with the Ad Hoc Noteholder Group to explore its interest in a strategic transaction with the Company. Throughout this process, the Debtors made clear to all potentially interested parties that they were receptive to any value-maximizing strategic transaction, whether in the form of a sale, restructuring, financing or otherwise, either in or out of court.

40.     This process resulted in the Company entering into in-depth due diligence with four potential counterparties and initiating two rounds for the submission of non-binding indications of interest. Although the Company received a "whole company" bid and multiple expressions of interests for the purchase of its assets, the Company did not receive any indications of interest on terms that would satisfy its funded debt obligations in full. In light of the interest in an asset-based sale transaction, Leerink Partners reset the bidding process in September 2023 and distributed letters requesting revised proposals from interested counterparties.

41.     After September 2023, the Company received six non-binding indications of interest. Following thorough exploration of these proposals and arm's length negotiations between these potential third-party bidders and the Debtors, the Debtors determined that a stalking horse bid (the "**Stalking Horse Bid**") from Merz Pharmaceuticals, LLC ("**Merz**" or the "**Stalking Horse Bidder**"), represented the best available path to a value-maximizing transaction. The Stalking Horse Bid includes an offer to purchase substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code for an aggregate purchase price composed of approximately $185 million plus the assumption of certain liabilities (the "**Purchase Price**") as specified in the Asset Purchase Agreement, dated as of March 31, 2024, by and among the Debtors and the Stalking Horse Bidder (the "**Stalking Horse APA**").

42.     As described in further detail in the *Motion of Debtors for Entry of Orders (i)(a)
Authorizing and Approving Bidding Procedures and Stalking Horse Bid Protections, (b)
Scheduling Auction and Sale Hearing, (c) Approving Form and Manner of Notice Thereof, (d)
Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory
Contracts, and (e) Granting Related Relief; and (ii)(a) Approving the Asset Purchase Agreement,
(b) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Other
Interests, (c) Authorizing Assumption and Assignment of Executory Contracts, (d) Authorizing
Distribution to the Prepetition Noteholders, and (e) Granting Related Relief* (the "**Bidding
Procedures Motion**"), to ensure that the Stalking Horse Bid is in fact the highest or otherwise best
offer for the purchase of the Debtors' assets, the Debtors have developed bidding and auction
procedures (the "**Bidding Procedures**") that will allow interested parties to submit competing bids
for the Debtors' assets.  The Debtors intend to conduct an open, transparent and thorough sale and
marketing process to ensure that the Debtors receive the maximum value possible for their assets
for the benefit of their stakeholders while preserving the Debtors' business as a going concern.

43.     In light of the comprehensive pre-petition marketing process and the fact that the
parties that engaged in this process are already familiar with the Debtors and their assets, the
Debtors have determined that a postpetition marketing and diligence period of 45 days is a
reasonable and sufficient amount of time for potentially interested bidders to formulate a
competing bid.   The Debtors have therefore proposed the following timeline for their sale process,
which is calibrated to achieve the twin goals of a value maximizing sale via a robust marketing
and auction process and consummating a transaction as quickly as practicable so as to preserve the
value of their assets and business.  It is also important to complete a sale in an expeditious manner
to ensure the continued supply of the Debtors' Products to patients.

| Event | Date |
|-------|------|
| Hearing to approve Bidding Procedures | On or before April 26, 2024 |
| Deadline for submission of potentially Qualified Bids (as defined in the Bidding Procedures) | May 16, 2024 at 5:00 p.m. (prevailing Eastern Time) |
| Deadline to notify each bidder whether its bid is a Qualified Bid | One (1) day before the Auction |
| Auction (if necessary) | May 22, 2024 at 10:00 a.m. (prevailing Eastern Time) |
| Sale Hearing | If no Auction, no later than May 24, 2024; otherwise, May 31, 2024 |

**C.      Restructuring Support Agreement**

44.     Contemporaneously with the sales and marketing process, in the months leading up to these Chapter 11 Cases, the Debtors began negotiations with ad hoc group of holders of over 90% of the Company's 2024 Notes (the "**Ad Hoc Noteholder Group**") represented by Perella Weinberg Partners LP as its investment banker and King & Spalding LLP as its legal advisor (together, the "**Ad Hoc Group Advisors**")  regarding the terms of a comprehensive restructuring, while the Debtors simultaneously pursued other options to address their liquidity and overleverage issues by engaging with other parties, both inside and outside the corporate structure, including potential third-party financing providers and potential asset purchasers.

45.     The Debtors provided the Ad Hoc Group Advisors with extensive diligence information concerning the Debtors and their operations.  Subsequently, the members of the Ad Hoc Noteholder Group executed non-disclosure agreements and became restricted to negotiate a restructuring transaction.  The extensive and arms' length negotiations with the Ad Hoc Note Holder Group culminated in the Restructuring Support Agreement (the "**Restructuring Support Agreement**") attached hereto as **Exhibit B**.

46.     The Restructuring Support Agreement contemplates the restructuring of the Company through a prearranged chapter 11 filing providing for (i) the sale of certain of the Company's core assets under section 363 of the Bankruptcy Code pursuant to the Stalking Horse Agreement (subject to higher or better offers as set forth in Bidding Procedures) (the "**Sale Transaction**") and (ii) a chapter 11 plan (the "**Plan**"). The Restructuring Support Agreement sets out certain milestones and conditions of the Company relating to the Sale Transaction and the Plan. Specifically, the Restructuring Support Agreement contains the following key terms, among other things:[5]

- Following the Petition Date, the Company shall oversee and manage a comprehensive sale and marketing process to solicit higher or otherwise better bids to the Stalking Horse Bid, in accordance with the Bidding Procedures in good-faith consultation with the Requisite Consenting Creditors (the "**Sale Process**");

- The members of the Ad Hoc Noteholder Group (the "**DIP Lenders**") shall provide the Company with a secured debtor-in-possession financing as set forth in a debtor-in-possession financing agreement, the proceeds of which shall be used for, among other things, general corporate purposes during the pendency of the Chapter 11 Cases and to conduct the Sale Process on the terms and conditions consistent with those set forth in the DIP Credit Agreement (the "**DIP Facility**");

- The Consenting Convertible Noteholders will also consent to the Debtors' use of the cash collateral of the Convertible Noteholders to help fund the administration of the Chapter 11 Cases;

- A Liquidating Trust will be formed and the Debtors shall transfer the Liquidating Trust Assets to the Liquidating Trust and the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and the beneficial interests therein; and

- The Consenting Creditors will accept the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code.

---

[5] Capitalized terms not otherwise defined in this section shall have the meaning ascribed to them in the Restructuring Support Agreement.

47.    The Restructuring Support Agreement also contemplates the following milestones

(the "**Milestones**") to facilitate these Chapter 11 Cases:

- As of 11:59 p.m. prevailing Eastern Time on the date that is three days from the Petition Date, the Debtors have filed the Bidding Procedures Motion;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 5 days from the Petition Date, the Interim DIP Order has been entered by the Court;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 21 days from the Petition Date, the Debtors have filed the Disclosure Statement and the Plan;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 28 days following the filing of the Bidding Procedures Motion, the Bidding Procedures Order has been entered by the Court;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 29 days from the Petition Date, the Final DIP Order has been entered by the Court;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 51 days from the Petition Date, the Debtors have commenced the Auction, if applicable (as defined in the Bidding Procedures);

- As of 11:59 p.m. prevailing Eastern Time on the date that is 60 days from the Petition Date, the Sale Order has been entered by the Court approving the sale of the Acquired Assets (as defined in the Bidding Procedures), provided that if there is no overbid for the Acquired Assets, then then the Sale Order shall be entered no later than 53 days from the Petition Date;

- As of 11:59 p.m. prevailing Eastern Time on the date that is 60 days from the Petition Date, the Court has entered the Disclosure Statement Order;

- As promptly as practicable following June 15, 2024 and in no event later than the Outside Date (as defined in the Bidding Procedures), the Debtors shall have consummated the sale of Acquired Assets;

- As of the 11:59 p.m. prevailing Eastern Time on the date that is 105 days from the Petition Date, the Court has entered the Confirmation Order; and

- As of the 11:59 p.m. prevailing Eastern Time on the date that is 120 days from the Petition Date, the Plan Effective Date has occurred.

48.    The Debtors believe that, to be successful, these Chapter 11 Cases must proceed in

the most expeditious manner permitted by the Bankruptcy Code.  The terms of the Restructuring

Support Agreement reflect that belief.   The proposed timeline for these Chapter 11 Cases

appropriately balances the Debtors' need to complete the Sale Transaction and their need to confirm a Plan that will provide for the administration of claims, the realization of any remaining assets, and the wind down of any remaining operations, and dissolution of the entities.

**D.    DIP Financing**

49.    In addition, as described in the *Declaration of Jay K. Sinha in Support of Motion of Debtors for (i) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (ii) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (iii) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (iv) Granting Liens and Superpriority Claims, (v) Modifying the Automatic Stay, and (vi) Scheduling a Final Hearing* (the "**DIP Motion**"), filed contemporaneously herewith, the Debtors, with the assistance of their financial advisors, conducted a process to solicit financing offers from potential third-party lenders, including traditional bank lenders and other firms experienced in direct non-bank lending in similar circumstances, to fund the Company's continued operations during the Chapter 11 Cases.  Due to the Debtors' financial position and existing capital structure, the Debtors found limited options to secure an adequate amount of financing, and, ultimately, the Debtors did not receive any financing proposals from the third-party financing sources it contacted.

50.    In connection with the Restructuring Support Agreement, the DIP Lenders agreed to enter into a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $60.0 million, consisting of (i) a term loan facility in an aggregate maximum principal amount of $10,000,000 available on the entry of the Interim DIP Order, (ii) a delayed draw term loan facility in an aggregate maximum principal amount of $10,000,000 available on the entry of the Final DIP Order, and (iii) a roll-up facility in the aggregate maximum

principal amount of $40,000,000 available upon entry of the Final DIP Order.  The Debtors have

an immediate need for this financing.  Absent the authority to enter into and access the DIP Facility,

even for a limited period of time, the Company will be unable to continue operating its businesses.

The proposed DIP Facility will provide critical liquidity necessary to, among other things, (i)

operate the business in the ordinary course, (ii) administer these Chapter 11 Cases, including to

satisfy working capital and other operational needs, and (iii) provide sufficient liquidity to operate

until the consummation of the 363 Sale.  The proposed DIP Facility is conditioned upon the

Debtors' compliance with the Milestones.

## V.    FIRST DAY PLEADINGS

51.    As mentioned above, the Company operates in a highly competitive industry.  It is

imperative that the Company make a seamless transition into chapter 11 to preserve the patient

supply of Products, the reputation of the business and the loyalty and goodwill of customers,

suppliers, patients, and employees.  The Company's sales and operations must continue in the

ordinary course of business to ensure the uninterrupted supply of Products to patients, preserve

and maximize the value of the Debtors' estates, and effectuate a timely and efficient sale process.

Accordingly, the Debtors have filed a number of First Day Pleadings designed to facilitate their

transition into these Chapter 11 Cases.  The Debtors anticipate that the Court will conduct a hearing

soon after the Petition Date at which the Court will hear and consider many of the First Day

Pleadings.[6]

52.    I have reviewed each of the First Day Pleadings, including any exhibits thereto.  I

believe that the relief requested by the First Day Pleadings is necessary to enable the Debtors to

preserve and maximize the value of their estates, and to efficiently implement their sale efforts

---

[6] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleading.

without disruption or delay.  As such, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

## A.        Administrative Pleadings

53.       The Debtors have filed four administrative pleadings that seek to (i) jointly administer the Chapter 11 Cases for procedural purposes only, (ii) authorize the Debtors to file a consolidated list of creditors, (iii) extend the time period by which the Debtors must file their Schedules and Statements (defined below), and (iv) authorize the Debtors to retain Kroll Restructuring Administration LLC ("**Kroll**") as claims and noticing agent.

### i.        *Joint Administration Motion*

54.       The Debtors have requested that the Chapter 11 Cases be jointly administered for procedural purposes only.  As set forth above, the Debtors are affiliated with each other.  Joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other papers and related notices that otherwise would need to be filed in all of the cases absent joint administration.  Accordingly, joint administration will save considerable time and expense.

### ii.        *Motion to File Consolidated List of Creditors*

55.       The Debtors seek entry of an order (i) authorizing the Debtors to (a) prepare a consolidated list containing the name and complete address of each creditor (the "**Creditor Matrix**") in electronic format only in lieu of submitting separate mailing matrices for each Debtor, (b) file a consolidated list of their 30 largest unsecured creditors, (c) redact certain personal identifiable information, and (ii) approving the form and manner for the mailing and publication of the notice to creditors and other parties-in-interest announcing the commencement of the Chapter 11 Cases (the "**Procedures**") in the form attached to the Proposed Order as **Exhibit 1** (the "**Notice of Commencement**").

56.     First, Permitting the Debtors to maintain a consolidated Creditor Matrix in electronic format only, in lieu of each Debtor filing a separate Creditor Matrix, is warranted under the circumstances of these cases.  The Debtors anticipate that there will be over 2,000 entities or individuals listed on the Creditor Matrix.  I understand that converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.  The Debtors have been working with Kroll, their proposed claims and noticing agent, to prepare a single, consolidated list of the Debtors' creditors in electronic format.  If the motion to retain Kroll is granted, I understand that Kroll will, among other things, complete the mailing of the applicable notices to the parties in the Creditor Matrix. The Debtors are also prepared to make the Creditor Matrix available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense), in lieu of submitting a mailing matrix to the clerk of this Court.

57.     Second, with respect to the list of unsecured creditors, it would be more efficient to compile a separate top 20 creditor lists for each individual Debtor.  The Debtors believe a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will provide the U.S. Trustee with a clearer picture of the Debtors' creditor constituency and aid in its efforts to communicate with these creditors.  As such, the Debtors believe that filing a single, consolidated list of the Debtors' 30 largest unsecured creditors in these Chapter 11 Cases is appropriate.

58.     Third, I believe that redacting certain personal identifiable information of any individual listed on, or appearing in, any document (i) made publicly available on the Debtors' case website, (ii) filed with the Court, or (iii) otherwise submitted to Kroll, including the consolidated Creditor Matrix, the claims register for each Debtor (the "**Claims Registers**"), and

the Schedules and Statements is appropriate.  The Debtors are not familiar with the personal circumstances of each of their creditors to know with sufficient certainty whether a release of their personal information could potentially jeopardize their safety or violate any foreign jurisdictions' privacy data protection regulations.  While the Debtors understand the concerns that arise from imposing potential impediments on certain creditors' ability to communicate and organize, they maintain that measures can be implemented to facilitate any necessary communications while maintaining a baseline of confidentiality and protection.  Further, the Debtors are sensitive to the privacy and safety concerns of their former and current employees and other individuals.  As with any large employer, certain employees' personal circumstances, including circumstances unrelated to their employment, would be negatively impacted by the disclosure of their residential addresses. Such disclosure of personal addresses would likely hinder the Debtors' efforts to attract and retain the employees necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

59.    Additionally, I understand based on discussions with the Company's advisors, including Baker McKenzie, that certain foreign data privacy laws (specifically, the UK GDPR and EU GDPR) restrict the processing and disclosure of certain personal information, and that violation of these laws could result in severe penalties, including monetary fines.  For these reasons, the Debtors seek authority to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Creditor Matrix and Schedules and Statements, (i) the home addresses of individual creditors—including the Debtors' employees—and individual equity holders, and (ii) the names, addresses, and other Personal Data of any natural person to the extent they are processed subject to foreign data privacy laws.  The Debtors propose to provide an unredacted version of the Creditor Matrix and any other redacted filings to the Court, the U.S. Trustee, counsel to any

statutory committee appointed in the Chapter 11 Cases, and other parties in interest upon reasonable request.  In each case, this would be subject to a review of whether such disclosure, on a case-by-case basis, would violate any obligation under the UK GDPR, EU GDPR, or any other privacy or data protection law or regulation.

60.    Finally, the Debtors propose that Kroll undertake all mailings directed by the Court or the U.S. Trustee, or as required by the Bankruptcy Rules, including the Notice of Commencement of these Chapter 11 Cases.  The Debtors believe that using Kroll to promptly provide notices to all applicable parties will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.

### iii.    *Motion Extending Time to File Schedules and Statements*

61.    The Debtors seek entry of an order extending the 14-day period to file the (i) schedules of assets and liabilities, (ii) schedules of current income and expenditures, (iii) schedules of executory contracts and unexpired leases, and (iv) statements of financial affairs (collectively, the "**Schedules and Statements**") for an additional 30 days, for a total of 45 days after the Petition Date, without prejudice to the Debtors' right to request additional time should it become necessary.

62.    I believe that, given the numerous burdens imposed by the Debtors' chapter 11 efforts, particularly in the early days of these Chapter 11 Cases, such relief is appropriate. Specifically, the Debtors have a limited number of employees available to gather the information for the Schedules and Statements, and there are competing demands on these employees, including efforts in preserving the Debtors' assets and concluding a sale of those assets.  Not only have the same employees with the expertise to complete the Schedules and Statements been diligently preparing for the chapter 11 filings, they also have been heavily engaged on numerous other work

streams related to the sale of the Debtors' assets.  In light of the amount of work necessary to complete the Schedules and Statements, and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, cause exists to extend the deadline to file the Schedules and Statements.  I do not believe that any party in interest will be prejudiced by the requested extension of time.

### iv.    *Application to Retain Kroll as Claims and Noticing Agent*

63.    The Debtors seek authority to retain Kroll as the claims and noticing agent for the Debtors in the Chapter 11 Cases.  I understand that requesting such appointment is required by the local rules of this Court, given that the Debtors anticipate that there will be more than 250 creditors and/or parties-in-interest listed on their creditor matrix.  I believe that Kroll's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  In addition, Kroll will assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.  Accordingly, I believe that retention of Kroll, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of both the Debtors' estates and their creditors.[7]

### B.    Operational Pleadings

64.    The Debtors have filed 10 "operational" pleadings that seek to (i) authorize the Debtors to continue using their Cash Management System, (ii) authorize the Debtors to pay Employees, (iii) authorize the Debtors to pay Taxes and Regulatory Fees, (iv) authorize the Debtors to pay their Utility Providers and provide adequate assurance of payment to those Utility Providers, (v) authorize the Debtors to maintain their Customer and Sales Programs, (vi) authorize

---

[7] The Debtors also intend to file a subsequent application to retain Kroll to perform certain administrative services under section 327 of the Bankruptcy Code.

the Debtors to pay certain Critical Vendor claims, (vii) authorize the Debtors to pay certain Lien Claimants, (viii) establish procedures for trading the Debtors' equity securities, (ix) authorize the Debtors to obtain postpetition financing and authorize the use of cash collateral,[8] and (x) approve Bidding Procedures related to the 363 Sale, approve the APA, and authorize the assumption and assignment of executory contracts[9] (each capitalized term herein as defined below).

### i.    Cash Management Motion

65.    The Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue using their existing Cash Management System, Bank Accounts, and Business Forms, (b) continue intercompany transactions, (ii) granting administrative expense status to postpetition intercompany claims, and (iii) waiving certain of the operating guidelines and reporting requirements for chapter 11 Debtors.  The Debtors also request the right, in their discretion, to (a) pay any Bank Account related fees and (b) to close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate these Chapter 11 Cases and operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these Chapter 11 Cases.

66.    Before the commencement of these Chapter 11 Cases, and in the ordinary course of business, the Debtors maintained 16 bank accounts (each a "**Bank Account**", and collectively, the "**Bank Accounts**") at various financial institutions (each a "**Bank**", and collectively, the "**Banks**") in the United States and Switzerland to conduct transactions necessary to the Debtors' operations, including collecting and disbursing funds generated by the sale of the Debtors' Products or

---

[8] Contemporaneously herewith, the Debtors have filed a declaration in support of their DIP Motion.
[9] Contemporaneously herewith, the Debtors have filed a declaration in support of their Bidding Procedures Motion.

received by the Debtors.  The Debtors primarily bank with Bank of America, N.A. ("**Bank of America**").[10]

67.     The Bank Accounts are part of the Debtors' prepetition cash management system (the "**Cash Management System**") that enables the Debtors to monitor the collection and disbursement of funds and maintain control over the administration of their Bank Accounts.  The Cash Management System is not automated, other than daily lockbox sweeps and bi-monthly funding to the Payroll Account, as further described below.  Employees of the Debtor maintain daily oversight over the Cash Management System and implement cash management controls for entering, processing, and disbursing funds.  The Cash Management System generally operates similarly to those used by other companies comparable in size and complexity to the Debtors to manage the cash of several operating units in a cost-effective, efficient manner.

68.     <u>Main Operating Accounts</u>.  The Debtors maintain four (4) main operating accounts to manage the collections and disbursement of funds: one (1) maintained by Acorda, which is used to collect customer receipts, make vendor disbursements, and fund other Bank Accounts for the Debtors' operations, as needed (the "**Acorda Operating Account**"); one (1) maintained by Civitas Therapeutics, Inc. ("**Civitas**"), which is used to collect customers receipts and make vendor payments for Civitas' operations (the "**Civitas Operating Account**"); one (1) maintained by Biotie Therapies, LLC. that was historically used to receive royalty payments from the sales of certain products, however, those arrangements are no longer active (the "**Biotie Operating Account**"), and one (1) maintained by Biotie Therapies AG that can be used for disbursements (the "**Biotie AG Operating Account**", and together with the aforementioned operating accounts,

---

[10] The Debtors previously banked with Citibank, N.A. ("**Citibank**") before transitioning a majority of their accounts to Bank of America.  The Debtors maintain three (3) Bank Accounts with Silicon Valley Bank and three (3) Bank Accounts with Citibank, which are either inactive or used on a limited basis as described herein.

the "**Main Operating Accounts**").   The interest earned on each Main Operating Account is credited to the respective account at the end of each month.

69.   As of the Petition Date, the balance of cash in the Acorda Operating Account is approximately $417,232, the balance of cash in the Civitas Operating Account is approximately $280,793, the balance of cash in the Biotie Operating Account is approximately $36,414, and the balance of cash in the Biotie AG Operating Account is approximately $7,937,116.

70.   <u>Cash Collection</u>.   With respect to cash collections, the Debtors generate and receive funds from sales of the Debtors' Products.   The Debtors' receipts generated from the sale of Ampyra and Inbrija are deposited directly into either the Acorda Operating Account or the Civitas Operating Account, depending on the customer.   With respect to Fampyra, the Debtors receive a quarterly payment from Biogen, deposited into the Acorda Operating Account.   Customer payments are made mainly by wire or electronic fund transfers, with the remainder received by check.   The Debtors utilize a lockbox arrangement to collect customer receipts.

71.   In addition to the Main Operating Account, Acorda maintains a predecessor account with Citibank that is largely inactive but collects a limited number of receipts from customers that are deposited directly into the account (the "**Acorda Predecessor Customer Account**"). Occasionally, the funds from the Acorda Predecessor Customer Account are manually transferred into the Acorda Operating Account.   As of the Petition Date, the balance of cash in the Acorda Predecessor Customer Account is approximately $11,473.   Similar to the Acorda Predecessor Customer Account, Civitas maintains an account with Silicon Valley Bank that collects receipts from customers that are deposited directly into the account (the "**Civitas Predecessor Customer Account**").   Occasionally, the funds from the Civitas Predecessor Customer Account are manually

transferred into the Civitas Operating Account. As of the Petition Date, there is no balance of cash in the Civitas Predecessor Customer Account.

72.     <u>Cash Disbursements</u>.   The Debtors use receipts concentrated in their Main Operating Accounts to satisfy their financial obligations.   Specifically, the Main Operating Accounts disburse funds for payments on account of operating expenses, interest, taxes and regulatory fees, utilities, and other vendors.   Disbursements are paid or auto-debited by wire, ACH, and check out of the respective Main Operating Account.   Also, the Debtors have separate and additional disbursement accounts dedicated to fund the Debtors' (i) payroll obligations, (ii) medical benefits, (iii) utilities, (iv) professional fees, (v) landlord deposit, and (vi) foreign disbursements, which are described in further detail below.

73.     <u>Payroll</u>.   The Debtors utilize a separate payroll account with Bank of America (the "**Payroll Account**") to fund the Debtors' payroll obligations.   UKG Inc. ("**UKG**") is the payroll processor for the Debtors.   UKG has authority to automatically draw funds from the Payroll Account, as needed, for the purpose of making payroll disbursements.   The Payroll Account is funded on a bi-monthly basis, approximately two (2) to three (3) business days in advance of each pay date, which falls on the 15th day of each month and the last day of each month, by automated transfer from the Acorda Operating Account to the Payroll Account.   UKG draws the funds from the Payroll Account the same day the funds are transferred to further process and disburse payroll. The Payroll Account is a zero-balance account.

74.     <u>Medical Benefits</u>.   The Debtors maintain a separate medical benefits account with Citibank to make payments to settle employer obligations for employee claims covered under company sponsored programs (the "**Benefits Account**").   Acorda maintains a self-funded medical benefits plan for its employees, administered by Cigna Health and Life Insurance Company

("**Cigna**").  Cigna manages the Benefits Account and has the authority to automatically draw funds

from the account to settle claims.  The Debtors receive a daily statement from Cigna, outlining the

account balance and amounts paid out each day to settle claims.  The Benefits Account is funded

on a monthly basis, between the 1st and the 5th of each month, by an automated reverse-wire from

the Acorda Operating Account to the Benefits Account, which is initiated by a payment draw from

Cigna.  The Benefits Account is restricted and the Debtors do not have authorization or access to

the Benefits Account to initiate payments.  If there are insufficient funds to meet Cigna's payments

draws, Cigna would be unable to process employee medical claims.  The balance of the Benefits

Account will fluctuate throughout the year based on estimated employee claims calculated by

Cigna.  As of the Petition Date, the balance of cash in the Benefits Account is approximately

$762,519.

75.    Utilities.  The Debtors maintain a separate utilities account with Bank of America,

which they intend to use to maintain an adequate assurance deposit for the benefit of the Debtors'

utility providers throughout the course of the Chapter 11 Cases.

76.    Professional Fees.  In connection with the debtor-in-possession financing, the

Debtors have opened a deposit account to hold in escrow professional fees related to these Chapter

11 Cases ("**Professional Fees Account**").  On a weekly basis, the Debtors intend to fund the

Professional Fees Account based on pay estimates received by its retained professionals, with

payment of fees from the Professional Fees Account subject to Court approval in all respects.

77.    Foreign Disbursements.  With respect to the Debtors' foreign operations, the

Debtors maintain one foreign Bank Account.  Specifically, Biotie Therapies AG maintains an

account with UBS Switzerland to make local vendor disbursements (the "**Biotie Swiss Account**").

The account is denominated in Swiss Francs.  The Biotie Swiss Account is managed and operated

by a third-party consultant, Intertrust, which administers the payment of operating expenses and fees for Biotie Therapies AG.  Prior to any payment being made from the Biotie Swiss Account, the payments are entered into the Debtors' accounts payable system and approved by Acorda.  As of the Petition Date, the balance of cash in the Biotie Swiss Account is approximately $712,635.

78.    <u>Investment Account.</u>  The Debtors maintain one account at Bank of America for the purpose of holding funds to earn interest (the "**Investment Account**").  Funds are manually transferred between the Acorda Operating Account and the Investment Account at the Debtors' discretion on an as-needed basis.  As of the Petition Date, the balance of cash in the Investment Account is approximately $66,600.

79.    <u>Lease Deposit Account</u>.  Acorda has a lease with Xenon Property, LLC with respect to a facility in Waltham, Massachusetts (the "**Waltham Facility Lease**").  On March 14, 2023, Bank of America issued an Irrevocable Standby Letter of Credit on behalf of Civitas for the benefit of Xenon Property, LLC, with respect to the obligations under the Waltham Facility Lease (the "**Letter of Credit**").  The Letter of Credit was automatically extended through December 31, 2024, and will continue to be automatically extended for one (1) year periods until December 31, 2026.  Civitas thus maintains a restricted account to hold funds as collateral against the Letter of Credit not to exceed $255,000 ("**Landlord Deposit Account**").  As of the Petition Date, the balance of cash in the Landlord Deposit Account is approximately $255,029.

80.    <u>Existing Business Forms</u>.  In the ordinary course of business, the Debtors utilize a variety of business forms, including checks, invoices, purchase orders, envelopes, and other business forms (the "**Business Forms**").  In the event the Debtors generate new Business Forms during the pendency of these Chapter 11 Cases, the Debtors will include a legend referring to the Debtors as "Debtors-In-Possession" status on such newly created Business Forms,  However, to

minimize administrative expense and delay, the Debtors request authority to continue to use their pre-existing Business Forms substantially in the forms existing immediately before the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status, rather than incur the expense and delay of ordering new Business Forms. I understand that all parties doing business with the Debtors will be on inquiry notice of the commencement of the Chapter 11 Cases. The Debtors will communicate with the various parties with which the Debtors conduct business in order to notify them and believe that such communications will provide adequate notice of the Debtors' status as debtors in possession.

81.    Bank Fees.  In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Account, certain service charges and other related fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**"). The Debtors incur Bank Fees on account of, among other things, initiating ACH payments, wires, or checks. The Bank Fees average approximately $7,112 per month and are deducted from the Debtors' Bank statements at the end of each month. As of the Petition Date, the Debtors do not believe that they have any Bank Fees currently due and owing. However, out of an abundance of caution, and to ensure continued access to the Bank Accounts and related banking services, the Debtors seek authority to pay any prepetition Bank Fees that may have been incurred and to continue to pay the Bank Fees in accordance with past practices.

82.    Corporate Cards.  As part of the Cash Management System, and in the ordinary course of business, the Debtors maintain company-provided American Express credit cards (the "**Corporate Cards**") that employees are required to utilize to pay for certain work-related expenses, travel expenses, business meals, and other small, non-recurring expenses. Certain of the Debtors' employees also use their Corporate Cards to pay for the Debtors' recurring operating

costs, including monthly hosting fees for Amazon Web Services, monthly fees for domain name registrations, and annual fees for cloud storage providers.  The Debtors directly incur the business-related expenses through the Corporate Cards, without the Debtors' employees incurring any reimbursable expenses.   Employees submit business-related expenses for approval through Concur®.  Such reports are then automatically routed to the employee's respective manager for review and approval.   The Debtors receive monthly statements from American Express for purchases (the "**Corporate Card Expenses**") made with the Corporate Cards in the preceding month. The Debtors estimate that as of the Petition Date there are approximately $120,000 of accrued but unpaid Corporate Card Expenses that will become due and payable within the interim period.

83.    <u>Intercompany Transactions</u>.  In the ordinary course of business, the Main Operating Accounts are used to meet the funding requirements of all of the Debtors.  As best as possible, collections and disbursements of the Debtor entities are kept in the respective Main Operating Accounts (e.g., Acorda receipts are collected into, and obligations paid from, the Acorda Operating Account and Civitas receipts are collected into, and obligations paid from, the Civitas Operating Account).   However, in certain limited circumstances funds are comingled between Bank Accounts and thus accounted for via an intercompany receivable / payable transaction (an "**Intercompany Transaction**").   Examples of Intercompany Transactions include, but are not limited to, when the Debtors receive a consolidated customer remittance for both Acorda and Civitas, a vendor incorrectly invoices the wrong entity, or when payroll is made.   In these circumstances, payments made or receipts received are recorded in the Debtors' books and records and added to the respective intercompany balance.  The Debtors engaged in these Intercompany Transactions on a regular basis prepetition and believe that such Intercompany Transactions ensure

the efficient operation of the Debtors' enterprise. Consistent with their prepetition practices, the Debtors intend to continue maintaining records and reconciling all Intercompany Transactions postpetition in the ordinary course of business.

    *ii.*    ***Employee Motion***

84.    The Debtors seek interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay prepetition obligations on account of the Compensation and Benefits Programs[11], and (b) continue the Compensation and Benefits Programs in the ordinary course; and (ii) granting related relief. I believe that failure to maintain the continued, uninterrupted services of the Workforce could upend the Debtors' smooth transition into chapter 11 and jeopardize the value of the Debtors' estates.

85.    The Debtors believe that the vast majority of their Workforce relies on the Compensation and Benefits Programs to pay for daily living expenses and to support their families. These individuals will thus be exposed to significant financial constraints if the Debtors are not permitted to continue their Compensation and Benefits Programs. Further, the Debtors' failure to honor their obligations in connection with the Compensation and Benefits Programs likely would result in attrition at a time when the Debtors need their Workforce to maximize estate value by facilitating the Debtors' ongoing business operations.

86.    As of the Petition Date, the Debtors owe approximately $2,854,000 on account of the Compensation and Benefits Programs, of which $1,786,000 will become due and payable during the interim period.

87.    <u>Compensation Obligations</u>. In the ordinary course of business, the Debtors incur obligations to the Workforce for (i) Employee Compensation, (ii) Withholding Obligations, (iii)

---

[11] The Compensation Obligations, Employee Benefits, Reimbursement Obligations, and Severance Obligations, each as defined herein, are collectively referred to as the "**Compensation and Benefits Programs.**"

Payroll Processing Fees, (iv) Independent Contractor Obligations, (v) Sales Representative Obligations, and (vi) Temporary Worker Obligations (each of the foregoing terms as defined herein and collectively, the "**Compensation Obligations**").  The Debtors seek authority to pay certain prepetition amounts related to the Compensation Obligations and to continue to pay the Compensation Obligations on a postpetition basis in the ordinary course of business and pursuant to past practices.

88.    <u>Employee Compensation</u>.    The Debtors pay Employees' wages, salaries, commissions, and bonuses. Employees are paid wages (the "**Employee Wages**") on a bi-monthly basis, on the 15th day of the month and the last day of the month.  When the date of payment is a weekend or holiday, the Employees are paid on the last working day preceding the weekend or holiday.  The Debtors estimate that their average gross payroll per payroll period for the Employee Wages is approximately $920,000.  The Debtors' last regular, bi-weekly payroll was made on March 29, 2024.

89.    To acknowledge Employees' hard work and commitment to the company, Acorda provides Employees with a service award for each five-year milestone of service (the "**Service Awards**").  The Service Awards differ depending on the milestone, but typically include a one-time cash payment and/or additional days of paid time off ("**PTO**").  In 2023, Debtors paid approximately $65,000 in Service Awards.  The Debtors estimate that, as of the Petition Date, there are no amounts with respect to the Service Awards that are due and owing.

90.    Additionally, Employees responsible for field sales and commercial strategy for the promotion and sale of the Debtors' products are entitled to commissions for, among other things, achieving certain sales or other performance objectives ("**Employee Commissions**," and collectively with the Employee Wages and Service Awards, the "**Employee Compensation**").

Employee Commissions are paid quarterly and calculated based on the applicable Employee's performance on the last day of each respective quarter, with various incentive components designed to align such Employee's interests with the operational goals and objectives of the Debtors. Employee Commissions are paid approximately ten weeks after the end of the applicable quarter. Employee Commissions are an integral part of the aggregate compensation package for eligible Employees and provide substantial value to the Debtors because they encourage such Employees to achieve important performance goals, including maintaining strong revenue. Payment of Employee Commissions is critical to maintaining the morale and productivity of the Debtors' operational salesforce and to maximizing the value of the Debtors' estate.

91.    Consistent with past practice, Employee Commissions for the quarterly period ending March 31, 2024 (the "**Q1 Commissions**") would be paid to eligible Employees no sooner than ten weeks after March 31, 2024. The Debtors estimate that the Q1 Commissions total approximately $360,000, based on estimated Employee performance. The Debtors seek authority to pay the Q1 Commissions pursuant to the Final Order, and to continue to honor and pay Employee Commissions in the ordinary course and consistent with past practices.

92.    <u>Withholding Obligations</u>. The Debtors are required by law to withhold income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and remit them to the appropriate taxing authorities. The Debtors are also required to make payments from their own funds on account of Social Security and Medicare taxes and to pay for, among other things, state and federal unemployment insurance (collectively, the "**Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**"). The Debtors also are required by law to withhold from certain Employee's Wages amounts for various garnishments, such as tax levies, child support or other court-ordered garnishments (together with the Payroll

Tax Obligations, the "**Withholding Obligations**"). Accordingly, the Debtors seek authority to remit such prepetition Withholding Obligations, and to continue to remit Withholding Obligations on a postpetition basis to the appropriate parties when such amounts become due in the ordinary course of business and consistent with past practices. As of the Petition Date, there are no amounts with respect to the Withholding Obligations that are due and owing.

93.     Payroll Processing Fees. The Debtors use UKG as their payroll administrator to processes payment of Employee Compensation and transmit Withholding Obligations to the Employees and various tax authorities, for which service the Debtors pay certain fees (the "**Payroll Processing Fees**"). As of the Petition Date, the Debtors owe UKG approximately $9,000 in accrued but unpaid Payroll Processing Fees, of which $9,000 will become due and payable in the interim period.

94.     Independent Contractor Obligations. In addition to the Employees, the Debtors rely on 30 Independent Contractors that provide technical and industry knowledge in key areas including quality reviews, compliance metrics, strategic market access, corporate registration and filing, human resources, information technology, and marketing. A number of the Independent Contractors are former employees retained to provide continued support given their specialized knowledge of the Debtors' operations and the pharmaceutical industry. The Independent Contractors' skills, knowledge, and understanding with respect to the Debtors' operations are essential to preserving the value of the Debtors' estates. The Independent Contractors are compensated by the Debtors for such services (the "**Independent Contractor Obligations**") in accordance with their individual contracts. As of the Petition Date, the aggregate amount of earned but unpaid Independent Contractor Obligations totals approximately $335,000, of which approximately $335,000 will become due and payable during the interim period.

95.   <u>Sales Representative Obligations</u>.   The Debtors contract with Syneos Health to provide full-time Contracted Sales Representatives to promote the Debtors products.   As of the Petition Date, Syneos Health provides 29 Contracted Sales Representatives to promote the Debtors products in the field, including to potential prescription writers and/or customers.   The Contracted Sales Representatives also earn quarterly commissions similar to the Employee Commissions, which are based on the Contracted Sales Representatives' achievement of certain sales or other performance objectives.   The Debtors pay Syneos Health a fixed monthly fee, the Sales Representatives' commissions, and certain travel, recruitment, and training expenses (collectively, the "**Sales Representative Obligations**").   As of the Petition Date, the aggregate amount of accrued but unpaid Sales Representative Obligations totals approximately $1,495,000, of which approximately $890,000 will become due and payable during the interim period.

96.   <u>Temporary Worker Obligations</u>.   In the ordinary course of business, the Debtors hire Temporary Workers through the Temporary Staffing Agencies and remit to the Temporary Staffing Agencies payment for the services provided by the Temporary Workers and administrative fees for services rendered by the Temporary Staffing Agencies (the "**Temporary Worker Obligations**").   As of the Petition Date, the Debtors had 13 Temporary Workers that provide staffing support across certain departments, including accounts payable, information technology, communications, and legal and compliance.   In addition, Temporary Workers are engaged to supplement and support sales campaigns, including tele-sales support for brand promotion.   The average monthly amount paid on account of the Temporary Worker Obligations is approximately $121,507.   As of the Petition Date, the aggregate amount of earned, but unpaid Temporary Worker Obligations totals approximately $152,000, of which approximately $152,000 will become due and payable during the interim period.

97.    <u>Health and Welfare Benefits</u>.    In the ordinary course of business, the Debtors provide various employee benefits programs to eligible Employees. As part of these employee benefits, the Debtors offer their Employees the ability to participate in a number of health-related plans and policies, including (i) the Medical Plan, (ii) the Dental Plan, (iii) the Vision Plan, (iv) the FSA, and (v) the Insurance Obligations (as each is defined below and collectively, the "**Health and Welfare Benefits**").    The Health and Welfare Benefits are available to full-time Employees who are scheduled to work 30 or more hours per week.    The Debtors seek authority to pay certain prepetition amounts related to the Employee Benefits and to continue to pay the Employee Benefits on a postpetition basis in the ordinary course of business and pursuant to past practices.

98.    <u>The Medical Plan.</u>    The Debtors provide a self-funded healthcare and prescription plan to Employees and their families (the "**Medical Plan**") that is administered by Cigna.    The Debtors fund a majority of the Medical Plan through their own contributions and take regular deductions from Employee Wages to fund the remainder of the Medical Plan.    As the Medical Plan is self-funded, the Debtors' costs are subject to fluctuations depending upon the number and amount of claims filed by Employees in any given month.    As of the Petition Date, the Debtors estimate they owe approximately $275,000 on account of accrued but unpaid Medical Plan claims and administrative fees, of which approximately $178,000 will become due and payable during the interim period.

99.    <u>The Dental and Vision Plan.</u>    The Debtors also offer their Employees the option of participating in dental insurance coverage (the "**Dental Plan**") and vision insurance coverage (the "**Vision Plan**"), both of which are administered by Cigna.    Employees and their dependents are able to participate in the Dental Plan and Vision Plan regardless of whether they are enrolled in the Medical Plan.    The Dental Plan and Vision Plan are self-funded and the premiums are paid on

a monthly basis by the Debtors. As of the Petition Date, the Debtors estimate they owe approximately $13,000 on account of the Dental Plans and Visions Plan, of which $7,000 will become due and payable during the interim period.

100. <u>FSA.</u> The Debtors also offer their Employees the opportunity to contribute a portion of their pre-tax compensation to pay for IRS-eligible healthcare, dependent care, and commuter expenses that are not covered by insurance plans through a flexible spending account program (the "**FSA**"). As of the Petition Date, there are no amounts with respect to administrative fees and other costs related to the FSA that are due and owing.

101. <u>Insurance Obligations.</u> The Debtors also offer life insurance, accidental death and dismemberment insurance, short-term disability insurance, long-term disability insurance, long-term care insurance, the employee assistance program, and the option to purchase additional supplemental insurance (the "**Insurance Plans**"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees for 18 months after their termination, retirement, or disability leave, including, without limitation, benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**," and collectively with the Insurance Plans, the "**Insurance Obligations**"). The former Employees pay the premiums on the Insurance Obligations. As of the Petition Date, the aggregate amount of accrued and outstanding Insurance Obligations total approximately $15,000, of which $15,000 will become due and payable during the interim period.

102. <u>Stop Loss Policy.</u> The Debtors maintain an aggregate stop loss policy with Cigna related to the self-insured Medical Plans (the "**Stop Loss Policy**"). The Stop Loss Policy protects the Debtors against catastrophic claims, and generally provides an individual stop loss limit of $165,000 for each individual covered under the Medical Plans on a policy year basis. The Debtors

pay approximately $30,000 per month in Stop Loss Policy premiums.  As of the Petition Date, there are no amounts with respect to premiums for the Stop Loss Policy that are due and owing.

103.    <u>Paid Leave</u>.  In the ordinary course of business, the Debtors provide PTO to certain of their Employees, which may be used for vacation or personal time.  PTO generally accrues at specific rates based on the Employee's length of service and position.  Typically, Employees receive up to 15 days of PTO in their first year of employment, prorated depending on when an employee is hired.  Employees receive one additional day of PTO for each additional year of service, which is capped at 20 days, after the Employee's sixth year of service.  Employees who reach 10 years of service receive an additional five (5) days of PTO to be used consecutively within the year it is earned.  Employees who reach 15 years of service receive an additional 20 days of PTO to be used consecutively within two (2) years.  Employees who reach 20 years of service receive an additional 10 days of PTO that must be used in blocks of at least five (5) days and used within two (2) years.  After 25 years of employment, Employees receive a total of 25 days of PTO. Aside from the specific exceptions noted below, accrued but unused PTO is generally paid out at termination.

104.    Employees working in California may carry over accrued but unused PTO up to the equivalent of one and one-half times their annual PTO allotment based on their current length of service (the "**Accrual Cap**").  Once the Employee's accrued but unused PTO reaches the Accrual Cap, PTO will stop accruing until PTO is taken and the accumulated PTO falls below the Accrual Cap.  For all other Employees not in California, certain amounts of accrued but unused PTO may roll over, depending on the position of the Employee.  Employees at the senior director level or above may carry over up to 10 days of PTO.  Employees from the associate to the director level may carry over up to five (5) days of PTO.  In limited circumstances, if an associate is unable to

take PTO for a valid business reason, additional carryover days may be granted if certain criteria are met.  As of the Petition Date, the Debtors estimate that the Employees have accrued approximately $715,000 for unused prepetition PTO.  This amount, however, is not a current cash payment obligation.

105.    The Debtors also provide other forms of paid leave for certain eligible Employees as a benefit, including for holidays, jury duty, bereavement leave, military leave, leave under the Family and Medical Leave Act (the "**FMLA**"), voting leave, and parental leave (with PTO, collectively "**Paid Leave**").  These other forms of Paid Leave do not involve incremental cash outlays beyond standard payroll obligations.  The Debtors believe that the continuation of Paid Leave policies in accordance with past practice is essential to maintaining Employee morale during these Chapter 11 Cases, and thus seek to continue their Paid Leave practices in the ordinary course and consistent with past practices.

106.    401(k) Plan.  The Debtors maintain a retirement savings plan for the benefit of their Employees (the "**401(k) Plan**"), managed and administered by Empower Annuity Insurance Company of America.  The 401(k) Plan allows for automatic pre-tax or post-tax salary deductions of eligible compensation (the "**Contribution**") up to the limits set forth by the Internal Revenue Code.  Employees who do not make a Contribution election within 30 days of being hired are automatically enrolled with a 10% Contribution, which can be changed at the Employee's election at any time.  Acorda matches 50% of an Employee's Contribution, up to a maximum of 6% of the Employee's eligible compensation.  In 2023, the Debtors' matching obligations for the 401(k) Plan average approximately $50,000 per month.  As of the Petition Date, the Debtors believe they are current on the 401(k) Plan matching obligations.

107. <u>Workers' Compensation</u>.   The Debtors also maintain workers' compensation insurance coverage (the "**Workers' Compensation Program**").   Under the laws of the states where the Debtors operate,[12] the Debtors are required to maintain the Workers' Compensation Program for their Employees for claims arising from or related to their employment with the Debtors.   To implement the Workers' Compensation Program, the Debtors maintain a workers' compensation policy through Berkley Life Sciences (the "**Workers' Compensation Policy**"). The premium for the Workers' Compensation Policy is approximately $30,000 and paid annually for the complete policy period.   As of the Petition Date, there are no amounts owed with respect to the Workers' Compensation Policy.   Additionally, there are currently no covered workers' compensation claims open against the Debtors.   Accordingly, as of the Petition Date, the Debtors do not owe any obligations for claims under the Workers' Compensation Program.

108. <u>Vehicle Reimbursement Program</u>.   The Debtors maintain a vehicle reimbursement program (the "**Vehicle Reimbursement Program**"), pursuant to which certain Employees using their personal vehicles for business purposes are reimbursed consistent with the rate per mile allowance as published by the Internal Revenue Service.   The Vehicle Reimbursement Program is administered by Motus, LLC ("**Motus**"), and the Debtors pay certain administration fees to Motus (the "**Motus Fees**").   In the three months before the Petition Date, the average monthly amount paid on account of the Vehicle Reimbursement Program, including the Motus Fees, was approximately $31,000.   As of the Petition Date, the Debtors estimate they owe approximately $35,000 on account of the Vehicle Reimbursement Program and the Motus Fees, of which $35,000 will become due and payable during the interim period.

---

[12] The Debtors operate in the following states:   Alabama, Arizona, California, Colorado, Florida, Idaho, Illinois, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, Tennessee, Texas, and Wisconsin.

109.    Other Employee Programs.  In addition to the foregoing, the Debtors have certain

other practices, programs, and policies that provide benefits to their Employees, such as an

employee assistance program that offers confidential access to counseling, programs, and services

needed to balance home and work life (the "**Other Employee Programs**").  The Debtors intend

to continue and honor such practices, programs, and policies after the Petition Date, and such

practices, programs, and policies may be modified, amended, or supplemented from time to time

in the ordinary course of the Debtors' business.  As of the Petition Date, the Debtors estimate that

there are no amounts due and owing with respect to the Other Employee Programs.

110.    Reimbursement Obligations.   In the ordinary course of business, the Debtors

reimburse its Employees for reasonable business-related expenses that the Employees may pay out

of pocket while performing their duties on behalf of the Debtors (the "**Reimbursement**

**Obligations**").  These Reimbursement Obligations include reasonable business travel expenses

such as airfare, car rentals, lodging, and business meals.  Business travel must be approved in

advance and expenses submitted as soon as possible after being incurred.  Once processed,

Reimbursement Obligations are paid to the Employees via direct deposit.  As of the Petition Date,

the Debtors estimate that approximately $165,000 in prepetition amounts have accrued in relation

to Reimbursement Obligations, of which $165,000 will become due and payable during the interim

period.

111.    Severance Obligations.  In the ordinary course of their business, the Debtors have

a practice of providing severance and other benefits (including accrued but unused PTO in

accordance with the policies described above) to Employees.  The Debtors' severance policy (the

"**Severance Policy**") provides for certain severance benefits to Employees that do not otherwise

have an individual agreement in the event of a termination of employment.  Under this Severance

Policy, the Debtors provide all eligible employees with (i) a lump-sum cash payment equal to three months' salary, and (ii) a lump-sum payment in lieu of COBRA benefits (collectively, the "**Severance Obligations**").  As of the Petition Date, there are no accrued but unpaid Severance Obligations.  However, the Debtors anticipate that, as a result of the sale of substantially all the Debtors' assets, certain Employees will be terminated and the Debtors will incur approximately $4,385,000 in Severance Obligations, which payments the Debtors believe arise entirely postpetition.

### iii.    *Taxes Motion*

112.    In the ordinary course of the Debtors' businesses, the Debtors collect, withhold, and incur sales and use, income, personal property, franchise, and other governmental taxes, fees, and assessments (collectively, the "**Taxes and Regulatory Fees**") that they remit periodically to various federal, state, and local government entities (collectively, the "**Governmental Authorities**").  With the exception of the sales and use taxes, the Debtors generally pay and remit the Taxes and Regulatory Fees to the applicable Governmental Authorities through checks and electronic transfers that are processed through their Banks and other financial institutions.  From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect to Taxes and Regulatory Fees.  The Debtors generally use these credits in the ordinary course of business to offset against future Taxes and Regulatory Fees, or the amount of such credits are refunded to the Debtors.  The Debtors seek entry of interim and final orders authorizing (i) the Debtors to pay Taxes and Regulatory Fees owed to the Governmental Authorities, whether asserted prior to, on or after the Petition Date, and (ii) granting related relief.

113.    Sales and Use Taxes.  The Debtors incur, collect, and remit state and local sales and use taxes to various Governmental Authorities in connection with the sale of their Products and

the purchase of inventory and supplies (the "**Sales and Use Taxes**").  The Debtors pay Sales and Use Taxes on a monthly, quarterly, semi-annual, or annual basis depending upon the relevant jurisdiction.  As of the Petition Date, the Debtors owe approximately $15,200 in prepetition Sales and Use Taxes that have not yet become due and payable, of which approximately $13,500 will become due and payable during the interim period.  In the ordinary course of business, the Debtors utilize a third-party, Vertex Inc. ("**Vertex**"), to manage and administer payments of the Debtors' Sales and Use Taxes to the applicable Governmental Authorities.  The Debtors typically pay Vertex a monthly processing fee of $1,647 per month in arrears (the "**Vertex Fees**").  As of the Petition Date, the Debtors estimate that approximately $3,294 is due and owing to Vertex on account of the Vertex Fees, of which approximately $3,294 will become due and payable during the interim period.

114.   <u>Income Taxes</u>.  The Debtors are required to make payments for amounts due to certain Governmental Authorities that require that the Debtors pay income or corporate taxes ("**Income Taxes**").  Generally, most Income Taxes are calculated as a percentage of net income (the difference between gross receipts and expenses, after accounting for additional write-offs). As of the Petition Date, the Debtors owe approximately $1,419,000 in prepetition Income Taxes that have not yet become due and payable, of which $1,392,900 will become due and payable during the interim period.

115.   <u>Personal Property Taxes</u>.  The Debtors are required to pay certain taxes on their personal property that is located in the facility in Waltham, Massachusetts (the "**Personal Property Taxes**"), which Acorda Therapeutics, Inc. leases from a third-party landlord.  The Personal Property Taxes are due on a quarterly basis.  As of the Petition Date, the Debtors estimate

that they owe approximately $133 in prepetition Personal Property Taxes, all of which will become due and payable after the interim period.

116.    <u>Franchise Taxes</u>.  The Debtors are required to pay certain state franchise taxes and related fees (the "**Franchise Taxes**") to operate their businesses in particular jurisdictions.  Certain states may refuse to qualify a company to do business in the state, or recognize a name change, merger, or other activity if the Franchise Taxes have not been paid.  The Debtors generally pay Franchise Taxes on an annual basis.  As of the Petition Date, the Debtors estimate that they owe approximately $135,700 in prepetition Franchise Taxes, all of which will become due and payable during the interim period.

117.    <u>Regulatory, Health, and Safety Fees and Assessments</u>.  In connection with the normal operations of their businesses, the Debtors incur various fees and assessments in connection with domestic and foreign health and safety laws and regulations, and participation in state and federal regulatory programs and boards (collectively, the "**Regulatory, Health, and Safety Fees and Assessments**").  These Regulatory, Health, and Safety Fees and Assessments include certifications, distribution licenses, product registration fees, wholesaling licenses, and manufacturer licenses.  Certain of the Regulatory, Health, and Safety Fees and Assessments carry substantial administrative, civil, and criminal penalties in the event the Debtors fail to comply as required.  The Debtors are required to remit these Regulatory, Health, and Safety Fees and Assessments to the relevant Governmental Authorities primarily on an annual or biannual basis.  As of the Petition Date, the Debtors estimate that they owe approximately $39,100 in prepetition Regulatory, Health, and Safety Fees and Assessments, all of which will become due and payable during the interim period.

### iv.    Utilities Motion

118.    In the ordinary course of their businesses, the Debtors obtain electricity, telephone, internet, gas, and other essential utility services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**").  The Debtors rely on the Utility Providers to provide Utility Services at their office in Pearl River, New York and the facility in Waltham, Massachusetts.  I believe that preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtors' operations.  Accordingly, the Debtors seek entry of interim and final orders (i) establishing procedures for determining adequate assurance of payment to the Utility Providers, (ii) finding Utility Providers adequately assured of payment, (iii) prohibiting Utility Providers from altering, refusing or discontinuing Utility Services, and (iv) granting related relief.

119.    The Debtors have historically paid the Utility Providers in the ordinary course of business in a timely manner.  To the best of the Debtors' knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.  The Debtors' aggregate average monthly cost for Utility Services is approximately $49,157.

120.    The Debtors intend to pay all undisputed postpetition obligations owed to Utility Providers in a timely manner.  The Debtors expect that their cash on hand, cash generated in the ordinary course of business, and proceeds from the Debtors' postpetition financing facility will be sufficient to timely pay all postpetition obligations owed to the Utility Providers in the ordinary course of business.

121.   However, to provide adequate assurance to the Utility Providers, the Debtors propose to deposit into a segregated account for the benefit of the Utility Providers (the "**Adequate Assurance Account**") an amount equal to one-half of one month's cost of Utility Services, calculated based on a historical average over the last twelve months (the "**Adequate Assurance Deposit**").  The aggregate amount of the proposed Adequate Assurance Deposit is approximately $24,578.  The Adequate Assurance Deposit will be held by the Debtors in the Adequate Assurance Account for the benefit of the Utility Providers during the pendency of the Chapter 11 Cases and the Debtors will not use the Adequate Assurance Account for any purpose other than holding the Adequate Assurance Deposit.

### v.   *Customer Programs Motion*

122.   Prior to the Petition Date and in the ordinary course of their business, the Debtors offered various programs that are integral to the sale of their Products (the "**Customer and Sales Programs**").  The Debtors' Customer and Sales Programs include, among other things, (i) Prompt Pay Discounts, (ii) Product Return Policy, (iii) Chargeback Program, and (iv) Co-Pay Discount Program (each as defined below).   Through these Customer and Sales Programs, the Debtors provide certain incentives, discounts, and other accommodations and incur obligations thereunder (the "**Customer and Sales Programs Obligations**").   The Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) maintain and administer the Customer and Sales Programs, and (b) pay and honor related prepetition Customer and Sales Programs Obligations (including by way of ordinary course setoffs and recoupment), and (ii) granting related relief, including (a) granting relief from the automatic stay to permit setoffs in connection with the Customer and Sales Programs and permit TrialCard (as defined below) to draw down on the Debtors' deposit and (b) authorizing financial institutions to receive, process, honor and pay related checks or transfers.

123.    The Debtors' Customer and Sales Programs are customary in the pharmaceutical industry and essential to preserving the value of the Debtors' businesses.  These Customer and Sales Programs are necessary to preserve the Debtors' critical relationships with their Customers (as defined herein) and, ultimately, to provide the Products to patients in a timely and cost efficient manner.  Maintaining the goodwill of the Debtors' Customers is vital to the Debtors' ongoing operations and the preservation and maximization of stakeholder value.  Indeed, absent the ability to continue the Customer and Sales Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing their current market share in an already competitive market and negatively impacting their business and revenue growth.

124.    The Debtors sell the Products to a variety of customers, including Specialty Pharmacies and its Wholesaler, ASD Specialty Healthcare, Inc., an affiliate of AmerisourceBergen Corp. (the Wholesaler and Specialty Pharmacies are collectively referred to as the "**Distributors**"). The Debtors also sell the Products to customers through direct purchase accounts, which primarily include university-affiliated medical centers, integrated delivery networks, and independently owned local pharmacies (together with the Distributors, the "**Customers**").

125.    The Products are primarily distributed in the United States through Specialty Pharmacies.  Between January 1, 2023, and January 31, 2024, Specialty Pharmacies accounted for approximately 98% of Ampyra sales and 90% of Inbrija sales in the United States, with sales to the other Customers accounting for approximately 2% and 10% of Ampyra and Inbrija sales in the United States, respectively.

126.    <u>Prompt Payment Discounts</u>.  The Debtors sell the Products to Customers at either the wholesale acquisition cost (the "**WAC**"), which is the base price set by the Debtors in their sole discretion and adjusted from time to time, or at a contractually-agreed price, which is typically

less than the WAC.  In the ordinary course of business, the Debtors offer cash discounts to their Customers if amounts owed are paid within an agreed-upon period of time (the "**Prompt Payment Discounts**").  The Prompt Payment Discount is typically a one percent (1%) discount on Ampyra and a two percent (2%) discount on Inbrija, off of either the WAC or the contract price (as applicable).  Prompt Payment Discounts are standard in the Debtors' industry, and the program incentivizes Customers to remit payments promptly.  Paying and honoring the Prompt Pay Discounts is vital to preserving Customer loyalty and goodwill, as it demonstrates the Debtors' ability to provide the Products on competitive terms.  Prompt Payment Discounts are typically applied in the form of a setoff or recoupment against the Debtors' accounts receivable at the time of prompt payment of the relevant receivable.

127.    For the last quarter of 2023, on average, the Debtors accrued approximately $205,000 per month in Prompt Payment Discounts.  As of the Petition Date, the Debtors estimate that approximately $230,000 has accrued in Prompt Payment Discounts, all of which is expected to become due and payable in the interim period.  Failure to pay and honor the Prompt Pay Discounts would likely result in loss of Customer loyalty or market share and an erosion of Customer satisfaction and goodwill, as the Debtors would not be providing their Products on market-competitive terms, causing Customers to seek alternative pharmaceutical treatments or generic versions of the Debtors' Product, where available, or reduce purchasing the Product.  The Debtors seek authority to continue to offer the Prompt Payment Discounts and allow their Customers to continue to setoff or recoup amounts against the Debtor's accounts receivable in the ordinary course and pursuant to prepetition customary terms between the Debtors and their Customers, even if such amounts constitute prepetition claims.

128.   <u>Product Return Policy</u>.   In the ordinary course of business, the Debtors allow

Customers to return purchased Products that they may be unable to sell, typically because the

Product is near or beyond its expiration date or damaged (a "**Return**").   The expiration date of the

Products is approved by the FDA.   The Products have an expiration period of 36 months from the

date of manufacture.   Customers may return the expired Product within six (6) months prior to and

12 months after the expiration date and may return damaged goods if the Debtors are notified of

the damage within five (5) days of receipt of the damaged goods (the "**Product Return Policy**").

Returns are applied in the form of a setoff or recoupment against accounts receivable and are not

paid separately by the Debtors.

129.   The Product Return Policy is both a valuable safety net for the Customers and their

retail network (who can, in turn, return Products to the Customers) and an important Customer

retention tool for the Debtors.   Due to a number of potential factors, including consumer demand,

Product production, distribution timing, and Product expiration, the Debtors' Products may reach

their expiration date before they are sold.   Policies similar to the Debtors' Product Return Policy

are standard in the pharmaceutical industry and provide necessary comfort to the Debtors'

Customers and are thus vital to maintaining Customer loyalty and goodwill.

130.   For the last quarter of 2023, the Debtors had no liability for Product Returns.   As

of the Petition Date, the Debtors estimate that there are no amounts that are due and owing related

to prepetition Returns under the Product Return Policy.   Notwithstanding that, failure to honor the

Product Return Policy would erode Customer loyalty and goodwill.   Customers would likely

decrease Product purchases, resulting in decreased revenues, Product outages, and ultimately,

reduced market share.   By this Motion, the Debtors seek authority to continue to honor valid

Returns under the Product Return Policy and continue to allow credits against Customer payments

to the Debtors for Returns under the Product Return Policy, in each case, in the ordinary course of business.

131.    <u>The Chargeback Program</u>.    The Debtors' participation in certain government programs—specifically, the 340B Program and the FSS (each as defined below)—requires the Debtors' Wholesaler to sell the Products at a price lower than either the WAC or contract price. In such cases, the Debtors are subject to an obligation to compensate the Wholesaler for the deficiency.    Accordingly, the Wholesalers will submit a chargeback request to the Debtors in an amount equal to the difference between the sale price (*i.e.*, the price that the Wholesaler sold the Products to their customers) and the purchase price (*i.e.*, the price that the Wholesaler purchased the Products from the Debtors) (the "**Chargeback Program**").    The Wholesaler typically deducts the amounts due on account of the Chargeback Program against outstanding payments due to the Debtors for Product purchases (a "**Chargeback**") and, therefore, the Debtors generally do not make a cash payment to the Wholesaler for Chargebacks under the Chargeback Program.

132.    <u>340B Program</u>.  The Debtors are enrolled in the 340B drug pricing program, which is a federal program provided through the U.S. Department of Health and Human Services (the "**340B Program**").    Certain hospitals and health care facilities (the "**340B Covered Entities**") that predominantly serve low-income patients receive payments from the Centers for Medicare & Medicaid Services to cover the costs of providing care to uninsured patients.    Under the 340B Program, the Debtors must offer the Products to 340B Covered Entities at significantly reduced prices (which prices are set by statute and calculated on a quarterly basis) as compared to the private end-customer price.    340B Covered Entities purchase the Products at these reduced rates through the Wholesaler, which then submits a Chargeback to the Debtors for the difference

between the either the WAC or contract price that the Wholesaler paid to the Debtors and the discounted price that the 340B Covered Entity paid to the Wholesaler.

133.    <u>Federal Supply Schedule</u>.  To participate in Medicaid, the Debtors must comply with the Federal Supply Schedule ("**FSS**").  The FSS requires the Debtors to offer deeply discounted pricing for the Products to federal agencies such as the U.S. Department of Veterans Affairs, the U.S. Department of Defense, the Coast Guard, and the Public Health Service (collectively, the "**FSS Organizations**").  The FSS establishes the maximum amount that can be charged to the FSS Organizations for pharmaceuticals based upon a formula that is set annually ("**FSS Price**").  This federally-mandated pricing that is often significantly lower than the WAC for the Products.  Typically, the FSS Organizations place orders for the Products through the Wholesaler, which purchases the Products from the Debtors at the WAC and delivers them to various hospitals and clinics at the FSS Price.  In cases where the FSS Price is lower than the WAC, the Wholesaler charges back the price difference to the Debtors.  Participation in the Medicaid program is an important component of the Debtors' business, and the Chargeback Program is key to the Debtors' continued ability to do so.

134.    The Chargeback Program is standard in the pharmaceutical industry.  For the last quarter of 2023, the Debtors' average monthly liability for the Chargeback Program was approximately $335,000.  As of the Petition Date, the Debtors estimate that approximately $750,000 in liabilities have accrued in connection with the Chargeback Program, of which $400,000 is expected to become due and payable in the interim period.  Failure to pay and honor the prepetition Chargebacks would likely result in loss of Wholesaler loyalty and goodwill.  If the Debtors are unable to honor the Chargebacks, the Wholesaler may seek alternative pharmaceutical treatments or generic alternatives, where available, to meet its demand, further resulting in a loss

of market share. The Debtors seek authority to continue the Chargeback Program and allow their Wholesaler to continue to setoff or recoup amounts against the Debtor's accounts receivable in the ordinary course and pursuant to prepetition customary terms between the Debtors and their Wholesaler, even if such Chargebacks constitute prepetition claims.

135.    Patient Co-Pay Discount Program. The Debtors participate in patient discount and assistance programs through the use of co-pay discounts in connection with the sale of the Products (the "**Co-Pay Discount Program**"). Co-pay discounts are offered to commercially-insured patients to help reduce or eliminate the out-of-pocket costs set by the patients' health insurers. Through the Co-Pay Discount Program, the Debtors fund some or all of a patient's co-pay— enabling the patient to purchase the Debtors' Products without incurring the full financial liability of the co-pay

136.    When a patient utilizes the co-pay discount as part of a purchase, the pharmacy will submit the co-pay claim and transaction receipt to the Debtors' contracted co-pay claims adjudicator, TrialCard (n/k/a Mercalis) ("**TrialCard**") and seek reimbursement of the discount provided. TrialCard reviews the co-pay claim and reimburses the pharmacy for qualifying co-pay claims, with such reimbursements funded from a deposit provided by the Debtors as described below. TrialCard charges monthly adjudication fees for these services. Absent authority to honor any prepetition claims, the Debtors will have to analyze all co-pay claims to determine whether they are pre- or postpetition, creating a costly and time-consuming administrative burden that the Debtors and their estates cannot reasonably undertake. Further, in the event of any delays or interruptions to TrialCard's services, it would not be feasible to use an alternative co-pay claims adjudicator or to bring the adjudication tasks in house.

137.    The Co-Pay Discount Program is a critical marketing effort and similar programs are typical in the pharmaceutical industry.  The Co-Pay Discount Program provides patients with access to the Debtors' Products and allows the Debtors to keep their prices competitive and more accessible for patients.  Any interruption in TrialCard's services will likely have a significant adverse impact on the Debtors' ability to reduce financial barriers for patients to access the Products and increase their target market, thus having a detrimental impact on the Debtors' business.

138.    TrialCard utilizes a deposit balance, provided by the Debtors, to settle co-pay reimbursement claims of pharmacies.  The deposit amount held by TrialCard is generally replenished by the Debtors on a bi-monthly basis once TrialCard provides an invoice specifying the required sums for the replenishment of the deposit, along with any applicable adjudication fees.  The average monthly liability of the Debtors to replenish Trial Card's deposit in connection with the Co-Pay Discount Program for January and February 2024 was approximately $950,000, and the average liability for services payable to TrialCard was $28,000.  The Debtors seek the authority to continue the Co-Pay Discount Program and to satisfy any prepetition obligations related to the Co-Pay Discount Program (i) by permitting TrialCard to draw on the Debtors' deposit to settle co-pay reimbursement claims in the ordinary course, even if such claims constitute prepetition claims; (ii) by allowing the Debtors to replenish TrialCard's deposit for the portion drawn down to satisfy prepetition claims, which the Debtors estimate will be approximately $1,250,000, of which approximately $1,000,000 is expected to be replenished in the interim period; and (iii) by authorizing payment of amounts owed for TrialCard's prepetition administrative services.

### vi.    *Critical Vendor Motion*

139.   The Debtors rely on third-party vendors to provide goods and services that are essential to the Debtors' operations, including the manufacturing and marketing of its Products (the "**Critical Vendors**").  The Debtors seek entry of interim and final orders (i) granting them the authority in their sole discretion to pay all or a portion of their prepetition obligations to certain Critical Vendors in an amount not to exceed $2,000,000 on an interim basis, (ii) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing, and (iii) granting related relief.  To identify vendors to be paid pursuant to the relief requested in this Motion, the Debtors, in consultation with their advisors, closely reviewed their accounts payable and prepetition vendor lists, and consulted with employees most familiar with the Debtors' supply chain to identify those vendors that are most essential to the Debtors' operations.[13]

140.   <u>Specialty Manufacturers</u>.  In the ordinary course of their business, the Debtors rely on third parties to (i) manufacture the active pharmaceutical ingredients ("**APIs**") for its Products, and (ii) manufacture the related components for its Products, including medical devices such as inhalers (collectively, the "**Specialty Manufacturers**").  The Debtors do not have any internal manufacturing capacity and do not take physical possession of the API, manufactured pharmaceuticals, or the medical devices at any point in the supply chain.  Rather, the Debtors rely on other third-party manufacturers to manufacture the API into consumable pharmaceuticals, test

---

[13] The criteria considered included:  (i) whether a vendor is a sole- or limited-source supplier of materials, parts, or other services for use in the Debtors' business; (ii) whether alternative vendors are available that can provide requisite volumes, specifications, customization, and expedited delivery of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operations without interruption while transitioning business thereto; (iii) the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim; (iv) whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms; (v) whether certain specifications, customization, location, or other relevant characteristics of ongoing operations prevent the Debtors from obtaining goods or services from alternative sources; and (vi) whether an amount less than the full amount of a vendor's claim could induce continuation of shipments.

the pharmaceuticals, package the Debtors' commercial Product, and distribute the Product to end-users.[14]  Any disruption to this supply chain could result in the failure to produce, or a delay in production of, adequate supplies of the components necessary to manufacture the Debtors' Products, delaying or reducing commercial sales, materially harming the Debtors' businesses, and negatively impacting the patients that rely on the Debtors' Products.

141.    The Specialty Manufacturers are sole-source providers and are already familiar with the Debtors' businesses and the above manufacturing processes.  Further, in order to ensure the quality of drug products, the FDA carefully monitors a drug manufacturer's compliance with its Current Good Manufacturing Practice ("**CGMP**") regulations.  For the Debtors to remain in compliance with the CGMP regulations, each of their manufacturers and suppliers must also be in compliance.  The Debtors' current manufacturers and suppliers have each passed the CGMP audit and certification.  To replace any of these vendors would require the Debtors to undertake an exhaustive and costly regulatory and review process to ensure the manufacturing facilities and processes of the new prospective vendor were also in compliance with the CGMP regulations.  Such process could take anywhere from six to twelve (12) months to complete.  In short, the Debtors' business is ill-equipped to switch vendors or suppliers on short notice and faces significant risks to its supply chain if certain prepetition amounts cannot be paid.  Due to the regulated nature of the Debtors' business and its relationship with sole-source providers, the Debtors have limited-to-no options for replacing the Specialty Manufacturers.

142.    The Debtors do business with certain of their Specialty Manufacturers without the benefit of contracts and, therefore, these Specialty Manufacturers generally are not obligated to do business with the Debtors or to honor particular trade terms for future orders.  Absent some

---

[14] For the Inbrija product, there is an added assembly step in this process, as the product includes an inhaler device.

payment of the prepetition Critical Vendor Claims, these Specialty Manufacturers may cease doing business with the Debtors.  Any failure of a Specialty Manufacturer to provide the necessary product for delivery to the Debtors' customers likely would create shortages in the Debtors' supply chain and adversely affect the customers' willingness to do business with the Debtors in the future, thereby impacting cash flow, profitability, and the ability of the Debtors to complete the sale of their business.

143.   <u>Marketing Agencies</u>.  The Debtors engage advertising and creative agencies, some of whom do not have contracts with the Debtors, to perform a range of marketing and promotional activities, including but not limited to: (i) brand strategy development; (ii) promotional product campaigns; (iii) production of promotional content (digital and physical); and (iv) coordination of marketing events (the "**Marketing Agencies**").   The market for developing and marketing pharmaceutical products is highly competitive, and it is essential to the Debtors' business that it maintain its marketing efforts without interruption to preserve the Product brands.  The Marketing Agencies are subject to regulations that govern the sale and promotion of the Debtors Products, which vary across jurisdiction and require the Marketing Agencies to have specialized knowledge and experience to navigate these regulations effectively.  As a result, it would be difficult, if not impossible, to find replacement Marketing Agencies during these Chapter 11 Cases without compromising the Product brands and incurring unnecessary replacement time and cost.  The risk of damage to the Product brands and certainty of additional fees and expenses in seeking a replacement would no doubt outweigh the prepetition amounts owed to these Marketing Agencies.

144.   Because the Debtors do not have contracts with certain Marketing Agencies, if the Debtors fail to pay certain prepetition amounts owed, the Marketing Agencies could (i) cease working on a project and keep all content or work that is not yet completed for a project, or (ii)

withhold any physical promotional materials used for the staging and hosting of marketing events of the Debtor.  Further, even if the Debtors do have a contract with the Marketing Agencies, certain Marketing Agencies receive a substantial amount (25% or more) of their business from the Debtors, and if they are not paid, would likely be rendered insolvent and unable to continue to provide the Debtors services.  Additionally, the Marketing Agencies have source files with data that may not be compelled even if the Debtors do have contracts with the Marketing Agencies.  Accordingly, the Debtors seek authority, in their sole discretion, to pay any prepetition amounts owed to the Marketing Agencies that it deems critical on a final basis.

145.    Foreign Vendors.  Although the Debtors believe that many of their foreign suppliers of goods and services (collectively, the "**Foreign Vendors**") may continue to do business with the Debtors after commencement of the Chapter 11 Cases, certain Foreign Vendors may not.  In the ordinary course, the Debtors use a limited number of foreign vendors to source essential goods and services required to operate their businesses, primarily in relation to ensuring that the Debtors are in compliance with certain regulatory requirements in Europe so that the Debtors' can sell and market their Products in Europe.  The Debtors believe that there is a material risk that the Foreign Vendors holding Critical Vendor Claims against the Debtors may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay and engage in conduct that disrupts the Debtors' operations, or simply may be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.  Notably, Foreign Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods and services.

146.    I understand that Foreign Vendors also may be able to sue the Debtors in a foreign court to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment

against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors. Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses could be irreparably harmed by any such action to the detriment of the Debtors' estates and creditors.

### vii.    Lien Claimants Motion

147.    As part of their business operations, the Debtors rely extensively and continually on a variety of third-party shippers, packagers, third-party logistics providers, and storage facilities (collectively, the "**Lien Claimants**") to ensure the timely packaging, storage, and distribution of Ampyra and Inbrija, throughout the manufacturing process and to various customers and patients. The Debtors seek entry of interim and final orders (i) authorizing the Debtors to pay certain prepetition claims held by the Lien Claimants; and (ii) authorizing financial institutions to honor and process checks or electronic transfers used by the Debtors to pay the foregoing.

148.    The services provided by the Lien Claimants, including the timely, reliable delivery of products for the Debtors is an absolute necessity to the Debtors' ability to conduct business and critical to the Debtors' day-to-day operations. The Debtors have a reputation for reliability and dependability amongst their customers. Many of the Debtors' pricing policies and marketing strategies revolve around their reliability and dependability. This reputation depends in substantial part on the timely delivery of product to the Debtors' customers and patients. In turn, the Debtors' ability to make timely deliveries depends on a successful and efficient system for receipt of the Products that the Debtors sell. This supply and delivery system involves the use of reputable service providers. Any disruption in the packaging, warehousing or transport of the Debtors'

Products would have a serious negative impact on the Debtors' ability to conduct their businesses and to ensure consumers and patients timely receive the Debtors' Products.

149.    <u>Cardinal Health</u>.    As part of their business operations, the Debtors use Cardinal Health 105, Inc. ("**Cardinal Health**") as their sole third-party logistics provider.  In the ordinary course, the Debtors' Products are shipped from either contract manufacturing organizations ("**CMOs**") or a secondary packager to Cardinal Health's warehouse, where the products are stored prior to ultimately being delivered to the Debtors' customers.

150.    Cardinal Health also manages the Debtors' inventory, receives and fulfills customer orders, prepares customer invoices on behalf of the Debtors, and tracks accounts receivable including cash receipt reconciliation.  Cardinal Health provides the Debtors access to crucial information related to these services, including sales data, inventory records, lot tracking, customer profiles, pricing, and other terms, as well as real-time updated aged accounts receivable information.  This information, in turn, supports various functions of the Debtors' business, such as operations, accounting, and financial management and reporting.  Cardinal Health invoices the Debtors monthly for provided services, based on a pre-established fee schedule.

151.    Further, in order to ensure the quality of drug products, the FDA carefully monitors a drug manufacturer's compliance with CGMP regulations.  For the Debtors to remain in compliance with the CGMP regulations, each of their manufacturers, suppliers, or packagers, including Cardinal Health, must also be in compliance.  To this end, Cardinal Health must maintain its warehouse facility in accordance and comply with federal, state, and local laws, rules and regulations including CGMP regulations.  The Debtors would be unable to replace Cardinal Health without undertaking an extensive regulatory process that might last months or even a year in order to comply with CGMP regulations, and without Cardinal Health's services the Debtors would not

be able to operate their day-to-day business, causing irreparable harm to the Debtors' supply chain and operations. As of the Petition Date, Cardinal Health held approximately $7,400,000 worth of the Debtors products. As of the Petition Date, the Debtors estimate that approximately $35,000 has accrued and is owing to Cardinal Health, of which $35,000 is expected to become due and payable in the interim period.

152.    <u>The Hibbert Group</u>. The Debtors are also reliant on the Hibbert Group ("**Hibbert**") as their sole service provider to store Inbrija and related inhalers. The Products held by Hibbert are then shipped to the Debtors' packager, Sharp (defined below), for packaging. Hibbert also holds inventory for the purpose of distribution to physicians as part of samples, demonstration kits, and promotional materials. In warehousing, storing, and handling the Debtors' Product, Hibbert is also subject to the CGMP regulations and other applicable laws. Any interruption in Hibbert's services would cause irreparable harm to the Debtors' supply chain, as products would not get timely delivered. Further, given that Hibbert is the Debtors sole service provider to store Inbrija and related inhalers and subject to CGMP regulations, the Debtors would be unable to replace Hibbert without undertaking a costly, time-consuming, and extensive regulatory process. As of the Petition Date, Hibbert held approximately $1,000,000 worth of the Debtors' products. As of the Petition Date, the Debtors estimate that approximately $50,000 has accrued and is owing to Hibbert, of which $30,000 is expected to become due and payable in the interim period.

153.    <u>Sharp Corporation</u>. In the ordinary course of their business, the Debtors exclusively rely on Sharp Corporation ("**Sharp**") to package and label their Inbrija products. Sharp routinely stores the product and charges the Debtors a fee for any product or packaged product held at the facility for more than sixty (60) days. Once Sharp packages the product, the finished goods are shipped from Sharp to Cardinal Health via the Debtors' Shippers (defined below). In packaging,

storing, and handling the Debtors' product, Sharp is also subject to the CGMP regulations and other applicable laws. Further, any interruption in Sharp's services would cause irreparable harm to the Debtors' supply chain, as products would not get timely delivered. Further, given the regulated and specialized nature of the packaging and labeling undertaken by Sharp, the Debtors would not be able to easily replace Sharp. As of the Petition Date, Sharp held approximately $3,900,000 worth of the Debtors' products. As of the Petition Date, the Debtors estimate that approximately $100,000 has accrued and is owing to Sharp, of which $85,000 is expected to become due and payable in the interim period.

154. <u>Shippers</u>. The Debtors rely on a number of shippers (the "**Shippers**") to transport its products. The Debtors rely exclusively on Prime, Inc. to transport Inbrija from the CMO to Hibbert or Sharp, and then on to Cardinal Health. The Debtors rely exclusively on FedEx Corporation to ship their products from Cardinal Health to the Debtors' customers. Finally, the Debtors rely exclusively on DHL Global Forwarding to ship their Inbrija product from the United States to the Debtors' distributor in Spain and Germany. As a result of the services they provide, the Shippers regularly possess certain of the Debtors' raw materials, product, and equipment in the ordinary course of the Debtors' operations. On any given day, the Debtors' have inventory that is in transit and at risk of not being delivered if the Shippers' claims are not paid. Due to the variable nature of inventory movements, it is highly challenging to calculate the value of the inventory in transit as of the Petition Date. As of the Petition Date, the Debtors estimate that approximately $40,000 has accrued and is owing to the Shippers, of which $40,000 is expected to become due and payable in the interim period.

*viii.*    ***NOL Motion***

155.    The Debtors seek entry of interim and final orders establishing notice and objection procedures for certain transfers of Acorda's common stock (the "**Equity Securities**") that must be complied with before such transfers are made and deemed effective and granting related relief.

156.    Acorda has experienced losses from the operation of its business.  As a result, Acorda estimates that its current U.S. federal income tax net operating losses are approximately $117 million (the "**NOLs**") as of December 31, 2022 (the last date for which U.S. federal income tax returns were filed; the tax returns for 2023 have not yet been filed), some of which are already subject to limits on annual use due to an ownership change that took place on June 1, 2022.  Acorda expects to have incurred additional NOLs from December 31, 2022, through the Petition Date. For example, assuming that utilizable NOLs amount to $107 million, Acorda would be able to minimize current U.S. federal income tax liabilities of approximately $22.5 million based on a corporate federal income tax rate of 21% for 2024, along with additional state income tax savings. These tax savings could substantially enhance Acorda's cash position for the benefit of parties-in-interest and contribute to the Debtors' efforts to maximize the value of their estates for the benefit of their creditors.

157.    Acorda may lose the ability to use its NOLs (and some of its other tax attributes) if it experiences another "ownership change" for federal income tax purposes.  It is my understanding that if left unrestricted, transfers of Equity Securities during the pendency of these Chapter 11 Cases could limit severely Acorda's ability to use its NOLs to minimize current income, which could have significant, negative consequences for the Debtors, their estates and their efforts to maximize value for creditors.  Specifically, transfers of Equity Securities could affect adversely Acorda's NOLs if (i) too many 5% or greater blocks of Equity Securities are created or (ii) too

many Equity Securities are added to or sold from such blocks, such that, together with previous transfers by or to 5% shareholders during the preceding three-year period (or shorter period where there has been a more recent ownership change), an ownership change within the meaning of IRC section 382 has occurred. In particular, asset sales by Acorda could generate significant taxable income, and in this case Acorda's NOLs will be essential to minimize cash taxes payable on such asset sales.

158.    Thus, to preserve to the fullest extent possible the ability of the Debtors to shelter current income, the Debtors seek limited relief that will enable them to closely monitor certain transfers of Equity Securities, and thereby put the Debtors in a position to act expeditiously to prevent or to limit such Transfers if necessary to preserve Acorda's NOLs.

Pursuant to Section 1746 of title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 2, 2024

/s/ Michael A. Gesser
Michael A. Gesser
Chief Financial Officer
Acorda Therapeutics, Inc.

## **Exhibit A**

**Organizational Chart**

# Corporate Organizational Chart



## **Exhibit B**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "***Agreement***"), dated as of April 1, 2024, is entered into by and between:

    (i)    Acorda Therapeutics, Inc. ("***Acorda***"), and its direct and indirect debtor subsidiaries (each, a "***Company Party***" and, collectively, the "***Company Parties***");

    (ii)    the undersigned holders of Convertible Notes (as defined herein) (together with their respective successors and permitted assigns, each a "***Consenting Convertible Noteholder***" and, collectively, the "***Consenting Convertible Noteholders***"); and

    (iii)    the undersigned holders of DIP Commitments (as defined herein) or loans under the DIP Facility (as defined herein) (together with their respective successors and permitted assigns, each a "***DIP Lender***" and, collectively, the "***DIP Lenders***" and, collectively with the Consenting Noteholders, the "***Consenting Creditors***" and, each a "***Consenting Creditor***").

Each Company Party, each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***." Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

## <u>RECITALS</u>

**WHEREAS,** the Company has outstanding obligations under that certain Indenture, dated as of December 23, 2019 (as amended, supplemented or otherwise modified from time to time, "***Indenture***" and, the 6.00% Convertible Senior Secured Notes issued thereunder, the "***Convertible Notes***" and, each holders thereof, a "***Convertible Noteholder***" and, collectively, the "***Convertible Noteholders***");

**WHEREAS,** as of the date hereof, the Consenting Convertible Noteholders collectively hold approximately [•]% aggregate principal amount outstanding of the Convertible Notes issued pursuant to the Indenture;

**WHEREAS,** the Parties have agreed to the Restructuring Transactions (as defined herein) consistent with the terms and subject to the conditions set forth in this Agreement and consistent with the Restructuring Term Sheet attached hereto as <u>Exhibit A</u> (together with all schedules, exhibits, and annexes attached thereto, and as may be modified in accordance with <u>Section 9</u> hereof, the "***Restructuring Term Sheet***"), which are the product of arms' length, good faith discussions between the Parties and their respective professionals;

**WHEREAS,** the Company will implement the Restructuring Transactions in connection with pre-arranged cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as

amended from time to time, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

**WHEREAS**, the DIP Lenders have agreed to commit to provide the DIP Facility (as defined below) (such commitment, in each case, a "***DIP Commitment***"), and the Company and the Consenting Convertible Noteholders have reached an agreement for the consensual use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), in accordance with and subject to the terms and conditions set forth in the DIP Orders (as defined below) and the DIP Credit Agreement (as defined below); and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement and in the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     **Certain Definitions & Other Interpretive Provisions.**

(a)     <u>Definitions</u>. As used in this Agreement, the following terms have the following meanings:

"*Acorda*" has the meaning assigned to such term in the preliminary statement of this Agreement.

"***Ad Hoc Group***" means, collectively, the Consenting Convertible Noteholders represented by King & Spalding LLP.

"***Ad Hoc Group Advisors***" means King & Spalding LLP, Perella Weinberg Partners LP and any other advisor retained by the Ad Hoc Group from time to time.

"***Agreement***" has the meaning assigned to such term in the preliminary statement hereto.

"***Alternative Transaction***" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company Parties or their assets other than the Restructuring Transactions.

"***B&M***" has the meaning set forth in <u>Section 3(b)(i)</u>.

"***Bankruptcy Code***" has the meaning assigned to such term in the recitals of this Agreement.

"***Bankruptcy Court***" has the meaning assigned to such term in the recitals of this Agreement.

"***Beneficial Ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

"***Bidding Procedures***" means the procedures governing the auction and Sale Process, as approved by the Bankruptcy Court.

"***Bidding Procedures Motion***" means a motion filed by the Company Parties with the Bankruptcy Court for entry of the Bidding Procedures Order.

"***Bidding Procedures Order***" means an order (i) approving the Bidding Procedures, (ii) setting dates for the submission of bids and the auction (if any) in accordance with the Bidding Procedures, and (iii) granting related relief.

"***Chapter 11 Cases***" has the meaning assigned to such term in the recitals of this Agreement.

2

"***Claim***" has the meaning set forth in the Bankruptcy Code.

"***Collateral Agent***" means Wilmington Trust, National Association, in its capacity as collateral agent under the Indenture, and its successors and assigns.

"***Company Party***" has the meaning assigned to such term in the preliminary statement of this Agreement.

"***Company Termination Event***" has the meaning set forth in <u>Section 5(b)</u>.

"***Confidentiality Agreements***" means, each of the following agreements: (i) the Confidentiality Agreement, dated as of November 30, 2023, by and among, Acorda, and Canyon Capital Advisors LLC, on behalf of its participating funds and accounts, (ii) the Confidentiality Agreement, dated as of November 30, 2023, by and among, Acorda and Davidson Kempner Capital Management LP, (iii) the Confidentiality Agreement, dated as of December 1, 2023, by and among, Acorda and D. E. Shaw Valence Portfolios, L.L.C., (iv) the Confidentiality Agreement, dated as of December 1, 2023, by and among, Acorda and Highbridge Capital Management, LLC, (v) the Confidentiality Agreement, dated as of November 29, 2023, by and among, Acorda and Soros Fund Management LLC, and (vi) the Confidentiality Agreement, dated as of November 30, 2023, by and among, Acorda and NINETEEN77 Global Multi-Strategy Alpha Master Limited.

"***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan.

"***Consenting Convertible Noteholder***" has the meaning assigned to such term in the preliminary statement of this Agreement.

"***Consenting Creditors***" has the meaning assigned to such term in the preliminary statement of this Agreement.

"***Convertible Noteholders***" has the meaning assigned to such term in the recitals of this Agreement.

"***Convertible Notes***" has the meaning assigned to such term in the recitals of this Agreement.

"***Creditor Termination Event***" has the meaning set forth in <u>Section 5(b)</u>.

"***Definitive Documents***" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Restructuring Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring Transactions, including, without limitation: (i) the Sale Documents; (ii) the Plan; (iii) each of the documents comprising the Plan Supplement; (iv) the Disclosure Statement; (v) the Disclosure Statement Motion; (vi) the Disclosure Statement Order; (vii) the Confirmation Order; (viii) the motion seeking approval by the Bankruptcy Court of the DIP Facility and the DIP Orders (including any declarations or affidavits submitted in support thereof) (the "***DIP Motion***"); (ix) the interim and final orders of the Bankruptcy Court approving the DIP Motion and authorizing the use of cash collateral (the "***Interim DIP Order***" and the "***Final DIP Order***," respectively and together the "***DIP Orders***")), (x) the DIP Credit Agreement and (xi) any other material, agreements, motions (including "first day" motions), pleadings, briefs, applications (other than applications to retain or compensate the Company Parties' advisors), orders and other filings made by the Company Parties with the Bankruptcy Court. Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Restructuring Term Sheet, and shall otherwise be reasonably acceptable to the Requisite Consenting Creditors, including with respect to any modifications, amendments, deletions, or supplements to such Definitive Documents at any time during the RSA Support Period; *provided*, notwithstanding anything to the contrary herein, the DIP Orders and the DIP Credit Agreement shall be acceptable (including any modifications, amendments, deletions, or supplements thereof) in all respects to the Requisite Consenting Creditors in their sole discretion.

"***DIP Commitment***" has the meaning assigned to such term in the recitals of this Agreement.

"***DIP Credit Agreement***" means the credit agreement evidencing the DIP Facility, substantially in the form attached to this Agreement as <u>Exhibit C</u> and as otherwise acceptable to the Company and the DIP Lenders.

"***DIP Facility***" means the debtor-in-possession financing facility to be provided to the Company Parties in accordance with the terms, and subject in all respects to the terms and conditions, as set forth in the DIP Credit Agreement and the DIP Orders.

"***DIP Lender***" has the meaning assigned to such term in the preliminary statement of this Agreement.

"***DIP Motion***" has the meaning assigned to such term in the definition of "Definition Documents".

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***Disclosure Statement***" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"***Disclosure Statement Motion***" means the motion seeking approval of the Disclosure Statement and entry of the Disclosure Statement Order.

"***Disclosure Statement Order***" means an order of the Bankruptcy Court approving the Disclosure Statement, the Plan Solicitation Materials, and the procedures for solicitation of the Plan.

"***Final DIP Order***" has the meaning assigned to such term in the definition of "Definition Documents".

"***Indenture***" has the meaning assigned to such term in the recitals of this Agreement.

"***Interim DIP Order***" has the meaning assigned to such term in the definition of "Definition Documents".

"***Joinder Agreement***" has the meaning set forth in <u>Section 3(b)(i)</u>.

"***K&S***" has the meaning set forth in <u>Section 3(b)(i)</u>.

"***Non-Consenting Creditor***" has the meaning set forth in <u>Section 9(b)</u>.

"***Party***" has the meaning assigned to such term in the preliminary statement of this Agreement.

"***Permitted Transfer***" has the meaning set forth in <u>Section 3(b)(i)</u>.

"***Permitted Transferee***" has the meaning set forth in <u>Section 3(b)(i)</u>.

"***Person***" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

"***Petition Date***" has the meaning set forth in <u>Section 2(b)</u>.

"***Plan***" means a chapter 11 plan implementing the Restructuring Transactions.

"***Plan Effective Date***" means the date upon which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof, as the case may be, and the Plan is substantially consummated.

"*Plan Solicitation Materials*" means the ballots and other related materials to be distributed in connection with the solicitation of votes on the Plan.

"*Plan Supplement*" means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules, and exhibits to the Plan to be filed with the Court.

"*Qualified Marketmaker*" means an entity that (a) holds itself out to the public, the syndicated loan market, or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, or equity interests in, the Company Parties, or enter with customers into long and short positions in claims against the Company Parties, in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, or debt or equity securities).

"*Qualified Marketmaker Joinder Date*" has the meaning set forth in Section 3(b)(i).

"*Requisite Consenting Creditors*" means, as of the date of determination, Consenting Creditors holding at least a majority in aggregate principal amount outstanding of the Convertible Notes held by all Consenting Creditors as of such date.

"*Restructuring Expenses*" means all reasonable and documented fees, costs and out-of-pocket expenses of the Ad Hoc Group Advisors, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and the Chapter 11 Cases, in each case, if applicable, pursuant to any engagement letters or fee reimbursement letters entered into between the applicable Company Parties, on the one hand, and each Ad Hoc Group Advisor, on the other hand.

"*Restructuring Term Sheet*" has the meaning assigned to such term in the recitals of this Agreement.

"*Restructuring Transactions*" means all acts, events, and transactions contemplated by, required for, and taken to implement the restructuring of the Company Parties in accordance with this Agreement and the Restructuring Term Sheet, including the Plan and the Sale Transactions.

"*RSA Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of (i) the date on which this Agreement is terminated in accordance with Section 5 and (ii) the Plan Effective Date.

"*Sale Documents*" means, collectively, (i) any asset purchase agreements and related motions, orders or other documents for or related to the Sale Transactions, (ii) the Bidding Procedures Motion and any other related motions, orders or other documents related to the Bidding Procedures (including, but not limited to, the Bidding Procedures Order) and (iii) any other motions, orders or other documents related to, or entered into by the Company Parties in connection with, the Sale Process.

"*SEC*" means the Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Stalking Horse Agreement*" means that certain asset purchase agreement by and among the Company Parties party thereto, as "Sellers", and [Purchaser], as "Purchaser", for sale pursuant to section 363 of the Bankruptcy Code of the assets identified therein as the "Acquired Assets".

"***Support Effective Date***" means the date on which the counterpart signature pages to this Agreement have been executed and delivered by the Company Parties and Consenting Creditors holding at least 66.7% of the aggregate principal amount of outstanding Convertible Notes.

"***Transfer***" has the meaning set forth in Section 3(b)(i).

"***Trustee***" means Wilmington Trust, National Association, in its capacity as trustee under the Indenture, and its successors and assigns.

(b)     Other Interpretive Provisions. With reference to this Agreement unless otherwise specified herein:

  (i)     the meanings of defined terms are equally applicable to the singular and plural forms of the defined terms;

  (ii)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

  (iii)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

  (iv)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

  (v)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

  (vi)     the use of "include" or "including" is without limitation, whether stated or not; and

  (vii)     the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**2.     Restructuring Term Sheet.**

(a)     The Restructuring Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Restructuring Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring Transactions; *provided*, *however*, that the Restructuring Term Sheet may be supplemented by the terms and conditions of this Agreement. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Restructuring Term Sheet (including the attachments thereto, as applicable), the Restructuring Term Sheet (including the attachments thereto, as applicable) shall control.

(b)     Commencement of the Chapter 11 Cases. The Company hereby agrees that, as soon as reasonably practicable, but in no event later than April 2, 2024 (the date on which such filing occurs, the "***Petition Date***"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(c)      _DIP Financing and Cash Collateral_. No later than the close of business on the second business day following the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking entry of the DIP Orders.

**3.      Agreements of the Consenting Creditors.**

(a)      _Agreement to Support_. During the RSA Support Period, subject to the terms and conditions hereof, each of the Consenting Creditors agrees, severally and not jointly, that it shall:

(i)      use its commercially reasonable efforts to support the Restructuring Transactions, act in good faith and take any and all reasonable actions necessary to consummate the Restructuring Transactions, in a manner consistent with this Agreement and the Restructuring Term Sheet;

(ii)      refrain from initiating (or directing or encouraging the Trustee, Collateral Agent or any other Person to initiate) any actions, including legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation, as applicable, of the Chapter 11 Cases, this Agreement or the other Restructuring Transactions;

(iii)      not direct the Collateral Agent, the Trustee, or any other administrative agent, collateral agent, notes agent or indenture trustee to take any action inconsistent with the Consenting Creditors' obligations under this Agreement, and, if the Collateral Agent, Trustee or any other administrative agent, collateral agent, notes agent or indenture trustee takes any action inconsistent with the Consenting Creditors' obligations under this Agreement, the Consenting Creditors shall direct and use their commercially reasonable efforts to cause the Collateral Agent, Trustee or any other administrative agent, collateral agent, notes agent or indenture trustee to cease, withdraw, and refrain from taking any such action;

(iv)      (a) timely vote (pursuant to the Plan) or cause to be voted all of its Claims (including on account of any claims other than those relating to the Indenture that are owned or controlled by such Consenting Creditor) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and the Disclosure Statement Order and (b) to the extent such election is available, not elect on its ballot to preserve claims, if any, that such Consenting Creditor may own or control that may be affected by any releases contemplated under the Plan (and, to the extent required by such ballot, to affirmatively "opt in" to any such releases and exculpation);

(v)      negotiate in good faith with the Company Parties the forms of the Definitive Documents and execute the Definitive Documents (to the extent such Consenting Creditor is a party thereto);

(vi)      not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); _provided_, _however_, that such vote shall, without any further action by the applicable Consenting Creditor, be deemed automatically revoked (and, upon such revocation, deemed void _ab initio_) by the applicable Consenting Creditor at any time following the expiration of the RSA Support Period or termination of this Agreement in accordance with the terms hereof, or vote or cause to be voted its Claims in support any Alternative Transaction;

(vii)      other than in respect of any such rights preserved under Section 3(d) below, not directly or indirectly, through any Person, (x) seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Transaction or (y) take any action, including initiating (or encouraging any other Person

to initiate) any legal proceeding, that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the consummation of the Restructuring Transactions;

(viii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(ix)    use its commercially reasonable efforts to obtain any and all required regulatory and third-party approvals for such Consenting Creditor to consummate the Restructuring Transactions and to support the Company Parties in connection with the same;

(x)    support and take all reasonable actions necessary to confirm such Consenting Creditors' support for the Bankruptcy Court's approval of the Plan and Disclosure Statement, the solicitation of votes on the Plan by the Company Parties, and the confirmation and consummation of the Plan and the Restructuring Transactions;

(xi)    not challenge or support any other party that challenges the validity, enforceability, or priority of the Indenture or the Notes Security Document (as defined in the Indenture) and the Claims thereunder;

(xii)    not to submit any credit bid against the Stalking Horse Bidder (as defined in the Bidding Procedures);

(xiii)    not to object to allowance and treatment of the Breakup Fee and Expense Reimbursement Amount (each as defined in the Bidding Procedures as of the date hereof), if applicable, as a superpriority claim with priority over any and all administrative expenses, debtor-in-possession financing, adequate protection claims, diminution claims, and all other claims against the Sellers' bankruptcy estates now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 506(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise (subject to any carve-out for professional fees set forth in the applicable debtor-in-possession and/or cash collateral orders entered by the Bankruptcy Court); and

(xiv)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, agree to provide, and to not opt-out of, the releases substantially in the form set forth in the Restructuring Term Sheet.

(b)    <u>Transfers</u>.

(i)    Each Consenting Creditor agrees that, for the duration of the RSA Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges or swaps) (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims (including any Beneficial Ownership in any such Claims or any proxies, deposit any Claims into a voting trust or enter into a voting agreement with respect to any such Claims), or any option thereon or any right or interest therein, unless the transferee thereof either (A) is a Consenting Creditor (with respect to a Transfer by a Consenting Creditor), in which case, within two (2) business days of such Transfer the transferee shall provide written notice to Baker & McKenzie LLP ("***B&M***"), as counsel to the Company Parties, and King & Spalding LLP, as counsel to the Consenting Creditors ("***K&S***"), detailing the principal amount of the Claims transferred and the identities of the transferee and the Consenting Creditor who has

transferred the Claims or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims it already may hold against or in the Company Parties prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as Exhibit B (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) B&M and (2) K&S, in which event (x) the transferee shall be deemed to be a Consenting Creditor hereunder to the extent of such Transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of and solely with respect to such Transferred Claims (but not with respect to any other Claims or equity interests acquired or held by such transferor) (such Transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*"); provided that notwithstanding anything to the contrary hereto, any Consenting Creditor may Transfer its Claims to an affiliate or subsidiary of such Consenting Creditor and such affiliate or subsidiary will automatically be deemed to be a "Consenting Creditor" hereunder; provided, further such affiliate or subsidiary transferee will provide a Joinder Agreement to K&S within two (2) business days of any such affiliate or subsidiary transfer. Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company Parties and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer; provided that a Consenting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker execute a Joinder Agreement, so long as (I) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such Transfer and (II) the Qualified Marketmaker complies with Section 3(b)(ii) hereof.

(ii)     If at the time of a proposed Transfer of Claims to a Qualified Marketmaker, such Claims (i) may be voted on the Plan, the proposed transferor Consenting Creditor must first vote such Claims in accordance with Section 3(a) hereof or (ii) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not Transfer such Claims or Interests to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the applicable voting deadline (such date, the "*Qualified Marketmaker Joinder Date*"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) business day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof (including the obligation to vote in favor of the Plan) and shall vote in favor of the Plan in accordance with the terms hereof; provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claims at such time that the transferee of such Claims becomes a Consenting Creditor, with respect to such Claims.

(iii)     This Section 3(b) shall not impose any obligation on the Company Parties to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Claims. Notwithstanding anything to the contrary herein, to the extent the Company Parties and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

(iv)     Each Consenting Creditor, severally and not jointly, agrees not to transfer any equity interests in any Company Party prior to the Petition Date in a manner that would change the

ownership of such equity interests for purposes of section 382 of title 26 of the United States Code without the prior consent of the Company Parties not to be unreasonably withheld, conditioned, or delayed.

(v)    Conversion Waiver.  From the date hereof until the Conversion Waiver Termination Date, each of the Consenting Convertible Noteholders (each a "**Specified Holder**", and collectively, the "**Specified Holders**") hereby waives its right to convert any of the outstanding principal amount of the Convertible Notes held by such Specified Holder into equity securities of the Company, pursuant to each Specified Holder's respective Convertible Note (the "**Conversion Waiver**"); provided, however, that, for the avoidance of doubt, the foregoing agreement not to convert shall cease to apply immediately and without further action by any Specified Holder upon any Conversion Waiver Termination Date. This Section 3(b)(v) shall automatically terminate sixty-one (61) days after the date that this Agreement expires or is terminated (the "**Conversion Waiver Termination Date**").

(c)    Additional Claims. This Agreement shall in no way be construed to preclude a Consenting Creditor from acquiring additional Claims; *provided* that, to the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company Parties entitled to vote on the Plan or (iii) holds or acquires any equity interests in the Company Parties entitled to vote on the Plan, then, in each case, each such Consenting Creditor shall notify B&M and K&S no more than two (2) business days following such acquisition, and each such Consenting Creditor agrees that all such Claims and/or equity interests shall be subject to this Agreement, and agrees that, for the duration of the RSA Support Period with respect to such Consenting Creditor and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or equity interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof. For the avoidance of doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(d)    Preservation of Rights. Nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Creditor, nor the acceptance of the Plan by any Consenting Creditor, shall: (i) be construed to limit consent and approval rights provided in this Agreement, the Restructuring Term Sheet, and the Definitive Documents; (ii) be construed to prohibit any Consenting Creditor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (iii) except as expressly set forth herein, be construed to limit the rights of a Consenting Creditor to consult with any other Convertible Noteholder or party in interest; (iv) limit the rights of any Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, or be construed to prohibit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in or arising in connection with the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or such Consenting Creditors' obligations hereunder and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions (and could not be reasonably expected to accomplish the same); (v) limit the ability of any Consenting Creditor to purchase, sell, or enter into any transaction in connection with its Claims, in compliance with the terms hereof and applicable law; (vi) constitute a waiver or amendment of any provision of the Indenture, the Note Security Documents (as defined in the Indenture) or any related documents or any other documents or agreements that give rise to a Consenting Creditor's Claims; (vii) bar any Consenting Creditor or the Collateral Agent or the Trustee on behalf of the Consenting Creditors from filing a proof of claim with the Bankruptcy Court, or taking action to establish the amount of such claim; or (viii) limit the ability of any Consenting Creditor to assert any rights, claims, or defenses under the Indenture, the Notes Security Documents (as defined in the Indenture), and any related documents or any other documents or agreements that give rise to a Consenting Creditor's Claims, to the extent the assertion of such rights, claims, or defenses are not inconsistent with this Agreement or such Consenting Creditors' obligations hereunder.

10

(e)      DIP Facility Commitment. Each Party, that has executed this Agreement prior to the Petition Date as a DIP Lender hereby commits, severally and not jointly, directly or through one more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such person), to participate in the DIP Loans based on their commitments set forth in Schedule 2.01 to the DIP Credit Agreement. In exchange for the DIP Loans, each DIP Lender shall be entitled to a commitment fee equal to 2.00% on its applicable DIP Commitment as further set forth in the DIP Credit Agreement.

(f)      Tax Attribute Protection Motions. Each Consenting Creditor agrees not to contest the filing of a customary stock trading order that restricts the accumulation and disposition of equity interests in Acorda by persons who own, or would own, more than approximately 4.50% of the equity interests during the pendency of the Chapter 11 Cases.

(g)      Joint and Several. The covenants and agreements of the Consenting Creditors in this Section 3 are several and not joint.

**4.      Agreements of the Company Parties.**

(a)      Covenants. Each Company Party agrees that, for the duration of the RSA Support Period, such Company Party shall:

(i)      (A) support and use commercially reasonable efforts to consummate and complete the Restructuring Transactions, and all transactions contemplated under this Agreement (including, without limitation, those described in the Restructuring Term Sheet), and take any and all reasonably necessary actions in furtherance thereof, including, without limitation, (1) complete and file, within the timeframes contemplated herein, the Sale Documents, the Plan, the Disclosure Statement, and the other Definitive Documents, (2) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving the DIP Credit Agreement, the DIP Orders, the Sale Documents (to the extent requiring approval of the Bankruptcy Court), the Disclosure Statement, and confirming the Plan, and any other Definitive Document requiring the approval of the Bankruptcy Court within the timeframes contemplated by this Agreement (or, if this Agreement is silent, as soon as reasonably practicable); and (3) prosecute and defend any objections or appeals relating to the DIP Orders, any orders approving the Sale Documents, the Disclosure Statement Order, the Confirmation Order, and/or the Restructuring Transactions or any Definitive Document filed or entered into by a Company Party in connection therewith; and (B) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of the DIP Motion, the Sale Documents, the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring Transactions or any Definitive Document filed or entered into by a Company Party;

(ii)      not seek, solicit, propose, or support an Alternative Transaction; *provided*, *however*, that if the Company Parties receive an unsolicited bona fide proposal or expression of interest in undertaking an Alternative Transaction that the boards of directors, members, or managers (as applicable) of the Company Parties, determine, upon advice of legal counsel and in their good-faith judgment, provides a higher or better economic recovery to the Company Parties' stakeholders (including the Consenting Creditors) than that set forth in this Agreement, and such Alternative Transaction is from a proponent that the boards of directors, members, or managers (as applicable) of the Company Parties have reasonably determined is capable of timely consummating such Alternative Transaction, the Company Parties will, within 48 hours of the receipt of such proposals or expression of interest, notify the Consenting Creditors in accordance with Section 20 hereof of the receipt thereof, with such notice to include the materials terms thereof, including the identity of the Person or Persons involved;

(iii)    at least two (2) business days before the Petition Date, provide draft copies of "first day" motions and orders, including a first day declaration, the motion seeking approval of the DIP Facility, the Bidding Procedures Motion, and the Bidding Procedures Order, in each case, in form and substance reasonably acceptable to the Requisite Consenting Creditors;

(iv)    provide draft copies of all material motions or applications and other documents (including the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the Confirmation Order) that the Company Parties intend to file with the Bankruptcy Court to K&S, at least two (2) business days prior to the date when the Company Parties intend to file any such pleading or other document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)    file the "first day" motions reasonably determined by the Company Parties, in form and substance reasonably acceptable to the Requisite Consenting Creditors, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Company Parties and the Requisite Consenting Creditors, from the Bankruptcy Court approving the relief requested in the first day" motions;

(vi)    not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring Transactions;

(vii)    subject to appropriate confidentiality arrangements, provide to the Consenting Creditors' professionals, upon reasonable advance notice to the Company Parties: (A) reasonable access (without any material disruption to the conduct of the Company Parties' business) during normal business hours to the Company Parties' books, records, and facilities; (B) reasonable access to the respective management and advisors of the Company Parties for the purposes of evaluating the Company Parties' finances and operations and participating in the planning process with respect to the Restructuring Transactions; (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any debtor-in-possession and/or exit financing); and (D) prompt and reasonable responses to all reasonable diligence requests; provided, that, in each case, the Company Parties shall not be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure is prohibited by law or any confidentiality obligation binding on such Company Parties, or (c) is subject to attorney-client or similar privilege or constitutes attorney work product;

(viii)    use their commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring;

(ix)    promptly pay all Restructuring Expenses in accordance with Section 16 of this Agreement;

(x)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(xi)    not enter into any commitment or agreement with respect to debtor-in-possession financing, use of cash collateral, adequate protection, exit financing, and/or any other financing arrangements other than the DIP Facility unless otherwise agreed to by the Company Parties, and the Requisite

Consenting Lenders, other than such financing arrangements that arise in the ordinary course of the Company Parties' business operations;

(xii)   not sell any assets outside of the ordinary course of business other than in connection with the Sale Transactions contemplated by the Bidding Procedures Motion without the prior written consent (including e-mail) of the Requisite Consenting Creditors;

(xiii)   subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring Transactions, preserve intact in all material respects the current business operations of the Company Parties (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than as contemplated by the Company Parties' current business plan provided to the Consenting Creditors, voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the Company Parties (other than terminations for cause or consistent with applicable fiduciary duties);

(xiv)   not commence or support any avoidance action or other legal proceeding (or consent to any other Person obtaining standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability, or priority of the Credit Agreement;

(xv)   provide prompt written notice (in accordance with Section 20 hereof) to the Consenting Creditors and K&S between the date hereof and the Plan Effective Date of (A) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions; (B) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions; and (C) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against the Company Parties, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions.

(b)   Automatic Stay. The Company Parties acknowledge and agree and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company Parties hereby waive, to the greatest extent legally possible, the applicability of the automatic stay to the giving of such notice); *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

   **5.   Termination of Agreement.**

   (a)   This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with Section 20 hereof, from, as applicable, (x) the Requisite Consenting Creditors at any time after and during the continuance of any Creditor Termination Event (as defined herein); or (y) Company Parties at any time after and during the continuance of any Company Termination Event, as applicable. Notwithstanding any provision to the contrary in this Section 5, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of a Creditor Termination Event or Company Termination Event (as defined herein) specified herein. This Agreement shall terminate on the Plan Effective Date without any further required action or notice.

   (b)   A "*Creditor Termination Event*" shall mean any of the following:

(i)      the breach in any material respect by any Company Party of (a) any covenant contained in this Agreement or (b) any other obligations of the Company Parties set forth in this Agreement, and, in either respect, such breach remains uncured (solely to the extent capable of being cured) for a period of three (3) business days following the Company Parties' receipt of written notice from the Requisite Consenting Creditors pursuant to Sections 5(a) and 20 hereof (as applicable);

(ii)     any representation or warranty in this Agreement made by a Company Party shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to Sections 5(a) and 20 hereof (as applicable);

(iii)    the Definitive Documents and any amendments, modifications, or supplements thereto filed or entered into by the Company Parties include terms that are materially inconsistent with the Restructuring Term Sheet and are not otherwise reasonably acceptable to the Requisite Consenting Creditors, and such event remains unremedied for a period of five (5) calendar days following the Company Parties' receipt of notice pursuant to Sections 5(a) and Section 20 hereto (as applicable);

(iv)     a Definitive Document alters the treatment of the DIP Lenders specified in the Restructuring Term Sheet without complying with Section 9 hereof and the Requisite Consenting Creditors have not otherwise consented to such Definitive Document;

(v)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (a) enjoining the consummation of the Restructuring Transactions or rendering illegal this Agreement, the Plan or the Restructuring Transactions, and (b) remains in effect for twenty-five (25) business days after such terminating Consenting Creditors transmit a written notice in accordance with Section 20 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Consenting Creditor that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(vi)     the Support Effective Date shall not have occurred on or before the Petition Date;

(vii)    the Company Parties shall not have complied with Milestones set out in the Restructuring Term Sheet; provided that the date for compliance with any such Milestone may be extended with the consent of the Requisite Consenting Creditors;

(viii)   the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of a trustee or examiner with expanded powers to operate the Company Parties' business in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein or (E) granting relief that is inconsistent with this Agreement or the Plan in any materially adverse respect to the Consenting Creditors, in each case;

(ix)     the Confirmation Order is reversed or vacated by a final order without the consent of the Requisite Consenting Creditors;

(x)      if either (A) any Company Party (or any person or entity on behalf of any Company Party or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of any of the obligations or Claims under the Indenture and Note Security Document

14

(as defined in the Indenture), or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Indenture and Note Security Documents (as defined in the Indenture);

(xi)     the DIP Facility is not approved by the Bankruptcy Court or is terminated in accordance with the terms of the DIP Credit Agreement and the DIP Orders;

(xii)    the Company Parties' use of cash collateral is not approved by the Bankruptcy Court or has been terminated in accordance with the terms of the DIP Orders;

(xiii)   any Company Party files or seeks approval of, or supports (or fails to timely object to) another party in, filing or seeking approval of an Alternative Transaction;

(xiv)    if any Company Party (A) withdraws the Plan or the Bidding Procedures Motion, (B) announces its intention not to support the Restructuring Transactions or the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or announces its intent to pursue an Alternative Transaction;

(xv)     the Bankruptcy Court enters an order modifying or terminating the Company Parties' exclusive right to file and solicit acceptances of a plan of reorganization (including the Plan);

(xvi)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) in order for the moving party to foreclose on any Material Asset of a Company Party in a manner that materially impacts Restructuring Transactions without the prior written consent of the Requisite Consenting Creditors;

(xvii)   the termination of the Stalking Horse Agreement or the asset purchase agreement(s) entered into in connection with the Sale Process (if not the Stalking Horse Agreement) without entry into a new purchase agreement reasonably acceptable to the Requisite Consenting Creditors within ten (10) business days; or

(xviii)  the Bankruptcy Court enters a final order disallowing, invalidating, subordinating, recharacterizing, or declaring unenforceable the claims, liens or interests, in any material respect, held by any Consenting Creditor or the Collateral Agent or Trustee arising under the Credit Agreement.

(c)     A "*Company Termination Event*" shall mean any of the following:

(i)      the breach in any material respect by one or more of the Consenting Creditors, of any of the undertakings, representations, warranties, or covenants of the Consenting Creditors set forth herein in any material respect that remains uncured (solely to the extent capable of being cured) for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 5(a) and 20 hereof (as applicable), *provided*, that this Agreement is still binding on other Consenting Creditors if they hold more than 66 2/3% of the aggregate outstanding amount of the Convertible Notes;

(ii)     the board of directors, members, or managers (as applicable) of any Company Party reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement or pursuit of the Restructuring Transactions would be

inconsistent with the exercise of its fiduciary duties under applicable law; *provided*, that the Company Parties shall provide notice of such determination to K&S via email within one (1) business day after the date thereof; *provided further* that the Consenting Creditors reserve all rights they may have to challenge the exercise by the Company Parties of their ability to terminate this Agreement pursuant to this <u>Section 5(c)(ii)</u>;

(iii)    the Company Parties shall not have obtained votes accepting the Plan from holders of the Convertible Notes sufficient to satisfy the conditions for acceptable set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(iv)    the Support Effective Date shall not have occurred on or before the Petition Date;

(v)    if the Plan Effective Date shall not have occurred on before 120 days following the Petition Date;  or

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty-five (25) business days after the Company Parties transmits a written notice in accordance with <u>Section 20</u> hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by the Company Parties if it sought or requested such ruling or order in contravention of any obligation set out in this Agreement.

(d)    <u>Mutual Termination</u>. This Agreement may be terminated by mutual agreement of the Company Parties and the Requisite Consenting Creditors upon the receipt of written notice delivered in accordance with <u>Section 20</u> hereof.

(e)    <u>Automatic Termination</u>. This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Plan Effective Date.

(f)    <u>Effect of Termination</u>. Upon the termination of this Agreement in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u> if the Restructuring Transactions have not been consummated, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Indenture and any ancillary documents or agreements thereto; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon any such termination of this Agreement, each vote or any consents given by any Consenting Creditor prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement, in each case, without further confirmation or other action by such Consenting Creditor. If this Agreement has been terminated in accordance with <u>Section 5(a)</u>, the Company Parties shall not oppose any attempt by a Consenting Creditor to change or withdraw (or cause to change or withdraw) its vote to accept the Plan. Such Consenting Creditor shall have no liability to the Company Parties or to any other Consenting Creditor in respect of any termination of this Agreement in accordance with the terms of this <u>Section 5</u> and <u>Section 21</u> hereof.

(g)    If the Restructuring Transactions have not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and

16

the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**6.      Definitive Documents; Good Faith Cooperation; Further Assurances.**

(a)      Subject to the terms and conditions described herein, during the RSA Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring Transactions, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents, which will, after the Support Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the exhibits and schedules) and be in a form and substance reasonably acceptable to the Requisite Consenting Creditors (subject to any consent rights with respect to the applicable Definitive Document, including those in the definition of such Definitive Document or set forth herein or in the Restructuring Term Sheet). Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; *provided* that no Consenting Creditor shall be required to incur any cost, expense, or liability in connection therewith.

(b)      Each of the Parties agrees to negotiate in good faith any amendments and modifications to the Definitive Documents as reasonably necessary and appropriate to effectuate the Restructuring Transaction and obtain confirmation of the Plan pursuant to an order of the Bankruptcy Court; *provided that* each Party shall have no obligation to agree to any modification that (i) is inconsistent with this Agreement in any material respect, (ii) creates any new material obligations on any Party, or (iii) adversely changes or otherwise adversely affects the economic treatment of such Party whether such change is made directly to the treatment of the Consenting Creditors or otherwise.

**7.      Representations and Warranties.**

(a)      Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Creditor that becomes a party hereto after the date hereof, as of the date such Consenting Creditor becomes a party hereto):

   (i)      such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

   (ii)      the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents) or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party other than any default caused by the commencement of the Chapter 11 Cases or as contemplated by the Restructuring Transactions; and

17

(iii)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)     Each Consenting Creditor severally (and not jointly), represents and warrants to the Company Parties that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of, or investment advisor or manager of funds that are beneficial owners of, the aggregate principal amount of Convertible Notes set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own, or manager or advisor funds that own, any other Convertible Notes and (ii) has, with respect to the beneficial owners of such Convertible Notes, (A) sole investment or voting discretion with respect to such Convertible Notes, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign and transfer such Convertible Notes, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

**8.     Disclosure; Publicity.**

Each Company Party shall submit drafts to K&S of any press releases that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days before making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company Parties and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company Parties and the Consenting Creditors, the principal amount of the Loans held by the Consenting Creditor or the identity of the Consenting Creditor, without such Consenting Creditor's prior written consent, including, without limitation, in any public filing or press release; *provided*, <u>however</u>, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure, (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Loans held by all the Consenting Creditors collectively, and (iii) any Party may disclose information requested by a regulatory or licensing authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person. Notwithstanding the provisions in this <u>Section 8</u>, any Party may disclose, only to the extent consented to in writing by such Consenting Creditor, such Consenting Creditor's individual holdings. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the Consenting Creditors and holdings of each Consenting Creditors (provided that the names and holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

**9.     Amendments and Waivers.**

(a)     This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company Parties and the Requisite Consenting Creditors; *provided*, *however*, that any waiver, modification, amendment or supplement to this <u>Section 9</u> shall require the written consent of all of the Parties; *provided, further*, to the extent the DIP Credit Agreement is not yet executed and effective, any amendment, modification or change to the form of DIP Credit Agreement shall require the written consent of the DIP Lenders; *provided, further*, that any modification, amendment or change to the definition of Requisite Consenting Creditors shall require the written consent of each Consenting Creditor that is a holder of Convertible Notes; *provided, further*, that any change, waiver, modification or amendment to this Agreement or the Restructuring Term Sheet that treats or affects any Consenting Creditor in a manner that is materially

18

disproportionately and adverse, on an economic basis to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditor's respective Claims, the relative priorities of such Claims set forth in the Indenture, and the recoveries contemplated by the Restructuring Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor.

(b)     In the event that an adversely affected Consenting Creditor does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor (such lender, a "**Non-Consenting Creditor**"), but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 66 2/3% of the aggregate outstanding principal amount of Convertible Notes, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors who have so consented, in a way consistent with this Agreement and the Restructuring Term Sheet as waived, changed, modified, or amended, as applicable.

## 10.   Effectiveness.

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; *provided* that signature pages executed by Consenting Creditors shall be delivered to (a) the other Consenting Creditors in a redacted form that removes such Consenting Creditors' holdings of the Loans or any other Claims against or interests in the Company Parties and any schedules to such Consenting Creditors' holdings (if applicable) and (b) the Company Parties, B&M, and K&S in an unredacted form (and to be kept confidential by the Company Parties, B&M, and K&S).

## 11.   Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in the Borough of Manhattan in the State of New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**12.    Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

**13.    Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 13, and Sections 4(b), 5(g), 10 (with respect to the redacted information), 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23 (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

**14.    Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**15.    Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Convertible Notes or Claims other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

16.     **Restructuring Expenses.**

Whether or not the transactions contemplated by this Agreement are consummated, the Company Parties hereby agree to pay, in cash, all Restructuring Expenses as follows: (i) all accrued and unpaid Restructuring Expenses shall be paid in full in cash on or prior to the Support Effective Date, (ii) prior to the Petition Date and after the Support Effective Date, all Restructuring Expenses incurred during such period (and not previously paid pursuant to the preceding clause (i), if any) shall be paid in full in cash by the Company Parties on a regular and continuing basis as soon as reasonably practicable after receipt of invoices, and in any event, prior to the Petition Date, and (iii) after the Petition Date and during the RSA Support Period, all accrued and unpaid Restructuring Expenses incurred up to (and including) the Plan Effective Date (including all accrued and unpaid fees and expenses incurred through the Support Effective Date) shall be paid in full in cash on the Plan Effective Date (provided, for the avoidance of doubt, that such Restructuring Expenses have not been satisfied during the Chapter 11 Cases pursuant to the DIP Orders) against receipt of invoices, without any requirement for Bankruptcy Court review or further Bankruptcy Court order. Notwithstanding the foregoing, nothing herein shall affect or limit any obligations of the Company Parties to pay the Restructuring Expenses as provided in the DIP Orders.

17.     **No Third-Party Beneficiaries.**

Subject to Section 25 and unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

18.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Restructuring Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company Parties and each Consenting Creditor shall continue in full force and effect.

19.     **Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

20.     **Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, by overnight courier or by registered or certified mail (return receipt requested) to the following addresses:

(a)     If to the Company Parties, to:

c/o Acorda Therapeutics, Inc.
2 Blue Hill Plaza, 3rd Floor
Pearl River, NY United States 10965
Attention:     Neil Belloff
E-mail:         nbelloff@acorda.com

with a copy (which shall not constitute notice) to:

Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018
Attention:      Blaire Cahn; John Dodd
E-mail:      Blaire.Cahn@bakermckenzie.com; John.Dodd@bakermckenzie.com

(b)      if to a Consenting Creditor or a transferee thereof, to the addresses or e-mail addresses set forth below such Consenting Creditor's signature hereto (or as directed by any transferee thereof), as the case may be, with a copy (which shall not constitute notice) to:

King & Spalding LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Attention:      Matthew Warren; Lindsey Henrikson;
E-mail:      mwarren@kslaw.com; lhenrikson@kslaw.com

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by electronic mail shall be effective upon transmission.

## 21.      Reservation of Rights; No Admission.

(a)      Nothing contained herein shall limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder.

(b)      Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company Parties. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

## 22.      Relationship Among Consenting Creditors.

It is understood and agreed that no Consenting Creditor has any duty of trust or confidence of any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them. No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditor shall in any way affect or negate this understanding and agreement.

## 23.      No Solicitation; Representation by Counsel; Adequate Information.

(a)      This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Consenting Creditors or a solicitation to tender or exchange any of the Loans. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor

has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company Parties and that it has been, or is part of a group that has been, represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)     Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is an accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act) and a qualified institutional buyer as such term is defined in Rule 144A of the Securities Act, (ii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment.

## 24.     Confidentiality Agreement Amendment

Each Consenting Convertible Noteholder hereby agrees that Section 13 of the Confidentiality Agreement applicable to it is hereby amended to replace the date "March 31, 2024" contained in the second sentence thereof, with "April 1, 2024".

## 25.     Prepetition Agent

Each Consenting Convertible Noteholder hereby authorizes and directs the Prepetition Agent (as defined in the DIP Orders) to consent to the DIP Orders and the terms and conditions set forth therein, and the Consenting Convertible Noteholders agree that the Prepetition Agent shall be afforded and entitled to all benefits, indemnities, immunities, privileges, protections and rights that are conferred upon it under the Indenture and other Notes Documents and applicable law in connection with its compliance with such instruction and direction, and the Prepetition Agent shall have no liability to any Convertible Noteholder for, or in any way related to or arising from, whether directly or indirectly, such instruction and direction. Each of the Parties agrees that the Prepetition Agent is an express third party beneficiaries of, and may enforce, any of the provisions of this Section 25.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**ACORDA THERAPEUTICS, INC.**
on its own behalf and on behalf of its direct and indirect debtor subsidiaries

By: _____

      Name:   Michael Gesser

      Title:   Chief Financial Officer

[Signature Pag  t  Restructurin  Suppor  Agreement]

Davidson Kempner Arbitrage, Equities and Relative
Value LP, as a Consenting Creditor and Convertible
Noteholder
By: Davidson Kempner Multi-Strategy GP II LLC, its
general partner
By: Davidson Kempner Liquid GP Topco LLC, its
managing member

By: _____

Name:    Gabriel T. Schwartz

Title:    Co-Deputy Executive Managing Member


M.H. Davidson & Co., as a Consenting Creditor and
Convertible Noteholder
By: M.H. Davidson & Co. GP, L.LC., its general
partner
By: Davidson Kempner Liquid GP Topco LLC, its
managing member

By: _____

Name:    Gabriel T. Schwartz

Title:    Co-Deputy Executive Managing Member


Midtown Acquisitions L.P., as a Consenting Creditor
and a DIP Lender
By: Midtown Acquisitions GP LLC, its general partner

By: _____

Name:    Gabriel T. Schwartz

Title:    Co-Deputy Executive Managing Member


[Signature Page to Restructuring Support Agreement (DK)]

Notice Address:



THE CANYON VALUE REALIZATION MASTER
FUND, L.P.
CANYON VALUE REALIZATION FUND, L.P., each
as a Consenting Creditor, a DIP Lender and Convertible
Noteholder

By: Canyon Capital Advisors LLC, as Investment
Advisor

By: _____

Name:    Luis A. Silva

Title:    Authorized Signatory



D. E. Shaw Valence Portfolios, L.L.C., as a Consenting
Creditor, a DIP Lender and Convertible Noteholder

By: _____

Name:   Harry Chiel

Title:   Authorized Signatory



Highbridge Tactical Credit Institutional Fund, Ltd., as a Consenting Creditor, a DIP Lender and Convertible Noteholder

By: Highbridge Capital Management, LLC, as Trading Manager and not in its individual capacity

By: *Jonathan Segal*

Name:   Jonathan Segal

Title:    Managing Director, Co-CIO

Highbridge Tactical Credit Master Fund, L.P., as a Consenting Creditor, a DIP Lender and Convertible Noteholder

By: Highbridge Capital Management, LLC, as Trading Manager and not in its individual capacity

By: *Jonathan Segal*

Name:   Jonathan Segal

Title:    Managing Director, Co-CIO



[Signature Page to Restructuring Support Agreement (Highbridge)]

Quantum Partners LP, as a Consenting Creditor and
Convertible Noteholder
By: QP GP LLC, its general partner

By: 

Name:    Neal Paul Donnelly

Title:    Attorney-in-Fact

Palindrome Master Fund LP, as a Consenting Creditor,
a DIP Lender and Convertible Noteholder
By: Palindrome Master Fund GP LLC, its general
partner

By:

Nam:    Neal Paul Donnelly

Title:    Attorney-in-Fact

Cedar Grove Holdings Ltd., as a Consenting Creditor
and DIP Lender

By:

Name:    Neal Paul Donnelly

Title:    Attorney-in-Fact

[Signature Page to Restructuring Support Agreement (Soros)]



Nineteen77 Global Multi-Strategy Alpha Master Limited,
as a Consenting Creditor, a DIP Lender and Convertible
Noteholder, by UBS O'Connor LLC, its investment
advisor

By: _____

Name:    Doyle Horn

Title:    Director

By: _____

Name:    James DelMedico

Title:    Executive Director



**EXHIBIT A**

**ACORDA THERAPEUTICS, INC.**
**RESTRUCTURING TERM SHEET**

This restructuring term sheet (this "***Restructuring Term Sheet***") sets forth the principal terms of a restructuring of the Company (as defined herein) (the "***Restructuring***" or "***Restructuring Transactions***") to be implemented in cases commenced by the Company under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").

This Restructuring Term Sheet is attached as **Exhibit A** to the Restructuring Support Agreement dated [•], 2024, by and among the Company and the signatories thereto (as amended, supplemented, or otherwise modified from time to time, the "***RSA***"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the RSA. To the extent of any direct conflict between this Restructuring Term Sheet and the RSA, the RSA will govern and control.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION OR LIQUIDATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, MAY ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS RESTRUCTURING TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO PROVIDE FINANCING OF THE TYPE DESCRIBED HEREIN OR OTHERWISE. ANY BINDING AGREEMENT AND/OR COMMITMENT TO EXTEND CREDIT ON THE TERMS AND CONDITIONS OUTLINED HEREIN SHALL BE SUBJECT TO, AND EXCLUSIVELY EVIDENCED BY, DEFINITIVE LEGAL DOCUMENTATION IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY AND THE REQUISITE CONSENTING CREDITORS (AS DEFINED IN THE RSA). IN ADDITION, THE TERMS AND CONDITIONS CONTAINED HEREIN ARE SUBJECT TO SATISFACTORY COMPLETION OF CREDIT AND UNDERWRITING APPROVAL AND SUCH OTHER TERMS AND CONDITIONS AS MAY BE DETERMINED BY THE COMPANY AND THE REQUISITE CONSENTING CREDITORS IN THEIR SOLE DISCRETION.

| **Company Overview** | |
|---|---|
| **Overview:** | This Restructuring Term Sheet summarizes the terms of the Restructuring of the Company to be effectuated through a prearranged chapter 11 filing providing for (i) the sale of certain of the Company's core assets under section 363 of the Bankruptcy Code pursuant to the Stalking Horse Agreement (subject to higher or better offers as set forth in Bidding Procedures) (together with any other sale or sales of the Company's assets pursuant to section 363 of the |

| | |
|---|---|
| | Bankruptcy Code, each, a "***Sale Transaction***"; and collectively, the "***Sale Transactions***") and (ii) a chapter 11 plan (the "***Plan***"). |
| **Company:** | Acorda Therapeutics, Inc. ("***Acorda***") and its direct and indirect subsidiaries, Civitas Therapeutics, Inc., Biotie Therapies, LLC., Biotie Therapies AG, Neuronex, Inc., and Acorda Therapeutics Limited (such entities, together with Acorda, collectively referred to as the "***Debtors***" or the "***Company***"). |
| **Claims and Interests to be Restructured:** | <u>Convertible Notes Claims</u>: Consisting of approximately \$[•] million in aggregate outstanding principal amount of the senior secured convertible notes issued pursuant to the Indenture, plus all accrued and unpaid interest, fees, and other amounts arising thereunder or payable pursuant thereto (the "***Prepetition Secured Convertible Notes Claims***")

<u>General Unsecured Claims</u>: Consisting of any Claim against the Debtors (other than any Intercompany Claims) as of the Petition Date that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court (the "***General Unsecured Claims***"). The General Unsecured Claims shall not include the Prepetition Secured Convertible Notes Claims (but shall include any unsecured deficiency claims).

<u>Existing Acorda Interests</u>: Consisting of any equity security (as defined in section 101(16) of the Bankruptcy Code) (the "***Interests***") of Acorda, including all ordinary shares, common stock, preferred stock, membership interest, partnership interest or other instrument evidencing any fixed or contingent ownership interest in Acorda, whether or not transferable, including any restricted share, option, warrant, or other right, contractual or otherwise, to acquire any such interest in Acorda (collectively, "***Existing Acorda Interests***"), that existed immediately before the effective date of the Plan (the "***Plan Effective Date***").

<u>Existing Subsidiary Debtor Interests</u>: Consisting of Interests in any Debtor entity that is a direct or indirect subsidiary of Acorda as of the Plan Effective Date (collectively, the "***Existing Subsidiary Debtor Interests***").

<u>Subordinated Claims</u>: Consisting of any prepetition Claim that is subject to subordination pursuant to sections 510(b)–(c) of the Bankruptcy Code or otherwise (collectively, the "***Subordinated Claims***"). |
|  | **Transaction Overview** |
| **Implementation:** | The Company will commence the Chapter 11 Cases and implement the Restructuring Transaction pursuant to the Plan as provided in the RSA. The transactions in this Restructuring Term Sheet may be effectuated as:

    (a)    one or more Sale Transactions followed by a wind-down of the estates based on a budget that is acceptable to the Debtors and the Requisite Consenting Creditors (the "***Wind-Down Budget***"); and/or |

| | |
|---|---|
| | (b)    such other transactions acceptable to the Company and the Requisite Consenting Creditors, in their sole discretion. |
| **Sale Process:** | Following the Petition Date, the Company shall oversee and manage a comprehensive sale and marketing process to solicit bids in accordance with the Bidding Procedures in good-faith consultation with the Requisite Consenting Creditors (the "*Sale Process*"). |
| | The Sale Process shall be conducted in accordance with the procedures and timeline set forth in the Bidding Procedures, subject to approval of the Bankruptcy Court. The Consenting Creditors and their advisors shall have the right to review all information, diligence, and materials provided by the Company or its advisors to any bidder or prospective bidder with respect to the sale and to consult with the Company and its advisors with respect to any potential Sale Transaction. |
| | In the event that the Debtors close a Sale Transaction, the Debtors shall distribute the proceeds of such Sale Transaction, if any, and the Debtors' remaining assets to the Convertible Noteholders and DIP Lenders in accordance with the terms of the DIP Facility and the Sale Order, subject to a Wind-Down Reserve (as defined below), Liquidating Trust (as defined below) funding, and payment of certain other claims and expenses. |
| | The Wind-Down Budget shall be in an amount sufficient to fund payment of professional fees, administrative expenses, priority claims, and all other post-Sale Transaction expenses as may be necessary or appropriate to confirm and effectuate the Plan.  The Parties shall determine the amount of the Wind-Down Budget in good faith prior to the closing date of a Sale Transaction.  After the closing date of a Sale Transaction, proceeds of such Sale Transaction, if any, in the amount of the Wind-Down Budget shall be held by the Debtors to be used to fund an orderly liquidation of the Chapter 11 Cases and the dissolution of the Debtors (the "*Wind-Down Reserve*") in accordance the Wind-Down Budget. |
| **Plan Process:** | The plan solicitation process shall generally be conducted in accordance with the Milestones (as defined herein) and the procedures and timeline set forth in the order approving the Disclosure Statement, subject to approval of the Bankruptcy Court. |
| **DIP Facility:** | Certain of the Parties shall provide the Company with a secured debtor-in-possession financing as set forth in a debtor-in-possession financing agreement (the "*DIP Credit Agreement*"), the proceeds of which shall be used for, among other things, general corporate purposes during the pendency of the Chapter 11 Cases and to conduct the Sale Process on the terms and conditions consistent with those set forth in the DIP Credit Agreement attached hereto as **Exhibit C** (the "*DIP Facility*"). |
| **Use of Cash Collateral:** | The Debtors will seek authority promptly upon commencement of the Chapter 11 Cases to use cash collateral of the Convertible Noteholders to help fund the administration of the Chapter 11 Cases. In connection with the Debtors' use of cash collateral and DIP Facility, subject to Bankruptcy Court approval, the |

| | |
|---|---|
| | Company will agree to provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the Consenting Creditors on terms and conditions mutually acceptable to the Debtors and the Consenting Creditors, in exchange for the Consenting Creditors' consent to use cash collateral. |
| **Liquidating Trust:** | On the Effective Date, the Debtors shall transfer the Liquidating Trust Assets to the Liquidating Trust and the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and the beneficial interests therein. Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the Liquidating Trust all of their rights, title and interest in and to all of the Liquidating Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The Liquidating Trustee shall be the exclusive administrator of the assets of the Liquidating Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the Liquidating Trustee's duties under the Liquidating Trust Agreement. The Liquidating Trust shall be governed by the Liquidating Trust Agreement and administered by the Liquidating Trustee. The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement. The Liquidating Trustee shall hold and distribute the Liquidating Trust Assets in accordance with the provisions of the Plan and the Liquidating Trust Agreement. Other rights and duties of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement. After the Effective Date, the Debtors shall have no interest in the Liquidating Trust Assets except as set forth in the Liquidating Trust Agreement. |
| | "*Liquidating Trust*" means the trust established pursuant to the Liquidating Trust Agreement. |
| | "*Liquidating Trust Agreement*" means a trust agreement by and among the Debtors and the Liquidating Trustee, which shall be in form and substance reasonably acceptable to the Requisite Consenting Creditors, the official creditors' committee, if any, and the Debtors. |
| | "*Liquidating Trust Assets*" shall consist of (i) any assets or property of the Debtors not purchased pursuant to any Sales Transaction; (ii) Avoidance Actions; and (iii) cash in an amount sufficient to fund the Liquidating Trust, which amount the Parties shall determine in good faith prior to the closing date of a Sale Transaction. |
| | "*Liquidating Trustee*" means the person selected by the official creditors' committee, if any, with the consent of the Requisite Consenting Creditors and in consultation with the Debtors to serve as the trustee of the Liquidating Trust, and any successor thereto in accordance with the Liquidating Trust Agreement. |

| Milestones: | The Consenting Creditors' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "**_Milestones_**"), which may be extended with the prior written consent of the Requisite Consenting Creditors: |
|---|---|
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 3 days from the Petition Date, the Debtors have filed the Bidding Procedures Motion; |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 5 days from the Petition Date, the Interim DIP Order has been entered by the Bankruptcy Court; |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 21 days from the Petition Date, the Debtors have filed the Disclosure Statement and the Plan; |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 28 days following the filing of the Bidding Procedures Motion, the Bidding Procedures Order has been entered by the Bankruptcy Court; |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 29 days from the Petition Date, the Final DIP Order has been entered by the Bankruptcy Court; |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 51 days from the Petition Date, the Debtors have commenced the Auction, if applicable (as defined in the Bidding Procedures); |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 60 days from the Petition Date, the Sale Order has been entered by the Bankruptcy Court approving the sale of the Acquired Assets (as defined in the Bidding Procedures), provided that if there is no overbid for the Acquired Assets, then then the Sale Order shall be entered no later than 53 days from the Petition Date; |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 60 days from the Petition Date, the Bankruptcy Court has entered the Disclosure Statement Order; |
| | • As promptly as practicable following June 15, 2024 and in no event later than the Outside Date (as defined in the Bidding Procedures), the Debtors shall have consummated the sale of Acquired Assets; |
| | • As of the 11:59 p.m. prevailing Eastern Time on the date that is 105 days from the Petition Date, the Bankruptcy Court has entered the Confirmation Order; and |

|  | • As of the 11:59 p.m. prevailing Eastern Time on the date that is 120 days from the Petition Date, the Plan Effective Date has occurred. |
|---|---|
| **Classification and Treatment of Claims and Interests Under the Plan** ||
| **DIP Claims:** | The claims arising under the DIP Credit Agreement (the "***DIP Claims***") shall be allowed in full. All outstanding DIP Claims, to the extent not already paid in full from the proceeds of the Sale, shall be paid in full in cash upon the Plan Effective Date. |
| **Administrative, Priority Tax, Other Priority, and Other Secured Claims:** | On or as soon as practicable after the Plan Effective Date, each holder of an administrative, priority tax or other priority claim, or any other secured claim (other than secured claims under the Indenture) will be paid in full from available cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. The allowed amounts and payment terms of 503(b)(9) claims shall each be satisfactory to Requisite Consenting Creditors as a condition to the occurrence of the Plan Effective Date. |
| **Prepetition Secured Convertible Notes Claims:** | Prepetition Secured Convertible Notes Claims shall be allowed in the outstanding principal amount of $[●], plus all accrued interest, costs, fees, and expenses owing under the Indenture. On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, the holders of outstanding allowed Prepetition Secured Convertible Notes Claims will receive their *pro rata* share of the sum of the amount of cash available for distribution to holders of Prepetition Secured Convertible Notes Claims, after the payment in full in cash (or establishment of reserves to satisfy) of administrative claims, priority tax or other priority claims, and other secured claims. <br><br> *Impaired – Entitled to Vote* |
| **General Unsecured Claims:** | On the Plan Effective Date, or as soon as reasonably practicable after each distribution date, holders of allowed General Unsecured Claims will receive their pro rata share of (i) its non-certificated beneficial interest in the Liquidating Trust (entitling such holder to a pro rata share of the Liquidating Trust Net Assets in accordance with the Liquidating Trust Agreement) and (ii) the net cash proceeds after the Prepetition Secured Convertible Notes Claims are satisfied in full in cash, until all allowed General Unsecured Claims are satisfied in full. <br><br> *Impaired – Entitled to Vote* |
| **Intercompany Claims:** | Intercompany Claims shall be extinguished, cancelled, and released or receive such other treatment that is acceptable to the Company and the Requisite Consenting Creditor in their respective reasonable discretion. <br><br> *Impaired – Deemed to Reject – Non-Voting* |

| | |
|---|---|
| **Subordinated Claims:** | Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan.<br><br>*Impaired – Deemed to Reject – Non Voting* |
| **Existing Acorda Interest:** | Existing Acorda Interest shall be extinguished, cancelled, and released on the Effective Date.<br><br>*[Impaired – Deemed to Reject – Non-Voting]* |
| **Existing Subsidiary Debtor Interests:** | Existing Subsidiary Debtor Interests shall be reinstated for administrative convenience.<br><br>*Unimpaired – Presumed to Accept* |
| **General Provisions** | |
| **Cancellation of Loans, Interests, Instruments, Certificates and other Documents:** | Except as provided herein, on the Plan Effective Date, all notes, instruments, certificates evidencing debt of, or equity interests in, the Company, including, without limitation, the Indenture, the DIP Credit Agreement, and the Interests, will be cancelled. In addition, on the Plan Effective Date, any registration rights agreements, stockholder agreements, or similar agreements with respect to Interests in Acorda will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets:** | On the Effective Date, the Debtors and the estates shall transfer the Liquidating Trust Assets to the Liquidating Trust, free and clear of all liens, charges, Claims, encumbrances, and interests for the benefit of the holders of allowed General Unsecured Claims. In accordance with Section 1141 of the Bankruptcy Code, all of the Liquidating Trust Assets, as well as the rights and powers of the Debtors' estates applicable to the Liquidating Trust Assets, shall vest in the Liquidating Trust, for the benefit of the holders of allowed General Unsecured Claims. |
| **Compromise and Settlement:** | The Plan will contain customary provisions for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of allowed claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such claims and interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |

| | |
|---|---|
| **Releases:** | The Plan will contain standard and customary estate and consensual third-party release provisions mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Exculpation:** | The Plan will contain standard and customary exculpation provisions mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Injunction:** | The Plan will contain standard and customary injunction provisions mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Definitive Documents and Due Diligence:** | This Restructuring Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Restructuring Term Sheet and the RSA. |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Restructuring Term Sheet will be structured so as to obtain the most beneficial structure for the Company, as agreed to by the Company and the Requisite Consenting Creditors |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Plan Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (e) other purposes. |
| **Resolution of Disputed Claims:** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court. Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their allowed Claim, mutually acceptable to the Company and the Requisite Consenting Creditors. |
| **Conditions to Effectiveness:** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are mutually acceptable to the Company and the Requisite Consenting Creditors.<br><br>The conditions to effectiveness may be waived in writing by the Company together with the Requisite Consenting Creditors. |

Exhibit B
[FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS]

This joinder agreement (the "***Joinder Agreement***") to the Restructuring Support Agreement dated [▪], 2024 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), between Acorda Therapeutics, Inc. ("***Acorda***"), and its direct and indirect subsidiaries (each, a "***Company Party***" and collectively, the "***Company Parties***") and the [●] (together with their respective successors and permitted assigns, the "***Consenting Creditors***" and each, a "***Consenting Creditor***") is executed and delivered by _____ (the "***Joining Party***") as of _____, 2024. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

Representations and Warranties. With respect to the aggregate principal amount of [●] set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 7 of the Agreement to each other Party to the Agreement.

Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

[**CONSENTING CREDITOR**] , as a Consenting Creditor, [a DIP Lender] and Convertible Noteholder

By: _____

    Name:

    Title:

Principal amount of Outstanding Convertible Notes:    $[•]

[Principal amount of DIP Commitments and DIP Loans:]    $[•]

<u>Notice Address</u>:

_____

_____

Fax: _____

Attention_____

E-mail: _____

[Signature Page to Joinder to Restructuring Support Agreement]

Acknowledged:

**ACORDA THERAPEUTICS, INC.,** on its own behalf
and on behalf of its direct and indirect debtor subsidiaries

By: _____

   Name:

   Title:

[Signature Page to Joinder to Restructuring Support Agreement]

**Exhibit C**

**DIP Credit Agreement**

*Proposed Execution Version*

---

### DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of  April 1, 2024

Among

ACORDA THERAPEUTICS, INC.,
as Borrower and as Debtor and Debtor-in-Possession,

THE LENDERS PARTY HERETO

and

GLAS USA LLC,
as Administrative Agent

and

GLAS Americas LLC,
as Collateral Agent

---

## TABLE OF CONTENTS

Page

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01  Defined Terms ................................................................................. 2
Section 1.02  Other Interpretive Provisions ......................................................... 28
Section 1.03  Accounting Terms ............................................................................ 29
Section 1.04  References to Agreements, Laws, Etc. ............................................ 29
Section 1.05  Times of Day .................................................................................... 29
Section 1.06  Timing of Payment or Performance ............................................... 29
Section 1.07  UCC Terms ...................................................................................... 29
Section 1.08  Swiss Terms ..................................................................................... 30

### ARTICLE II

### THE COMMITMENTS AND THE LOANS

Section 2.01  The Commitments and the Loans .................................................... 30
Section 2.02  Borrowings of Loans ....................................................................... 31
Section 2.03  Prepayments .................................................................................... 32
Section 2.04  Repayment of Loans ........................................................................ 34
Section 2.05  Interest ............................................................................................. 34
Section 2.06  Fees .................................................................................................. 35
Section 2.07  Computation of Interest and Fees ................................................... 36
Section 2.08  Evidence of Indebtedness ............................................................... 36
Section 2.09  Payments Generally ......................................................................... 37
Section 2.10  Sharing of Payments ........................................................................ 37

### ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01  Taxes ................................................................................................ 38
Section 3.02  [Reserved ......................................................................................... 42
Section 3.03  [Reserved ......................................................................................... 42
Section 3.04  Increased Cost and Reduced Return; Capital and Liquidity
Requirements. ................................................................................. 42
Section 3.05  [Reserved] ........................................................................................ 43
Section 3.06  Matters Applicable to All Requests for Compensation ................... 43
Section 3.07  Mitigation Obligations; Replacement of Lenders under Certain
Circumstances ................................................................................ 44
Section 3.08  Survival ............................................................................................ 45

ARTICLE IV

CONDITIONS PRECEDENT TO LOANS

Section 4.01  Conditions to Initial Loans.........................................................45
Section 4.02  Conditions to all Loans. ............................................................47

ARTICLE V

REPRESENTATIONS AND WARRANTIES

Section 5.01  Existence, Qualification and Power; Compliance with Laws..................48
Section 5.02  Authorization; No Contravention ...............................................49
Section 5.03  Governmental Authorization; Other Consents.................................49
Section 5.04  Binding Effect ........................................................................50
Section 5.05  No Material Adverse Effect .......................................................50
Section 5.06  Litigation...............................................................................50
Section 5.07  Ownership of Property; Liens ....................................................50
Section 5.08  Secured, Super-Priority Obligations ............................................50
Section 5.09  Environmental Compliance ........................................................51
Section 5.10  Taxes ...................................................................................52
Section 5.11  Compliance with ERISA............................................................53
Section 5.12  Labor Matters .........................................................................53
Section 5.13  Insurance ..............................................................................53
Section 5.14  Subsidiaries; Equity Interests.....................................................53
Section 5.15  Margin Regulations; Investment Company Act; Anti-Terrorism
              Laws; Sanctions and Other Regulations ........................................53
Section 5.16  Disclosure .............................................................................54
Section 5.17  Intellectual Property.................................................................55
Section 5.18  Initial Approved Budget ...........................................................55
Section 5.19  EEA Financial Institution ..........................................................55
Section 5.20  Contractual Obligations ...........................................................55
Section 5.21  Financing Order. .....................................................................55

ARTICLE VI

AFFIRMATIVE COVENANTS

Section 6.01  Financial Statements ................................................................56
Section 6.02  Certificates; Reports; Other Information ........................................57
Section 6.03  Notice Requirements; Other Information ........................................58
Section 6.04  Environmental Matters ..............................................................59
Section 6.05  Maintenance of Existence ..........................................................61
Section 6.06  Maintenance of Properties .........................................................61
Section 6.07  Maintenance of Insurance ..........................................................61
Section 6.08  Compliance with Laws ..............................................................62

Section 6.09    Books and Records .................................................................................. 62
Section 6.10    Inspection Rights; Lender Calls .............................................................. 62
Section 6.11    Additional Guarantors ............................................................................ 63
Section 6.12    Use of Proceeds ...................................................................................... 63
Section 6.13    Anti-Corruption and Sanctions Laws ...................................................... 64
Section 6.14    Taxes ...................................................................................................... 64
Section 6.15    End of Fiscal Years; Fiscal Quarters ...................................................... 64
Section 6.16    ERISA .................................................................................................... 64
Section 6.17    Further Assurances .................................................................................. 65
Section 6.18    Business .................................................................................................. 65
Section 6.19    Post-Closing Matters .............................................................................. 65
Section 6.20    Compliance with Financing Order .......................................................... 65
Section 6.21    Milestones .............................................................................................. 65
Section 6.22    Bankruptcy Covenants ............................................................................ 66
Section 6.23    Cash Management ................................................................................... 66
Section 6.24    No Flowback to Switzerland ................................................................... 66

ARTICLE VII

NEGATIVE COVENANTS

Section 7.01    Liens ....................................................................................................... 66
Section 7.02    Investments ............................................................................................ 68
Section 7.03    Indebtedness ........................................................................................... 69
Section 7.04    Fundamental Changes .............................................................................. 70
Section 7.05    Dispositions ............................................................................................ 70
Section 7.06    Restricted Payments ............................................................................... 70
Section 7.07    Change in Nature of Business ................................................................. 71
Section 7.08    Transactions with Affiliates ................................................................... 71
Section 7.09    Prepayments and Modifications of Certain Agreements ......................... 71
Section 7.10    Negative Pledge ...................................................................................... 72
Section 7.11    Amendments to Organization Documents ............................................... 72
Section 7.12    Use of Proceeds ...................................................................................... 72
Section 7.13    Accounting Changes ............................................................................... 73
Section 7.14    OFAC ..................................................................................................... 73
Section 7.15    Ownership of Subsidiaries ...................................................................... 73
Section 7.16    Compliance with Financing Orders and Approved Budget ...................... 73
Section 7.17    Compliance With Certain Laws ............................................................... 73
Section 7.18    Chapter 11 Claims .................................................................................. 73
Section 7.19    Revision of Orders; Applications to Bankruptcy Court ........................... 74
Section 7.20    Adequate Protection ............................................................................... 74

# ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default ................................................................... 74
Section 8.02    Remedies Upon Event of Default ........................................... 78
Section 8.03    Application of Funds............................................................... 80

# ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization .............................................. 81
Section 9.02    Delegation of Duties .............................................................. 83
Section 9.03    Liability of the Agent ............................................................. 83
Section 9.04    Reliance by the Agent ............................................................ 84
Section 9.05    Notice of Default.................................................................... 85
Section 9.06    Credit Decision; Disclosure of Information by the Agent ....... 85
Section 9.07    Indemnification of the Agent ................................................. 85
Section 9.08    The Agent in its Individual Capacity ..................................... 86
Section 9.09    Successor Agents ................................................................... 86
Section 9.10    Agent May File Proofs of Claim............................................ 87
Section 9.11    Release of Collateral and Guarantee....................................... 87
Section 9.12    Other Agents; Arrangers and Managers ................................. 88
Section 9.13    Appointment of Supplemental Agent ..................................... 88
Section 9.14    Certain Bankruptcy Matters................................................... 89
Section 9.15    Erroneous Payments............................................................... 90
Section 9.16    Collateral................................................................................ 94

# ARTICLE X

## MISCELLANEOUS

Section 10.01   Amendments, Etc. ................................................................... 95
Section 10.02   Notices and Other Communications; Facsimile and Electronic
                Copies ................................................................................... 96
Section 10.03   No Waiver; Cumulative Remedies ........................................ 100
Section 10.04   Costs and Expenses................................................................ 100
Section 10.05   Indemnification by the Borrower............................................ 101
Section 10.06   Payments Set Aside............................................................... 102
Section 10.07   Successors and Assigns.......................................................... 103
Section 10.08   Confidentiality ...................................................................... 107
Section 10.09   Setoff..................................................................................... 107
Section 10.10   Counterparts........................................................................... 108
Section 10.11   Integration ............................................................................. 108
Section 10.12   Survival of Representations and Warranties........................... 108

Section 10.13  Severability ........................................................................ 108
Section 10.14  GOVERNING LAW ........................................................... 109
Section 10.15  WAIVER OF RIGHT TO TRIAL BY JURY ....................... 109
Section 10.16  Binding Effect ................................................................... 109
Section 10.17  Lender Action ................................................................... 110
Section 10.18  PATRIOT Act .................................................................... 110
Section 10.19  No Advisory or Fiduciary Responsibility ........................... 110
Section 10.20  Acknowledgement and Consent to Bail-In of Affected Financial
              Institution ....................................................................... 111
Section 10.21  Conflicts with Financing Orders. ....................................... 111
Section 10.22  Limitations for Swiss Loan Parties. ................................... 111

ARTICLE XI

GUARANTEE

Section 11.01. Guarantee .......................................................................... 113
Section 11.02. Guarantee of Payment and Performance; Continuing Guarantee .......... 113
Section 11.03. No Limitations, Etc ........................................................... 113
Section 11.04. Reinstatement .................................................................... 115
Section 11.05. Agreement To Pay; Contribution; Subrogation ................... 115
Section 11.06. Information ........................................................................ 116
Section 11.07. Maximum Liability ............................................................ 116
Section 11.08. Taxes ................................................................................ 117

ARTICLE XII

PLEDGE OF SECURITIES

Section 12.01  Pledge ............................................................................... 117
Section 12.02  Voting Rights; Dividends and Interest, Etc ......................... 118
Section 12.03  Agent Not Partner or Limited Liability Company Member .......... 120

ARTICLE XIII

SECURITY INTERESTS IN OTHER PERSONAL PROPERTY

Section 13.01  Security Interest ................................................................ 120
Section 13.02  Security Interest Absolute ................................................. 122
Section 13.03  Binding Effect; Several Agreement ..................................... 123
Section 13.04  Agent's Fees and Expenses; Indemnification ....................... 123
Section 13.05  Collateral Agent Appointed Attorney-in-Fact ..................... 123
Section 13.06  Additional Subsidiaries ..................................................... 124
Section 13.07  Financing Orders; Matters Relating to Security. .................. 124

SCHEDULES

| | | |
|---|---|---|
| Schedule 1 | - | Closing Checklist |
| Schedule 2 | - | Subsidiary Guarantors & Subsidiary Loan Parties |
| Schedule 2.01 | - | Commitments |
| Schedule 2.02(d) | - | Roll-Up Lenders |
| Schedule 5.01 | - | Existence, Qualification and Power; Compliance with Laws |
| Schedule 5.02 | - | Authorizations; No Contravention |
| Schedule 5.06 | - | Litigation |
| Schedule 5.07(b) | - | Real Property |
| Schedule 5.09 | - | Environmental Compliance |
| Schedule 5.10 | - | Taxes |
| Schedule 5.14 | - | Subsidiaries and Other Equity Investments |
| Schedule 5.17 | - | Intellectual Property, Licenses |
| Schedule 5.20 | - | Material Contracts |
| Schedule 7.01(b) | - | Existing Liens |
| Schedule 7.02(c) | - | Existing Investments |
| Schedule 7.03(b) | - | Surviving Indebtedness |
| Schedule 7.08 | - | Transactions with Affiliates |
| Schedule 10.02 | - | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

| Exhibit A-1 | -- | Form of Committed Loan Notice |
| Exhibit A-2 | -- | Form of Prepayment Notice |
| Exhibit B | -- | Form of Note |
| Exhibit C | -- | Form of Compliance Certificate |
| Exhibit D | -- | Form of Assignment and Assumption |
| Exhibit E | -- | Form of Officer's Certificate |
| Exhibit F | -- | Form of Administrative Questionnaire |
| Exhibit G | -- | Form of Interim Order |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of [_____], 2024 among ACORDA THERAPEUTICS, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined) (the "Borrower"), each Subsidiary Guarantor (together each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each a "Guarantor" and collectively, the "Guarantors") each Lender (as hereinafter defined) from time to time party hereto and GLAS USA LLC, a limited liability company organized and existing under the laws of the State of New Jersey, as administrative agent (in such capacities, together with any successor administrative agent, the "Administrative Agent") and GLAS Americas, LLC, a limited liability company organized and existing under the laws of the State of New York, as collateral agent for the Lenders (in such capacities, together with any successor collateral agent, the "Collateral Agent").

## PRELIMINARY STATEMENTS

1.      On April [1], 2024 (the "Petition Date"), the Borrower and certain of its Subsidiaries (collectively, the "Debtors") filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of the United States Code (the "Bankruptcy Code") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and such reorganization case is being jointly administered under Case Number [____] (the "Chapter 11 Case").

2.      Prior to the Petition Date, certain of the Lenders and/or certain of their affiliates or controlled funds provided financing to the Borrower, pursuant to those certain 6.00% Convertible Senior Secured Notes due 2024, dated as of December 23, 2019 (the "Prepetition Notes") among the Borrowers, the guarantors from time to time party thereto, the lenders party thereto from time to time (the "Prepetition Noteholders"), and Wilmington Trust, National Association as administrative agent and collateral agent (the "Prepetition Agent") (the Prepetition Notes, as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Indenture" and, together with all related Loan Documents (as defined therein), the "Prepetition Notes Documents", and the outstanding principal amount of debt under the Prepetition Indenture, the "Prepetition Secured Obligations").

3.      The Borrower has requested that the Lenders party hereto provide a senior secured, "superpriority" debtor-in-possession term loan facility available in multiple draws as set forth herein to the Borrowers in the maximum aggregate original principal amount of $60,000,000, consisting of (i) an interim term loan facility in an aggregate maximum original principal amount of $10,000,000 (the "Interim DIP Loans") available immediately upon entry of the Interim Order; and (ii) a final delayed draw term loan facility in an aggregate maximum original principal amount of $10,000,000 (the "Final DIP Loans", such loans, together with the Interim DIP Loans, the "New Money DIP Loans") (clauses (i) and (ii) hereof, the "New Money DIP Facility") and (iii) a roll-up facility in the aggregate maximum principal amount of $40,000,000, representing a roll-up of Prepetition Secured Obligations on a two dollars to one dollar basis of the Commitments hereunder made pursuant to the Prepetition Notes Documents (the "Roll-Up Financing", and such loans the

"Roll-Up Loans"), which shall be included, in the Final Order (clause (iii) hereof, the "Roll-Up DIP Facility" and together with the New Money DIP Facility, the "DIP Facility").

4.    The Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to the Administrative Agent, for the benefit of the Secured Parties (as hereinafter defined), a lien on substantially all of their respective assets, in accordance with the priorities provided in the Loan Documents (as hereinafter defined) and the Final Order (as hereinafter defined).

Subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the "super-priority" debtor-in-possession term loan facility provided for herein:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounting Changes" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"Administration Fee" has the meaning specified in Section 2.06(d).

"Administrative Agent" has the meaning specified in the first paragraph of this Agreement and shall include any successor administrative agent appointed in accordance with Section 9.09.

"Administrative Agent's Office" means, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire substantially in the form of Exhibit F.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, in respect of any Person which, directly or indirectly, controls, is controlled by or is under common control with such Person; and for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" or "under common control with") means the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting Equity Interests or by contract or otherwise;

2

"Agent" means, individually or collectively, Administrative Agent or Collateral Agent. as applicable.

"Agent Fee Letter" means that certain fee letter by and among GLAS Americas LLC, GLAS USA LLC and the Borrower.

"Agent Parties" has the meaning specified in Section 10.02(f).

"Agent-Related Persons" means the Administrative Agent, together with its Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"Aggregate Commitments" means the Commitments of all the Lenders.  As of the Closing Date, the amount of the Aggregate Commitments is $60,000,000.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Anti-Corruption Laws" has the meaning specified in Section 5.15(g).

"Anti-Terrorism Law" means any Requirement of Law related to money laundering or financing terrorism, including the PATRIOT Act, and its implementing regulations, The Currency and Foreign Transactions Reporting Act (also known as the Bank Secrecy Act, 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended), Executive Order 13224 (effective September 24, 2001) and the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 and 1957).

"Applicable Lending Office" means for any Lender, such Lender's office, branch or affiliate designated for the Loans, as notified to the Administrative Agent and the Borrower or as otherwise specified in the Assignment and Assumption pursuant to which such Lender became a party hereto, any of which offices may, subject to the applicable provisions of Article III, be changed by such Lender upon ten (10) days' prior written notice to the Administrative Agent and the Borrower; provided that for the purposes of the definition of "Excluded Taxes" and Section 3.01, any such change shall be deemed an assignment made pursuant to an Assignment and Assumption.

"Applicable Rate" means a percentage per annum equal to, as of any date of determination, 10.5%.

"Approved Bankruptcy Court Order" means (a) the applicable Financing Order, as such order is in effect from time to time and (b) any other order entered by the Bankruptcy Court that (x) is in form and substance satisfactory to the Required Lenders in all respects, (y) once entered, has not been vacated, reversed or stayed, and (z) has not been amended or modified except in a manner satisfactory to the Required Lenders.

"Approved Budget" means, initially, the Initial Approved Budget, and, following approval of any Supplemental Approved Budget, the "Approved Budget" as defined in and approved pursuant to the Financing Orders.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or Affiliate of an entity that administers, advises or manages a Lender.

"Article 9 Collateral" shall have the meaning assigned to such term in Section 13.01.

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit D.

"Attorney Costs" means and includes, regardless of if any transactions are ever actually consummated, all reasonable and documented fees, out-of-pocket costs, disbursements and expenses and actual disbursements of any law firm or other external legal counsel, limited to one counsel to the Agent (which on the date hereof is King & Spalding LLP) and one counsel to the Lenders (which on the date hereof is King & Spalding LLP) and, to the extent reasonably necessary, local counsel for each of the Agent and the Lenders in any relevant jurisdiction (and, in the event of any actual conflict of interest, additional counsel to the affected parties).

"Attributable Indebtedness" means, at any date, (a) in respect of any Capital Lease Obligation (other than a lease resulting from a Sale Leaseback) of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Sale Leaseback, the lesser of (i) the present value, discounted in accordance with GAAP at the interest rate implicit in the related lease, of the obligations of the lessee for net rental payments over the remaining term of such lease (including any period for which such lease has been extended or may, at the option of the lessor be extended) and (ii) the fair market value of the assets subject to such transaction.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning specified in the Preliminary Statements hereto.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Business Day" means any day other than a Saturday, Sunday or other day on which

commercial banks are authorized or required to close under the Laws of, or are in fact closed in, the State of New York.

"Capital Lease" means, with respect to any Person, any leasing or similar arrangement conveying the right to use any property, whether real or personal property, or a combination thereof, by that Person as lessee that, in conformity with GAAP, is required to be accounted for as a capital lease on the balance sheet of such Person.

"Capital Lease Obligation" means, with respect to any Person, all monetary or financial obligations of such Person and its Subsidiaries under any Capital Leases, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date on which such lease may be terminated by the lessee without payment of a penalty.

"Carve-Out" means the "Carve-Out" as defined in the Financing Orders.

"Cash Equivalents" means any of the following: (a) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, (b) insured certificates of deposit of or time deposits with any commercial bank that is a Lender or any other domestic commercial bank having capital and surplus in excess of $500,000,000 maturing not more than one year after the date of issuance, (c) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than thirty (30) days, with respect to securities issued or fully guaranteed or insured by the Government of the United States, (d) securities with maturities of three hundred and sixty-five (365) days or less from the date of acquisition that are issued or fully guaranteed by any state, district or territory of the United States, by any political subdivision or taxing authority of any such state, district or territory or by any foreign government, the securities of which state, district or territory, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (e) commercial paper maturing not more than two hundred and seventy (270) days from the date of issue and issued by a corporation (other than an Affiliate of any Loan Party) organized under the laws of any state of the United States of America or of the District of Columbia and, at the time of acquisition thereof, rated A 2 or higher by S&P, P 2 or higher by Moody's or F2 or higher by Fitch, (f) money market mutual or similar funds that invest substantially all of their assets in one or more type of securities satisfying the requirements of clauses (a) through (e) of this definition, (g) Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions having capital of at least $500,000,000, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a) and (b) of this definition, (h) agencies (LSE's), State (municipal bonds), or corporate bonds having a long term rating of at least A- or A3 from S&P, Moody's or Fitch, having maturities of not more than fifteen (15) months from the date of acquisition and (i) money market funds having a rating of AAAm/Aaa or better from S&P, Moody's or Fitch.

"Casualty Event" means any casualty, loss, damage, destruction or other similar loss with respect to real or personal property or improvements.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"Change in Law" means (a) the adoption of any law, treaty, order, policy, rule or regulation after the date of this Agreement, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law); provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Change of Control" means the occurrence of any of the following events:

(a)    any direct or indirect Subsidiary of the Borrower on the Closing Date shall cease to be a Wholly-owned direct or indirect Subsidiary of the Borrower; or

(b)    any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have (x) acquired beneficial ownership or control of 25% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of the Borrower; or (y) obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of the Borrower;

For the avoidance of doubt the proposal or entry into (but not the consummation of the transactions pursuant to) the definitive documents contemplated by the Restructuring Support Agreement shall not constitute a Change of Control.

"Chapter 11 Case" has the meaning specified in the Preliminary Statements hereto.

"Closing Date" means the date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means a collective reference to all property required to be pledged to the Collateral Agent, for the benefit of the Secured Parties, to secure all or part of the Obligations

pursuant to the Collateral Documents or the applicable Financing Order; provided that "Collateral" shall include the collective reference to Article 9 Collateral and Pledged Collateral.

"Collateral Agent" has the meaning specified in the first paragraph of this Agreement and shall include any successor agent appointed in accordance with Section 9.09.

"Collateral Documents" means, collectively, the applicable Financing Order (with respect to the granting of Liens thereunder), this Agreement, and, to the extent required hereunder or reasonably requested by the Administrative Agent (at the direction of the Required Lenders) and the Lenders, any mortgages, any collateral assignments, any security agreements, pledge agreements, control agreements or other similar agreements, or any supplements to any of the foregoing, in each case delivered to the Administrative Agent and the Lenders in connection with this Agreement or any other Loan Document or any transaction contemplated hereby or thereby to secure or guarantee the payment of any part of the Obligations or the performance of any Loan Party's other duties and obligations under the Loan Documents. The Collateral Documents shall supplement, and shall not limit, the grant of a Lien on the Collateral pursuant to this Agreement or the applicable Financing Order.

"Commitment" means, as to each Lender, its obligations to make Loans pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the caption "Commitment". Commitments will reduce on a dollar for dollar basis once advanced.

"Commitment Expiration Date" means the earliest to occur of (i) the date on which the entire amount of the Aggregate Commitments has been drawn and (ii) the date on which the Aggregate Commitments have been terminated pursuant to this Agreement and the applicable Financing Order.

"Commitment Fee" has the meaning provided in Section 2.06(a).

"Committed Loan Notice" means a notice of borrowing substantially in the form of Exhibit A-1.

"Communications" has the meaning specified in Section 10.02(e).

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Confirmation Order" means the "Confirmation Order" as defined in the Restructuring Support Agreement.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Copyright License" shall mean any written agreement, now or hereafter in effect, granting any right to any Pledgor under any Copyright now or hereafter owned by any other person, and all rights of any Pledgor under any such agreement (including, without limitation, any such rights that such Pledgor has the right to license).

"Copyright Security Agreement" means any Copyright Security Agreement, in form and substance satisfactory to Required Lenders.

"Copyrights" shall mean all of the following which any Pledgor now or hereafter owns or in which any Pledgor now or hereafter has an interest (pursuant to a Copyright License or otherwise): (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered, (b) all registrations and applications for registration of any such Copyright in the United States or any other country, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office and the right to obtain all renewals thereof, including those listed on Schedule 5.17, (c) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past or future infringement thereof.

"Credit Agreement" shall have the meaning assigned to such term in the preliminary statement of this Agreement.

"Debtors" has the meaning set forth in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to the Applicable Rate plus 2.0% per annum to the fullest extent permitted by applicable Laws.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided

that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state, federal or foreign regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any asset or property by any Person (including any Sale Leaseback and any sale of Equity Interests).

"Disqualified Equity Interests" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety one (91) days after the Maturity Date then in effect; provided that, if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Borrower or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

9

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under <u>Section 10.07(b)(iii)</u>, <u>(v)</u> and <u>(vi)</u> (subject to such consents, if any, as may be required under <u>Section 10.07(b)(iii))</u>.

"<u>Environmental Action</u>" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health and safety as it relates to any Hazardous Material or the environment, including, without limitation, (a) by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages relating to Releases of Hazardous Materials or actual or alleged violations of Environmental Laws and (b) by any Governmental Authority or third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"<u>Environmental Laws</u>" means any and all federal, provincial, local and foreign statutes, laws, regulations, ordinances, rules, decrees or other governmental restrictions of legal effect relating to the environment, to the release of any Hazardous Materials into the environment or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials but only to the extent such Environmental Laws are legally applicable to any Loan Party pursuant to any Environmental Law.

"<u>Environmental Liability</u>" in respect of any Person, any and all legal obligations and liabilities under Environmental Laws for any Release caused by such Person or which is discovered or uncovered during the ownership or control of any real property by such Person and which adversely impacts any Person, property or the environment whether or not caused by a breach of applicable laws (including Environmental Laws).

"<u>Environmental Permit</u>" means any permit, approval, hazardous waste identification number, license or other authorization issued by or submitted to a Governmental Authority required under any Environmental Law.

"<u>Equity Interests</u>" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and Treasury regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with any Loan Party and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of any Loan Party or ERISA Affiliate as described in Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, notification of any Loan Party or ERISA Affiliate concerning the imposition of withdrawal liability or notification that a Multiemployer Plan is insolvent or is in reorganization within the meaning of Title IV of ERISA (or that is in endangered or critical status, within the meaning of Section 305 of ERISA); (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (g) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); or (h) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Pension Plan.

"Erroneous Payment" has the meaning assigned to it in Section 9.15(a).

"Erroneous Payment Deficiency Assignment" has the meaning assigned to it in Section 9.15(d)(i).

"Erroneous Payment Impacted Class" has the meaning assigned to it in Section 9.15(d)(i).

"Erroneous Payment Return Deficiency" has the meaning assigned to it in Section 9.15(d)(i).

"Erroneous Payment Subrogation Rights" has the meaning assigned to it in Section 9.15(e).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Account" shall mean any Deposit Account or Securities Account that (a) is solely used for the purpose of (x) making payroll and withholding tax payments related thereto and other employee wage and benefits payments and accrued and unpaid employee compensation payments (including salaries, wages, benefits, and expense reimbursements, 401(k) and other retirement plans and employee benefits, including rabbi trusts for deferred compensation and health care benefits), (y) paying taxes, including sales taxes or (z) the Professional Fee Escrow Account (as defined in the applicable Financing Order), or (b) is a fiduciary or trust account or otherwise held exclusively for the benefit of an unaffiliated third party.

"Excluded Collateral" shall have the meaning assigned to such term in Section 13.01.

"Excluded Equity Interests" shall have the meaning assigned to such term in Section 12.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.07(b) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Excluded Subsidiary" means Biotie Therapies GmbH, a German limited liability company, and Acorda Therapeutics Ireland Limited, an Irish company.

"Existing Agreements" means, the Prepetition Notes Documents.

"Exit Fee" has the meaning specified in Section 2.06(b).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or

12

convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"Final DIP Loan Commitment" means, with respect to each Lender holding an Interim DIP Loan Commitment, the commitment of such Lender to make an Final DIP Loan, which commitment is in the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the caption "Final DIP Loan Commitment." The aggregate amount of the Final DIP Loan Commitments on the Closing Date shall be the lesser of (a) $10,000,000 and (b) such amount as approved by the Bankruptcy Court authorizing Final DIP Loan Commitments pursuant to the Final Order.

"Final DIP Loans" has the meaning specified in the Preliminary Statements hereto; provided that such Loans shall be in one or more drawings, but in any event the Final DIP Loans shall not exceed two drawings in aggregate, and shall be in an aggregate principal amount not to exceed the aggregate Final DIP Loan Commitments.

"Final Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court substantially in the form of Interim Order, inter alia, (a) approving on a final basis this Agreement and the other Loan Documents, (b) authorizing the incurrence by the Loan Parties of the post-petition secured indebtedness under this Agreement, (c) approving the payment by the Loan Parties of the fees contemplated by this Agreement and the other Loan Documents, (d) authorizing on a final basis the Loan Parties to use cash collateral (as defined in the Bankruptcy Code), and (b) granting the Prepetition Noteholders certain adequate protection, among other related relief, which order or judgment is in effect and not stayed, and as the same may be amended, supplemented or modified from time to time after entry thereof with the consent of the Required Lenders.

"Final Sale Order" has the meaning set forth in the applicable Financing Order.

"Financial Advisor" means Perella Weinberg Partners, in its capacity as financial advisor to the Lenders and their counsel solely with respect to the Loan Documents.

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"Fiscal Year" means the fiscal year of the Borrower and its Subsidiaries, ending on December 31 of each calendar year.

"Fitch" means Fitch Ratings, Inc. and its successors.

"Foreign Lender" means (a) if the borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is a resident or organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes.

"Foreign Subsidiary" means any direct or indirect Subsidiary of the Borrower organized outside the United States.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time.

"Governmental Authority" means any nation or government, any provincial, state, local, municipal or other political subdivision thereof, and any entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorization" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"Granting Lender" has the meaning specified in Section 10.07(f).

"Guarantee Obligations" means, with respect to any Person, any obligation or arrangement of such Person to guarantee or intended to guarantee any Indebtedness or other payment obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of non-performance by any other party or parties to an agreement or (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof.  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guarantee Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Guarantors" means the has the meaning specified in the Preliminary Statements hereto.

"Hazardous Materials" means any material, substance or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous",

"toxic", a "pollutant", a "contaminant", a "deleterious substance", "dangerous goods", "radioactive" or words of similar meaning or effect, including petroleum and its by-products, asbestos, polychlorinated biphenyls, radon, greenhouse gases, mold, urea formaldehyde insulation, chlorofluorocarbons and all other ozone-depleting substances.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding in each case (i) accounts payable and other accrued liabilities incurred in the ordinary course of business not past due for more than ninety (90) days after its stated due date (except for accounts payable contested in good faith), (ii) any earn-out obligation until such obligation is both required to be reflected as a liability on the balance sheet of such Person in accordance with GAAP and not paid after becoming due and payable and (iii) deferred or equity compensation arrangements entered into in the ordinary course of business and payable to directors, officers or employees), (e) all Indebtedness (excluding prepaid interest thereon) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed but, in the case of Indebtedness which is not assumed by such Person, limited to the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, (f) all Attributable Indebtedness of such Person, (g) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty (excluding the portion thereof that has been fully cash collateralized in a manner permitted by this Agreement), (h) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, surety bonds and performance bonds, whether or not matured, (i) all obligations of such Person in respect of Disqualified Equity Interests and (j) all guarantees by such Person in respect of any of the foregoing.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  Anything herein to the contrary notwithstanding, obligations in respect of any Indebtedness that has been irrevocably defeased (either covenant or legal) or satisfied and discharged pursuant to the terms of the instrument creating or governing such Indebtedness shall not constitute Indebtedness.

"Indemnified Liabilities" has the meaning specified in Section 10.05(a).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.05(a).

"Information" has the meaning specified in Section 10.08.

"Initial Approved Budget" means the "Initial Approved Budget" as defined in the Financing Orders.

"Intellectual Property" has the meaning specified in Section 5.17.

"Interim DIP Loan Commitment" means, with respect to each Lender holding an Interim DIP Loan Commitment, the commitment of such Lender to make an Interim DIP Loan, which commitment is in the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the caption "Interim DIP Loan Commitment." The aggregate amount of the Interim DIP Loan Commitments on the Closing Date shall be the lesser of (a) $10,000,000 and (b) such amount as approved by the Bankruptcy Court authorizing Interim DIP Loan Commitments pursuant to the Interim Order.

"Interim DIP Loans" has the meaning specified in the Preliminary Statements hereto; provided that such Loans shall be made on the Closing Date, and shall be in an aggregate principal amount not to exceed the aggregate Interim DIP Loan Commitments.

"IP Agreements" shall mean all Copyright Licenses, Patent Licenses, Trademark Licenses, and all other material agreements relating to the license, development, use or disclosure of any Intellectual Property to which a Pledgor, now or hereafter, is a party or beneficiary, including, without limitation, the agreements set forth on Schedule 5.17 hereto.

"Interest Payment Date" means the last Business Day of each calendar month, commencing April 30, 2024, and the Maturity Date.

"Interest Period" means, with respect to each Loan, a period commencing on the date of the making of such Loan and ending one month thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(d) below) to the next succeeding Business Day, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is one month after the date on which the Interest Period began, as applicable, and (d) the Borrower may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Chapter 11 Case substantially in the form of Exhibit G, inter alia, (a) authorizing, on an interim basis, the Loan Parties to use cash collateral (as defined in the Bankruptcy Code), and (b) granting the Prepetition Noteholders certain adequate protection, among other related relief, which order or judgment is in effect and not stayed, and as the same may be amended, supplemented or modified from time to time after entry thereof with the consent of the Required Lenders.

"Investment" in any Person, means any loan or advance to such Person, any purchase or other acquisition of any voting Equity Interests or other Equity Interests or

16

Indebtedness or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all international, foreign, federal, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" means any Lender that may be a party to this Agreement from time to time, including its successors and assigns as permitted hereunder (each of which is referred to herein as a "Lender").

"Lien" means any assignment, mortgage, charge, pledge, lien, encumbrance, title retention agreement (including Capital Leases but excluding operating leases) or any other security interest whatsoever, howsoever created or arising, whether fixed or floating, legal or equitable, perfected or not, but specifically excludes any legal, contractual or equitable right of set-off.

"Loan" means an extension of credit by a Lender to the Borrower under Article II, which shall include (a) the Interim DIP Loans, (b) the Final DIP Loans and (c) following the Roll-Up Effective Time, the deemed extensions of credit under Section 2.02(d) in the form of Roll-Up Loans, and "Loan" means any of such Loans.

"Loan Documents" means, collectively, (i) the Collateral Documents, (ii) the Notes, (iii) any agency fee letter entered into between the Borrower and the Agent in connection with this Agreement and the other Loan Documents, (v) the Financing Orders and (vi) all other instruments and documents delivered from time to time by or on behalf of the Borrower or any of its Subsidiaries in connection herewith or therewith.

"Loan Parties" or "Loan Party" means, collectively or individually as the context may require, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, assets, liabilities (actual or contingent), financial condition of the Borrower and its Subsidiaries, taken as a whole, except as a result of (i) the commencement of the Chapter 11 Case or the events and conditions related and/or leading up thereto, (ii) the effects that customarily result from the commencement of a Chapter 11 Case (including the issuance of the Financing Orders), or (iii) any defaults under agreements as a result of the commencement of the Chapter 11 Case that have no effect under the terms of the Bankruptcy Code; (b) a material impairment of the ability of any Loan Party or its Subsidiaries to perform its obligations under any Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party; or (d) a material impairment of the Agent's or the Lenders' ability to enforce the Obligations or realize upon the Collateral.

17

"<u>Material Contracts</u>" means any Contractual Obligation of any Loan Party the failure to comply with which, or the termination (without contemporaneous replacement) of which, could reasonably be expected to have a Material Adverse Effect or otherwise result in liabilities in excess of $500,000.

"<u>Maturity Date</u>" means, the earliest to occur of (i) the date that is one hundred and eighty (180) calendar days after the Petition Date, (ii) if the Final Order has not been entered, twenty nine (29) calendar days after the Petition Date, (iii) the acceleration of the Loans and the termination of the Commitments upon the occurrence, and during the continuance of an Event of Default, (iv) the effective date of any Chapter 11 plan, (v) the date the Bankruptcy Court converts any of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Case, (vii) the date of the entry of the Final Sale Order by the Bankruptcy Court, (viii) the Final Sale Order and (ix) the date an order is entered in any bankruptcy case appointing a Chapter 11 trustee or examiner.

"<u>Milestone</u>" has the meaning assigned to such term in the then applicable Financing Order.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and its successors.

"<u>Multiemployer Plan</u>" means a multiemployer plan, as defined in <u>Section 4001(a)(3)</u> of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"<u>Net Cash Proceeds</u>" means:

(a)     with respect to the Disposition of any asset by any Loan Party or any Casualty Event the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of its Subsidiaries) over (ii) the sum of (A) the principal amount of any Indebtedness permitted by this Agreement that is secured by a lien (other than a Lien on the Collateral that is subordinated or junior to the Liens securing the Obligations) by the asset subject to such Disposition or Casualty Event and that is repaid (and is timely repaid) in connection therewith (other than Indebtedness under the Loan Documents), (B) the reasonable out-of-pocket expenses actually incurred and paid by the Borrower or any of its Subsidiaries in connection with such Disposition or Casualty Event (including, reasonable and documented attorney's, accountant's and other similar professional advisor's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant, and other customary fees) to third parties (other than the Loan Parties or any of their

Affiliates), (C) taxes paid or reasonably estimated to be actually payable or that are actually accrued in connection therewith with respect to the current tax year as a result of any gain recognized in connection therewith by such Person or any of the direct or indirect stockholders thereof and attributable to such Disposition or Casualty Event; provided that, if the amount of any estimated taxes pursuant to this subclause (C) exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Cash Proceeds and (D) any reasonable reserve actually maintained in respect of (x) the sale price of such asset or assets established in accordance with GAAP, and (y) any liabilities associated with such asset or assets and retained by the Borrower or any of its Subsidiaries after such sale or other Disposition thereof, including pension and other post-employment benefit liabilities and liabilities related against any indemnification obligations associated with such transaction and it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents (1) received upon the Disposition of any non-cash consideration received by such Person in any such Disposition, and (2) received upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in subclause (D) above or, if such liabilities have not been satisfied in cash and such reserve not reversed within two years after such Disposition or Casualty Event, the amount of such reserve, in each case of subclauses (A) through (D) above, to the extent approved by the Bankruptcy Court (if such approval is necessary pursuant to the Bankruptcy Code); and

(b)     with respect to the incurrence or issuance of any Indebtedness by the Borrower or any of its Subsidiaries not permitted under Section 7.03, the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance over (ii) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses (including reasonable attorney's, accountant's and other similar professional advisor's fees), incurred by such Loan Party in connection with such incurrence or issuance to third parties (other than the Loan Parties or any of their Affiliates), in the case of the foregoing clause (ii), to the extent approved by the Bankruptcy Court (if such approval is necessary pursuant to the Bankruptcy Code)

"New Money DIP Facility" has the meaning assigned to such term in the recitals to this Agreement.

"New Money DIP Loans" has the meaning assigned to such term in the recitals to this Agreement.

"New York UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "New York UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

"Non-Consenting Lender" has the meaning specified in Section 3.07(c).

"Note" means a promissory note of the Borrower payable to a Lender or its assigns, substantially in the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower owing to such Lender resulting from the Loans made by such Lender.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include the obligation (including Guarantee Obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees (including pursuant to the Agent Fee Letter), Attorney Costs, any Loan Party's obligations to pay, discharge and satisfy subrogation rights in connection with any the Erroneous Payment Subrogation Rights, indemnities, and other amounts payable by any Loan Party under any Loan Document.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate and/or articles of formation, incorporation, association or organization and, if applicable, operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, declaration, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07(b)).

"Participant" has the meaning specified in Section 10.07(d).

"Participant Register" has the meaning specified in Section 10.07(d).

"Patent License" shall mean any written agreement, now or hereafter in effect, granting to any Pledgor any right under any Patent, now or hereafter owned by any other person

(including, without limitation, any such rights that such Pledgor has the right to license) and all rights of any Pledgor under any such agreement.

"Patent Security Agreement" means any Patent Security Agreement, in form and substance satisfactory to Required Lenders.

"Patents" shall mean all of the following which any Pledgor now or hereafter owns or in which any Pledgor now or hereafter has an interest (pursuant to a Patent License or otherwise): (a) all letters patent of the United States or the equivalent thereof in any other country or jurisdiction, including those listed on Schedule 5.17, and all applications for letters patent of the United States or the equivalent thereof in any other country or jurisdiction, including those listed on Schedule 5.17, (b) all provisionals, reissues, extensions, continuations, divisions, continuations-in-part, reexaminations or revisions thereof, and the inventions disclosed or claimed therein, including the right to make, use, import, offer for sale and/or sell the inventions or designs disclosed or claimed therein, (c) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past or future infringement thereof.

"Payment Recipient" has the meaning assigned in Section 9.15(a).

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor thereof).

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time since January 1, 2003.

"Permitted Liens" has the meaning specified in Section 7.01.

"Permitted Variances" means the "Permitted Variances" as defined in the Financing Orders.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"Petition Date" has the meaning specified in the Preliminary Statements hereto.

"PIK Interest" has the meaning set forth in Section 2.05(a).

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning specified in Section 10.02(e).

"Pledged Collateral" shall have the meaning assigned to such term in Section 12.01.

"Pledged Debt Securities" shall have the meaning assigned to such term in Section 12.01.

"Pledged Equity Interests" shall have the meaning assigned to such term in Section 12.01.

"Pledged Securities" shall mean any promissory notes, stock certificates or other certificated securities now or hereafter included in the Pledged Collateral, including all certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"Pledgor" shall mean the Borrower and each Subsidiary Loan Party.

"Prepayment Notice" means a notice of prepayment in respect of any voluntary or mandatory prepayment in substantially the form of Exhibit A-2.

"Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitment of such Lender at such time and the denominator of which is the amount of the Aggregate Commitments at such time; provided that if the Aggregate Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the outstanding principal amount of the Loans held by such Lender divided by the aggregate principal amount of all outstanding Loans held by all Lenders.

"Proceeding" has the meaning specified in Section 10.05(a).

"Professional Persons" means professionals or professional firms retained by the Debtors, Lenders and any official committee of creditors.

"Public Lender" has the meaning specified in Section 10.02(h).

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Recipient" means the Agent or any Lender, as applicable.

"Register" has the meaning specified in Section 10.07(c).

"Registered" means, with respect to Intellectual Property, issued by, registered with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leeching or migration of any Hazardous Material in or into the environment (including the abandonment or disposal of any barrels, tanks, containers or receptacles containing any Hazardous Material), or out of any vessel or facility, including the movement of any Hazardous Material through the air, soil, subsoil, surface, water, ground water, rock formation or otherwise.

"Reportable Event" means with respect to any Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived that could reasonably be expected to result in a material liability for a Loan Party.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the aggregate principal amount of all outstanding Loans and unused Commitments at such time. provided that the unused Commitments of, and the portion of the Aggregate Commitments held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lender.

"Requirement of Law" means, as to any Person, any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction or settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or, except for purposes of Sections 6.02 or 6.03, any other similar officer or a Person performing similar functions of a Loan Party (and, as to any document delivered on the Closing Date, to the extent permitted or required by the terms of this Agreement, any secretary or assistant secretary of a Loan Party).  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any:

(a)      dividend or other distribution (whether in cash, securities or other property) or any payment (whether in cash, securities or other property), in each case, with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, including any sinking fund or similar deposit, on account of the purchase, retraction, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof and including any thereof acquired through the exercise of warrants or rights of conversion, exchange or purchase); and

(b)      payment of any management or similar type fees by a Loan Party or its Subsidiary to any Affiliate thereof.

"Restricting Information" has the meaning assigned to such term in Section 10.02(i).

"Restructuring Support Agreement" means the Restructuring Support Agreement dated as of April [1], 2024, by and among [_____].

"Roll-Up DIP Facility" has the meaning assigned to such term in the recitals to this Agreement.

"Roll-Up Effective Time" means, as applicable, the moment in time with respect to the Roll-Up Financing, immediately following the entry of the Final Order by the Bankruptcy Court approving the roll-up of the Prepetition Secured Obligations as contemplated therein and herein.

"Roll-Up Lender" means each Person listed on Schedule 2.02(d) (as updated by the Administrative Agent from time to time on or prior to the Roll-Up Effective Time in accordance with the terms of the Final Order, as set forth in Section 2.02(d)) and any other Person that shall become a party to this Agreement as a Roll-Up Lender pursuant to an Assignment and Assumption with respect to a Roll-Up Loan, other than any Person that ceases to be a party hereto as a Lender pursuant to an Assignment and Assumption.

"Roll-Up Loan Amount" means, with respect to a Roll-Up Lender, the percentage of the Roll-Up Loans allocated to such Roll-Up Lender as set forth opposite such Roll-Up Lender's name on Schedule 2.02(d) under the heading "Roll-Up Loan Amount" (as updated by the Administrative Agent from time to time on or prior to the Roll-Up Effective Time in accordance with the terms of Final Order, as set forth in Section 2.02(d)).

"Roll-Up Loans" has the meaning assigned thereto in Section 2.02(d).

"S&P" means Standard & Poor's Ratings Services LLC, a Standard & Poor's Financial Services LLC business, and its successors.

"Sale Leaseback" means any transaction or series of related transactions pursuant to which the Borrower or any of its Subsidiaries (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed.

"Sanctions" means economic or financial sanctions or trade embargos imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, Canada, any European Union member state, His Majesty's Treasury of the United Kingdom or the Swiss State Secretariat for Economic Affairs SECO and the Swiss Directorate of International Law.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any comprehensive Sanctions (at the time of this Agreement, the so-called

Donetsk People's Republic, the so- called Luhansk People's Republic, the Crimea Region of Ukraine, Zaporizhzhia and Kherson Regions of Ukraine, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means any individual or entity, at any time, that is the subject or target or Sanctions, including (a) any individual or entity listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union, Canada, any Member State of the European Union, the United Kingdom or Switzerland, (b) any individual or entity operating, organized or resident in a Sanctioned Country or (c) any entity that is, in the aggregate, 50 percent or greater owned, directly or indirectly or otherwise, or where relevant under Sanctions, controlled by any such person or entity described in clause (a).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, (a) the Lenders, (b) the Agent, (c) each Supplemental Agent, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (d) the successors and permitted assigns of each of the foregoing.

"Security Interest" shall have the meaning assigned to such term in Section 13.01.

"SPC" has the meaning specified in Section 10.07(f).

"Subsidiary" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means (a) each Subsidiary of the Borrower, including each Subsidiary listed under the heading "Subsidiary Guarantors" on Schedule 2, and (b) each other Subsidiary that becomes a Guarantor pursuant to a Supplement or other documentation in form and substance reasonably satisfactory to the Required Lenders, provided that in no event shall any Excluded Subsidiary be a Subsidiary Guarantor.

"Subsidiary Loan Party" shall include each Subsidiary of Borrower identified on Schedule 2 hereto and any other person that is required to become a Subsidiary Guarantor pursuant to the Credit Agreement.

"Supplement" means a Supplement to this Agreement, in form and substance satisfactory to Required Lenders.

"Supplemental Agent" has the meaning specified in Section 9.13(a) and "Supplemental Agents" shall have the corresponding meaning.

"Supplemental Approved Budget" means the "Supplemental Approved Budget" as defined in the Financing Orders.

"Swiss Limitation" has the meaning given to that term in paragraph (a) of Section 10.22.

"Swiss Loan Party" means any Loan Party incorporated in Switzerland.

"Swiss Restricted Obligations" has the meaning given to that term in paragraph (a) of Section 10.22.

"Swiss Withholding Tax" means any Taxes levied pursuant to the Swiss Federal Act on Withholding Tax (*Bundesgesetz über die Verrechnungssteuer vom 13. Oktober 1965, SR 642.21*), together with the related ordinances, regulations and guidelines, all as amended and applicable from time to time.

"Taxes" means any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, stamp taxes, withholdings (including backup withholding) or other charges imposed by any Governmental Authority (including additions to tax, penalties and interest with respect thereto).

"Termination of the DIP Financing" means, collectively, the termination of all Lenders' Commitments and payment in full in cash of all Obligations (other than Unasserted Contingent Obligations).

"Threshold Amount" means $1,000,000.

"Ticking Fee" has the meaning specified in Section 2.06(c).

"Trade Date" has the meaning specified in Section 10.07(h).

"Trademark License" shall mean any written agreement, now or hereafter in effect, granting to any Pledgor any right under any Trademark now or hereafter owned by any third party (including, without limitation, any such rights that such Pledgor has the right to license).

"Trademark Security Agreement" means any Trademark Security Agreement, in form and substance satisfactory to Required Lenders.

"Trademarks" shall mean all of the following which any Pledgor now or hereafter owns or in which any Pledgor now or hereafter has an interest (pursuant to a Trademark License or otherwise): (a) all trademarks, service marks, trade names, brand names, domain names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof (if any), and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State

of the United States or any other country or any political subdivision thereof (except for "intent-to-use" applications for trademark or service mark registrations filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, unless and until an Amendment to Allege Use or a Statement of Use under Sections 1(c) and 1(d) of the Lanham Act has been filed and accepted, to the extent that, and solely during the period for which, any assignment of an "intent-to-use" application prior to such filing and acceptance would violate the Lanham Act), and all renewals thereof, including those listed on Schedule 5.17, (b) all goodwill associated therewith or symbolized thereby, (c) all claims for, and rights to sue for, past or future infringements of any of the foregoing and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past or future infringement thereof.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Uniform Commercial Code" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any security interest in any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(g)(ii)(B)(3).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same may be amended, supplemented, modified, replaced or otherwise in effect from time to time.

"Unasserted Contingent Obligations" means, at any time, any contingent indemnification and reimbursement obligations that are not yet due and payable and for which no claim has been asserted as of such time.

"Wholly-owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly-owned Subsidiaries of such Person.

"<u>Withdrawal Liability</u>" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Withholding Agent</u>" means any Loan Party and the Administrative Agent.

"<u>Write-Down and Conversion Powers</u>" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    <u>Other Interpretive Provisions</u>.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, paragraph, clause, subclause, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(h)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine or neuter forms.

Section 1.03   <u>Accounting Terms</u>.  (a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP consistently applied, except as otherwise specifically prescribed herein; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent in writing that the Borrower requests an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then the Lenders and the Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and the Borrower after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, (i) the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred and (ii) the Borrower shall provide to the Administrative Agent and the Lenders a written reconciliation in form and substance reasonably satisfactory to the Required Lenders, between calculations of any baskets and other requirements hereunder before and after giving effect to such Accounting Change.

(b)   Where reference is made to a Person "and its Subsidiaries on a consolidated basis" or similar language, such consolidation shall not include any subsidiaries other than Subsidiaries.

Section 1.04   <u>References to Agreements, Laws, Etc.</u>  Unless otherwise expressly provided herein, (a) references to documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.05   <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06   <u>Timing of Payment or Performance</u>.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.07   <u>UCC Terms</u>. The following terms shall have the respective meanings provided for in the Uniform Commercial Code as in effect from time to time in the State of New York: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights",

"Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Securities Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

Section 1.08    Swiss Terms. In this Agreement with respect to a Swiss Loan Party, a reference to:

(a)    receiver, administrative receiver, administrator, trustee in bankruptcy, custodian, conservator, liquidator, receiver manager, compulsory manager, monitor or similar officer refers to any (i) *Sachwalter* appointed in accordance with the Swiss Code of Obligations (*Schweizerisches Obligationenrecht*; SR 220, "Swiss Code of Obligations"), (ii) *Liquidator* appointed in accordance with the Swiss Code of Obligations and (iii) *Konkursamt, Konkursverwaltung* or *Sanierunsbeauftragter* (including a supervisory authority acting in any such capacity) or any of its officials or employees, any *Liquidator* or *Sachwalter* or other officer appointed in accordance with the Swiss Federal Act on Debt Enforcement and Bankruptcy (*Bundesgesetz über Schuldbetreibung und Konkurs*; SR 281.1, "Swiss Federal Act on Debt Enforcement and Bankruptcy").

(b)    a liquidation, winding-up, administration, dissolution, bankruptcy, liquidation, composition with creditors or moratorium refers to (i) a filing for the declaration of bankruptcy (*Antrag auf Konkurseröffnung*) or a formal declaration of bankruptcy (*Konkurseröffnung*) within the meaning of the Swiss Federal Act on Debt Enforcement and Bankrupt, (ii) the filing for a request for a moratorium (*Gesuch um Nachlassstundung*) or a grant of a moratorium (*provisorische oder definitive Nachlassstundung/Stundung/Notstundung/Fälligkeitsaufschub*) or protective measures (*Schutzmassnahmen/sichernde Massnahmen*) within the meaning of the Swiss Federal Act on Debt Enforcement and Bankruptcy, (iii) a moratorium on any of its indebtedness, its dissolution or liquidation and (iv) the notification of the court of over-indebtedness pursuant to article 725b paragraph 3 of the Swiss Code of Obligations.

(c)    a person being unable to pay its debts refers to that person being in a state of inability to make payments (*Zahlungsunfähigkeit*) and being over-indebted (*Überschuldung*).

(d)    a director or a manager refers to in relation to a company limited by shares (*Aktiengesellschaft*) a member of the board of directors (*Verwaltungsrat*) or a member of the executive management (*Geschäftsleitung*).

## ARTICLE II

## THE COMMITMENTS AND THE LOANS

Section 2.01    The Commitments and the Loans.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make (or cause its Applicable Lending Office to make) to the Borrower, from time to time on and after the Closing Date and until the Commitment Expiration Date, term loans in one or more drawings in an aggregate principal amount not to exceed such Lender's Commitment; provided that the Loans made by all Lenders under this Section 2.01 shall not exceed in the aggregate the lesser of (i) the Aggregate Commitments and (ii) the maximum amount authorized by the Final Order. The Commitment of each Lender shall

be reduced by the amount of any funding thereunder and shall be terminated on the Commitment Expiration Date. Amounts paid or prepaid in respect of the Loans may not be reborrowed. Subject to Section 6.19, the proceeds of all Loans shall remain in a bank account maintained by the Borrower that is subject to a control agreement in favor of the Administrative Agent (for the benefit of the Secured Parties) until such proceeds are used in accordance with Section 6.12.

Section 2.02   Borrowings of Loans.  (a) Each borrowing of Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent of such borrowing.  Each such notice must be received by the Administrative Agent not later than 12:00 noon (New York, New York time) four (4) Business Days prior to the requested date of any borrowing of Loans in the form of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each borrowing of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $5,000,000 in excess thereof.   Each Committed Loan Notice shall specify, as applicable, (i) the requested date of the borrowing (which shall be a Business Day), (ii) the principal amount of Loans to be borrowed (iii) the principal amount of Loans to be borrowed and (iv) the location and number of the relevant Borrower's account or any other designated account(s) to which funds are to be disbursed (which may be in the form of a funds flow memorandum). Notwithstanding anything to the contrary contained herein, the Borrower may not submit more than three (3) Committed Loan Notices in connection with borrowings, such Committed Loan Notices to be delivered (ii) in connection with the initial borrowing on the Closing Date (if any) and (ii) in connection with the borrowings to be made (if any) thereafter in accordance with the terms of this Agreement and the Final Order.

(b)      Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans requested.  In the case of each borrowing, each Lender shall make (or cause its Applicable Lending Office to make) the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. (New York, New York time) on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction or waiver of the applicable conditions set forth in Section 4.02 (or, if such borrowing is the initial borrowing, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)      The failure of any Lender to make the Loan to be made by it as part of any borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any borrowing.

(d)      Effective upon the occurrence of the Roll-Up Effective Time, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Final Order, a portion of the Prepetition Secured Obligations owing to the Prepetition Noteholders at the Roll-Up Effective Time shall, on a pro rata basis as among each Roll-Up Lender in respect of its Roll-Up Loan Amount, be substituted and exchanged for (and deemed prepaid by) and deemed to be Loans hereunder held by (and owing by the Borrowers to) each Roll-Up Lender in an aggregate principal amount for such Roll-Up Lender equal to

31

such Roll-Up Lender's Roll-Up Loan Amount (collectively, the "Roll-Up Loans"); provided that, for the avoidance of doubt, such Roll-Up Loans shall be secured by a perfected lien and security interest on all Collateral unless otherwise provided for under the Loan Documents. Subject to the terms and conditions set forth herein and in the Final Order, on the Roll-Up Effective Time, each Roll-Up Lender's Roll-Up Loans shall, from and after such date, be designated as such and administered hereunder. For the avoidance of doubt, each Roll-Up Lender acknowledges and agrees that by accepting the benefits of this Agreement, on the Roll-Up Effective Time, each Prepetition Noteholder rolling up Prepetition Secured Obligations under this Agreement shall, to the extent such Roll-up Lender has not executed a signature page to this Agreement on the Closing Date, become a party to this Agreement as a Roll-Up Lender hereunder by executing and delivering a joinder to this Agreement. Amounts of Roll-Up Loans that are issued or deemed issued under this Section 2.02(d) that are repaid or prepaid may not be reborrowed. At the Roll-Up Effective Time, the Administrative Agent shall update Schedule 2.02(d) in accordance with the terms of the Final Order, as applicable, to reflect each Roll-Up Lender's Roll-Up Loan Amount (which Roll-Up Loan Amount shall be conclusive absent manifest error) and deliver such updated Schedule 2.02(d) to the Borrower and the Roll-Up Lenders, whereupon such updated Schedule 2.02(d) shall constitute Schedule 2.02(d) for all purposes hereunder. Notwithstanding anything in this Agreement, including Schedule 2.02(d) as in effect from time to time, or any other Loan Document to the contrary, (a) the aggregate principal amount of each Roll-Up Lender's Roll-Up Loans shall not exceed such Roll-Up Lender's Roll-Up Loan Amount and (b) the aggregate principal amount of all Roll-Up Loans of all Roll-Up Lenders shall not exceed $40,0000,000 at any time. To the extent that there is a successful challenge to any Prepetition Secured Obligations that are converted into the Roll-Up Loans, (i) the Roll-Up Loans shall be automatically unwound and deemed null and void in an equivalent amount and (ii) notwithstanding anything to the contrary in this Section 2.02(d), the Prepetition Secured Obligations that previously were deemed "Roll-Up Loans" shall be reinstated and constitute outstanding Prepetition Secured Obligations under the Prepetition Indenture on the same terms and priorities as if the Roll-Up Loans never occurred. Notwithstanding anything to the contrary set forth herein, upon the Required Lenders' consent the outstanding principal amount of Roll-Up Loans and any accrued and unpaid interest thereon may be subject to a different treatment, including pursuant to a plan of reorganization filed in the Chapter 11 Case.

Section 2.03   Prepayments. (a) Optional Prepayments. The Borrower may, upon delivery of a Prepayment Notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans, in whole or in part subject to payment of the Exit Fee at the time of such prepayment; provided that (1) such notice must be received by the Administrative Agent not later than 12:00 noon (New York, New York time) two (2) Business Days prior to any date of prepayment of Loans; and (2) any prepayment of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding, in each case, with accrued and unpaid interest on the Loans to be repaid. Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Each prepayment of Loans pursuant to this Section 2.03(a) shall be paid to the Lenders in accordance with their respective Pro Rata Shares.

(b)     Mandatory Prepayments.

(i) If the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any Disposition (other than any Disposition permitted under Section 7.05 (c), (d), (e) or (f), the Borrower shall, subject to Section 2.03(c), cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds. If the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any Casualty Event, the Borrower shall, subject to Section 2.03(c), cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds.

(ii)     If the Borrower or any of its Subsidiaries incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds.

(b)     If the Borrower or any of its Subsidiaries receives any Net Cash Proceeds from any issuance of Equity Interests (including capital contributions), the Borrower shall cause to be prepaid an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom as promptly as reasonably practicable, but in any event, prior to the date which is three (3) Business Days after the receipt of such Net Cash Proceeds.

(iv)     The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clauses (i) through (iv) of this Section 2.03(b) at least two (2) Business Days prior to the date of such prepayment pursuant to a Prepayment Notice.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment.  The Administrative Agent will promptly notify each Lender of the contents of the Borrower's Prepayment Notice and of such Lender's Pro Rata Share of the prepayment, in each case, with accrued and unpaid interest on the Loans to be repaid and the Exit Fee with respect to such Loans.

(c)     Restrictions.   Notwithstanding the foregoing, to the extent any or all of the Net Cash Proceeds of any Disposition by, or Casualty Event of, a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.03(b) is prohibited or delayed by any applicable local Requirements of Law from being repatriated to the Borrower including through the repayment of intercompany Indebtedness (each, a "Repatriation"; with "Repatriated" having a correlative meaning) (Borrower hereby agreeing to use reasonable efforts to cause the applicable Foreign Subsidiary to take promptly all actions reasonably required by such Requirements of Law to permit such Repatriation), or if the Borrower has determined in good faith that Repatriation of any such amount would reasonably be expected to have material adverse tax or legal consequences with respect to its Subsidiaries, after taking into account any foreign tax credit or benefit actually

33

received in connection with such Repatriation, the portion of such Net Cash Proceeds so affected (such amount, the "Excluded Prepayment Amount") will not be required to be applied to prepay Loans at the times as provided in this Section 2.03; provided, that if and to the extent any such Repatriation ceases to be prohibited or delayed by applicable local Requirements of Law at any time immediately following the date on which the applicable mandatory prepayment pursuant to this Section 2.03(c) was required to be made, the Borrower shall reasonably promptly repatriate, or cause to be repatriated, an amount equal to such portion of the Excluded Prepayment Amount, and the Borrower shall reasonably promptly pay such portion of the Excluded Prepayment Amount to the Lenders, which payment shall be applied in accordance with this Section 2.03.  For the avoidance of doubt, the non-application of any Excluded Prepayment Amount pursuant to this Section 2.03(c) if such Repatriation ceases to be prohibited or delayed shall constitute a Default or an Event of Default.

(d)     Interest.  All prepayments under this Section 2.03 shall be accompanied by all accrued interest thereon.

Section 2.04   Repayment of Loans.  The Borrower shall repay in cash on the Maturity Date to the Administrative Agent (for the ratable account of the Lenders) the aggregate principal amount of all Loans, together with all accrued and capitalized interest (including interest paid in kind) and fees thereon (including the Exit Fee and all other outstanding Obligations), outstanding on such date.

Section 2.05   Interest (a) Subject to the provisions of Section 2.05(b), each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate. The accrued interest shall be due and payable in kind on each Interest Payment Date. Notwithstanding the foregoing or anything to the contrary contained herein, on each date on which interest is to be paid in accordance with this Section 2.05, such interest shall be paid in kind on each such date by capitalizing and adding such interest to the then outstanding principal balance of each Loan ("PIK Interest") and any interest to be so capitalized pursuant to this clause (a) shall be capitalized on the relevant date provided for payment herein and added to the then-outstanding principal amount of the applicable Loans so as to increase the principal balance of such Loan, which principal amount shall be payable when the principal amount of such Loans is payable in accordance with Section 2.06. For purposes of this Agreement and the other Loan Documents, from the date so capitalized, PIK Interest capitalized pursuant to this Section 2.05 shall bear interest in accordance with this Section 2.05 as if it had originally been part of the outstanding principal amount of the applicable Loans and all references herein or in any other Loan Document to the principal amount of the applicable Loans shall include PIK Interest. For avoidance of doubt, interest at the Default Rate shall not be PIK Interest.

(b)     Commencing upon the occurrence and during the continuance of any Event of Default, the Borrower shall pay interest on (i) the principal amount of the Loans and (ii) to the extent then due and payable all other outstanding Obligations hereunder, in each case under clauses (i) and (ii), at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest to the fullest extent permitted by applicable Laws) shall be due and payable upon demand in cash.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto in accordance with Section 2.05(a) and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after any judgment. Interest shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans.

(d)     The basis for determining the rate of interest with respect to any Loan, and the Interest Period, shall be as set forth herein and notified to Administrative Agent and Lenders pursuant to any Committed Loan Notice.

Section 2.06   Fees.

(a)     Commitment Fee.  The Borrower shall pay to each Lender on the Closing Date a commitment fee (the "Commitment Fee") equal to 2.00% of the sum of the (x) Interim DIP Loan Commitments and (y) Final DIP Loan Commitments, in each case of such Lender as of the Closing Date. The Commitment Fee of each Lender shall be fully earned and due on the Closing Date and, shall be paid in kind and capitalized to the balance sheet of the Borrower upon the entry of the Final Order. For the avoidance of doubt, no Commitment Fee shall be earned or payable on the Roll-Up Loans.

(b)     Exit Fee. The Borrower shall pay in cash to each Lender, on the earlier of (i) the date of repayment of all or a portion of any Loans and (ii) the Maturity Date, for the account of each Lender, an exit fee (the "Exit Fee") equal to 2.00% of the aggregate Loans actually advanced hereunder, payable to each Lender ratably based on the amount of Loans actually advanced by such Lender hereunder (whether or not such Lender is a Lender as of the date of the payment of the Exit Fee), subject to reduction in the case of any partial payment of the Exit Fee in connection with any partial repayment of the Loans in accordance with this Agreement. The Exit Fee (x) shall be fully earned on the Closing Date, and (y) once paid shall not be refundable. For the avoidance of doubt, an Exit Fee shall be earned and payable on the Roll-Up Loans.

(c)     Ticking Fee.  The Borrower shall pay to each Lender a ticking fee (the "Ticking Fee") equal to such Lender's Pro Rata Share of the product of (i) 2.00% per annum multiplied by (ii) for each monthly period (or partial period if applicable), the actual daily amount by which the Aggregate Commitment exceeds the aggregate amount of Loans advanced. The Ticking Fee shall be payable monthly in arrears on the last Business Day of each calendar month, commencing April 30, 2024 and shall accrue at all times from and after the execution and delivery of this Agreement through the earlier of: (a) the Commitment Expiration Date and (b) the Termination of the Obligations. The Ticking Fee shall, subject to Section 2.04, be paid in cash and fully earned and due when paid and once paid shall not be refundable for any reason.

(d)     Administration Fee.  The Borrower shall pay to the Lenders or their respective designees on the Closing Date, for the account of each Lender, an administration fee (the "Administration Fee") in the aggregate amount for all such Lenders equal to $50,000, paid ratably to the Lenders based on their Pro Rata Share of the Commitments.  The Administration

Fee shall be paid in cash and fully earned on the Closing Date and once paid shall not be refundable for any reason.

(e)    Agent Fees.  The Borrower shall pay to the Agent, for its own account, the fees set forth in the Agent Fee Letter as between the Borrower and the Agent.

Section 2.07   Computation of Interest and Fees.  All computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on such Loan, or any portion thereof, for the day on which such Loan or such portion is paid; provided that any such Loan that is repaid on the same day on which it is made shall, subject to Section 2.09(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.08   Evidence of Indebtedness.  (a) The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent upon reasonable notice, the Borrower shall execute and deliver to such Lender (directly or through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)    In addition to the accounts and records referred to in Section 2.08(c), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.08(a), and by each Lender in its account or accounts pursuant to Section 2.08(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.09   <u>Payments Generally</u>.  (a) All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office and in immediately available funds not later than 2:00 p.m. (New York, New York time) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. (New York, New York time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)      If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrower by the Agent because the conditions (if any) to the Loan set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and neither the Agent nor any Lender shall be responsible for the failure of any other Lender to make its Loan.

(e)      Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)      Whenever any payment received by the Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Agent and applied by the Agent and the Lenders in the order of priority set forth in <u>Section 8.03</u>.  If the Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the aggregate principal amount of all Loans outstanding at such time.

Section 2.10   <u>Sharing of Payments</u>.  If, other than as expressly provided elsewhere herein (including, without limitation, in <u>Section 10.07</u>), any Lender shall obtain on account of the Loans made by it in excess of its ratable share (or other share contemplated hereunder subject to the priorities set forth herein) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact and (b) purchase from the other Lenders such participations in the Loans made

by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans pro rata with each of them; provided that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.10 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.10 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01   Taxes.

(a)   Defined Terms.  For purposes of this Section 3.01, the term "applicable law" includes FATCA.

(b)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.01(b)) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)   Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)      Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01 (d)) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf, shall be conclusive absent manifest error.

(e)      Indemnification by the Lenders.  Each Lender shall severally indemnify the Agent, for the full amount of any Taxes imposed by any Governmental Authority that are attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), and that are payable or paid by the Agent, together with all interest, penalties, reasonable costs and expenses arising therefrom or with respect thereto, as determined by the Agent in good faith.  Should the applicable Withholding Agent not deduct or withhold any Taxes imposed by FATCA from a payment under any Loan Document based on the documentation provided by a Lender pursuant to Section 3.01(g)(ii), any amounts subsequently determined by a Governmental Authority to be subject to United States Federal withholding Tax imposed pursuant to FATCA (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) shall be indemnified by such Lender.  A certificate as to the amount of such payment or liability delivered to any Lender by the Withholding Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this paragraph (e).

(f)      Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.01, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)      Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  in addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(iv) (A), (B) and (D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material

unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(iv)    Without limiting the generality of the foregoing.

    (A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

    (B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

    (1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN (or W-8BEN-E, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or W-8BEN-E, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

    (2)    executed copies of IRS Form W-8ECI;

    (3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form provided by Administrative Agent and the other Lenders to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN (or W-8BEN-E, as applicable); or

    (4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate substantially in the form provided by

Administrative Agent and the other Lenders, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form provided by Administrative Agent and the other Lenders on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this Section 3.01), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority

with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival. Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02   [Reserved].

Section 3.03   [Reserved].

Section 3.04   Increased Cost and Reduced Return; Capital and Liquidity Requirements.

(a)     Increased Costs Generally. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     <u>Capital Requirements</u>.  If any Lender reasonably determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

(d)     <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 3.04</u> shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.05    [Reserved].

Section 3.06    <u>Matters Applicable to All Requests for Compensation</u>.

(a)     The Agent or any Lender claiming compensation under this <u>Article III</u> shall deliver a <u>certificate</u> to the Borrower setting forth the additional amount or amounts to be paid to it hereunder, which shall be conclusive absent manifest error.  In determining such amount, the Agent or such Lender may use any reasonable averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under Sections 3.01 or 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make Loans or continue to make Loans from one Interest Period to another, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); provided that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     If the obligation of any Lender to make or continue any Loan shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Loan shall be repaid on the last day of the then current Interest Period for such Loan and, unless and until such Lender

gives notice that the circumstances specified in <u>Section 3.01</u> or <u>Section 3.04</u> hereof that gave rise to such conversion no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist).

Section 3.07   <u>Mitigation Obligations; Replacement of Lenders under Certain Circumstances</u>.

(a)   <u>Designation of a Different Applicable Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different Applicable Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.04</u> or <u>Section 3.01</u>, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)   <u>Replacement of Lenders</u>.  If at any time (i) any Lender requests compensation under Section 3.04, (ii) the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 and, in each case, such Lender has declined or is unable to designate a different Applicable Lending Office in accordance with Section 3.07(a), (iii) any Lender is a Non-Consenting Lender, or (iv) any Lender becomes a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender (and such Lender shall be obligated to) to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.04 or Section 3.01) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)   the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 10.07(b)</u>;

(ii)   such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)   in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not conflict with applicable law;

(v)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent; and

(vi)     in connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(c)     In the event that (i) the Borrower or the Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "Non-Consenting Lender".

Section 3.08    Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT TO LOANS

Section 4.01    Conditions to Initial Loans.  The obligation of each Lender to make initial Loans is subject to satisfaction or waiver of the following conditions precedent, except as otherwise agreed between the Borrower, the Administrative Agent and the Required Lenders:

(a)     The Administrative Agent's or the Lenders' (as applicable) receipt of the following, each properly executed by a Responsible Officer of the signing Loan Party, and each in form and substance reasonably satisfactory to the Required Lenders:

(i)     executed counterparts of this Agreement and each other Loan Document by each party thereto;

(ii)     an original Note executed by the Borrower in favor of each Lender that has requested a Note;

(iii)    a Committed Loan Notice relating to the initial Loans; and

(iv)    the certificates, documents, instruments, agreements and deliverables set forth on the Closing Checklist attached hereto as <u>Schedule 1</u>.

(b)    The Administrative Agent and each Lender shall have received the Initial Approved Budget.

(c)    All proceedings commenced in connection with the execution of this Agreement, all other Loan Documents and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related hereto and thereto) shall be satisfactory in all respects to the Administrative Agent and the Required Lenders.

(d)    The Loan Parties shall have commenced the Chapter 11 Case and all of the "first day motions," "first day orders" and all related pleadings entered or to be entered at the time of the Petition Date or shortly thereafter shall have been made available to the Administrative Agent and Lenders in advance, and shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders.

(e)    The Interim Order shall have been entered by the Bankruptcy Court, within five (5) days of the Petition Date (but in any event not later than the Closing Date), which Interim Order shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders and shall have been entered on the docket for the Chapter 11 Case on such prior notice to such parties in accordance with Bankruptcy Rule 4001, and the Administrative Agent and the Lenders (or their respective counsel) shall have received a copy of same, and such order shall be in full force and effect and shall not have been stayed, vacated, revised, rescinded, amended or modified in a manner that is adverse to the Administrative Agent and the Lenders without the prior written consent of the Administrative Agent and the Required Lenders.  The Loan Parties shall be in compliance in all respects with the Interim Order.

(f)    All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, including the Financing Orders, and all other motions and documents filed or to be filed with, and submitted to the Bankruptcy Court in connection therewith, shall be satisfactory in all respects in form and substance to the Administrative Agent and the Required Lenders.

(g)    (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no order shall have been entered permitting a Person to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such orders; <u>provided</u> that this clause (ii) shall not apply to any order that is being contested in good faith by the Loan Parties.

(h)    The Borrower shall have paid all accrued and unpaid costs, fees and expenses (including applicable Attorney Costs (with respect to the reasonable and documented fees and expenses of King & Spalding LLP) and the reasonable and documented out-of-pocket fees and expenses of the Financial Advisor, and any other advisors to the Agent and the Lenders

46

(including pursuant to the Agent Fee Letter)) and any other compensation required to be paid to the Agent and the Lenders on or prior to the Closing Date shall have been received (to the extent an invoice for such costs, fees and expenses has been provided to the Borrower at least three (3) Business Days prior to the Closing Date).

(i)     The Lenders shall have received at least three (3) Business Days on or prior to the Closing Date (or such shorter period as the Lenders may reasonably agree) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations that each Lender reasonably requests, including without limitation the USA PATRIOT Act, to each Lender who has requested the same at least five (5) Business Days prior to the Closing Date, in order to allow the Lenders to comply therewith.

(j)     The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower in substantially the form of Exhibit E certifying as to clauses (a) and (b) of Section 4.02.

(k)     Since the Petition Date, there shall have been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect, except for (i) the commencement of the Chapter 11 Case, (ii) the continuation of the circumstances giving rise to the filing thereof or as a result thereof, and (iii) any defaults under agreements as a result of the commencement of the Chapter 11 Case that have no effect under the terms of the Bankruptcy Code.

(l)     The Restructuring Support Agreement shall have been executed by all parties thereto and shall be in full force and effect.

(m)     The filing of the Chapter 11 Case with the Bankruptcy Court (the date of such filing, the "Petition Date").

(n)     The Chapter 11 Case of the Debtors shall not have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

(o)     The entry into the Loan Documents shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently.

(p)     Pursuant to the Interim Order, the Collateral Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein.

Without limiting the generality of the provisions of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Closing Date specifying its objection thereto.

Section 4.02    Conditions to all Loans.  The obligation of each Lender to make Loans on any date, including on the Closing Date, is subject to satisfaction or waiver of the following conditions

precedent, except as otherwise agreed between the Borrower, the Administrative Agent and the Lenders in accordance with Section 10.01:

(a)    The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of the incurrence of such Loans (before and after giving effect to the incurrence of such Loans); provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b)    No Default or Event of Default shall exist, or would result from the incurrence of such Loans or from the application of the proceeds therefrom.

(c)    The aggregate outstanding amount of Loans after giving effect to such Loan shall not exceed the lesser of (i) the Aggregate Commitments and (ii) the maximum amount authorized by the applicable Financing Order, and each condition to borrowing such Loan in the applicable Financing Order shall have been satisfied.

(d)    The applicable Financing Order shall be in full force and effect, and shall not have been vacated, reversed, rescinded, and an appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective, and without the prior written consent of the Administrative Agent and the Required Lenders, such order shall not have been amended or modified. The Loan Parties shall be in compliance with the applicable Financing Order.

(e)    With respect to any Final DIP Loan, (i) such borrowing shall be in an amount of $5 million, (ii) the projected cash reserve in an Approved Budget for the two weeks following the date of the applicable Final DIP Loan is less than $10,000,000 (excluding any cash held by Biotie Therapies AG in any deposit account or securities account) and (iii) the proceeds of the Final DIP Loan shall be used to make the expenditures set forth in the Approved Budget (subject to the Permitted Variances).

Each Committed Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 4.02(a) through (e) have been satisfied on and as of the date of the applicable Loans.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01    Existence, Qualification and Power; Compliance with Laws. Except as set forth on Schedule 5.01 or, in the case of clause (d), Schedule 5.06, each Loan Party and each of its Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and in good

standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) subject to the entry of the applicable Financing Order and subject to the terms thereof, has all requisite power and authority to (i) own or lease its material assets and carry on its business and (ii) subject to the entry and effectiveness of the applicable Financing Order, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) subject to the entry of the applicable Financing Order and subject to the terms thereof, is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), orders, writs, injunctions (except to the extent failure to comply therewith is permitted by Chapter 11 of the Bankruptcy Code) and orders and (e) subject to the entry of the applicable Financing Order, has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted, except, with respect to the foregoing clauses (c), (d) and (e), to the extent failure to do so would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

Section 5.02    Authorization; No Contravention.  Subject to the entry of the applicable Financing Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the any transactions hereunder, (a) are within such Loan Party's corporate or other powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not and will not (i) contravene the terms of any of such Person's Organization Documents, (ii) except as set forth on Schedule 5.02, conflict with or result in any breach or contravention (except in respect of the Existing Agreements) of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Material Contracts to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, or (iii) violate any material applicable Law.

Section 5.03    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority (except as required under the Bankruptcy Code and applicable state and federal bankruptcy rules) or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Agent (at the direction of the Required Lenders) or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) the approval of the Bankruptcy Court in or pursuant to the applicable Financing Order; and (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect; (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04   <u>Binding Effect</u>.  Subject to the entry of the applicable Financing Order and subject to the terms thereof, this Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Upon entry of the applicable Financing Order, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws at the time in effect affecting the rights of creditors generally and to the effect of general principles of equity whether applied by a court of law or equity.

Section 5.05   <u>No Material Adverse Effect</u>   Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect, except for (i) the commencement of the Chapter 11 Case, (ii) the continuation of the circumstances giving rise to the filing thereof or as a result thereof, or (iii) any defaults under agreements as a result of the commencement of the Chapter 11 Case that have no effect under the terms of the Bankruptcy Code.

Section 5.06   <u>Litigation</u>.  Except for the Chapter 11 Case and claims, actions, suits, investigations, litigation or proceedings stayed by 11 U.S.C. § 362 and set forth on <u>Schedule 5.06</u>, there is no action, suit, investigation, litigation or proceeding affecting any Loan Party or its Subsidiaries, including any Environmental Action, pending or, to the knowledge of any Loan Party, threatened in writing before any Governmental Authority or arbitrator that (i) would be reasonably likely to result in liabilities in excess of the Threshold Amount other than liabilities for which payment is stayed or excused under the Bankruptcy Code or (ii) purports to affect the legality, validity or enforceability of any Loan Document in a way that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.07   <u>Ownership of Property; Liens</u>.  (a) Each Loan Party and its Subsidiaries is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, except for Permitted Liens.

(b)   Each Loan Party and each of its Subsidiaries has good and marketable title in fee simple to (or otherwise holds full legal (and, if applicable, beneficial) ownership under applicable Law), or valid leasehold interests in, or easements or other limited property interests in, all material real property necessary in the ordinary conduct of its business, free and clear of all Liens except for defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by <u>Section 7.01</u> and except where the failure to have such title or other interest would not reasonably be expected to have a Material Adverse Effect.  Set forth as <u>Schedule 5.07(b)</u> hereto is a complete and accurate list of all real property owned by any Loan Party or any of its Subsidiaries, showing, as of the date hereof, the street address, state and any other relevant jurisdiction, record owner and fair market value.  Set forth on <u>Schedule 5.07(b)</u> hereto is a complete and accurate list of all leases of real property under which any Loan Party or any Subsidiary is the tenant, showing as of the date hereof the street address, state and any other relevant jurisdiction, parties thereto, sublessee (if any), expiration date and annual base rental cost thereof.

Section 5.08   <u>Secured, Super-Priority Obligations</u>.   Subject to the entry of the applicable Financing Order, the provisions of the Collateral Documents, taken together with, and subject to

50

the terms of, the applicable Financing Order are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties and any other secured parties identified therein, a legal, valid and enforceable Lien or security interest in all right, title and interest of the Loan Parties in the Collateral and all proceeds thereof with the priority set forth in the applicable Financing Order (and subject to the Carve-Out).  Pursuant to the terms of the applicable Financing Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.

Section 5.09    Environmental Compliance.  Except as set forth on Schedule 5.09 or as would not individually be reasonably expected to result in a liability in excess of the Threshold Amount to the Loan Parties and their Subsidiaries (provided that the aggregate of all such events, circumstances, developments and liabilities could not reasonably be expected to result in a Material Adverse Effect):

(a)    The operations and properties of each Loan Party and each of its Subsidiaries comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that would be reasonably likely to (A) to the knowledge of the Loan Parties, form the basis of an Environmental Action against any Loan Party or any Subsidiary or any of their properties or (B) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law.

(b)    None of the properties currently or, to the knowledge of the Loan Parties, formerly, owned or operated by any Loan Party or any of its Subsidiaries is listed or, to such Loan Party's or each of its Subsidiaries' knowledge, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no, and, to the knowledge of the Loan Parties, never have been, any underground or aboveground storage tanks other than in compliance with applicable Environmental Laws or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or, to the best of its knowledge, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries other than in compliance with applicable Environmental Laws; and other than in compliance with applicable Environmental Laws, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and Hazardous Materials have not been released, discharged or disposed of by any Loan Party or any of its Subsidiaries on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries other than in material compliance with applicable Environmental Laws.

(c)    Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported by or on behalf of any Loan

Party or any of its Subsidiaries to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have, to the knowledge of the Loan Parties, been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any of its Subsidiaries.

(d)     The Borrower and each of its Subsidiaries has obtained all material Environmental Permits required for ownership and operation of its property and business as presently conducted.  Neither the Borrower nor any of its Subsidiaries has received any written notification pursuant to any applicable Environmental Law or otherwise has knowledge that (A) any work, repairs, construction or capital expenditures are required to be made in order to be in or continue to be in compliance with any applicable Environmental Laws or any material Environmental Permit or (B) any Environmental Permit is about to be reviewed, made subject to new limitations or conditions, revoked, withdrawn or terminated.

(e)     Except as would not reasonably be expected to result in a material liability, no Loan Party nor any of its Subsidiaries has contractually assumed any liability or obligation under or relating to any applicable Environmental Law.

(f)     Nothing contained in this Section 5.09 is intended to apply to any action, suit, investigation, litigation or proceeding (including any Environmental Action) relating to exposure to asbestos, in any form, or any asbestos containing materials.

Section 5.10   Taxes.  (a) Each of the Loan Parties and each of their respective Subsidiaries has timely filed all income and all other material Tax returns and reports required to be filed, and have timely paid all Taxes (whether or not shown on such tax returns or reports) and all other amounts of federal, provincial, state, municipal, foreign and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are set forth on Schedule 5.10(a), are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP, or for which payment is stayed or excused pursuant to the Bankruptcy Code.

(a)     Except as set forth on Schedule 5.10(b) or as would not, individually or in the aggregate, be reasonably likely to result in any material liability (including because payment is stayed or excused pursuant to the Bankruptcy Code), (i) there are no claims being asserted in writing with respect to any amounts of Taxes, (ii) there are no presently effective waivers or extensions of statutes in writing with respect to any amounts of Taxes, and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from, the IRS or any other Taxing authority, in each case, with respect to the Loan Parties or any of their respective Subsidiaries.

(c)     Neither the Borrower nor any of its Subsidiaries is party to any Tax sharing agreement other than with an affiliate included in a consolidated or combined Tax return.

Section 5.11   <u>Compliance with ERISA</u>.  (a) Each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws, except as is not, either individually or in the aggregate, reasonably likely to have a Material Adverse Effect.

(b)     Except as is not, either individually or in the aggregate, reasonably likely to have a Material Adverse Effect (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) none of the Loan Parties or any of their Subsidiaries has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under <u>Section 4219</u> of ERISA, would result in such liability) under <u>Section 4201</u> *et seq.* or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) none of the Loan Parties or any of their Subsidiaries or any ERISA Affiliate has engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA.

Section 5.12   <u>Labor Matters</u>.  There are no strikes pending or, to the knowledge of any Loan Party, threatened in writing against the Borrower or any of its Subsidiaries that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  The (i) hours worked and payments made to employees of the Borrower or any of its Subsidiaries have not been in violation in any material respect of the Fair Labor Standards Act or any other applicable law dealing with such matters, except where such violations, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, and (ii) all material payments due from the Borrower or any of its Subsidiaries or for which any claim may be made against the Borrower or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP except for liabilities the payment of which is stayed or excused pursuant to the Bankruptcy Code and except as would not, individually or in the aggregate, be expected to have a Material Adverse Effect.

Section 5.13   <u>Insurance</u>.  The properties of the Loan Parties and their Subsidiaries are insured in the manner contemplated by <u>Section 6.07</u>.

Section 5.14   <u>Subsidiaries; Equity Interests</u>.  As of the date hereof, the Loan Parties do not have any Subsidiaries other than those specifically disclosed in <u>Schedule 5.14</u>, and all of the outstanding Equity Interests in each such Person and each such Subsidiary have been validly issued, are fully paid and non-assessable.  As of the date hereof, <u>Schedule 5.14</u> (a) sets forth the name and ownership interest of each Person that owns any Equity Interests in the direct and indirect Subsidiaries of the Borrower, (b) sets forth the name and jurisdiction of organization of the Borrower and each direct and indirect Subsidiary of the Borrower, (c) sets forth the ownership interest of each direct and indirect Subsidiary of the Borrower, including the percentage of such ownership and (d) sets forth a notation as to whether each such Subsidiary is a debtor in the Chapter 11 Case.

Section 5.15   <u>Margin Regulations; Investment Company Act; Anti-Terrorism Laws; Sanctions and Other Regulations</u>.  (a) None of the Loan Parties or any of their Subsidiaries is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Loans will be used for any purpose that violates Regulation U issued by the FRB.

(b)      None of the Loan Parties or any of their Subsidiaries is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(c)      No Loan Party nor any of its Subsidiaries or to its knowledge any of the respective officers, directors, brokers or agents of such Loan Party or Subsidiary has violated any applicable Anti-Terrorism Law in any material respect.

(d)      No Loan Party, nor any of its Subsidiaries, any of their respective directors, officers or employees, or to the knowledge of the Loan Party, any agent of the Loan Party or any Subsidiary that act in any capacity in connection with the Loans, is (i) a Sanctioned Person, (ii) organized, resident or located in a Sanctioned Country, (iii) in violation of Sanctions, or (iv) engaged in any transactions or dealings with a Sanctioned Person or in a Sanctioned Country; and each Loan Party has instituted and maintains policies and procedures designed to ensure continued compliance by each Loan Party, its Subsidiaries, and their respective directors, officers, employees and agents with Sanctions.

(e)      No Loan Party or any of its Subsidiaries or to its knowledge any of the respective officers, directors, brokers or agents of such Loan Party or Subsidiary acting or benefiting in any capacity in connection with the Loans (i) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (ii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(f)      No Loan Party nor any of its Subsidiaries or any of the respective officers, directors, brokers or agents of such Loan Party or Subsidiary will directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any individual or entity (i) for the purpose of funding, financing, or facilitating any activities, business or transaction of or with a Sanctioned Person, or in any Sanctioned Country, or (ii) in any manner that would result in a violation of Sanctions by any party to this agreement.

(g)      None of the Loan Parties or any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, employee or other person acting on behalf of the Borrower or any of its Subsidiaries has taken any action, directly or indirectly, that would result in a material violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder or any other applicable anti-corruption law (collectively, "Anti-Corruption Laws"); and the Loan Parties have instituted and maintain policies and procedures designed to ensure continued compliance therewith in all material respects.

(h)      None of the Loan Parties or any of its Subsidiaries is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005.

Section 5.16   Disclosure.  No report, financial statement, certificate or other written information furnished by or on behalf of the Borrower or any of its Subsidiaries to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other

information so furnished) when taken as a whole contains when furnished any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided to the extent any information is included in an Approved Budget or constitutes projections or other forward-looking information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.17   Intellectual Property.  As of the date hereof, set forth on Schedule 5.17 and the schedules to the Collateral Documents is a complete and accurate list of all Registered patents, trademarks, service marks, domain names and copyrights, owned by the Borrower or any of its Subsidiaries and all IP Agreements as of such date, showing as of such date the jurisdiction in which each such item of registered Intellectual Property is registered or in which an application is pending and the registration or application number.  The Borrower and each Subsidiary owns or has the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, know-how, technology and other intellectual property recognized under applicable Law (collectively, "Intellectual Property") that are material to the operation of their respective businesses as currently conducted and, to the knowledge of the Loan Parties, except as set forth in the "Disputes or Litigation" section of Schedule 5.17, the use of such Intellectual Property by such Person or the operation of their respective businesses is not infringing upon any Intellectual Property rights held by any other Person and there are no other disputes or litigation proceedings involving such Intellectual Property.

Section 5.18   Initial Approved Budget.  The Initial Approved Budget was prepared in good faith by the management of the Loan Parties, based on assumptions believed by the management of the Loan Parties to be reasonable at the time made and upon information believed by the management of the Loan Parties to have been accurate based upon the information available to the management of the Loan Parties at the time such Initial Approved Budget was furnished (it being understood and agreed that financial projections are not a guarantee of financial performance, actual results may differ from financial projections and such differences may be material and financial projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties).

Section 5.19   EEA Financial Institution.  Neither the Borrower nor any other Loan Party is an EEA Financial Institution.

Section 5.20   Contractual Obligations.  Set forth on Schedule 5.20 hereto are all Material Contracts to which the Loan Parties and their Subsidiaries are party as of the Closing Date.  As of the Closing Date, none of the Loan Parties or their Subsidiaries have knowledge of any events of default under any such Material Contracts.

Section 5.21   Financing Order.

(a)   The Loan Parties are in compliance with the terms and conditions of the applicable Financing Order.

(b)      The applicable Financing Order is in full force and effect and has not been vacated, reversed, rescinded, amended or modified without the prior written consent of the Administrative Agent and the Required Lenders, in their sole discretion and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment outstanding hereunder or any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Section 6.01, Section 6.02 and Section 6.03) cause each Subsidiary to:

Section 6.01   Financial Statements.  Deliver to the Administrative Agent and to each Lender:

(a)      Quarterly and Annual Financial Statements.  (i) As soon as available, but in any event, within forty-five (45) days after the end of each of the first three fiscal quarters of each Fiscal Year of the Borrower (commencing with the first full fiscal quarter ended after the Closing Date), unaudited internally prepared balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related unaudited internally prepared consolidated statements of income or operations and cash flows for such fiscal quarter, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to year-end adjustments, and (ii) as soon as available, but no later than one hundred and twenty (120) days after the last day of Borrower's fiscal year, internally prepared consolidated financial statements of the Borrower for the fiscal year then ended (to be comprised of a consolidated balance sheet and income statement and cash flows covering the Borrower's and its Subsidiaries' operations for such fiscal year), prepared in a manner consistent with GAAP and with prior practices, and complete and correct in all material respects, subject to normal year-end adjustments that, in the aggregate, are not material to the Borrower's business operations, certified by a Responsible Officer.

(b)      Management Discussion and Analysis Reports.  Simultaneously with the delivery of each set of consolidated financial statements referred to in Section 6.01(a), a report setting forth management's analysis and discussion of the condition (financial and otherwise) and operations, in respect of the business of the Borrower and its Subsidiaries.

(c)      Approved Budget.  The Borrower shall deliver to the Administrative Agent and the Lenders the proposed Supplemental Approved Budget and variance reports in accordance with the applicable Financing Order;

(d)      Monthly Financial Statements.  At the request of the Required Lenders, the Borrower shall provide to the Lenders a consolidated balance sheet of the Borrower and its

Subsidiaries as of the end of last fiscal month, and the related consolidated statements of income or operations for such fiscal month.

(e)      [Reserved].

(f)      Other Statements.  Contemporaneous with the delivery to the holders under the Prepetition Notes Documents (and in any case no later than three (3) days following such delivery), copies of all statements, reports, notices made available to Borrower's security holders generally, or to any other holders of Indebtedness for borrowed money or notes, including, without limitation, (i) notice of the occurrence of any default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto and (ii) notice of the occurrence of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(g)      Notices to Prepetition Noteholders.  Copies of all notices to or from, and agreements and documents (including any amendments or modifications thereto) entered into in connection with the documents in connection with the Prepetition Indenture (or the trustee thereof), in each case, within one (1) Business Day of delivery, receipt or execution as the case may be.

Section 6.02   Certificates; Reports; Other Information.  Promptly deliver to the Administrative Agent and to each Lender:

(a)      upon delivery of the financial statements referred to in Section 6.01(a) a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)      promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower files with the SEC or with any successor Governmental Authority (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)      promptly upon receipt thereof, notice that any third party has expressed an interest in writing (either formally or informally) in acquiring all or substantially all of the Loan Parties' business (other than the Stalking Horse Bidder (as defined in the First Day Declaration referred to in the Financing Orders);

(d)      prior to the filing thereof in the Bankruptcy Court, drafts of all material filings related to the transactions contemplated by this Agreement and the other Loan Documents; it being understood that the foregoing requirement will be deemed satisfied to the extent such drafts are delivered to counsel for the Administrative Agent and counsel for the Lenders;

(e)      all filings made with the Bankruptcy Court by any of the Loan Parties in the Chapter 11 Case (except to the extent filed under seal and disclosure to the Administrative Agent or Lenders is not permitted); it being understood that the foregoing requirement will be deemed

satisfied to the extent such filings required to be delivered are available online and reasonably accessible to the Administrative Agent and Lenders; and

(f)     no later than the first Business Day after delivery thereof, all written reports given by any of the Loan Parties to any official or unofficial creditors' committee in the Chapter 11 Case, except to the extent disclosure thereof is not permitted.

(g)     as soon as commercially reasonable, and in any event not less than two (2) Business Days prior to filing, all material pleadings, motions and other documents (provided that any of the foregoing relating to the Loan Documents shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court to the Administrative Agent and the Lenders and their counsel.

(h)     Promptly deliver via email, upon receipt of same, to the Administrative Agent and the Lenders copies of any term sheets, proposals, presentations or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or all of the Debtors.

Delivery of any reports, information and documents under Section 6.01 and Section 6.02 as well as any such reports, information and documents pursuant to this Agreement, to the Administrative Agent and the Lenders is for informational purposes only and the Administrative Agent's and Lenders' receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which the Administrative Agent and the Lenders are entitled to rely exclusively on the Compliance Certificates). The Administrative Agent and the Lenders shall have no responsibility or liability for the filing, timeliness or content of any report required under Section 6.01 or Section 6.02 or any other reports, information and documents required under this Agreement (aside from any report that is expressly the responsibility of the Lenders subject to the terms hereof).

Section 6.03   Notice Requirements; Other Information.  Promptly after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent and each Lender of each of the following events or circumstances and provide to the Administrative Agent and each Lender the following information and documents:

(a)     the occurrence of any Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(b)     the occurrence of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)     the commencement of, or any material development in, any litigation or governmental proceeding (including without limitation pursuant to any applicable Environmental Laws) pending against the Borrower or any of the Subsidiaries that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect;

(d)     the occurrence of any ERISA Event (x) that results in a liability of a Loan Party which is above the Threshold Amount or (y) which could otherwise have a Material Adverse Effect or the material breach of any representation in <u>Section 5.12</u>;

(e)     any information with respect to environmental matters as required by <u>Section 6.04(b)</u>;

(f)     copies of all notices, requests and other documents (other than any filings made with the Bankruptcy Court that are available online and reasonably accessible to the Administrative Agent and the Lenders) received by any Loan Party or any of its Subsidiaries under or pursuant to any instrument, indenture, loan or credit or similar agreement relating to Indebtedness in excess of the Threshold Amount regarding or related to any breach or default by any party thereto or any other event that could materially impair the value of the interests or the rights of any Loan Party or otherwise have a Material Adverse Effect and copies of any amendment, modification or waiver of any provision of any such instrument, indenture, loan or credit or similar agreement relating to Indebtedness in excess of the Threshold Amount and, from time to time upon request by the Administrative Agent (at the direction of the Required Lenders), such information and reports regarding such instruments, indentures and loan and credit and similar agreements relating to Indebtedness in excess of the Threshold Amount as the Administrative Agent may reasonably request (at the direction of the Required Lenders);

(g)     a tax event or liability not previously disclosed in writing by the Borrower to the Administrative Agent which would reasonably be expected to result in a material liability, together with any other information as may be reasonably requested by the Required Lenders to enable the Required Lenders to evaluate such matters, other than any tax event or liability the payment of which is stayed or excused under the Bankruptcy Code;

(h)     any occurrence of a Change of Control; and

(i)     any change (i) in any Loan Party's corporate name, (ii) any Loan Party's identity and corporate structure, (iii) any Loan Party's taxpayer identification number or (iv) any Loan Party's jurisdiction of incorporation.

Section 6.04   <u>Environmental Matters</u>.  (a) Comply and cause each of its Subsidiaries to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all material Environmental Permits required under Environmental Laws for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action required to remove and clean up all releases or threatened releases of Hazardous Materials from any of its properties, as required under, and in accordance with the requirements of all Environmental Laws; <u>provided</u>, <u>however</u>, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and, to the extent required by GAAP, appropriate reserves are being maintained with respect to such circumstances.

(b)     Promptly, and in any event within ten (10) Business Days, after a Responsible Officer obtains knowledge thereof, notify the Administrative Agent of, or deliver to the Administrative Agent, for further distribution to each Lender, copies of any and all material, non-privileged written communications and material, non-privileged documents concerning:

(i)     any Environmental Action against or of any non-compliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that would (1) reasonably be expected to result in a liability to any Loan Party in excess of the Threshold Amount or (2) cause any owned real property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(ii)     to the extent any of the following is reasonably expected to result in a liability to any Loan Party in excess of the Threshold Amount: (1) any occurrence of any release or threatened release of Hazardous Materials required to be reported to any Governmental Authority under applicable Environmental Law, (2) any remedial actions taken by any Loan Party or its Subsidiaries in respect of any such release or threatened release that could reasonably be expected to result in an Environmental Action or (3) the Loan Parties' discovery of any occurrence of or condition on any real property adjoining or in the vicinity of any site or facility that would be reasonably expected to cause such site or facility or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)     to the extent reasonably expected to result in a liability to any Loan Party in excess of the Threshold Amount, any action proposed to be taken by the Borrower or any of its Subsidiaries to modify current operations in a manner that would reasonably be expected to subject the Borrower and its Subsidiaries to any material additional obligations or requirements under Environmental Laws;

(iv)     copies of all material environmental reports or audits (whether produced by the Borrower or its Subsidiaries or any third party or Governmental Authority) and any Phase I or Phase II reports in respect of any sites or real property owned, leased or operated by the Borrower and its Subsidiaries that are in possession or control of any Loan Party or any of its Subsidiaries;

(v)     to the extent any of the following is reasonably expected to result in a liability to any Loan Party in excess of the Threshold Amount: copies of any and all material, non-privileged written communications with respect to (A) any Environmental Action, (B) any release or threatened release or non-compliance with any Environmental Law required to be reported to any Governmental Authority and (C) any request for information from a Governmental Authority that suggests such Governmental Authority is investigating the potential responsibility of the Borrower or any of its Subsidiaries as a potentially responsible party;

(vi)     the good faith belief that a release of Hazardous Materials, or a violation of Environmental Law reasonably likely to result in a fine or penalty in excess of the Threshold Amount, has occurred on or after the Closing Date, and within 60 days after such request and at the expense of the Borrower, any additional environmental site

assessment reports for any of its or its Subsidiaries' properties described in such request prepared by an environmental consulting firm acceptable to the Required Lenders, indicating the presence or absence of such Hazardous Materials and the estimated cost of any compliance, removal or remedial action in connection with any such Hazardous Materials on such properties; without limiting the generality of the foregoing, if the Required Lenders reasonably determine at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrower, and the Borrower hereby grants and agrees to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof, the right, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment; and

(vii)    any such other documents and information as the Administrative Agent (at the direction of the Required Lenders) may reasonably request from time to time.

Section 6.05    <u>Maintenance of Existence</u>. (a) Preserve, renew and maintain in full force and effect its legal existence, structure and name under the Laws of the jurisdiction of its organization and (b) take all commercially reasonable action to maintain all rights, privileges (including its good standing, where such concept exists), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) other than with respect to any Loan Party, to the extent the Borrower's board of directors (or in the case of clause (b), a Responsible Officer) shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries and to the extent that the loss thereof shall not be disadvantageous to Borrower, its Subsidiaries or the Lenders in any material respect, (ii) pursuant to a transaction permitted by <u>Section 7.04</u> or <u>Section 7.05</u> or (iii) in the case of clause (b), failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 6.06    <u>Maintenance of Properties</u>. Maintain, preserve and protect all of its material properties and equipment that are used or useful in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and make all commercially reasonable and appropriate repairs, renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof except where failure to do so would not reasonably be expected to materially adversely affect the use of the related property.

Section 6.07    <u>Maintenance of Insurance</u>.    Maintain with financially sound and reputable insurance companies (in the good faith judgment of management of the Borrower), insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) as are customarily carried by Person engaged in similar businesses and owning or leasing similar properties in the same general areas in which the Borrower or such Subsidiary operates. Subject to the terms of the applicable Financing Order, Borrower shall cause all property policies to have a lender's loss payable endorsement showing Collateral Agent as lender loss payee for the benefit of the Lenders

and use commercially reasonable efforts to cause such endorsement to provide that the insurer must give Collateral Agent at least thirty (30) days' notice before canceling, amending, or declining to renew its policy.  All liability policies shall show, or have endorsements showing, Collateral  Agent as an additional insured, and all such policies (or the loss payable and additional insured endorsements) shall provide that the insurer shall give Collateral Agent at least twenty (30) days' notice before canceling, amending, or declining to renew its policy.  At any Lender's request, each Loan Party shall deliver certified copies of policies and evidence of all premium payments. Proceeds payable under any casualty policy in connection with a Casualty Event shall be subject to Section 2.03(b)(ii).

Section 6.08   Compliance with Laws.   Except as otherwise excused or prohibited by the Bankruptcy Code, and subject to any required approval by the Bankruptcy Court, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except where such non-compliance is not, either individually or in the aggregate, reasonably likely to have a Material Adverse Effect.

Section 6.09   Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and as are sufficient to permit the preparation of financial statements in conformity with GAAP consistently applied, shall be made of all material financial transactions and matters involving the assets and business of any of the Loan Parties.

Section 6.10   Inspection Rights; Lender Calls.   (a) Permit representatives and independent contractors of the Agent and each Lender (including, without limitation, financial advisors retained by or for the benefit of the Agent or the Lenders or their counsel, including the Financial Advisor) to visit and inspect any properties and books and records of the Borrower and its Subsidiaries (subject, in the case of third party customer sites, to customary access agreements) and to discuss its affairs, finances and accounts with its directors, officers, advisors and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that such visits and inspections shall be coordinated through the Required Lenders and any review of books and records shall be done no more frequently than once per month absent the continuation of an Event of Default.  The Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants to the extent reasonably feasible.  Neither the Borrower nor any Subsidiary shall be required to disclose to the Agent or any Lender any information that, in the opinion of counsel to the Borrower or such Subsidiary, is prohibited by Law to be disclosed, is subject to attorney client privilege or constitutes attorney work product or the disclosure of which would cause a material breach of a binding non-disclosure agreement with a third party to the extent such agreement is not made in contemplation of the avoidance of this Section 6.10.

(b)     Up to one (1) time in every two-week period, upon the reasonable request of the Required Lenders, the Borrower's chief financial officer, together with the Borrower's financial advisor shall hold a conference call (at a mutually agreeable time, the cost of such call to be paid by the Borrower) with the Administrative Agent and the Lenders, on which conference calls shall be reviewed the Loan Parties' financial performance, operations, current trends and variance reports.

Section 6.11   <u>Additional Guarantors</u>.   Notify the Administrative Agent and the Lenders at the time that any Subsidiary becomes a debtor in the Chapter 11 Case, and (a) promptly thereafter (and in any event within five business (5) days), seek an order of the Bankruptcy Court authorizing such Person to become a Guarantor and (b) immediately upon the entry of such order, (i) cause such Person to become a Guarantor by executing and delivering to the Administrative Agent a supplement to this Agreement substantially in the form attached to this Agreement, and (ii) deliver to the Administrative Agent any applicable documents of the types referred to in <u>Section 4.01(a)</u>, all in form, content and scope reasonably satisfactory to the Required Lenders.

Section 6.12   <u>Use of Proceeds</u>.   Use the proceeds of any Loan, whether directly or indirectly, (i) to pay certain costs, fees, and expenses related to the Chapter 11 Case, including the fees, costs, and expenses of Professional Persons, (ii) to make adequate protection payments and other payments pursuant to any applicable Financing Order entered by the Bankruptcy Court and any related orders; <u>provided</u> that the form and substance of such orders shall be acceptable to the Required Lenders, and (iii) to fund working capital needs and expenditures of the Debtors during the Chapter 11 Case, in each case in accordance with the Approved Budget and the Loan Documents; provided further, solely in the manner set forth in the applicable Financing Order, and the Approved Budget, subject to the Permitted Variances. Notwithstanding the foregoing and subject to the terms of the Restructuring Support Agreement, no part of the proceeds of any Loan shall be used directly or indirectly:

(a)   for any purpose that is prohibited under the Bankruptcy Code or the applicable Financing Order;

(b)   to make any distribution under a plan of reorganization in the Chapter 11 Case; or

(c)   to finance in any way payment of the fees and expenses of any Person incurred in connection with (i) the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings, suits, arbitrations, proceedings, applications, motions or other litigation of any type adverse to any of the Secured Parties or any of their respective Affiliates, agents or representatives, or their respective rights and remedies under or in respect of the Loans provided pursuant to this Agreement or the applicable Financing Order; (ii) challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations and liens and security interests granted under the Loan Documents or the Existing Agreements, including, in each case, without limitation, for lender liability or pursuant to Section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; or (iii) attempting to prevent, hinder or otherwise delay any of the Lenders' or the Collateral Agent's assertion, enforcement or realization upon any of the Collateral.

Notwithstanding the foregoing, the Loan Parties shall be permitted to pay compensation and reimbursement of fees and expenses of professionals allowed and payable under Sections 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable, to the extent expressly permitted by the applicable Financing Order.

Nothing herein shall in any way prejudice or prevent the Agent or the Lenders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Agent's and the Lenders' right to review and object to any such requests, motions or applications).

Section 6.13    Anti-Corruption and Sanctions Laws.  To the extent existing on the Closing Date, the Borrower will maintain in effect such policies and procedures designed to promote compliance in all material respects by the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with the FCPA and any other applicable anti-corruption laws as well as Sanctions.

Section 6.14    Taxes.  To the extent permitted by the Bankruptcy Court and the Bankruptcy Code, pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies arising after the Closing Date imposed upon it or upon its income or profits, or upon any properties belonging to it, in each case on a timely basis, which, if unpaid when due and payable, may reasonably be expected to become a Tax Lien upon any properties of the Borrower or any of its Subsidiaries thereof not otherwise permitted under this Agreement; provided that neither the Borrower nor any of its Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim (i) which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP unless and until any Tax Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors or (ii) non-payment of which is required under the Bankruptcy Code or order of the Bankruptcy Court.

Section 6.15    End of Fiscal Years; Fiscal Quarters.  Cause (i) its fiscal year to end on or about December 31 of each calendar year and (ii) its fiscal quarters to end on or about March 31, June 30, September 30 and December 31 of each calendar year, in each case unless otherwise approved by the Required Lenders.

Section 6.16    ERISA.  (a) ERISA Events and ERISA Reports.  (i) Promptly and in any event within ten (10) days after any Loan Party, any Subsidiary or any ERISA Affiliate knows or has reason to know that any ERISA Event that could reasonably be expected to result in a liability of a Loan Party in excess of the Threshold Amount has occurred, a statement of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, that such Loan Party, such Subsidiary or such ERISA Affiliate has taken and proposes to take with respect thereto and (ii) on the date any records, documents or other information must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information.

(b)    Plan Terminations.  Promptly and in any event within five (5) Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(c)     Plan Annual Reports.  Promptly and in any event within thirty (30) days after the filing thereof with the IRS, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Plan.

(d)     Multiemployer Plan Notices.  Promptly and in any event within five (5) Business Days after receipt thereof by any Loan Party, any Subsidiary or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (i) the imposition of Withdrawal Liability by any such Multiemployer Plan, (ii) the reorganization or termination, or a determination that such Multiemployer Plan is in endangered or critical status, within the meaning of Title IV of ERISA, of any such Multiemployer Plan or (iii) the amount of liability incurred, or that may be incurred, by such Loan Party, such Subsidiary or such ERISA Affiliate in connection with any event described in clause (i) or (ii).

Section 6.17    Further Assurances.  Execute and deliver, or cause to be executed and delivered, to the Agent such reasonable documents and agreements, and shall take or cause to be taken such reasonable actions, as the Agent may, from time to time, reasonably request (at the direction of the Required Lenders) to carry out the terms and conditions of this Agreement and the other Loan Documents.

Section 6.18    Business.  Except to the extent required or authorized by the Bankruptcy Court, the Borrower will only, and will only permit the Subsidiaries to, engage directly or indirectly in the business engaged in by the Borrower and the Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary, corollary, synergistic or complimentary thereto.

Section 6.19    Post-Closing Matters. To the extent not prohibited by any Requirement of Law and not otherwise resulting in material adverse tax consequences to the Borrower and its Subsidiaries, at the request of the Required Lenders (or automatically to the extent requested under the Prepetition Indenture), the Borrower shall cause its Foreign Subsidiaries designated by the Required Lenders to execute such guarantees, pledge agreements and security documents as shall be customary in such local jurisdictions to grant to Collateral Agent, for the benefit of the Secured Parties, a guaranty of the Obligations secured by the equity interests and substantially all assets of such Subsidiaries within sixty (60) days of such request (or such longer period as the Required Lenders may agree in their sole discretion).   In addition, the Borrower shall deliver the following within forty-five (45) days of the Closing Date (or such longer period as the Required Lenders may agree in their sole discretion): (i) control agreements with respect to the Borrower's deposit accounts listed on the schedules to the Collateral Documents (other than any Excluded Account) and (ii) insurance endorsements in accordance with Section 6.07, in each case in form and substance reasonably acceptable to the Collateral Agent (subject to indemnity provisions in such control agreements being subject to the Collateral Agent's approval in its sole discretion) and the Required Lenders.

Section 6.20    Compliance with Financing Order.  Comply with the applicable Financing Order to the extent the Loan Parties' compliance therewith is required at such time.

Section 6.21    Milestones. Each of the Debtors covenants and agrees with Administrative Agent and each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses

or amounts payable under any Loan Document have been paid in full in cash, each of the Debtors shall and shall cause each of the Subsidiaries to ensure that each of the Milestones set forth in the applicable Financing Order is achieved in accordance with the applicable timing referred to therein (or such later dates as may be approved in writing by the Required Lenders in their sole discretion).

Section 6.22   <u>Bankruptcy Covenants</u>. Notwithstanding anything in the Loan Documents to the contrary, the Debtors shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the applicable Financing Orders in all material respects.

Section 6.23   <u>Cash Management</u>. Subject to approval by the Bankruptcy Court, after commencement of the Chapter 11 Case, the Debtors shall use a cash management system that is the same as or substantially similar to its cash management system in effect prior to such date. Any material changes from such prepetition cash management system must be acceptable to the Agent (at the direction of the Required Lenders).

Section 6.24   <u>No Flowback to Switzerland</u>. None of the proceeds borrowed under the Loans may be used in Switzerland in a manner which would constitute a use of proceeds in Switzerland as interpreted by the Swiss Federal Tax Administration for purposes of Swiss Withholding Tax unless: (i) a tax ruling countersigned by the Swiss Federal Tax Administration is obtained confirming that any such use of proceeds in Switzerland does not result in Swiss Withholding Tax consequences, or (ii) any such use of proceeds in Switzerland does not result in any Swiss Withholding Tax consequences under then applicable Swiss tax laws.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment outstanding hereunder or any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

Section 7.01   <u>Liens</u>. Subject to the applicable Financing Order, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues (including accounts receivable), whether now owned or hereafter acquired, other than the following Liens (collectively, "<u>Permitted Liens</u>"):

(a)   Liens pursuant to any Loan Document which shall have the priority set forth in the applicable Financing Order;

(b)   Liens existing on the Petition Date and listed on <u>Schedule 7.01(b)</u>;

(c)   Liens for Taxes, assessments, governmental charges which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

66

(d)      statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, suppliers, construction contractors, employees, pension plan administrators or other like Liens arising in the ordinary course of business which secure amounts  not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled (or if filed have been discharged or stayed) and no other action has been taken to enforce such Lien or which are being contested in good faith, if adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

(e)      Liens (i) arising out of pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security or other insurance (including unemployment insurance) and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary and (iii) Liens securing the financing of insurance premiums  (to the extent such Liens extend to the unearned premiums for such insurance) in the ordinary course of business;

(f)      Liens consisting of deposits made in connection with Indebtedness of the types permitted under Sections 7.03(e) or 7.03(g) (in each case, other than for borrowed money) entered into in the ordinary course of business or to secure the obligations otherwise permitted;

(g)      easements, rights-of-way, covenants, conditions, restrictions, encroachments, and other survey defects protrusions and other similar encumbrances and minor title defects affecting real property which were not incurred in connection with Indebtedness and do not in any case materially and adversely interfere with the use of the property encumbered thereby for its intended purposes;

(h)      Liens arising by virtue of any contractual, statutory or common law provision relating to banker's Liens, rights of set-off or similar rights and remedies (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary Guarantor (so long as such Subsidiary remains a Subsidiary Guarantor) to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or such Subsidiary Guarantor or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i)      Liens arising from precautionary Uniform Commercial Code financing statement filings regarding leases entered into by the Borrower and its Subsidiaries in the ordinary course of business;

(j)      any zoning, land-use or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property;

(k)      the modification, replacement, renewal or extension of any Lien permitted by clause (b) of this Section 7.01; provided that (i) the Lien does not extend to any additional property or additional Indebtedness (except with respect to paid-in-kind obligations pursuant to the terms of such Indebtedness as in effect on the Closing Date) other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03, and (B) proceeds and products thereof; and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(l)      nonconsensual statutory Liens arising after the Petition Date;

(m)      judgment Liens in existence for less than thirty (30) days after the entry thereof, or with respect to which execution has been stayed or the payment of which is covered in full by insurance maintained with responsible insurance companies, or which judgment Liens do not otherwise result in an Event of Default under Section 8.01(h);

(n)      any interest or title of a lessor, licensor or sublessor under any lease, license or sublease entered into by the Borrower or any of its Subsidiaries in the ordinary course of its business and covering only the assets so leased, or subleased;

(o)      to the extent constituting a Lien and permitted under Section 7.05, any non-exclusive licenses of Intellectual Property granted to third parties and set forth on Schedule 5.17 and other non-exclusive licenses after the Closing Date, in each case to the extent not resulting in a legal transfer of title of the licensed Intellectual Property and in the ordinary course of business;

(p)      to the extent constituting Liens and permitted under Section 7.05, any leases, subleases, licenses, or sublicenses (other than licenses of Intellectual Property) granted to third parties that do not materially interfere with the Loan Parties' ordinary course of business;

(q)      Liens securing Indebtedness permitted under Section 7.03(g) which shall have the priority set forth in the applicable Financing Order;

(r)      other Liens granted pursuant to the Financing Orders.

Section 7.02   Investments.  Make any Investments, except:

(a)      Investments by the Borrower or its Subsidiaries in cash and Cash Equivalents;

(b)      Investments existing as of the Closing Date and disclosed on Schedule 7.02(b) and Investments consisting of any modification, replacement, renewal, reinvestment or extension of any such Investment; provided that the amount of any Investment permitted pursuant to this Section 7.02(b) is not increased from the amount of such Investment on the Closing Date;

(c)      Investments received in connection with the bankruptcy or reorganization

68

of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)     Investments in the form of trade credit to customers of the Loan Parties arising in the ordinary course of business and consistent with past practices;

(e)     Contributions, loans, or advances to, or investments in, a Loan Party made by another Loan Party;

(f)     Promissory notes and other noncash consideration received by any Loan Party in connection with any asset sale permitted hereunder, with the bankruptcy or reorganization of suppliers and customers, or with the settlement of delinquent obligations of, and disputes with, customers and suppliers arising in the ordinary course of business;

(g)     Investments consisting of inter-company loans and inter-company receivables owed to a Loan Party by an Affiliate of such Loan Party (that is itself not a Loan Party), solely to the extent set forth in the Approved Budget.

Section 7.03   Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except the following, without duplication:

(a)     Indebtedness of the Borrower and other Loan Parties under the Loan Documents;

(b)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b);

(c)     Indebtedness in respect of performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, indemnity, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations), and, in each case, letters of credit in respect thereof, incurred in the ordinary course of business;

(d)     non-recourse Indebtedness incurred by the Borrower or any of its Subsidiaries to finance the payment of insurance premiums of such Person;

(e)     Indebtedness owed to any Person providing worker's compensation, unemployment insurance and other social security legislation, health, disability or other employee benefits or property, casualty or liability insurance to the Borrower or any of its Subsidiaries incurred in connection with such Person providing such benefits or insurance pursuant to customary reimbursement or indemnification obligations to such Person;

(f)     to the extent constituting Indebtedness, each of the Investments permitted pursuant to Section 7.02;

(g)     Indebtedness of the Borrower and the Loan Parties under the Prepetition Indenture in an aggregate principal amount not to exceed the outstanding aggregate

principal amount thereof as of the Closing Date plus any paid-in-kind interest in accordance with the terms thereof to the extent permitted in an Approved Bankruptcy Court Order; provided, that no Subsidiaries of the Borrower shall guaranty such Indebtedness unless such Subsidiaries also guaranty the Obligations; and

Section 7.04   Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, split or allow any change to the ownership of the Borrower or any of its Subsidiaries, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except any liquidation or share capital reduction by the Swiss Loan Party.

Section 7.05   Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

     (a)   Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries, in each case to the extent constituting immaterial property;

     (b)   Dispositions in the ordinary course of business of Cash Equivalents;

     (c)   sales of inventory in the ordinary course of business;

     (d)   the leasing, as lessor, of real or personal property not presently used or useful in such Person's business and is otherwise in the ordinary course of business;

     (e)   Dispositions of equipment or other assets, to the extent that such equipment is exchanged for credit against the purchase price of similar replacement equipment or assets or the proceeds of such Dispositions are reasonably promptly applied to the purchase price of similar replacement equipment, all in the ordinary course of business;

     (f)   Dispositions constituting an Intellectual Property that is not material to the conduct of the business of the Borrower and its Subsidiaries;

     (g)   Dispositions otherwise permitted by Sections 7.01, 7.02 or 7.03 and Dispositions from any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party; and

     (h)   any other Disposition approved by the Bankruptcy Court and approved by Required Lenders.

Section 7.06   Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

     (a)   to the extent constituting a Restricted Payment, the payment of fees of non-insider directors to the extent permitted in an Approved Bankruptcy Court Order and the reimbursement of reasonable expenses;

(b)     the Subsidiaries of the Borrower may make direct or indirect Restricted Payments to the Borrower and other Subsidiaries of the Borrower that are Loan Parties, either by direct payment or for the Swiss Loan Party as a consequence of a liquidation or restructuring of its share capital, including by share capital reduction; and

(c)     the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person (other than Disqualified Equity Interests).

Section 7.07   <u>Change in Nature of Business</u>.  Except as required by the Bankruptcy Code or as set forth in any order of the Bankruptcy Court, engage in any line of business other than those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business reasonably related or ancillary thereto.

Section 7.08   <u>Transactions with Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrower or its Subsidiaries, whether or not in the ordinary course of business, other than:

(a)     transactions to the extent permitted pursuant to an Approved Bankruptcy Court Order;

(b)     transactions contemplated by the Restructuring Support Agreement;

(c)     any transactions expressly permitted under Section 7.02, Section 7.04 and Section 7.06; <u>provided</u> that all parties to such transactions are Loan Parties or their Wholly-owned Subsidiaries;

(d)     so long as it has been approved by the Borrower's or its applicable Subsidiary's board of directors or other governing body to the extent required in accordance with applicable law, (i) customary indemnifications of non-officer directors of the Loan Parties and their respective Subsidiaries and (ii) the payment of reasonable and customary compensation and indemnification arrangements and benefit plans for officers and employees of the Loan Parties and their respective Subsidiaries in the ordinary course of business, in each case to the extent permitted in an Approved Bankruptcy Court Order and approved by all independent directors of the Borrower's board of directors; and

(e)     transactions under the agreements existing on the Closing Date and listed on <u>Schedule 7.08</u>.

Section 7.09   <u>Prepayments and Modifications of Certain Agreements</u>.  (a) Amend or modify any of the terms of any Indebtedness in an outstanding amount exceeding the Threshold Amount of any of the Loan Parties or their Subsidiaries arising prior to or after the Petition Date if such amendment or modification would add or change any terms in a manner adverse to the Loan Parties or the Lenders, or shorten the final maturity or average life to maturity of any such Indebtedness or require any payment to be made sooner than originally scheduled or increase the interest rate applicable thereto.

(b)      Make any payment of any Indebtedness or any claim arising prior to the Petition Date except as permitted pursuant to the Financing Orders or other order of the Bankruptcy Court and otherwise not prohibited by the terms of this Agreement, or make any voluntary, optional or other non-scheduled payment, prepayment, redemption, acquisition for value, refund, refinance or exchange of any Indebtedness of such Loan Party arising after the Petition Date (including, without limitation, any interest, premium or other amounts owing in respect thereof), in each case whether or not mandatory, except (i) with respect to Indebtedness under the Loan Documents and (ii) for payments made pursuant to the applicable Financing Order.

(c)      Amend or modify, or permit the amendment, modification or waiver of, any provision of any Material Contract to which any Loan Party or any Subsidiary thereof is a party or by which it or any of its property or assets is bound, in each case after the original execution and delivery thereof (or, if later, the date hereof) in any substantive manner that would be adverse to the Lenders' interests hereunder, without the written consent of the Required Lenders.

Section 7.10   <u>Negative Pledge</u>.   Enter into or suffer to exist, or permit any of its Subsidiaries to enter into or suffer to exist, (x) any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (a) agreements in favor of the Agent or (b) prohibitions or conditions by reason of customary provisions restricting pledges, assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (<u>provided</u> that such restrictions are limited to the property or assets subject to such leases, licenses or similar agreements, as the case may be) or (iii) any Indebtedness outstanding on the Closing Date (including, for the avoidance of doubt, the Indebtedness under the Existing Agreements) or (y) any agreement or arrangement limiting the ability of any of its Subsidiaries to declare or pay dividends or other distributions in respect of its Equity Interests or repay or prepay any Indebtedness owed to, make loans or advances to, or otherwise transfer assets to or make Investments in, the Borrower or any of its Subsidiaries of the Borrower (whether through a covenant restricting dividends, loans, asset transfers or investments, a financial covenant or otherwise), except (a) the Loan Documents and (b) any Indebtedness outstanding on the Closing Date (including, for the avoidance of doubt, the Indebtedness under the Existing Agreements).

Section 7.11   <u>Amendments to Organization Documents</u>.   Amend, or permit any of its Subsidiaries to amend, its certificate of incorporation or bylaws or other Organization Documents, without the written consent of the Required Lenders, except any liquidation or share capital reduction by the Swiss Loan Party.

Section 7.12   <u>Use of Proceeds</u>.   (a) Use, directly or indirectly, the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, to fund, finance, or facilitate any activities, business, or transaction of or with any Sanctioned Person, or in any Sanctioned Country, in a manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise).

(b)      Use any part of the proceeds of the Loans directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law.

Section 7.13    Accounting Changes.  Make any change in (a) accounting policies or reporting practices, except as required by GAAP or (b) Fiscal Year.

Section 7.14    OFAC.  (a)   Become a Sanctioned Person, (b) become organized, resident or located in a Sanctioned Country, or (c) engage in any transactions or dealings with a Sanctioned Person or in a Sanctioned Country in violation of Sanctions.

Section 7.15    Ownership of Subsidiaries.   Notwithstanding any other provisions of this Agreement to the contrary, organize, create, acquire or permit to exist after the Petition Date any Subsidiaries of the Borrower other than those existing on the Petition Date and set forth on Schedule 5.14.

Section 7.16    Compliance with Financing Orders and Approved Budget   Except as otherwise provided herein or approved by the Required Lenders, the Loan Parties shall not use any cash or the proceeds of any Loans or Collateral in a manner or for a purpose other than in accordance with the applicable Financing Order and the Approved Budget, subject to the Permitted Variances. Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, in no event shall the Loan Parties make any expenditures, payments, repayments or prepayments, dividends, distributions, reimbursements or similar transaction to equity owners of the Borrower or any Subsidiary thereof (excluding Borrower and any Subsidiary thereof) during the term of this Agreement unless expressly permitted pursuant to an Approved Bankruptcy Court Order and set forth in the Approved Budget.

Section 7.17    Compliance With Certain Laws.

(a)     (i) Violate any Anti-Terrorism Laws, (ii) engage in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering or (iii) permit any of their respective Affiliates to violate these laws or engage in these actions.

(b)     (i) Deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempt to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(c)     Become an "investment company" or a company controlled by an "investment company" under the Investment Company Act of 1940, as amended.

Section 7.18    Chapter 11 Claims.    Incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim or other super-priority claim or lien which is pari passu with or senior to the claims or liens, as the case may be, of the Collateral Agent or the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do

so, except for the Carve-Out and as expressly permitted by the Financing Orders, an Approved Bankruptcy Court Order or the Required Lenders.

Section 7.19   <u>Revision of Orders; Applications to Bankruptcy Court</u>.

(a)   Seek, consent to or suffer to exist any modification, stay, vacation or amendment of the applicable Financing Order that is adverse to the interests of the Lenders, except for any modifications and amendments agreed to in writing by the Administrative Agent and the Required Lenders.

(b)   Apply to the Bankruptcy Court for authority to take any action prohibited by this <u>Article VII</u> (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Agent and the Required Lenders or all Lenders, as applicable).

Section 7.20   <u>Adequate Protection</u>.  Except as permitted in the Financing Orders, incur, create, assume, suffer to exist or permit any obligation to make adequate protection payments, or otherwise provide adequate protection.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01   <u>Events of Default</u>.  Any of the following events referred to in this <u>Section 8.01</u> shall constitute an "<u>Event of Default</u>":

(a)   <u>Non-Payment</u>.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three (3) Business Days after the same becomes due in cash, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)   <u>Specific Covenants</u>.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of <u>Section 6.01(d)</u>, <u>Section 6.01(f)</u>, <u>Section 6.03(a)</u>, <u>Section 6.05</u>, <u>Section 6.07</u>, <u>Section 6.10(b)</u>, <u>Section 6.12</u>, <u>Section 6.19</u>, <u>Section 6.20, Section 6.22, Section 6.23</u> or <u>Article VII</u>; or

(c)   <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days; or

(d)   <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)   <u>Cross-Default</u>.  Except to the extent resulting or arising from the Chapter 11 Case, any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any post-Petition Date Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount, unless such failure to pay is a result of the Chapter 11 Case, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, in each case, unless such failure to observe or perform is a result of the Chapter 11 Case; or

(f)   <u>Material Adverse Effect</u>; There occurs an event that has resulted in a Material Adverse Effect; or

(g)   <u>Judgments</u>.  After the Petition Date, there is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not deny or fail to confirm coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(h)   <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which would reasonably be expected to exceed the Threshold Amount, (ii) any Loan Party, any Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under <u>Section 4201</u> of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to exceed the Threshold Amount, or (iii) any Loan Party, any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties, the Subsidiaries and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an aggregate amount which would reasonably be expected to exceed the Threshold Amount; or

(i)   <u>Invalidity of Loan Documents</u>.  Any material provision of any Loan Document, at any time after its execution and delivery or entry (with respect to the applicable Financing Order) and for any reason other than as expressly permitted hereunder

75

or thereunder or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document (other than as a result of the Termination of the DIP Financing), purports to revoke or rescind any Loan Document or asserts (including by commencing or joining in any legal proceeding) that any Collateral Document is invalid or unenforceable or contests in any manner that any Loan Document constitutes a valid and enforceable agreement against it; or

(j)    Change of Control; Structure.  There occurs any (i) Change of Control or (ii) any change to the ownership of direct and indirect Subsidiaries of the Borrower from the ownership structure set forth on Schedule 5.14; or

(k)    Liens.  Any Collateral Document shall for any reason cease to create a valid and perfected Lien (having the priorities specified in the applicable Financing Order) on and security interest in the Collateral; or

(l)    Dissolution or Liquidation.  Any Loan Party voluntarily or involuntarily dissolves or is dissolved, liquidates or is liquidated or files a motion with the Bankruptcy Court seeking authorization to dissolve or liquidate, except a liquidation and/or a share capital reduction of the Swiss Loan Party; or

(m)    Failure to Conduct Business.  If any Loan Party is enjoined, restrained or in any way prevented by court order (other than an Approved Bankruptcy Court Order) from continuing to conduct all or any material part of its business affairs or any Loan Party or any of their respective Subsidiaries' cessation of all or any material part of its business operations (other than in connection with a sale of assets permitted by the Loan Documents or otherwise consented to by the Required Lenders); or

(n)    Independent Directors.  With respect to the board of directors of the Borrower, the independent directors no longer constitute 50% of such board of directors; or

(o)    Financial Advisor.  The Borrower no longer retains Ducera Partners LLC as its financial advisor unless replaced with a financial advisor acceptable to the Required Lenders; or

(p)    Financing Order.  The Bankruptcy Court fails to (i) enter the Interim Order within five (5)  days of the Petition Date (with such changes as the Administrative Agent and the Required Lenders may agree to), or (ii) enter the Interim Order within twenty-nine (29)  days of the Petition Date (with such changes as the Administrative Agent and the Required Lenders may agree to) or the Bankruptcy Court enters an order (other than one subject to a stay) that reverses, vacates or stays for a period in excess of ten (10) days the effectiveness of the applicable Financing Order whether on appeal or otherwise, in each case without the written consent of the Required Lenders; or

(q)    Certain Orders.  An order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court (or any of the Loan Parties shall file any pleading or

motion requesting entry of an order) (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, or (iii) dismissing or converting the Chapter 11 Case to a Chapter 7 case; or

(r)     Non-Compliance with Financing Order.  Any Loan Party fails or neglects to comply with any provision of the (x) Interim Order or (y) Final Order; or

(s)     Filing of Unapproved Plan.  Any Person other than a Loan Party shall have filed a plan of reorganization or liquidation in the Chapter 11 Case following termination of the Loan Parties' exclusivity periods under Section 1121 of the Bankruptcy Code, unless approved by the Required Lenders; or

(t)     Entry of Unapproved Order.  (i) An order (other than one subject to a stay and the super priority claims granted to Stalking Horse Bidder (as defined in the First Day Declaration referred to in the applicable Financing Order) with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court (A) permitting any administrative expense claim or any other claim (now existing or hereafter arising, of any kind or nature whatsoever) to have priority as to any of the Loan Parties that is pari passu or senior to the Obligations, other than the Carve-Out or other claims expressly permitted to have priority over the Obligations under the applicable Financing Order; (B) granting or permitting the grant of a Lien on the Collateral (other than a Permitted Lien); or (ii) an order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case which does not provide for (x) the Termination of the DIP Financing and (y) until the Termination of the DIP Financing, the continuity and priority of the Liens of the Collateral Agent in the Collateral, the super-priority administrative expense claim status of the Obligations to the same extent as is provided in the applicable Financing Order upon such dismissal; or

(u)     Relief from the Automatic Stay.  The Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code for any reason to any Person holding a Lien upon any pre-petition or post-petition assets of any Loan Party with respect to any Collateral as to which the Collateral Agent has been granted a first priority Lien, or any other assets of any Loan Party where the aggregate value of the property subject to all such order or orders is greater than the Threshold Amount; or

(v)     Motion against the Lenders.  Any of the Loan Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (i) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document or (ii) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in the applicable Financing Order in favor of the Collateral Agent; or

(w)     Prohibited Payment.  Any of the Loan Parties shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any

claim or Indebtedness arising prior to the Petition Date other than those payments in respect of adequate protection permitted pursuant to the terms of the applicable Financing Order and payments authorized by the Bankruptcy Court in respect of (i) any payments required and/or permitted in the "first day orders" or any subsequent Approved Bankruptcy Court Order or (ii) accrued payroll and related expenses as of the Petition Date; or

(x)    Other Bankruptcy Matters.  (i) An order shall have been entered modifying the adequate protection obligations granted in the applicable Financing Order without the prior written consent of the Agent or Required Lenders, (ii) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Agent and the Required Lenders of any amounts received in respect of the Obligations, (iii) any Loan Party shall file with the Bankruptcy Court a motion seeking authority to use any cash proceeds of any of the Collateral to the extent prohibited hereunder, without the written consent of the Required Lenders and the Agent or (iv) any Loan Party shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not require (x) the Termination of the DIP Financing and (y) until the Termination of the DIP Financing, the continuity and priority of the Liens of the Collateral Agent in the Collateral, the super-priority administrative expense claim status of the Obligations to the same extent as is provided in the applicable Financing Order; or

(y)    Restructuring Support Agreement.  The Restructuring Support Agreement (i) is no longer in effect or (ii) is amended, modified or subject to a waiver, in the case of clause (ii), in a manner adverse to the interests of the Lenders without the consent of the Required Lenders.

Section 8.02    Remedies Upon Event of Default.  (a) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the applicable Financing Order, if any Event of Default occurs and is continuing, the Agent shall, at the request of the Required Lenders, by written notice to the Borrower, take any or all of the following actions without further order of, or application to, the Bankruptcy Court:

(i)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)    set-off against any outstanding Obligations amounts held for the account of the Loan Parties as cash collateral or in the accounts of any Loan Party maintained by or with the Agent, any Lender or their respective Affiliates; and

(iv)    take any action or exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

(b)    If an Event of Default has occurred and is continuing:  (i) the Agent shall have for the benefit the Secured Parties, in addition to all other rights of the Agent and the Lenders, the rights and remedies of a secured party under the Uniform Commercial Code; (ii) the Agent (at the direction of the Required Lenders) may, at any time, take possession of the Collateral and keep it on any Loan Party's premises, at no cost (including any charge pursuant to Section 506(c) of the Bankruptcy Code) to the Agent or any Lender, or remove any part of it to such other place or places as the Agent (at the direction of the Required Lenders) may desire, or the Borrower shall, upon the Agent's demand, at the Borrower's cost, assemble the Collateral and make it available to the Agent at a place or places reasonably convenient to the  Agent; and (iii) the Agent (at the direction of the Required Lenders) may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Agent deems advisable at the direction of the Required Lenders, and may, if the Agent at the direction of the Required Lenders deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale.  Without in any way requiring notice to be given in the following manner, the Loan Parties agree that any notice by the Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to the Loan Parties if such notice is mailed by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt to the Borrower, at least ten (10) Business Days prior to such action to the Borrower's address specified herein.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Obligations until the Agent or the Lenders receive payment, and if the buyer defaults in payment, the Agent may resell the Collateral without further notice to the Loan Parties.  In the event the Agent (at the direction of the Required Lenders) seeks to take possession of all or any portion of the Collateral by judicial process, the Loan Parties irrevocably waives: (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Agent retain possession and not dispose of any Collateral until after trial or final judgment.  The Loan Parties agree that the Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The Agent is hereby granted a license or other right to use, without charge, but subject to the terms of the of licenses to the Loan Parties with respect to Intellectual Property licensed to the Loan Parties, the Loan Parties' Intellectual Property and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral,  provided, that such licenses to be granted hereunder with respect to  trademarks and service marks shall be subject to the maintenance of quality standards with respect to the goods and services on which such trademarks and service marks are used sufficient to preserve the validity and enforceability of such trademark and service mark and the applicable Loan Party's rights under all licenses and all franchise agreements shall inure to the Agent's benefit for such purpose.  The proceeds of sale shall be applied first to all expenses of sale, including attorneys' fees, and then to the Obligations in accordance with Section 8.03. Following the Termination of the DIP Financing, the Agent will deliver any excess proceeds of the Collateral in accordance with the applicable order of the Bankruptcy Court. The Loan Parties shall remain liable for any deficiency.

(c)     Upon the occurrence and during the continuance of an Event of Default, subject solely to the giving of five (5) Business Days' prior written notice as set forth in clause (d) below, the automatic stay arising pursuant to Bankruptcy Code Section 362 shall be vacated and terminated in accordance with the applicable Financing Order r without further action or order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading so as to permit the Agent and the Lenders full exercise of all of their rights and remedies based on the occurrence of an Event of Default, including, without limitation, all of their rights and remedies with respect to the Collateral and the Guarantors.  With respect to the Agent's and Lenders' exercise of their rights and remedies, the Loan Parties agree, waive and, release, and shall be enjoined from attempting to contest, delay, or otherwise dispute the exercise by the Agent and the Lenders of their rights and remedies before the Bankruptcy Court or otherwise.

(d)     Notwithstanding the foregoing, any exercise of remedies is subject to the giving of five (5) Business Days' prior written notice in accordance with the terms of the applicable Financing Order.  For the avoidance of doubt, it is understood and agreed that the giving of five (5) Business Days' prior written notice as set forth above is a one-time requirement and is not required to be delivered with any exercise of remedies after the first such exercise.

Section 8.03    <u>Application of Funds</u>.  If the circumstances described in <u>Section 2.09(f)</u> have occurred, or after the exercise of remedies provided for in <u>Section 8.02</u> any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (after giving effect to the Carve-Out and any other payments required pursuant to the applicable Financing Order):

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>) payable to the Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under <u>Section 10.04</u> and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this <u>clause Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest (including, but not limited to, post-petition interest), ratably among the Lenders in proportion to the respective amounts described in this <u>clause Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal or face amounts of the Loans, ratably among the Lenders in proportion to the respective amounts described in this <u>clause Fourth</u> held by them;

<u>Fifth</u>, to the payment of all other Obligations of the Loan Parties that are due and payable to the Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agent and the other Secured Parties on such date; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, as required by the applicable order of the Bankruptcy Court.

The Loan Parties shall remain liable for any deficiency.

## ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01   <u>Appointment and Authorization</u>.   (a) Each Lender hereby irrevocably appoints, designates and authorizes the Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained in this Agreement or in any other Loan Document, the Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision contained in this Agreement providing for any action in the Agent's reasonable discretion or approval of any action or matter in the Agent's reasonable satisfaction, the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) which may be delivered by electronic transmission (including e-mail by such Lenders or counsel to the Required Lenders (which on the date hereof is King & Spalding LLP); <u>provided</u> that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable Law and shall, in the Agent's sole discretion, be accompanied by indemnity or security satisfactory to the Agent and subject to the indemnification set forth in Section 9.07.  The Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Loan Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Agent or any other Agent-Related Person in any capacity.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or

observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral or collectability of any Obligations, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(b)     The Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints and authorizes the Agent to act as the agent of (and to hold any security interest, charge or other Lien created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as If set forth in full herein with respect thereto.

(c)     The Agent shall be entitled to request written instructions, or clarification of any instruction, from the Required Lenders (or, if the relevant Loan Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Agent may refrain from acting unless and until it receives those written instructions or that clarification. In the absence of written instructions, Agent, as applicable, may act (or refrain from acting) as it considers to be in the best interests of the Lenders. Whenever in the administration of the Loan Documents the Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Agent (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, may conclusively rely upon instructions from the Required Lenders. The Agent may request that the Required Lenders or other parties deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Loan Documents. The duties of the Agent under the Loan Documents are solely mechanical and administrative in nature.

(d)     The Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(e)     The Agent shall not  be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or as to the existence or

possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing, or (ii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided).

Section 9.02    <u>Delegation of Duties</u>.    The Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through Affiliates, agents, employees or attorneys-in-fact, such sub-agents as shall be deemed necessary by the Agent, and shall be entitled to advice of counsel, both internal and external, and other consultants or experts concerning all matters pertaining to such duties.    The Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct as determined by a final nonappealable judgment of a court of competent jurisdiction.

Section 9.03    <u>Liability of the Agent</u>.    (a) No Agent-Related Person shall (x) be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final nonappealable judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (y) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. The Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall the be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes, pandemics or epidemics, or acts of God and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that the Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances. Calculation of any prepayment premium shall not be a duty or obligation of Agent or "collateral agent." In no event shall the Agent be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits,

even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.  Except with respect to its own gross negligence or wilful misconduct, the Agent shall not be responsible to any Secured Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any security document or any other instrument or document furnished pursuant thereto.

(b) Beyond the exercise of reasonable care in the custody thereof, the Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords similar collateral and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee.  The Agent shall have no responsibility for or liability with respect to monitoring compliance of any other party to the Loan Documents or any other document related hereto or thereto.  The Agent has no duty to monitor the value or rating of any Collateral on an ongoing basis.

Section 9.04   Reliance by the Agent.  (a) The Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by the Agent.  The Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall be justified in taking any action reasonably believed to it to be required by any order of the Bankruptcy Court.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with any order of the Bankruptcy Court or in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)    For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Agent for the account of the Lenders, unless the Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default".  The Agent will promptly notify the Lenders of its receipt of any such notice.  The Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Agent has received any such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

Section 9.06    Credit Decision; Disclosure of Information by the Agent.    Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by the Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to the Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent herein, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of the Agent.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities to the extent incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final non-appealable judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case

of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, if any.  The language in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation or removal of the Agent.

Section 9.08    The Agent in its Individual Capacity.  The Agent and its Affiliates may, but has no obligation to, make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though the Agent were not the Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, the Agent or its Affiliates may receive information regarding any Loan Party or any Affiliate of a Loan Party (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Agent shall not be under any obligation to provide such information to them. With respect to its Loans, the Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Agent, and the terms "Lender" and "Lenders" include Cantor Fitzgerald Securities in its individual capacity.

Section 9.09    Successor Agents.  The Agent may resign as the Agent upon thirty (30) days' notice to the Lenders and the Borrower.  If the Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Agent, the retiring Agent may appoint, after consulting with the Lenders, a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Agent and the term "Agent", shall mean such successor administrative agent and/or Supplemental Agent, or collateral agent and/or supplemental collateral agent, as the case may be, and the retiring Agent's appointment, powers and duties as the Agent shall be terminated.  After the retiring Agent's resignation hereunder as the Agent, the provisions of this Article IX and Section 10.04 and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.  If no successor agent has accepted appointment as the Agent by the date which is thirty (30) days following the retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Lenders assuming the role of Agent as specified in the immediately preceding sentence shall assume the rights and obligations of the Agent (including the indemnification provisions set forth in Section 9.07) as if each such Lender were the Agent.  Upon the acceptance of any appointment as the Agent hereunder by a successor and upon the execution and filing or recording of such

financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may reasonably request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, the successor Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents.

Section 9.10   <u>Agent May File Proofs of Claim</u>.  The Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove an administrative claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under <u>Section 2.06</u> and <u>Section 10.04</u> or otherwise hereunder) allowed in an applicable proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due to the Agent under <u>Section 2.06</u> and <u>Section 10.04</u> or otherwise hereunder.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11   <u>Release of Collateral and Guarantee</u>.  The Lenders irrevocably agree and authorize the Collateral Agent:

(a)      to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (i) upon the Termination of the Obligations, (ii) upon any permitted sale, lease, transfer or other disposition of any item of Collateral of any Loan Party (including, without limitation, as a result of the sale, in accordance with the terms of the Loan Documents, of the Loan Party that owns such Collateral) in accordance with the terms of the Loan Documents, (iii) subject to <u>Section 10.01</u>, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property

subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under this Agreement pursuant to <u>clause (b)</u> below, or (v) in accordance with an order of the Bankruptcy Court; and

 (b) in the case of any Subsidiary, such Person ceasing to be subject to Section 6.11 as a result of a transaction permitted hereunder (as certified by a Responsible Officer) and the Borrower notifying the Collateral Agent in writing that it wishes such Guarantor to be released from its obligations under this Agreement.

 The Collateral Agent will, at the Borrower's expense, execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of Collateral pursuant to this <u>Section 9.11</u> from the assignment and security interest granted under the Collateral Documents (or the release of the Guarantor from its Guarantee Obligations in respect of the Obligations) in accordance with the terms of the Loan Documents (<u>provided</u> that the Borrower shall have delivered to the Collateral Agent a certificate of a Responsible Officer certifying that such transaction has been consummated in compliance with the Loan Documents and the execution and delivery of such documents are authorized and permitted under the Loan Documents, and the Collateral Agent may conclusively rely on such certification without further inquiry). Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this <u>Section 9.11</u>.

Section 9.12 <u>Other Agents; Arrangers and Managers</u>. None of the Lenders shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders shall have or be deemed to have any fiduciary relationship with any other Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the other Lenders in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.13 <u>Appointment of Supplemental Agent</u>. (a) It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Agent deems in its reasonable discretion that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Agent is hereby authorized to appoint an additional individual or institution selected by the Agent in its sole discretion as a separate trustee, co-trustee, Agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "<u>Supplemental Agent</u>" and collectively as "<u>Supplemental Agents</u>").

 (b) In the event that the Agent appoints a Supplemental Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Agent

to the extent, and only to the extent, necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be enforceable by either the Agent or such Supplemental Agent, and (ii) the provisions of this Article IX and of Section 10.04 and Section 10.05 that refer to the Agent shall inure to the benefit of such Supplemental Agent and all references therein to the Agent shall be deemed to be references to the Agent and/or such Supplemental Agent, as the context may require.

(c)     Should any instrument in writing from any Loan Party be required by any Supplemental Agent so appointed by the Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Agent.  In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by Law, shall vest in and be exercised by the Agent until the appointment of a new Supplemental Agent.

Section 9.14   Certain Bankruptcy Matters.

(a)     Except to the extent provided otherwise in the applicable Financing Order and subject to the Carve-Out, the Borrower hereby agrees that the Obligations shall (i) constitute super-priority allowed administrative expense claims in the Bankruptcy case having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against any Loan Party now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code subject to the priority set forth in the applicable Financing Order and, to the extent provided in the applicable Financing Order, shall not be subject to claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.

(b)     The Collateral Agent's Liens and the super-priority administrative expense claim priority granted pursuant to clause (a) above have been independently granted by the Loan Documents, and may be independently granted by other Loan Documents heretofore or hereafter entered into.  The Collateral Agent's Liens and the administrative expense claim priority granted pursuant to clause (a) above, this Agreement, the applicable Financing Order and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lenders and the Collateral Agent hereunder and thereunder are cumulative.  In the event of a direct conflict between the applicable Financing Order and any other Loan Document, the applicable Financing Order shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     The Collateral Agent's Liens on Collateral of the Loan Parties shall be deemed valid and automatically perfected by entry of the applicable Financing Order,

which entry shall have occurred on or prior to the Closing Date. The Collateral Agent and the Lenders shall not be required to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on Collateral granted by or pursuant to this Agreement, the applicable Financing Order or any other Loan Document. If the Collateral Agent (at the direction of the Required Lenders) or the Required Lenders shall, in its or their sole discretion, from time to time elect to file, register or publish any such financing statements, mortgages, hypothecs, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on Collateral, all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date the applicable Financing Order is entered.

(ii)    The Liens, lien priorities, super-priority administrative expense claims and other rights and remedies granted to the Collateral Agent and the Lenders pursuant to this Agreement, the applicable Financing Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the administrative expense claim priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever. Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(A)    no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Collateral Agent against the Borrower in respect of any Obligation;

(B)    the Collateral Agent's Liens on Collateral shall constitute valid, enforceable and perfected Liens with the priority set forth in the applicable Financing Order; and

(C)    the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Agent or any Lender to file, register or publish any financing statements, mortgages, hypothecs, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable nonbankruptcy law.

Section 9.15    Erroneous Payments.

(a) If the Agent (x) notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the

Agent has determined in its reasonable discretion (whether or not after receipt of any notice under immediately succeeding <u>clause (b)</u>) that any funds (as set forth in such notice from the Agent) received by such Payment Recipient from the Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf)  (any such funds, whether  transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "<u>Erroneous Payment</u>") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof) (*provided*, that, without limiting any other rights or remedies (whether at law or in equity), the Agent may not make any such demand under this <u>clause (a)</u> with respect to an Erroneous Payment unless such demand is made within 5 Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Agent pending its return or repayment as contemplated below in this <u>Section 9.15</u> and held in trust for the benefit of the Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Agent may, in its sole discretion, specify in writing), return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received) and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)  Without limiting immediately preceding <u>clause (a)</u>, each Lender, Secured Party or any Person who has received funds on behalf of a Lender, or Secured Party (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) that such Lender, or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)  it acknowledges and agrees that (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error and mistake shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender, or Secured Party shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 9.15(b).

For the avoidance of doubt, the failure to deliver a notice to the Agent pursuant to this Section 9.15(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 9.15(a) or on whether or not an Erroneous Payment has been made.

(c) Each Lender  or Secured Party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Agent to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Agent has demanded to be returned under immediately preceding clause (a).

(d) (i) In the event that an Erroneous Payment (or portion thereof) is not recovered by the Agent for any reason, after demand therefor in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf)  (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Loans (but not its Commitments) of the relevant Class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Approved Electronic Platform as to which the Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender  shall deliver any Notes evidencing such Loans to the Borrower or the Agent (but the failure of such Person to deliver any such Notes shall not affect the effectiveness of the foregoing assignment), (B) the Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the Agent

as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (D) the Agent and the Borrower shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (E) the Agent will reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(ii)   Subject to Section 10.07 (but excluding, in all events, any assignment consent or approval requirements (whether from the Borrower or otherwise)), the Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Agent on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Loans are then owned by the Agent) and (y) may, in the sole discretion of the Agent, be reduced by any amount specified by the Agent in writing to the applicable Lender from time to time.

(e)  The parties hereto agree that (x) irrespective of whether the Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") (*provided* that the Loan Parties' Obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Loans that have been assigned to the Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; *provided* that this Section 9.15 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Agent; *provided*, *further*, that for the avoidance of doubt,

immediately preceding <u>clauses (x)</u> and <u>(y)</u> shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)   To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to  an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)   Each party's obligations, agreements and waivers under this Section 9.15 shall survive the resignation or replacement of the Agent, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Section 9.16   Collateral. Where a Guarantor is required to promptly and duly authorize, execute and deliver, and have recorded, such further instruments and documents and take such further actions as are necessary and as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction within the United States with respect to the security interests created hereby (the "Recording Requirements"), such Guarantor shall perform the Recording Requirements  without the written request of the Collateral Agent. Notwithstanding anything in the Loan Documents to the contrary, the Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

(b)      No provision of this Agreement, or any of the other Loan Documents shall require the Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Agreement, any of the other Loan Documents or the exercise of any of its rights or powers.  If it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability including an advance of moneys necessary to perform work or to take the action requested is not reasonably assured to it, the Agent may decline to act unless it receives indemnity satisfactory to it in its sole discretion, including an advance of moneys necessary to take the action requested.

(c)      The Agent shall be under no obligation or duty to take any action under this Agreement, any of the other Loan Documents or otherwise if taking such action (i) would subject the Agent to a tax in any jurisdiction where it is not then subject to a tax or (ii) would require the Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(d)      Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Agent or to any election,

decision, opinion, acceptance, use of judgment, expression of satisfaction, reasonable satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Agent, it is understood that in all cases the Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Agent, as it deems appropriate. This provision is intended solely for the benefit of the Agent and the Agent's successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

(e)     Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any agent selected by the Agent in good faith.  Agent will have no additional duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Agent will not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Liens on the Collateral

## ARTICLE X

## MISCELLANEOUS

Section 10.01  Amendments, Etc.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that:

(a)     no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)     change the number of Lenders or the percentage of (x) the Commitments or (y) the aggregate unpaid principal amount of Loans that, in each case, shall be required for the Lenders or any of them to take any action hereunder (including pursuant to any change to the definition of "Required Lenders"),

(ii)     release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agent and the Lenders under this Agreement), if such release or limitation is in respect of all or substantially all of the value represented by this Agreement to the Lenders,

(iii)     release, or subordinate the Collateral Agent's Liens in, all or substantially all of the Collateral in any transaction or series of related transactions (other than as expressly permitted herein or in the applicable Financing Order), or

(iv)     amend any provision of this Section 10.01;

95

(b)      no amendment, waiver or consent shall, unless in writing and signed by each Lender specified below for such amendment, waiver or consent:

(i)      increase the Commitments of a Lender without the consent of such Lender;

(ii)      reduce the principal of, or stated rate of interest on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender; provided if the Required Lenders agree to waive, or forbear from exercising remedies with respect to, any Event of Default and such waiver or forbearance is effective in accordance with this Section 10.01 or if the Required Lenders agree to change any financial definitions that would reduce the stated rate of interest or any fees or other non-principal amounts stated to be payable hereunder or under the other Loan Documents pursuant to any amendment, waiver or consent not being effected in order to reduce the stated rate of interest or such fees or other amounts, then only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate in connection with such Event of Default or reduce the stated rate of interest or such fees in connection with such amendment, waiver or consent described in this proviso to clause (b)(ii), as applicable; or

(iii)      except as provided in the definition of "Maturity Date", postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.04 or Section 2.05, any date scheduled for payment or for any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender; or

(iv)      modify Section 8.03 in any manner that adversely affects the Lenders without the consent of each Lender directly and adversely affected thereby; or

(v)      modify Section 2.10 without the consent of each Lender directly and adversely affected thereby;

provided further that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Agent under this Agreement or the other Loan Documents.

Section 10.02   Notices and Other Communications; Facsimile and Electronic Copies.  (a) General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission) (and, as to service of process, only in writing and in accordance with applicable law) and, to the extent set forth in Section 10.02(e), in an electronic medium and delivered as set forth in Section 10.02(e).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications

expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to any Loan Party:

c/o Acorda Therapeutics, Inc.
2 Blue Hill Plaza, 3rd Floor
Pearl River, NY United States 10965
Attention:      Neil Belloff
E-mail:      nbelloff@acorda.com

With a copy (which shall not constitute notice) to:

Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018
Attention:      Blaire Cahn; John Dodd; Kevin Whittam
E-mail:Blaire.Cahn@bakermckenzie.com;
John.Dodd@bakermckenzie.com; kevin.whittam@bakermckenzie.com

(ii)      if to the  Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties from time to time; and

(iii)      if to any other Lender, to the address, facsimile number or electronic mail address specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a written notice to the Borrower and the Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(b)), when delivered; provided that notices and other communications to the Borrower and the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person during the Person's normal business hours.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)      Effectiveness of Facsimile Documents and Signatures.  Loan Documents may be transmitted and/or signed by facsimile or other electronic transmission (including a .pdf or .tif copy); provided that original copies are delivered promptly thereafter (it being understood that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission).

(c)    <u>Reliance by the Agent and Lenders</u>.  The Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) in good faith purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct by such Agent-Related Person or such Lender as determined by a final non-appealable judgment.

(d)    <u>Notice to other Loan Parties</u>.  The Borrower agrees that notices to be given to any other Loan Party under this Agreement or any other Loan Document may be given to the Borrower in accordance with the provisions of this <u>Section 10.02</u> with the same effect as if given to such other Loan Party in accordance with the terms hereunder or thereunder.

(e)    The Borrower hereby agrees that it will provide to the Agent all information, documents and other materials that it is obligated to furnish to the Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Loan, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan hereunder (all such non-excluded communications being referred to herein collectively as "<u>Communications</u>"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Agent to an electronic mail address specified by the Agent to the Borrower.  In addition, the Borrower agrees to continue to provide the Communications to the Agent in the manner specified in the Loan Documents but only to the extent requested by the Agent.  The Borrower further agrees that the Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "<u>Platform</u>").

(f)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "<u>AGENT PARTIES</u>") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR

EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE PLATFORM, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(g)     The Agent agrees that the receipt in accordance with Section 10.02 of the Communications by the Agent at its e-mail address set forth on Schedule 10.02 shall constitute effective delivery of the Communications to the Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of the Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(h)     Each Loan Party hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to any Loan Party or its securities) (each, a "Public Lender"). Each Loan Party hereby agrees that (i) Communications that are to be made available on the Platform to Public Lenders who notify the Borrower and the Agent of such Lender's status as a Public Lender shall be clearly and conspicuously marked by such Loan Party as "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Communications "PUBLIC," each Loan Party shall be deemed to have authorized the Agent and the Lenders to treat such Communications as either publicly available information or not material information (although it may contain sensitive business information and remains subject to the confidentiality undertakings of Section 10.08) with respect to such Loan Party or its securities for purposes of United States Federal and state securities laws, (iii) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information," and (iv) the Agent shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(i)     EACH LENDER ACKNOWLEDGES THAT UNITED STATES FEDERAL AND STATE SECURITIES LAWS PROHIBIT ANY PERSON WITH MATERIAL, NON-PUBLIC INFORMATION ABOUT AN ISSUER FROM PURCHASING OR SELLING SECURITIES OF SUCH ISSUER OR, SUBJECT TO CERTAIN LIMITED EXCEPTIONS, FROM COMMUNICATING SUCH INFORMATION TO ANY OTHER PERSON. EACH LENDER AGREES TO COMPLY WITH APPLICABLE LAW AND ITS RESPECTIVE CONTRACTUAL OBLIGATIONS WITH RESPECT TO CONFIDENTIAL AND MATERIAL NON-PUBLIC INFORMATION. Each Lender that is not a Public Lender confirms to the Agent that such Lender has adopted and will maintain internal policies and procedures reasonably designed to permit such Lender to take delivery of Restricting Information (as defined below) and maintain its compliance with applicable law and its respective contractual obligations with respect

to confidential and material non-public information.  A Public Lender may elect not to receive Communications and Information that contains material non-public information with respect to the Loan Parties or their securities (such Communications and Information, collectively, "Restricting Information"), in which case it will identify itself to the Agent as a Public Lender. Such Public Lender shall not take delivery of Restricting Information and shall not participate in conversations or other interactions with the Agent Parties, any Lender or any Loan Party in which Restricting Information may be discussed.  No Agent Party, however, shall by making any Communications and Information (including Restricting Information) available to a Lender (including any Public Lender), by participating in any conversations or other interactions with a Lender (including any Public Lender) or otherwise, be responsible or liable in any way for any decision a Lender (including any Public Lender) may make to limit or to not limit its access to the Communications and Information.  In particular, no Agent Party shall have, and the Agent, on behalf of all Agent Parties, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender (including any Public Lender) has elected to receive Restricting Information, such Lender's policies or procedures regarding the safeguarding of material nonpublic information or such Lender's compliance with applicable laws related thereto.  Each Public Lender acknowledges that circumstances may arise that require it to refer to Communications and Information that might contain Restricting Information.  Accordingly, each Public Lender agrees that it will nominate at least one designee to receive Communications and Information (including Restricting Information) on its behalf and identify such designee (including such designee's contact information) on such Public Lender's Administrative Questionnaire.   Each Public Lender agrees to notify the Administrative Agent in writing from time to time of such Public Lender's designee's address to which notice of the availability of Restricting Information may be sent.  Each Public Lender confirms to the Agent and the Lenders that are not Public Lenders that such Public Lender understands and agrees that the Agent and such other Lenders may have access to Restricting Information that is not available to such Public Lender and that such Public Lender has elected to make its decision to enter into this Agreement and to take or not take action under or based upon this Agreement, any other Loan Document or related agreement knowing that, so long as such Person remains a Public Lender, it does not and will not be provided access to such Restricting Information.  Nothing in this Section 10.02(i) shall modify or limit a Lender's (including any Public Lender) obligations under Section 10.08 with regard to Communications and Information and the maintenance of the confidentiality of or other treatment of Communications or Information.

Section 10.03  No Waiver; Cumulative Remedies.  No failure by any Lender or the Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04  Costs and Expenses.  The Borrower agrees (a) to pay or reimburse the  Agent and Lenders for all reasonable and documented out-of-pocket costs and expenses incurred before, on or after the Closing Date in connection with the preparation, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof requested by the Borrower or negotiated in

consultation with Borrower (in each case, whether or not the transactions contemplated thereby are consummated), including all Attorney Costs, (b) to pay or reimburse the Agent and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all Attorney Costs and other costs and expenses incurred in connection with any workout or restructuring in respect of the Loans and all such costs and expenses incurred during any legal proceeding, including any proceeding in the Chapter 11 Case and (c) without limiting the generality of the foregoing, to pay all reasonable and documented out-of-pocket fees and expenses of any financial advisory, appraisers or accounting firm retained by or for the benefit of the Agent or Lenders or by King & Spalding LLP, as counsel to the Agent or Lenders, as applicable, including, without limitation, the fees and expenses of the Financial Advisor. The Borrower's obligation to pay all such reasonable and documented out-of-pocket costs, expenses and charges includes, without limitation, any such costs, expenses and charges that accrue after any conversion of the Chapter 11 Case to proceedings administered under Chapter 7 of the Bankruptcy Code. The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by the Agent. The agreements in this <u>Section 10.04</u> shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this <u>Section 10.04</u> shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Agent in its sole discretion.

Section 10.05  <u>Indemnification by the Borrower</u>.  (a) Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless the Agent, each Agent-Related Person (including without limitation, King & Spalding LLP), each Lender and their respective Affiliates, directors, officers, employees, counsel, agents, trustees, advisors and attorneys-in-fact (including without limitation, King & Spalding LLP and Perella Weinberg Partners LLC)  (collectively the "<u>Indemnitees</u>") from and against any and all liabilities, obligations, losses, taxes, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including one counsel to the Agent and a separate counsel to the Lenders, taken as a whole) (and, in the event of any actual conflict of interest, additional counsel to the affected parties) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability related to the Borrower, any Subsidiary or any other Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (any of the foregoing described in this clause (iv), a "<u>Proceeding</u>") (all the foregoing described in clauses (ii) to (iv), collectively, the "<u>Indemnified Liabilities</u>"), in all cases, whether

101

or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and whether brought by an Indemnitee, a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated hereby are consummated; provided that such indemnity shall not, as to any Indemnitees, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by a final non-appealable judgment of a court of competent jurisdiction.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through the Platform, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document.  All amounts due in respect of costs, expenses and disbursements under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; provided, that each Indemnitee receiving any such reimbursement shall repay such amounts to the relevant Loan Party in the event that such Indemnitee shall not be entitled thereto pursuant to the provisions hereof.  The agreements in this Section 10.05 shall survive the resignation or removal of the Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

(c)     The Borrower shall not be liable for any settlement of any Proceedings effected without its consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Borrower's consent or if there is a final judgment for the plaintiff in such Proceedings, the Borrower shall indemnify and hold harmless each Indemnitee from and against any Indemnified Liabilities in accordance with the foregoing clause (a).  The Borrower shall not, without the prior written consent of an Indemnitee (which consent shall not be unreasonably withheld or delayed), effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee in form and substance satisfactory to such Indemnitee from all liability on claims that are the subject matter of such Proceedings, (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnitee and (iii) contains customary confidentiality and non-disparagement provisions.

(d)     In the event that an Indemnitee is requested or required to appear as a witness in any action brought by or on behalf of or against the Borrower or any of its Subsidiaries or Affiliates in which such Indemnitee is not named as a defendant, the Borrower shall reimburse such Indemnitee for all reasonable and documented expenses incurred by it in connection with such Indemnitee's appearing and preparing to appear as such a witness, including without limitation, the reasonable and documented fees and expenses of its legal counsel.

Section 10.06 Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Agent or any Lender, or the A Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agent or such Lender in its discretion) to be repaid to a trustee,

receiver or any other party, in connection with any proceeding in the Chapter 11 Case or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its applicable share of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Applicable Rate.

Section 10.07  <u>Successors and Assigns</u>.

(a)      <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 10.07(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 10.07(d)</u>, (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.07(e)</u> or (iv) to an SPC in accordance with the provisions of <u>Section 10.07(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>Section 10.07(d)</u> and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its Commitment and/or the Loans at the time owing to it (and its rights and obligations under this Agreement relating thereto); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)      <u>Minimum Amounts</u>.

(A)      in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in <u>paragraph (b)(i)(B)</u> of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in <u>paragraph (b)(i)(A)</u> of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade

Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000 unless the Administrative Agent consents (such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)     Required Consents.  Any such assignment shall require the prior written consent of the Borrower, which consent shall not be unreasonably withheld, conditioned, delayed or burdened; provided, however, that (A) no consent of the Borrower shall be required for an assignment to a Lender, to an Affiliate of a Lender, to an Approved Fund or, if an Event of Default has occurred and is continuing, to any other assignee, and (B) the Borrower shall be deemed to have consented to any such assignment unless it objects thereto by written notice delivered to the Administrative Agent within ten (10) Business Days after having received notice thereof.

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and the tax documentation required pursuant to Section 3.01.

(v)     [Reserved].

(vi)     No Assignment to Natural Persons.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(c), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     Register.  The Administrative Agent shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of its Commitment and/or the Loans at the time owing to it (and its rights and obligations under this Agreement relating thereto); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 9.07 with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in Section 10.01(a) or Section 10.01(b) that directly and adversely affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 (subject to the requirements and limitations therein, including the requirements under Section 3.01(g) (it being understood that the documentation required under Section 3.01(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Sections 3.01 or 3.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.07(b) with respect to any Participant. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.10 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or

any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The Participant Register shall be available for inspection by the Administrative Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     SPCs.  Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Agent and the Borrower (an "SPC") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01 or 3.04), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and such liability shall remain with the Granting Lender, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Agent, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee Obligation or credit or liquidity enhancement to such SPC.

(g)     Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee

for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

Section 10.08 Confidentiality.   Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information and to not use or disclose such information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority or examiner regulating any Lender or the Agent; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) to any pledgee referred to in Section 10.07(e) or Section 10.07(g), Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (f) with the written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 by the disclosing party; (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); (i) to the extent not known by it to consist of non-public information, (j) for purposes of establishing a "due diligence" defense or (k) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder.   In addition, the Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agent and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments and the Loans.   For the purposes of this Section 10.08, "Information" means all information received from any Loan Party or its Affiliates or its Affiliates' directors, officers, employees, trustees, investment advisors or agents, relating to the Borrower or any of their Subsidiaries or their business, other than any such information that is publicly available to the Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08, including, without limitation, information delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.

Section 10.09 Setoff.   In addition to any rights and remedies of the Agent and the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, subject to the applicable Financing Order, each Lender and its Affiliates and the Agent and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off

and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates or the Agent and its Affiliates, as the case may be, to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Agent and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness. Each Lender and the Agent agrees promptly to notify the Borrower and the Agent after any such set off and application made by such Lender or the Agent, as the case may be; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Agent and each lender under this <u>Section 10.09</u> are in addition to other rights and remedies (including other rights of setoff) that the Agent and such Lender may have.

Section 10.10  <u>Counterparts</u>. This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile transmission or other electronic transmission (including a .pdf or .tif copy) of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document; <u>provided</u> that original signatures shall be promptly delivered thereafter, it being understood that that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

Section 10.11  <u>Integration</u>. This Agreement comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter. In the event of any conflict or inconsistency between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; <u>provided</u> that the inclusion of supplemental rights or remedies in favor of the Agent or the Lenders in any other Loan Document shall not be deemed a conflict or inconsistency with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.12  <u>Survival of Representations and Warranties</u>. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Agent and each Lender, regardless of any investigation made by the Agent or any Lender or on their behalf and notwithstanding that the Agent or any Lender may have had notice or knowledge of any Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.13  <u>Severability</u>. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired

thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.14  <u>GOVERNING LAW</u>.  (a) THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE (EXCEPT, WITH RESPECT TO ANY OTHER LOAN DOCUMENT, AS OTHERWISE EXPRESSLY PROVIDED THEREIN); <u>PROVIDED</u> THAT THE AGENT AND THE LENDERS SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)   ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL, EXCEPT AS OTHERWISE SET FORTH IN THE LOAN DOCUMENTS, BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, THE AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE JURISDICTION OF THOSE COURTS.   THE BORROWER, THE AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

Section 10.15  <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.15</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 10.16  <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Borrower and the Agent, and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and

inure to the benefit of the Borrower, the Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Required Lenders.

Section 10.17  Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Collateral Agent.  The provision of this Section 10.17 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.18  PATRIOT Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the PATRIOT Act.  The Borrower agrees to provide, and to cause each other Loan Party to provide, such information promptly upon request.

Section 10.19  No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges and agrees that it has informed its other Affiliates, that: (i) (A) no fiduciary, advisory or agency relationship between any of the Borrower and its Subsidiaries and the Agent or any Lender is intended to be or has been created in respect of any of the transactions contemplated hereby and by the other Loan Documents, irrespective of whether the Agent or any Lender has advised or is advising any of the Borrower and its Subsidiaries on other matters, (B) the arranging and other services regarding this Agreement provided by the Agent and the Lenders are arm's-length commercial transactions between the Loan Parties, on the one hand, and the  Agent and the Lenders, on the other hand, (C) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (D) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agent and each of the Lenders is and has been acting solely as a principal and, except as may otherwise be expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates, or any other Person and (B) none of the Agent or any Lender has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Agent or any Lender has any obligation to disclose any of such interests and transactions to the Borrower or any of its Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.20 <u>Acknowledgement and Consent to Bail-In of Affected Financial Institution</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

> (a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

> (b)    the effects of any Bail-In Action on any such liability, including, if applicable:

> (i)    a reduction in full or in part or cancellation of any such liability;

> (ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

> (iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 10.21 <u>Conflicts with Financing Orders</u>.  In the event of a conflict between any provision of this Agreement and any Financing Order, such Financing Order shall govern.

Section 10.22 <u>Limitations for Swiss Loan Parties</u>.

> (a)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the fulfilment of any obligation of, and the application of proceeds from the enforcement of any security interest or guarantee granted by, any Swiss Loan Party under this Agreement or under any other Loan Document to satisfy obligations of another Loan Party (other than obligations of any of that Swiss Loan Party's wholly-owned direct or indirect subsidiaries) ("**Swiss Restricted Obligations**") shall be limited to the maximum amount permitted by law at the time of fulfilment or enforcement (as the case may be) ("**Swiss Limitation**").

> (b)    The Swiss Limitation shall not release any Swiss Loan Party from the fulfilment of its obligations or the application of enforcement proceeds in excess of the Swiss Limitation, but merely postpone the performance date thereof until such time as it is again permitted notwithstanding the Swiss Limitation. Each Swiss Loan Party shall take all action and cause all action to be taken to enable the fulfilment of its obligations or the application of enforcement proceeds as soon as possible and in an amount as large as possible notwithstanding the Swiss Limitation. In particular, to the extent permitted by law and Swiss accounting standards and upon request by the Administrative Agent, each Swiss Loan Party shall:

(i)    write up or sell any of its assets that are shown in its balance sheet with a book value that is significantly lower than the market value of the assets, in case of a sale, however, only if such assets are not necessary for the Swiss Loan Party's business (*nicht betriebsnotwendig*); and

(ii)    reduce its share capital to the minimum allowed under then applicable law.

(c)    To the extent that the fulfilment of any obligation or the application of proceeds from the enforcement of any security or guarantee to satisfy Swiss Restricted Obligations are subject to Swiss Withholding Tax, the Swiss Loan Party:

(i)    Shall:

(A)    use its best efforts to procure that the fulfilment of such obligation or the application of such enforcement proceeds can be made without deduction of Swiss Withholding Tax by discharging the liability of such tax by notification pursuant to applicable law rather than payment of the tax;

(B)    if the notification procedure pursuant to sub-paragraph (A) above does not apply, deduct the Swiss Withholding Tax at such rate (i) as in force from time to time or (ii) as provided by any applicable double tax treaties, from the respective amount to be paid and promptly pay any such Swiss Withholding Tax deducted to the Swiss Federal Tax Administration; and

(C)    provide the Administrative Agent with evidence that such a notification of the Swiss Federal Tax Administration has been made or, as the case may be, such Swiss Withholding Tax deducted has been paid to the Swiss Federal Tax Administration;

(ii)    shall use its best efforts to procure that any person who is entitled to a full or partial refund of the Swiss Withholding Tax deducted pursuant to this paragraph (ii):

(A)    requests a refund of the Swiss Withholding Tax under applicable law as soon as possible; and

(B)    pays to the Administrative Agent upon receipt any amount so refunded to cover any outstanding part of the Restricted Obligation;

(iii)    notwithstanding anything to the contrary in any Loan Document, shall not be required to gross up, indemnify or hold harmless any Finance Party for the deduction of Swiss Withholding Tax in an amount exceeding the Swiss Limitation, provided that this should not in any way limit any obligations of any other Loan Party under the Loan Documents to indemnify the Finance Parties in respect of the deduction of the Swiss Withholding Tax.

The Administrative Agent shall deduct the amount necessary for payment of the Swiss Withholding Tax (at the expense of the Finance Parties) from the net proceeds from the enforcement of any security interest or guarantee which is subject to the Swiss Limitation and shall pay, on behalf of the Swiss Loan Party, such amount to the Swiss Federal Tax Administration. The Swiss Loan Party shall provide to the Administrative Agent (or shall procure that the Administrative Agent will be provided with) any evidence and/or documents requested by the Swiss Federal Tax Administration in connection with the deduction of such Swiss Withholding Tax.

## ARTICLE XI

## GUARANTEE

Section 11.01. <u>Guarantee</u>. Subject to the Financing Orders, each Guarantor unconditionally guarantees, jointly with the other Guarantors and severally, to the Agent for the ratable benefit of the Secured Parties, as a primary obligor and not merely as a surety, the due and punctual payment and performance of the Obligations. Each Guarantor further agrees that the Obligations may be extended or renewed, in whole or in part, or amended or modified, in each case, in accordance with the terms of the Loan Documents, without notice to or further assent from such Guarantor, and that such Guarantor will remain bound upon its guarantee hereunder notwithstanding any extension or renewal, or amendment or modification, of any Obligation.  Each Guarantor waives promptness, presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment. Capitalized terms used but not defined in this Article IXX shall have the meaning set forth in the New York UCC.

Section 11.02. <u>Guarantee of Payment and Performance; Continuing Guarantee</u>. Each Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment and performance when due (whether at the stated maturity, by acceleration or otherwise) and not merely of collection, and waives any right to require that any resort be had by the Agent or any other Secured Party to any security held for the payment of any of the Obligations or to any balance of any Deposit Account or credit on the books of the Agent or any other Secured Party in favor of any Loan Party or any other person. The obligations of each Guarantor hereunder are independent of the obligations of the Borrower or any other Guarantor, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against the Borrower or any other Guarantor and whether or not the Borrower or any other Guarantor is joined in any such action or actions. Each Guarantor agrees that its guarantee hereunder is continuing in nature and applies to all of the Obligations, whether currently existing or hereafter incurred.

Section 11.03. <u>No Limitations, Etc</u>. (a) Except for termination of a Guarantor's obligations hereunder as expressly provided for in this Agreement, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations, any impossibility in the

performance of any of the Obligations or otherwise. Without limiting the generality of the foregoing, except for termination or release of a Guarantor's obligations hereunder in accordance with the terms of this Agreement (but without prejudice to Section 11.04), the obligations of each Guarantor hereunder, to the fullest extent permitted by applicable law, shall not be discharged or impaired or otherwise affected by, and each Guarantor hereby waives any defense to the enforcement hereof by reason of:

(i)      the failure of the Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(ii)      any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement;

(iii)      the failure to perfect any security interest in, the impairment of or the release of, any of the Collateral held by or on behalf of the Collateral Agent or any other Secured Party for the Obligations;

(iv)      any default, failure or delay, willful or otherwise, in the performance of the Obligations;

(v)      any other act or omission that may in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity;

(vi)      any illegality, lack of validity or enforceability of any Obligation or any Loan Document;

(vii)      any change in the corporate existence, structure or ownership of any Loan Party, or any insolvency, bankruptcy, reorganization or similar proceeding affecting any Loan Party or its assets or any resulting release or discharge of any of the Obligations;

(viii)      the existence of any claim, set-off or other rights that any Guarantor may have at any time against the Borrower, the Agent, any other Secured Party or any other person, whether in connection herewith, the other Loan Documents or any unrelated transactions;

(ix)      this Agreement having been determined (on whatsoever grounds) to be invalid, non-binding or unenforceable against any other Guarantor *ab initio* or at any time after the Closing Date;

(x)      the fact that any person that, pursuant to the Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the Secured Parties;

(xi)      any action permitted or authorized hereunder;

114

(xii)    any other circumstance (including any statute of limitations) or any act or omission that may in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a defense to, or a legal or equitable discharge of, the Borrower or any Guarantor or any other guarantor or surety (other than the payment in full in cash or immediately available funds of the Obligations (without prejudice to Section 11.04)); or

(xiii)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Borrower, any other Guarantor or any other person under any Loan Document, by operation of law or otherwise.

Each Guarantor expressly authorizes the Secured Parties to take and hold security for the payment and performance of the Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Obligations or take any other actions permitted by the Loan Documents, all without affecting the obligations of any Guarantor hereunder.

(b)    To the fullest extent permitted by applicable law and except for termination or release of a Guarantor's obligations hereunder in accordance with the terms of this Agreement (but without prejudice to Section 11.04), each Guarantor waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than, after all Commitments have been terminated, the payment in full in cash or immediately available funds of all the Obligations (other than Unasserted Contingent Obligations) (but without prejudice to Section 11.04). The Agent and the other Secured Parties may, at their election, exercise any right or remedy available to them against any other Loan Party pursuant to this Agreement or the other Loan Documents, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent that after giving effect thereto all Obligations have been terminated and paid in full (other than Unasserted Contingent Obligations) (but without prejudice to Section 11.04). To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election or exercise by any Secured Party even though such election or exercise operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any other Loan Party, or any security, including, without limitation, the Collateral. To the fullest extent permitted by applicable law, each Guarantor waives any all suretyship defenses.

Section 11.04. <u>Reinstatement</u>. Each Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if, at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by the Agent or any other Secured Party upon the bankruptcy or reorganization (or analogous proceeding in any jurisdiction) of the Borrower or any other Loan Party or otherwise. The provisions of this <u>Section 11.04</u> shall survive the termination of this Agreement.

Section 11.05. <u>Agreement To Pay; Contribution; Subrogation</u>. In furtherance of the foregoing and not in limitation of any other right that the Agent, or any other Secured Party has at law or in equity against any Guarantor by virtue hereof, upon the failure of any Loan Party to pay

any Obligation when and as the same shall become due, whether an amortization payment, at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Agent for distribution to the applicable Secured Parties in cash or other immediately available funds the amount of such unpaid Obligation. Subject to the foregoing, to the extent that any Guarantor shall, under this Agreement or the Credit Agreement as a joint and several obligor, repay any of the Obligations constituting Loans or other advances made to or reimbursement obligations owed by another Loan Party under the Credit Agreement (an "Accommodation Payment"), then the Guarantor making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Guarantors in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Guarantor's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Guarantors; provided that such rights of contribution and indemnification shall be subordinated to the discharge of Obligations. As of any date of determination, the "Allocable Amount" of each Guarantor shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Guarantor hereunder and under the Credit Agreement without (a) rendering such Guarantor "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Guarantor with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Guarantor unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA. Upon payment by any Guarantor of any sums to the Agent as provided above, all rights of such Guarantor against the Borrower, any other Loan Party or any other Guarantor arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Article VI hereof.

Section 11.06. Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the financial condition and assets of the Borrower and each other Loan Party and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that no Secured Party will have any duty or obligation to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

Section 11.07. Maximum Liability. Each Guarantor, and by its acceptance of this guarantee, each Secured Party hereby confirms that it is the intention of all such persons that this guarantee and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, the UFCA, the UFTA or any similar foreign, federal or state law to the extent applicable to this guarantee and the Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Obligations of Guarantor under this guarantee at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this guarantee not being void or voidable under applicable law, including under Section 548 of the Bankruptcy Code or any comparable provisions under any other applicable law.

Section 11.08. <u>Taxes</u>. The provisions of Section 3.01 of this Agreement shall apply to each Guarantor *mutatis mutandis*.

## ARTICLE XII

## PLEDGE OF SECURITIES

Section 12.01 <u>Pledge</u>. Subject to the Financing Orders, as security for the payment or performance, as the case may be, in full of its Obligations, each Pledgor hereby pledges to the Collateral Agent, its successors and permitted assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and permitted assigns, for the benefit of the Secured Parties, a security interest in all of such Pledgor's right, title and interest in, to and under:

(a)(i) the Equity Interests directly owned by it (including those Equity Interests listed on **Error! Reference source not found.**) and (ii) any other Equity Interests obtained in the future by such Pledgor and, in each case, the certificates representing all such Equity Interests (the foregoing clauses (i) and (ii), collectively, the "<u>Pledged Equity Interests</u>"); <u>provided</u> that the Pledged Equity Interests shall not include any Equity Interests constituting an amount greater than 65% of the voting Equity Interests of any "first tier" Foreign Subsidiary that are controlled financial corporations (collectively, the "<u>Excluded Equity Interests</u>");

(b)(i) all Indebtedness and the promissory notes and any instruments evidencing such Indebtedness owned by it as of the Closing Date (including those listed opposite the name of such Pledgor on **Error! Reference source not found.**) and (ii) any promissory notes and instruments and any Indebtedness in the future issued to such Pledgor (the foregoing clauses (i) and (ii) collectively, the "<u>Pledged Debt Securities</u>"), in each case including all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all Pledged Debt Securities;

(c) all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the securities referred to in clauses e and interest in, to and under:

(a) and (b) above;

(d) all rights and privileges of such Pledgor with respect to the securities and other property referred to in clauses e and interest in, to and under:

(a), (b) and      (c) above; and

(e) all proceeds of any of the foregoing (the items referred to in clauses e and interest in, to and under:

(a) through (e) being collectively referred to as the "<u>Pledged Collateral</u>").

To have and to hold the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Collateral Agent, its successors and permitted assigns, for the benefit of the Secured Parties, forever, subject, however, to the terms, covenants and conditions hereinafter set forth.

Section 12.02   <u>Voting Rights; Dividends and Interest, Etc</u>. (a) Unless and until an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given written notice to the relevant Pledgors of the Collateral Agent's intention to exercise its rights hereunder:

(i)      Each Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement, the Financing Orders, the Credit Agreement and the other Loan Documents; <u>provided</u> that, except as expressly permitted under the Credit Agreement and the Financing Orders, such rights and powers shall not be exercised in any manner that could materially and adversely affect the rights inuring to a holder of any Pledged Collateral, the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement, the Financing Orders, the Credit Agreement or any other Loan Document or the 118bilityy of the Secured Parties to exercise the same.

(ii)      The Collateral Agent shall promptly execute and deliver to each Pledgor (at such Pledgor's sole expense), or cause to be executed and delivered to such Pledgor, all such proxies, powers of attorney and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above, in each case, as shall be specified in such request.

(iii)      Each Pledgor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the Financing Orders, the other Loan Documents and applicable laws; <u>provided</u> that (A) any noncash dividends, interest, principal or other distributions, payments or other consideration in respect thereof, including any rights to receive the same to the extent not so distributed or paid, that would constitute Pledged Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities, received in exchange for Pledged Securities or any part thereof, or in redemption thereof, as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise and (B) any noncash dividends and other distributions paid or payable in respect of any Pledged Securities that would constitute Pledged Securities in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid in surplus, shall be and become part of the Pledged Collateral, and, if received by any

Pledgor during the continuance of an Event of Default, shall not be commingled by such Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Collateral Agent, for the ratable benefit of the Secured Parties, and shall be forthwith delivered to the Collateral Agent, for the ratable benefit of the Secured Parties, in the same form as so received (endorsed in a manner, or with any necessary stock or note powers or other instruments of transfer, reasonably satisfactory to the Collateral Agent).

(b)     Upon the occurrence and during the continuance of an Event of Default and after written notice by the Collateral Agent to the relevant Pledgors of the Collateral Agent's intention to exercise its rights hereunder, all rights of any Pledgor to dividends, interest, principal or other distributions that such Pledgor is authorized to receive pursuant to paragraph (a)(iii) of this Section 12.02 shall cease, and all such rights shall thereupon become vested, for the ratable benefit of the Secured Parties, in the Collateral Agent which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions, subject to the Financing Orders. All dividends, interest, principal or other distributions received by any Pledgor contrary to the provisions of this Section 12.02 shall not be commingled by such Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Collateral Agent, for the ratable benefit of the Secured Parties, and shall be forthwith delivered to the Collateral Agent, for the ratable benefit of the Secured Parties, in the same form as so received (endorsed in a manner, or with any necessary stock or note powers or other instruments of transfer, sufficient to transfer title to the Collateral Agent). Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account of the Collateral Agent and shall be applied in accordance with the provisions of this Agreement. After all Events of Default have been cured or waived, the Collateral Agent shall promptly repay to each Pledgor (without interest) all dividends, interest, principal or other distributions that such Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 12.02 and that remain in such account, subject to the Financing Orders.

(c)     Upon the occurrence and during the continuance of an Event of Default and after the Collateral Agent (at the direction of the Required Lenders) shall have given written notice to the Borrower of the Collateral Agent's intention to exercise its rights hereunder, all rights of any Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 12.02, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 12.02, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, for the ratable benefit of the Secured Parties, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers, subject to the Financing Orders; provided that unless otherwise directed by the Required Lenders, the Collateral Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Pledgors to exercise such rights. After all Events of Default have been cured or waived, each Pledgor shall have the right to exercise the voting and/or consensual rights and powers that such Pledgor would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) above.

(d)     In order to permit the Collateral Agent to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends

and other distributions which it may be entitled to receive hereunder, each Pledgor shall promptly execute and deliver (or cause to be promptly executed and delivered) to the Collateral Agent all proxies, dividend payment orders and other instruments as are necessary or that the Collateral Agent (at the direction of the Required Lenders) may from time to time reasonably request in writing in accordance with the terms of this Section 12.02.

Section 12.03  Agent Not Partner or Limited Liability Company Member. Nothing contained in this Agreement shall be construed to make the Agent or any other Secured Party liable as a member of any limited liability company or as a partner of any partnership and neither the Agent nor any other Secured Party by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership. The parties hereto expressly agree that, unless the Agent shall become the absolute owner of any Pledged Equity Interests consisting of a limited liability company interest or a partnership interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Agent, any other Secured Party, any Pledgor and/or any other Person.

## ARTICLE XIII

## SECURITY INTERESTS IN OTHER PERSONAL PROPERTY

Section 13.01  Security Interest. Subject to the Financing Orders, as security for the payment or performance when due (whether at the stated maturity, by acceleration or otherwise), as the case may be, in full of the Obligations, each Pledgor hereby pledges to the Collateral Agent, its successors and permitted assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and permitted assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Pledgor or in which such Pledgor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

       (i)     all Accounts;

       (ii)    all Chattel Paper;

       (iii)   all cash, cash equivalents and Deposit Accounts;

       (iv)   all Documents;

       (v)    all Equipment, Fixtures and other Goods;

       (vi)   all General Intangibles (other than Intellectual Property);

       (vii)  all Instruments;

       (viii) all Inventory;

       (ix)   all Investment Property;

(x)      all Letter of Credit Rights;

(xi)      all Intellectual Property, together with the right to sue or otherwise recover for any past, present and future infringement, dilution, misappropriation, or other violation or impairment thereof, and all Proceeds of the foregoing, including without limitation license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto;

(xii)      all Commercial Tort Claims, including, without limitation, those described on **Error! Reference source not found.** hereto;

(xiii)      (1) Securities Accounts, (2) Investment Property credited to Securities Accounts or Deposit Accounts from time to time and all Security Entitlements in respect thereof, (3) all cash held in any Securities Account or Deposit Account, (4) all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained by such Pledgor with any bank or other financial institution and (5) all other Money in the possession of the Collateral Agent;

(xiv)      all books and Records pertaining to the Article 9 Collateral;

(xv)      all Proceeds, Supporting Obligations and products of (i) any and all of the foregoing, (ii) Excluded Collateral to the extent the proceeds of such Excluded Collateral is not itself Excluded Collateral and (iii) all collateral security and guarantees given by any person with respect to any of the foregoing; and

(xvi)      all other "Collateral" as defined in the Financing Orders.

Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a Security Interest in, and each reference to Article 9 Collateral or to any relevant type or item of property constituting Article 9 Collateral shall be deemed to exclude, the following ("Excluded Collateral"): (a) any "intent-to-use" applications for trademark or service mark registrations filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, unless and until an Amendment to Allege Use or a Statement of Use under Sections 1(c) and 1(d) of the Lanham Act has been filed and accepted; (b) any governmental licenses or state or local franchises, charters and authorizations to the extent a security interest in such licenses, franchises, charters or authorizations is prohibited or restricted thereby (other than to the extent that any such prohibition would be rendered ineffective pursuant to any other applicable requirements of law, including pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Code) or any other applicable anti-assignment provisions of the Code; (c) any asset the granting of a security interest in which is prohibited or restricted by applicable law; (d) any Excluded Account, (e) any lease, license, contract or other agreement of such Loan Party if the grant of a security interest in such lease, license, contract or other agreement in the manner contemplated by the Loan Documents is prohibited under the terms of such lease, license, contract or other agreement or under applicable law or would result in default thereunder, the termination thereof or give the other parties thereto the right to terminate, accelerate or otherwise alter such Loan Party's rights, titles and interests

121

thereunder (including upon the giving of notice or the lapse of time or both) and (f) any segregated deposits that constitute Permitted Liens and are prohibited from being subject to other Liens.

Each Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) with respect to the Collateral (including all Article 9 Collateral consisting of Pledged Collateral) or any part thereof and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment (or the analogous legislation of each applicable jurisdiction), including (i) whether such Pledgor is an organization, the type of organization and any organizational identification number issued to such Pledgor, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of the property to which such Article 9 Collateral relates and (iii) a description of collateral that describes such property in any other manner as the Collateral Agent may reasonably determine is necessary to ensure the perfection of the security interest in the Collateral granted under this Agreement, including describing such property as "all assets", whether now owned or hereafter acquired, or words of similar effect. Each Pledgor agrees to provide such information to the Collateral Agent promptly upon request. For the avoidance of doubt, the Agent and Lenders each shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

The Collateral Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) such documents as may be reasonably necessary for the purpose of perfecting, continuing, enforcing or protecting the Security Interest granted by each Pledgor, without the signature of any Pledgor, and naming any Pledgor or the Pledgors as debtors and the Collateral Agent as secured party. For the avoidance of doubt, the Agent and Lenders each shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

Notwithstanding the foregoing authorizations, each Pledgor agrees to file and deliver to the Collateral Agent upon recording such financing statements as are or may be necessary to establish and maintain a valid, enforceable, perfected security interest in the Collateral as provided herein and the other rights and security contemplated hereby or as the Collateral Agent may from time to time reasonably request, and authorization to the Collateral Agent hereunder shall not relieve the Pledgor of its obligation to make such filings.

Section 13.02 <u>Security Interest Absolute</u>. All rights of the Collateral Agent hereunder, the Security Interest in the Article 9 Collateral, the security interest in the Pledged Collateral and all obligations of each Pledgor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or

guaranteeing all or any of the Obligations or (d) subject only to termination or release of a Guarantor's obligations hereunder in accordance with the terms of **Error! Reference source not found.** hereof, any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Pledgor in respect of the Obligations or this Agreement (other than a defense of payment or performance).

All rights, remedies and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

Section 13.03  Binding Effect; Several Agreement. This Agreement shall become effective as to any party to this Agreement when a counterpart hereof executed on behalf of such party shall have been delivered to the Agent and a counterpart hereof shall have been executed on behalf of the Agent, and thereafter shall be binding upon such party and the Agent and their respective permitted successors and assigns, and shall inure to the benefit of such party, the Agent and the other Secured Parties and their respective permitted successors and assigns, except that no party shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or any other Loan Document. This Agreement shall be construed as a separate agreement with respect to each Loan Party and may be amended, modified, supplemented, waived or released with respect to any Loan Party without the approval of any other Loan Party and without affecting the obligations of any other Loan Party hereunder.

Section 13.04  Agent's Fees and Expenses; Indemnification. The parties hereto agree that the Agent shall be entitled to payment of fees and reimbursement of its expenses incurred hereunder pursuant to the Agent Fee Letter and to be indemnified and held harmless by each Pledgor, jointly with the other Pledgors and severally, as provided in Sections 10.04 and 10.05 of the Credit Agreement and such provisions shall be incorporated by reference herein and apply to each Pledgor *mutatis mutandis.* The Lenders, by acceptance of the benefits of this Agreement, hereby acknowledge and agree that the rights, privileges and immunities in the Credit Agreement (including without limitation Article IX thereof) and the other Loan Documents shall be incorporated by reference herein and apply to each Lender *mutatis mutandis.* This Section 13.01 shall survive the termination of this Agreement or any other Loan Document, the repayment of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, the resignation or removal of the Agent or any investigation made by or on behalf of any Secured Party.

Section 13.05  Collateral Agent Appointed Attorney-in-Fact. Each Pledgor hereby irrevocably appoints the Collateral Agent the attorney-in-fact of such Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary to accomplish the purposes hereof subject to the Financing Orders, which appointment is irrevocable and coupled with an interest. The Collateral Agent shall have the right, upon the occurrence and during the continuance of an Event of Default and at the direction of the Required Lenders, subject to the Financing Orders, with full power of substitution

either in the Collateral Agent's name or in the name of such Pledgor, (a) to receive, endorse, assign or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof, (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral, (c) to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Collateral, (d) to sign the name of any Pledgor on any invoice or bill of lading relating to any of the Collateral, (e) to send verifications of Accounts to any Account Debtor, (f) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral, (g) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, (h) to notify, or to require any Pledgor to notify, Account Debtors to make payment directly to the Collateral Agent, and (i) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Pledgor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct. Each Pledgor acknowledges that the rights and responsibilities of the Agent under this Agreement with respect to any action taken by the Agent or the exercise or non-exercise by the Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Agent and the Secured Parties, be governed by the Credit Agreement and such other agreements with respect thereto as may exist from time to time among them, but, as between the Agent and the Pledgors, the Agent shall be conclusively presumed to be acting as agent for the applicable Secured Parties with full and valid authority so to act or refrain from acting, and no Pledgor shall be under any obligation, or entitlement, to make any inquiry respecting such authority. The Collateral Agent shall be entitled to all of the rights, privileges and immunities entitled to it as set forth in the Credit Agreement and the other Loan Documents, including those rights, privileges and immunities provided to the Collateral Agent and Administrative Agent, as applicable, whether or not expressly set forth herein.

Section 13.06  Additional Subsidiaries. Upon execution and delivery by the Collateral Agent and any Subsidiary that is required to become a party hereto by the Credit Agreement of an instrument in the form and substance satisfactory to Collateral Agent (as directed by Required Lenders), such Subsidiary shall become a Subsidiary Loan Party hereunder with the same force and effect as if originally named as a Subsidiary Loan Party herein. The execution and delivery of any such instrument shall not require the consent of any other party to this Agreement. The rights and obligations of each party to this Agreement shall remain in full force and effect notwithstanding the addition of any new party to this Agreement.

Section 13.07  Financing Orders; Matters Relating to Security.

124

(e)     Notwithstanding anything herein to the contrary, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of the applicable Financing Order.  In the event of any conflict between the terms of this Agreement and the applicable Financing Order, the terms of the applicable Financing Order, shall govern and control.

(f)     The security interest granted by and pursuant to this Agreement may be independently granted by the applicable Financing Order and the Loan Documents.  This Agreement, applicable Financing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent and Secured Parties hereunder and thereunder are cumulative.

(g)     The security interest hereunder shall be deemed valid, binding, continuing, enforceable and fully perfected Liens on the Collateral by entry of, and subject to, applicable Financing Order.  Notwithstanding anything in this Agreement, the Collateral Agent shall not be required to file any financing statements, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, applicable Financing Order or any other Loan Document.

The security interest, the priority of the security interest, and the other rights and remedies granted to the Collateral Agent pursuant to this Agreement, applicable Financing Order, and the other Loan Documents (specifically including but not limited to the existence, validity, enforceability, extent, perfection and priority of the security interest) and the administrative superpriority provided herein and therein shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Pledgor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Bankruptcy case, or by any other act or omission whatsoever.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**ACORDA THERAPEUTICS, INC.**

By: _____
Name:
Title:

**CIVITAS THERAPEUTICS, INC.**

By: _____
Name:
Title:

**BIOTIE THERAPIES, LLC**

By: _____
Name:
Title:

**BIOTIE THERAPIES AG**

By: _____
Name:
Title:

[Signature Page to Debtor-in-Possession Credit Agreement]

**NEURONEX, INC.**

By: _____
Name:
Title:

**ACORDA THERAPEUTICS LIMITED**

By: _____
Name:
Title:

[Signature Page to Debtor-in-Possession Credit Agreement]

## <u>Exhibit C</u>

### Committees Organized Prepetition

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the following committees have been formed prior to the Petition Date.

| Committee | Counsel for Committee |
|---|---|
| Ad Hoc Committee of Noteholders | King & Spalding, 110 N Wacker Drive, Suite 3800, Chicago, Illinois 60606 (Attn: Matthew Warren and Lindsey Henrikson) |

## Exhibit D

**Consolidated List of 30 Largest Unsecured Creditors**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Petition Date, the 30 largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. | CATALENT MASSACHUSETTS LLC 14 Schoolhouse Road Somerset, NJ 08873 | Attn: General Counsel (Legal Department) Phone: (857) 323-8641 Email: GensCouns@Catalent.com | Settlement Agreement | Unliquidated | – | – | $4,000,000 |
| 2. | CATALENT MASSACHUSETTS LLC 14 Schoolhouse Road Somerset, NJ 08873 | Attn: General Counsel (Legal Department) Phone: (857) 323-8641 Email: GensCouns@Catalent.com | Inventory | Unliquidated | – | – | $3,216,511 |
| 3. | NSIGHT DRIVEN COMMUNICATIONS LLC 379 West Broadway Suite 550 New York, NY 10012 | Attn: John Tenaglia Title: Partner Phone: +1 (914) 204-6145 Email: john.tenaglia@wearemoonrabbit.com | Trade Debt | Unliquidated | – | – | $1,448,740 |
| 4. | SYNEOS HEALTH COMMERCIAL SERVICES, LLC 500 Atrium Drive Somerset, NJ 08873 | Attn: Whitney Armond, III Title: Sr. Vice President, Deployment Solutions Phone: (222) 324-8781 Email: Whitney.armond@syneoshealth.com | Contract Salesforce | Unliquidated | – | – | $1,110,423 |
| 5. | YIPKOS, INC. 6628 Sky Pointe Drive Suite 123 Las Vegas, NV 89131 | Attn: Matt Boylan Title: CTO Phone: +1 (714) 273-3679 Email: matt@yipkos.com | Trade Debt | Unliquidated | – | – | $335,490 |
| 6. | SMC, LTD. 330 SMC Drive Somerset, WI 54025 | Attn: Contract Administration Phone: (715) 247-3500 Fax: (715) 247-3611 Email: SMC.AR@smcltd.com | Inventory | Unliquidated | – | – | $279,247 |
| 7. | PRIME VIGILANCE LTD 26-28 Frederick Sanger Road. Surrey Research Park Guildford, Surrey GU2 7YD | Attn: Richard O'Hara Title: Senior Medical Information Associate Phone: +44(0) 148 3307920 Email: Accounts.ReceivablePV@primevigilance.com | Trade Debt | Unliquidated | – | – | $186,672 |
| 8. | FORTREA PATIENT ACCESS PO Box 931364 Atlanta, GA 31193-1364 | Attn: Lillian Steinbock Title: Executive Director Patient Support Solutions Phone: (240) 623-3926 Email: lillian.steinbock@fortrea.com | Prescription Support Servicer | Unliquidated | – | – | $151,974 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9. | JONES DAY 250 Vesey Street New York, NY 10281-1047 | Attn: Adriane Antler Title: Of Counsel Phone: (212) 326-3630 Email: amantler@jonesday.com | Professional Services | Unliquidated | – | – | $123,282 |
| 10. | SHARP CORPORATION7451 Keebler WayAllentown, PA 18106 | Attn: Barbara OstTitle: Vice PresidentPhone: (610) 254-1765Email: barbara.ost@sharpservices.com | Packager | Unliquidated | – | – | $81,624 |
| 11. | APOLLO RX, LLC 150 N Riverside Plaza Suite 3400 Chicago, IL 60606 | Attn: Dan Wallenberg Title: Chief Commercial Officer Phone: (630) 253-3535 Email: dwallenberg@novosgrowth.com | Trade Debt | Unliquidated | – | – | $70,000 |
| 12. | AXIOM GLOBAL, INC. 75 Spring Street/Floor 8 New York, NY 10012 | Attn: Lynn LaPierre Phone: (312) 261-6040 Email: hello@axiomglobal.com | Professional Services | Unliquidated | – | – | $63,000 |
| 13. | EVERSANA LIFE SCIENCE SERVICES 24740 Network Place Chicago, IL 60673-1247 | Attn: Tammy White Title: Associate Director, Medical Communications Phone: (833) 656-1055 Email: Accounting-MC@eversana.com | Trade Debt | Unliquidated | – | – | $56,338 |
| 14. | DLA PIPER LLP (US) PO Box 780528 Philadelphia, PA 19178-0528 | Attn: Michael Sitzman Title: Partner Phone: (415) 615-6175 Email: michael.sitzman@us.dlapiper.com | Professional Services | Unliquidated | – | – | $55,038 |
| 15. | COMPUTER PACKAGES, INC. 11 N. Washington Street, Suite 300 Rockville, MD 20850 | Attn: Anna Sarkissain Phone: (301) 424-8890 Email: ASarkissian@computerpackages.com | Professional Services | Unliquidated | – | – | $52,806 |
| 16. | PRINT COTTAGE 54 Market Street Onancock, VA 23417 | Attn: James Altadonna Title: President Phone: (516) 369-1749 Email: jaltadonna@aol.com | Trade Debt | Unliquidated | – | – | $45,522 |
| 17. | RESEARCH CATALYST, LLC 701 E. Hampden Avenue Suite 510 Englewood, CO 80113 | Attn: Melissa Overbaugh Title: Director Phone: (720) 597-3958 Email: moverbaugh@ResearchCat.com | Trade Debt | Unliquidated | – | – | $41,666 |
| 18. | SLATE360, INC. 6628 Sky Pointe Drive Suite 120 Las Vegas, NV 89131 | Attn: Shawn Donnelly Title: Partner Phone: +1 (508) 298-9048 Email: Accounting@slate360inc.com | Trade Debt | Unliquidated | – | – | $37,841 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 19. XENON PROPERTY, LLCARE/283 Bear Hill Road Region No. 46Waltham, MA 02451 | Phone: (617) 912-7000Email: MRIWebFarm@cbre.com | Landlord | Unliquidated | – | – | $33,027 |
| 20. INSIGHT PO Box 731069 Dallas, TX 75373-1069 | Attn: Rob McConnell Title: Senior Sales Account Manager Phone: (800) 804-4155 x5752 Email: Rob.McConnell@Insight.com | Trade Debt | Unliquidated | – | – | $32,205 |
| 21. DELAWARE DEPARTMENT OF FINANCE Office of Unclaimed Property, Carvel State Office Building P.O. Box 8923 Wilmington, DE 19899 | Attn: Holder Reporting Team Phone: (855) 505-7520 Email: escheat.claimquestions@delaware.gov | Government Agency | Unliquidated | – | – | $32,185 |
| 22. IQVIA, INC. PO Box 8500-784290 Philadelphia, PA 19178-4290 | Attn: Sylwia Szymanski Title: Finance Manager Phone: (973) 316-4000 Email: Sylwia.Szymanski@iqvia.com | Trade Debt | Unliquidated | – | – | $27,627 |
| 23. SYNERGISTIX, INC. 480 Sawgrass Corporate Pkwy. Suite 200 Sunrise, FL 33325 | Attn: Don Schenker Title: President & CEO Phone: (954) 707-4201 Email: Don.Schenker@synergistix.com | Trade Debt | Unliquidated | – | – | $27,388 |
| 24. THE HIBBERT COMPANY, INC. 400 Pennington Avenu Trenton, NJ 08618 | Attn: Oksana Posewa Title: Senior Director of Sales Phone: (609) 222-6088 | Inventory / Warehouse | Unliquidated | – | – | $27,298 |
| 25. EUROPEAN MEDICINES AGENCY Domenico Scarlattilaan 6 1083 HS Amsterdam, The Netherlands | Phone: +31 (0)88 781 6000 Email: accountsreceivable@ema.europa.eu | Regulator | Unliquidated | – | – | $26,174 |
| 26. NYS OFFICE OF THE STATE COMPTROLLER Office of Unclaimed Funds Remittance Control, 2nd Floor 110 State Street Albany, NY 12236 | Attn: Office of the State Comptroller Phone: 1 (800) 221-9311 Email: Contactus@osc.ny.gov | Government Agency | Unliquidated | – | – | $25,414 |
| 27. INDEGENE, INC. PO Box 69091 Baltimore, MD 21264 | Attn: Matt Skoronski Title: Sr Director Phone: (203) 556-2115 Email: matthew.skoronski@indegene.com | Trade Debt | Unliquidated | – | – | $22,500 |
| 28. ELMORE PATENT LAW GROUP. PC484 Groton RoadWestford, MA 01886 | Attn: Carolyn ElmoreTitle: PresidentPhone: (978) 251-3509Email: celmore@elmorepatents.com | Professional Services | Unliquidated | – | – | $19,518 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 29. THE CEMENTWORKS, LLC 32 Old Slip 15th Floor New York, NY 10005 | Attn: Jennifer Matthews Title: CEO and President Phone: (212) 524-6200 Email: jmatthews@thebloc.com | Trade Debt | Unliquidated | – | – | $16,698 |
| 30. CAREMARK, L.L.C. 2211 Sanders Road 8th Floor Northbrook, IL 60062 | Attn: Bradley Kruk Title: Manager, Trade Services Email: bradley.kruk@cvshealth.com | Customer | Unliquidated | – | – | $14,303 |

## Exhibit E

### Consolidated List of Holders of the Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, the following is a list of the creditors holding the five largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101. The Debtors note that each of the holders of these claims are party to the same Indenture dated as of December 23, 2019 (as amended, supplemented or modified from time to time, the "**Indenture**"), by and among Acorda Therapeutics, Inc. ("**Acorda**"), as issuer, its wholly-owned subsidiary Civitas Therapeutics, Inc. ("**Civitas**"), along with any domestic subsidiaries acquired or formed after the date of issuance, as guarantors (the "**Guarantors**") [1] and Wilmington Trust, National Association, as trustee and collateral agent. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. This list is exclusive of secured claims that may arise by operation of law, such as those securing unmatured claims for taxes, promissory liens, or otherwise.

At present, the Debtors do not anticipate disputing the claims listed below, however, Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The exhibit estimates outstanding claim amounts (including principal and interest) as of the Petition Date.

| No. | Creditor name and complete address | Amount of Claim[2] | Description of the collateral and value |
|---|---|---|---|
| 1 | Davidson Kempner Capital Management 520 Madison Avenue, 30th Floor New York, New York 10022 | $53.37 million | Substantially all of the assets of Acorda and the Guarantors<br><br>Value: Unknown |
| 2 | Highbridge Capital Management LLC 277 Park Avenue, 23rd Floor New York, New York 10172 | $46.19 million | Substantially all of the assets of Acorda and the Guarantors<br><br>Value: Unknown |
| 3 | UBS AG One North Wacker Drive, 32nd floor Chicago, Illinois 60606 | $30.6 million | Substantially all of the assets of Acorda and the Guarantors<br><br>Value: Unknown |

---

[1] Civitas has not formed or acquired any domestic subsidiaries since December 23, 2019.
[2] Includes principle plus accrued interest.

| 4 | Soros Fund Management LLC<br>250 West 55th Street, 29th Floor<br>New York, New York 10019 | $28.51 million | Substantially all of the assets of Acorda and the Guarantors<br><br>Value: Unknown |
| 5 | Canyon Capital Advisors LLC<br>2000 Avenue of the Stars, 11th FL<br>Los Angeles, California 90067 | $26.39 million | Substantially all of the assets of Acorda and the Guarantors<br><br>Value: Unknown |

## **Exhibit F**

### **Summary of the Debtors Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the below is a summary of the Debtors' assets and liabilities.

As of December 31, 2023, on a consolidated basis, the total value of the Debtors' assets is approximately $108,525,000, and the total value of the Debtors' current liabilities is approximately $227,773,000.[3]

---

[3] This data is as reported in Acorda's Form 10-K for the period ended December 31, 2023 and filed on April 1, 2024.

**Exhibit G**

**Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, the Debtors have the below number and classes of publicly held stock, debentures, or securities:

| Publicly Held Security | Approximate Outstanding | Approximate Number of Record Holders |
|---|---|---|
| 6.00% Convertible Senior Secured Notes due 2024 | $207 million[4] | 9 |
| Common stock, $0.001 par value per share | 1,242,098[5] | 10 |

Common stock held by officers and directors:

| Name | Number of Shares |
|---|---|
| Ron Cohen, M.D. | 7,488 |
| Kerry Clem | 504 |
| Sandra Panem | 24 |

---

[4] Aggregate principal amount.
[5] As of March 27, 2024.

## **Exhibit H**

### **Summary of Debtors' Property in Possession of Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following is a list of property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, materialmen, distributors, warehousemen, fulfillment houses, service providers, custodians, public officers or agents, where the Debtors' ownership interest is not affected. In the ordinary course of business, inventory of the Debtors is held by certain known contract manufacturers, shippers, warehousemen and logistics companies, including: (i) Cardinal Health 105, Inc.; (ii) Hibbert Group; (iii) Sharp Corporation; (iv) Prime, Inc; (v) FedEx Corporation; (vi) DHL Global Forwarding; and (vii) SMC Ltd.

## **Exhibit I**

### **List of Premises from which the Debtors Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Address | City, State | Zip | Country | Type (Leased/Owned) |
|---------|-------------|-----|---------|---------------------|
| 2 Blue Hill Plaza, 3rd Floor | Pearl River, New York | 10965 | USA | Leased |
| 283 Bear Hill Road | Waltham, MA | 02451 | USA | Leased |

## Exhibit J

### Location of the Debtors' Substantial Assets and Books and Records and Nature and Location of Debtors' Assets Outside the United States

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of Debtors' Substantial Assets**

As of December 31, 2023, the Debtors had assets of approximately $108,525,000, as provided in Exhibit F, with substantial assets located at (i) 2 Blue Hill Plaza, Pearl River, New York 10965 USA; (ii) 283 Bear Hill Road Waltham, MA 02451 USA; and (iii) 15 Ingram Boulevard, Suite 100, La Vergne, TN 37086.

**Books and Records**

The Debtors' books and records are located at (i) 2 Blue Hill Plaza, Pearl River, New York 10965 USA; and (ii) 283 Bear Hill Road Waltham, MA 02451 USA.

**Debtors' Assets Outside the United States**

The Debtors do not have significant assets located outside of the territorial limits of the United States.

**<u>Exhibit K</u>**

**Legal Actions Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), below is a summary of the nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent.

The Debtors do not believe that there are actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent.  However, actions are pending in the German Federal Patent Court seeking to invalidate both of the Debtors German patents that derived from European patents, EP 1732548 (the '548 patent) and EP 2377536 (the '536 patent).  At an oral hearing on March 4, 2024, the German Federal Patent Court held that the '536 patent was invalid.  The Debtors are considering an appeal of this decision and will make a determination following receipt of the formal written decision.  At an oral hearing on July 11, 2023, the German Federal Patent Court held that the '548 patent was invalid.  The German Federal Patent Court issued its formal written decision on the '548 patent on November 10, 2023.  The Debtors appealed the decision on December 11, 2023, and the appeal remains pending before the Federal Court of Justice.

## Exhibit L

### The Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name (Position) | Responsibilities and Relevant Experience |
|---|---|
| Ron Cohen, M.D. (President, Chief Executive Officer) | Ron Cohen, M.D. is President, CEO and founder of Acorda Therapeutics, Inc. Dr. Cohen previously was a principal in the startup of Advanced Tissue Sciences, Inc., a biotechnology company engaged in the growth of human organ tissues for transplantation. In addition, he previously served on the board of directors of VBL Therapeutics and Dyax Corp. Dr. Cohen previously served as Chair of the board of the Biotechnology Innovation Organization (BIO), as Chair of the Emerging Companies Section of the BIO board, and as a Director and Chairman of New York Biotechnology Association (NYBA). He also previously served as a member of the Columbia-Presbyterian Health Sciences Advisory Council and was awarded Columbia University's Alumni Medal for Distinguished Service. In 2010 Dr. Cohen was named NeuroInvestment's (now called NeuroPerspective) CEO of the Year and in 2009 he was recognized by PharmaVoice Magazine as one of the 100 Most Inspirational People in the Biopharmaceutical Industry. Dr. Cohen is a recipient of the Ernst & Young Entrepreneur of the Year Award for the New York Metropolitan Region, and is an inductee into the National Spinal Cord Injury Association's "Spinal Cord Injury Hall of Fame." In 2010, Dr. Cohen was recognized by NYBA as its "The Cure Starts Here" Business Leader of the Year and was named by MM&M and PR Week as one of the top 50 health influencers of 2017. <br><br> Dr. Cohen received his B.A. with honors in Psychology from Princeton University, and his M.D. from the Columbia College of Physicians & Surgeons. He completed his residency in Internal Medicine at the University of Virginia Medical Center, and is Board Certified in Internal Medicine. |
| Michael Gesser (Chief Financial Officer) | Michael Gesser has been the Chief Financial Officer at Acorda since November 2021. Prior to joining the Company, Mr. Gesser was Chief Financial Officer of Tergus Pharmaceutical, LLC, a provider of contract services for topical pharmaceutical products, from January 2020 to September 2021. Prior to that, from September 2017 to August 2019, Mr. Gesser was Chief Financial Officer and Chief Operating Officer of BioMedomics, Inc., an early-stage medical device development company. Between September 2011 and August 2017, Mr. Gesser held Chief Financial Officer positions at several other biopharmaceutical and medical device companies, including Osmotica Pharmaceutical |

| | |
|---|---|
| | Corp., SunTech Medical Inc., and HAP Innovations LLC. Previous to those roles, he held several senior-level financial positions at Allergan Pharmaceuticals. Mr. Gesser has been a member of the board of directors of privately-held Flow Sciences, Inc., a provider of pharmaceutical safety containment solutions, since October 2021. |
| | Mr. Gesser received his B.S. in Finance from the Cameron School of Business at the University of North Carolina at Wilmington, and his M.B.A. from the Belk School of Business at the University of North Carolina at Charlotte. |
| Kerry Clem (Chief Commercial Officer) | Kerry Clem has been the Chief Commercial Officer at Acorda since September 2021. He joined Acorda in January 2011 as VP of Sales, and most recently was Executive Vice President of Sales, Market Access, and Commercial Operations. |
| | Before joining Acorda, from 2009 to 2010, Mr. Clem was Vice President of Sales at Allos Therapeutics, Inc. where he built the organization's inaugural sales force to launch their first commercially available product. Also, from 2007 to 2009, Mr. Clem served as Vice President of Sales and Marketing at Solstice Neurosciences, Inc. Mr. Clem has over 20 years of sales and marketing experience in the areas of neurology, oncology, movement disorders, cardiology, anesthesiology, and pain. Over the span of his career, he has been involved in the development of commercial organizations and multiple product launches. Mr. Clem holds a B.S. degree from Florida State University. |
| Neil Belloff (General Counsel) | Neil Belloff has been the General Counsel at Acorda since November 2021 and Corporate Secretary since June 2022. Mr. Belloff has over 30 years of business and legal experience and from June 2018 to August 2021 was the General Counsel and Corporate Secretary of Eloxx Pharmaceuticals, Inc. ("Eloxx"), a publicly listed global biopharmaceutical company. From 2020 to 2021 Mr. Belloff was also Chief Operating Officer of Eloxx. From 2011 to 2018, Mr. Belloff was Senior Corporate Counsel at Celgene Corporation, formerly a publicly listed global biopharmaceutical company (acquired by Bristol-Meyers Squibb in 2019). Mr. Belloff also served for seven years as Executive Vice President and U.S. Corporate and Securities Counsel at Deutsche Telekom, one of the largest telecommunications companies in the world. In addition, he previously served as a Senior Attorney-Advisor in the Division of Corporation Finance at the U.S. Securities and Exchange Commission in Washington, D.C. |
| | Mr. Belloff holds a J.D. from Quinnipiac University School of Law, a M.A. from New York University, a B.A. from Queens College of the City University of New York, and completed post-graduate studies in |

| | |
|---|---|
| | the LL.M. Program in Securities Regulation at Georgetown University Law Center. |
| Denise Duca (Executive Vice President, Human Resources) | Denise Duca has been Executive Vice President of Human Resources at Acorda since January 2015. She has held leadership positions of increasing responsibility in Acorda's human resources department since 2002. |
| | Ms. Duca received her B.A. in Professional Studies from Pace University, and an M.A. and Master of Education in Psychological Counseling from Teachers College, Columbia University. She has also been a doctoral candidate in the Organization and Leadership Department at Teachers College, Columbia University. |
| Elizabeth Gorman (Sr. Vice President, Legal Commercial and Compliance Officer) | Elizabeth Gorman has been with Acorda Therapeutics, Inc. since Fall 2013. Ms. Gorman serves as Senior Vice President, Legal Commercial and Compliance Officer. She specializes in health care law and is responsible for general legal support for the company's commercial operations, and other business units, including contract preparation and negotiation, FDA promotion and Fraud and Abuse review, and counseling. Additionally, she leads a team of attorneys, and is also responsible for providing general legal support in other areas of the business as needed. In addition, as Compliance Officer, she is responsible for ensuring the compliant operations of the company. Before joining Acorda, Ms. Gorman was with UCB, Inc., for three years and with Schering-Plough Corporation then Merck for seven years, holding various leadership positions, including Associate General Counsel and Executive Director and Associate General Counsel, respectively. Previously, Ms. Gorman specialized in litigation at Dewey Leboeuf. |
| | Ms. Gorman graduated magna cum laude from Seton Hall University and earned her J.D. summa cum laude from Seton Hall University School of Law. She is admitted to the State Bars of New York, New Jersey, and the District of Columbia, as well as the United States Courts of Appeals for the Second and Third Circuits, the United States District Court for the Southern and Eastern Districts of New York and the United States District Court for the District of New Jersey. |
| Susan Way (Sr. Vice President, Drug Development & Regulatory Affairs) | Susan Way has served as the Senior Vice President of Drug Development and Regulatory Affairs at Acorda Therapeutics, Inc. since 2022. She is responsible for managing relationships with regulatory bodies, ensuring compliance with laws and regulations, interpreting new legal mandates for organizational impact, and guiding policy and procedure updates. Additionally, she oversees new product development from ideation to market launch, including the management of the product life cycle and the creation of design briefs for strategic product initiatives. Dr. Way joined Acorda Therapeutics, |

|  | Inc. in August 2008, initially holding positions as Vice President of Program Management and later as Vice President of Regulatory Affairs and Pharmaceutical and Device Development.  Before her tenure at Acorda, Dr. Way was employed at Boehringer Ingelheim Pharmaceuticals from 1994 to 2008, where she progressed from a Senior Principal Scientist to Senior Associate Director of R&D Project Management.<br><br>Dr. Way holds a PhD in Pharmaceutical Sciences from the University of Kentucky College of Pharmacy. |

## Exhibit M

### Estimated Weekly Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount to be paid to officers, stockholders, directors, and the estimated amount to be paid for services of financial and business consultants retained by the Debtors for the 30-day period following the Petition Date.

| Payments | Payment Amount |
| --- | --- |
| Payments to employees (not including officers, directors, and stockholders) | $410,000 per week |
| Payments to officers, directors, and stockholders | $55,000 per week |
| Payments to financial and business consultants retained by the Debtors | $1,000,000 |

## Exhibit N

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30- day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $9,137,697 |
| Cash Disbursement | $(3,348,175) |
| Net Cash Flow | $5,789,522 |
| Unpaid Obligations (excluding professional fees) | $22,164,762[6] |
| Unpaid Receivables (excluding professional fees) | $11,425,541 |

---

[6] Includes accrued payables, accrued expenses and gross-to-nets.