John R. Dodd (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: john.dodd@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4695
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| ACORDA THERAPEUTICS, INC., *et al.,*[1] | Case No. 24-22284 (DSJ) |
| Debtors. | Joint Administration Requested |
| _____/ | |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT
TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF
CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY
CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING
THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Acorda Therapeutics, Inc. (1168), Civitas Therapeutics, Inc. (2814), Biotie Therapies, LLC (2149), Biotie Therapies AG (N/A), Neuronex, Inc. (5094), and Acorda Therapeutics Limited (N/A). For the purposes of these chapter 11 cases, the address for the Debtors is: 2 Blue Hill Plaza, 3rd Floor, Pearl River, New York 10965.

Acorda Therapeutics, Inc. ("**Acorda**") and certain of its affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby file this motion (this "**Motion**") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and following the Final Hearing (as defined herein), entry of a final order granting the relief requested herein (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), granting the relief requested herein.  In support of this Motion, the Debtors rely upon and incorporate by reference (i) the *Declaration of Michael A. Gesser, Chief Financial Officer, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), and (ii) the *Declaration of Jay K. Sinha in Support of Motion of Debtors for (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing*, sworn to the date hereof (the "**Sinha Declaration**") and annexed hereto as **Exhibit B**.  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

3.      On April 1, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") with the Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), nor has a trustee or examiner been appointed in the Chapter 11 Cases.

4.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to rule 1015(b) of the Bankruptcy Rules.

5.      Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases, are set forth in detail in the First Day Declaration.

## PRELIMINARY STATEMENT

6.      The Debtors seek authorization to obtain postpetition financing (the "**DIP Financing**") and approval of their entry into a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of up to $60 million (the "**DIP Facility**"), provided by certain of the Debtors' prepetition secured noteholders (solely in such capacity, the

"**DIP Lenders**"), GLAS USA LLC, as administrative agent, and GLAS Americas LLC, as collateral agent (solely in such capacities, the "**DIP Agent**"), with an interim draw of $10 million under the proposed DIP Financing, subject to entry of the Interim Order (as defined herein).

7.      As described herein, the DIP Financing provides the Debtors with necessary liquidity, on reasonable terms and customary budget covenants.   The relief sought in this Motion is critical for the Debtors to pay their ordinary-course operating expenses, finance these Chapter 11 Cases, pursue the Sale Process (as defined herein), and, ultimately, to consummate the transactions contemplated by the restructuring support agreement (the "**RSA**").

8.      The Debtors' initial budget (the "**Initial DIP Budget**" and, any budget thereafter, a "**Budget**") reflecting the anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth week following the Petition Date is annexed as **Exhibit A** to the Interim Order.

9.      As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases with the support of an ad hoc group of noteholders (the "**Ad Hoc Group**") holding over 90% of the Prepetition Notes (as defined below).   On April 1, 2024, the Debtors executed the RSA with members of the Ad Hoc Group, pursuant to which the members of the Ad Hoc Group agreed to support a chapter 11 plan, as well as the Debtors' marketing and sale process for certain of the Debtor's core assets (the "**Sale Process**").   As of the Petition Date, the Debtors have an aggregate principal amount of at least $207 million in outstanding debt obligations under the Prepetition Indenture, and thus require immediate access to the DIP Financing and authority to use Cash Collateral (as defined herein) to ensure that they have sufficient liquidity to operate their business and pursue the Sale Process, as contemplated by the RSA.   The members of the Ad Hoc

Group have committed to provide the Debtors with DIP Financing in an aggregate amount of up to $60 million to finance these Chapter 11 Cases and support the Sale Process.

10. Several reasons to justify the relief requested herein:

a. The Debtors are entering chapter 11 with limited cash on hand and a large amount of outstanding liabilities. Immediate access to DIP Financing is therefore critical to ensure the Debtors' smooth entry into chapter 11 and their ability to prudently operate their business during the pendency of these Chapter 11 Cases, including consummating the Sales Process.

b. The Debtors, with assistance from experienced financial and legal advisors (who have substantial experience with the Debtors and familiarity with their business), engaged with their Prepetition Noteholders (as defined below) to solicit an initial proposal to provide debtor-in-possession financing.

c. Negotiations with the proposed DIP Lenders were conducted at arm's length and were rigorous. The robust nature of this negotiation process is demonstrated by the terms of the DIP Facility. The Debtors believe the DIP Facility provides sufficient liquidity with customary budget restrictions, all at reasonable rates and market fees.

d. The Debtors propose a limited, initial draw of $10 million on the terms set forth herein.

e. Although the Debtors propose a two dollars to one dollar "roll-up" of the Debtors' outstanding obligations under the Prepetition Notes held by the DIP Lenders (the "**DIP Roll Up**"), the DIP Roll Up is subject to approval of the Final Order (as defined herein), and the DIP Roll Up is an inextricable

component of the DIP Facility, and the Prepetition Noteholders would not have otherwise consented to the use or priming of Prepetition Collateral (as defined below) (including Cash Collateral), and the DIP Secured Parties (as defined in the DIP Credit Agreement) would not otherwise be willing to provide the DIP Facility or extend new credit to the Debtors thereunder, without the inclusion of the DIP Roll Up. Moreover, the DIP Roll Up will enable the Debtors to obtain necessary financing in order to administer these Chapter 11 Cases and fund their operations, and thereby preserve and maximize the going concern value of the Debtors.

f.  The Debtors expect that vendors, customers, and their employees will be highly focused on whether these Chapter 11 Cases are appropriately funded to maximize the value to creditors of the Debtors' estate.

## RELIEF REQUESTED

11.     By this Motion, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), and 6004(h), and 9014, and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), the Debtors request (i) entry of the Interim Order and, (ii) following the Final Hearing, the Final Order, and the relief as provided therein:

a.  authority to enter into the superpriority secured deposit in possession credit agreement, the terms of which shall substantially conform to the terms included in the draft credit agreement annexed hereto as **Exhibit C** to the Interim Order, (the "**DIP Credit Agreement**"), security documents, guarantees and other

6

related documents (collectively, the "**DIP Documents**"), providing for a DIP Facility in an aggregate principal equal to $60 million, comprised of (a) a "new money" multiple draw term loan facility in an aggregate principal of $20 million, of which (i) an initial draw amount of $10 million (the "**Initial DIP Term Loans**") will be made available to be drawn in a single drawing upon entry of the Interim Order and satisfaction of the other applicable conditions to any Initial DIP Term Loans set forth in the DIP Credit Agreement, and (ii) an additional amount of $10 million (the "**Delayed Draw DIP Term Loans**" and, together with the Initial DIP Term Loans, the "**New Money DIP Loans**", and the commitments of the DIP Lenders to provide such New Money DIP Loans, the "**New Money DIP Commitments**"), will be made available to be drawn in a one or two drawings upon entry of the Final Order and satisfaction of the other applicable conditions to any Delayed Draw DIP Term Loans set forth in the DIP Credit Agreement, and (b) "roll-up" term loan credit facility pursuant to which principal amounts outstanding under the Prepetition Notes held by each DIP Lender, in an amount equal to the aggregate amount of commitments of New Money DIP Loans as of the Final Order, shall, upon and subject to entry of the Final Order, automatically be deemed substituted and exchanged for, and converted into, loans under the DIP Facility (such conversion, the "**Roll-Up DIP Loans**" and, together with the New Money DIP Loans, the "**DIP Loans**") on a cashless two dollar for one dollar basis, in each case, in accordance with and subject to the terms and conditions set forth in that certain DIP Credit Agreement;

b.  authority to pay the following interest and fees: (a) payable in kind interest at a rate of 10.5% *per annum* and (b) certain fees, including (i) a commitment fee of 2.00%, which shall be payable in kind on the entry of the Final Order, of the aggregate amount of New Money DIP Commitments (but not, for the avoidance of doubt, payable on the Roll-Up DIP Loans); (ii) an exit fee of 2.00%, which shall be payable in cash upon the earlier of the date of repayment of all or a portion of any Loans and the Maturity Date, on the aggregate amount of Loans; (iii) a ticking fee equal to such DIP Lender's pro rata share of the product of (1) 2.00% per annum multiplied by (2) for each monthly period (or partial period if applicable), the actual daily amount by which the Aggregate Commitment (as defined in the DIP Credit Agreement) exceeds the aggregate amount of the DIP Loans advanced, and (iv) agency fees, as described in that certain *Fee Letter* by and among the Debtors and the DIP Agent (the "**Fee Letter**");

c.  grant, in each case subject to the Carve Out and certain other exceptions set forth in the Interim Order, a first priority, perfected, priming security interest and lien on all prepetition and postpetition assets of each Debtors' estate and all proceeds thereof (other than avoidance actions, but including, subject to and effective upon entry of the Final Order, any proceeds of such avoidance actions), not including any Excluded Collateral (as defined in the DIP Credit Agreement) (the "**DIP Collateral**"), and superpriority claims over all other administrative expenses;

d.  authority to use Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code;

8

e.  approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties (as defined below), including (a) cash payment of the reasonable and documented costs and expenses of the Prepetition Secured Parties; (b) adequate protection liens and superpriority claims; (c) 506(c) and 552(b) waivers (in each case subject to entry of the Final Order); (d) stipulations as to the liens and claims held by such parties; (e) receipt of proceeds upon the sale of Prepetition Collateral, subject to the conditions set forth in the DIP Credit Agreement, and (f) certain financial reporting requirements;

f.  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, subject to the Remedies Notice Period (as defined herein), as applicable;

g.  waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

h.  scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "**Final Hearing**") no later than twenty-nine (29) days after entry of the Interim Order.

## CONCISE STATEMENTS REGARDING DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2[2]

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY[3] | | |
|---|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Acorda Therapeutics, Inc. ("<u>Borrower</u>") | DIP Credit Agreement Preamble (p. 1) |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each Subsidiary of the Borrower (and each other Person that executes a joinder agreement and becomes a "Guarantor", each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>"), including each of the guarantors under the Prepetition Notes, but excluding Biotie Therapies GmbH, a German limited liability company, and Acorda Therapeutics Ireland Limited, an Irish company. | DIP Credit Agreement Preamble (p. 1), § 1.01 "Guarantors" and § 1.01 "Excluded Subsidiary" |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Any Lender that may be a party to the DIP Credit Agreement from time to time, its any successors and assigns, including one or more of the holders of the Prepetition Notes or their affiliates. | DIP Credit Agreement Preamble (p. 1) and § 1.01 "Lenders" |
| **Administrative Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Administrative Agent: GLAS USA LLC<br><br>Collateral Agent: GLAS Americas, LLC | DIP Credit Agreement Preamble (p. 1) |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(1) | $60.0 million secured superpriority debtor-in-possession delayed draw credit facility, consisting of a multiple draw term loan facility in an aggregate principal amount of $20.0 and a roll-up facility in the aggregate maximum principal amount of $40.0, representing a roll-up of Prepetition Secured Obligations (as defined below) on a two dollar to one dollar basis of the Commitments under the DIP Credit Agreement made by the Prepetition Noteholders. | DIP Credit Agreement Recitals (p. 1), Interim DIP Order p. 2 |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(3) | Up to $60.0 million, consisting of up to $10.0 million available upon entry of the Interim Order, up to $10.0 million available upon entry of the Final Order, and a $40.0 roll-up facility available upon entry of the Final Order. | DIP Credit Agreement § 1.01 "Final DIP Loan Commitment", |

---

[2] The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement, the relevant DIP Documents, and/or the Interim DIP Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Credit Agreement, the DIP Documents, or the Interim DIP Order, the provisions of the Interim DIP Order or the DIP Documents, as applicable, shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Credit Agreement, the DIP Documents, and/or the Interim DIP Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001–2 herein.

[3] Summary subject to finalization of DIP Credit Agreement and Interim DIP Order.

| | | and "Interim DIP Loan Commitment," and §2.01 |
|---|---|---|
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(3) | 10.5% per annum, calculated on the basis of the actual number of days elapsed in a 360 day year. | DIP Credit Agreement §1.01 "Applicable Rate" and 2.07 |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(3) | <u>Commitment Fee</u>: A Commitment Fee of 2.0% bps of the DIP Lenders' New Money DIP Commitments payable in kind and capitalized to the balance sheet of the Borrower upon the entry of the Final Order.<br><br><u>Exit Fee</u>: An aggregate Exit Fee of 2.0% bps of the aggregate principal amount of DIP Loans payable in cash on the earlier of (i) the date of repayment of all or a portion of any DIP Loans and (ii) the Maturity Date.<br><br><u>Ticking Fee</u>: Ticking Fee equal to each DIP Lender's pro rata share of the product of (i) 2.0% per annum multiplied by (ii) for each monthly period (or partial period if applicable), the actual daily amount by which the New Money DIP Commitments exceeds the aggregate amount of New Money DIP Loans advanced.<br><br><u>Administration Fee</u>: An administration fee in the aggregate amount for all DIP Lenders equal to $50,000, paid in cash ratably to the DIP Lenders based on their pro rata share of the commitments under the DIP Facility.<br><br><u>Agent Fees</u>: Certain agent fees as described in that certain Fee Letter between the Borrower and the Administrative Agent. | DIP Credit Agreement §2.06 |
| **Superpriority Claim**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(a)(4), Local Bankruptcy Rule 4001-2(a)(4) | The granting to the Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against any Loan Party now existing or hereafter arising, of any kind or nature whatsoever (other than avoidance actions, but, upon entry of the Final Order, including avoidance actions and the proceeds thereof), including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the Carve-Out and super priority claims granted to Stalking Horse Bidder (as defined in the First Day Declaration) shall have priority over, and be senior to, the DIP Facility superpriority claim. | Interim DIP Order ¶ 2(m) |

| | | |
|---|---|---|
| **Use of DIP Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | To (i) to pay certain costs, fees, and expenses related to the Chapter 11 Case, including the fees, costs, and expenses of Professional Persons, (ii) to make adequate protection payments and other payments pursuant to any applicable Financing Order entered by the Bankruptcy Court and any related orders; <u>provided</u> that the form and substance of such orders shall be acceptable to the Requisite DIP Lenders, and (iii) to fund working capital needs and expenditures of the Debtors during the Chapter 11 Case, in each solely in the manner set forth in the applicable DIP Order, and the Approved Budget, subject to the Permitted Variances. | DIP Credit Agreement §6.12; Interim DIP Order ¶ 2(m) |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(10) | The earliest to occur of (i) the date that is one hundred and eighty (180) calendar days after the Petition Date, (ii) if the Final Order has not been entered, twenty nine (29) calendar days after the Petition Date, (iii) the acceleration of the Loans and the termination of the Commitments upon the occurrence, and during the continuance of an Event of Default, (iv) the effective date of any Chapter 11 plan, (v) the date the Bankruptcy Court converts any of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Case, (vii) the date of the entry of the Final Sale Order by the Bankruptcy Court, (viii) the Final Sale Order and (ix) the date an order is entered in any bankruptcy case appointing a Chapter 11 trustee or examiner. | DIP Credit Agreement §1.01 "Maturity Date" |
| **Prepayment Provisions**<br>Local Bankruptcy Rule 4001-2(a)(13) | Amounts outstanding under the DIP Facility may be voluntarily repaid in full at any time without premium or penalty, other than payment of the Exit Fee. | DIP Credit Agreement §2.03; |
| **Joint Liability of Debtors**<br>Local Bankruptcy Rule 4001-2(a)(14) | The DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the Debtors and the Secured Party Adequate Protection Superpriority Claims Obligations shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. | Interim DIP Order ¶ 2(c) and ¶ 3(ii) |
| **Provision for the Funding of Non-Debtor Affiliates**<br>Local Bankruptcy Rule 4001-2(a)(15) | The Debtors shall not enter into any transaction of any kind with any Affiliate of the Borrower or its Subsidiaries, whether or not in the ordinary course of business, other than transactions permitted by an Approved Bankruptcy Court Order or contemplated by the Restructuring Support Agreement. | DIP Credit Agreement §7.08 |
| **Reaffirmation of Prepetition Notes Documents** | The Prepetition Secured Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Notes Documents (other than in respect of the | Interim DIP Order ¶ E(ii) |

| | | |
|---|---|---|
| Local Bankruptcy Rule 4001-2(a)(16) | stay of enforcement arising from section 362 of the Bankruptcy Code). | |
| **Change of Control Provisions** Local Bankruptcy Rule 4001-2(a)(11) | The occurrence of any of the following events shall constitute a change of control:<br><br>(i)  any direct or indirect Subsidiary of the Borrower on the Closing Date shall cease to be a Wholly-owned direct or indirect Subsidiary of the Borrower; or<br><br>(ii)  any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have (x) acquired beneficial ownership or control of 25% or more on a fully diluted basis of the voting and/or economic interest in the Equity Interests of the Borrower; or (y) obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of the Borrower.<br><br>The proposal or entry into (but not the consummation of the transactions pursuant to) the definitive documents contemplated by the Restructuring Support Agreement shall not constitute a Change of Control. | DIP Credit Agreement §1.01 and 8.01(j) |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(8) | Usual and customary covenants for financings of this type, including, among other things:<br><br>Affirmative Covenants:<br>(i)  Delivery of monthly and quarterly unaudited and consolidated financial statements and annual audited and consolidated financial statements (i.e., balance sheet, income statement and cash flow statements) together with compliance certificates;<br><br>(ii)  delivery of Management Discussion and Analysis Reports, Approved Budget, notices to Prepetition Noteholder and other reports;<br><br>(iii)  delivery of copies of SEC filings by the Borrower;<br><br>(iv)  notice that any third party has expressed an interest in acquiring all or substantially all of the Loan Parties' business and delivery of copies of any term sheets, proposals, presentations or other documents; | DIP Credit Agreement Articles VI and VII; Interim DIP Order ¶ 2(e) and 2(f) |

(v)      delivery of drafts of material filings related to the Chapter 11 Case, copies of all filings made with the Bankruptcy Court and all material pleadings, motions and other documents to be filed on behalf of the Debtors with the Bankruptcy Court;

(vi)      delivery of copies of all written reports given by any of the Loan Parties to any official or unofficial creditors' committee;

(vii)      notice of the occurrence of any Default, any event that could result in a Material Adverse Effect, occurrence of an ERISA Event, a Change of Control or a tax event or liability;

(viii)      notice of commencement of, or material development in, any litigation or governmental proceeding or information on environmental matters;

(ix)      notice of change in Loan Party's corporate name, structure, jurisdiction of incorporation or taxpayer ID;

(x)      compliance with Environmental Laws and Permits, notice of any Environmental Action and delivery of copies of environmental reports; and

(xi)      maintenance of existence, property, insurance, compliance with laws, compliance with use of proceeds provisions and Milestones.

<u>Negative Covenants:</u>

(i)      Not to create, incur or assume any Lien or Indebtedness or make any Disposition, Investments or Restricted Payments, other than as permitted under the DIP Credit Agreement;

(ii)      not to make any Fundamental Changes or change in nature of business;

(iii)      not to enter into transactions with Affiliates;

(iv)      not to make prepayments or modifications to certain material agreements;

(v)      not to make any accounting changes;

| | | |
|---|---|---|
| | (vi) not to incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim or other super-priority claim or lien which is pari passu with or senior to the claims or liens, as the case may be, of the Administrative Agent or the Secured Parties against the Loan Parties, or apply to the Bankruptcy Court for authority to do so, except as expressly permitted by the Financing Orders, an Approved Bankruptcy Court Order or the Required Lenders; or<br><br>(vii) except as permitted in the Financing Orders, not to incur, create, assume, suffer to exist or permit any obligation to make adequate protection payments, or otherwise provide adequate protection.<br><br>Financial Covenants:<br><br>Compliance with Budget (subject to Permitted Variances as defined in the Loan Documents). | |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(2) | Initial Approved Budget is attached as **Exhibit A** to the Motion. | Interim DIP Order ¶ 2(e), 2(f) and Exhibit A |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B), Local Bankruptcy Rule 4001-2(a)(10) | Usual and customary events of default for financings of this type, including, among other things:<br><br>(i) failure to make payments when due;<br><br>(ii) non-compliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);<br><br>(iii) non-compliance with covenants contained in other Loan Documents;<br><br>(iv) breaches of representations and warranties in any material respect;<br><br>(v) cross-defaults;<br><br>(vi) occurrence of an event that has a Material Adverse Effect;<br><br>(vii) failure to satisfy or stay execution of judgments in excess of specified amounts; | DIP Credit Agreement §8.01 |

| | | |
|---|---|---|
| (viii) | occurrence of an ERISA Event with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which would reasonably be expected to exceed the Threshold Amount; | |
| (ix) | invalidity of any material provision of any Loan Document; | |
| (x) | change of ownership or control; | |
| (xi) | any Collateral Document ceases to create a valid and perfected Lien; | |
| (xii) | any dissolution or liquidation or filing of a motion in a Bankruptcy Court of any Loan Party; except a liquidation and/or a share capital reduction of the Swiss Loan Party; | |
| (xiii) | any Loan Party is enjoined, restrained, or prevented from continuing to conduct business; | |
| (xiv) | the independent directors no longer constitute 50% of the board of directors of the Borrower; | |
| (xv) | the Borrower no longer retains Ducera Partners LLC as its financial advisor unless replaced with a financial advisor acceptable to the Required Lenders | |
| (xvi) | the Bankruptcy Court fails to (i) enter the Interim Order within five (5) calendar days of the Petition Date (with such changes as the Administrative Agent and the Required Lenders may agree to), or (ii) enter the Interim Order within twenty-nine (29) calendar days of the Petition Date; | |
| (xvii) | an order with respect to the Chapter 11 Case is entered by the Bankruptcy Court (or any of the Loan Parties files any pleading or motion requesting entry of an order) (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code, | |

|  | | or (iii) dismissing or converting the Chapter 11 Case to a Chapter 7 case; | |
|  | (xviii) | any Loan Party fails or neglects to comply with any provision of the Interim Order or Final Order; | |
|  | (xix) | any Person other than a Loan Party files a plan of reorganization or liquidation in the Chapter 11 Case following termination of the Loan Parties' exclusivity periods under Section 1121 of the Bankruptcy Code, unless approved by the Required Lenders; | |
|  | (xx) | the Bankruptcy Courts enters any Unapproved Order (other than one subject to a stay) and the super priority claims granted to Stalking Horse Bidder (as defined in the First Day Declaration referred to in the applicable Financing Order); | |
|  | (xxi) | the Bankruptcy Court enters an order granting relief from the automatic stay for any reason to any Person holding a Lien upon any pre-petition or post-petition assets of any Loan Party with respect to any Collateral as to which the Administrative Agent has been granted a first priority Lien, or any other assets of any Loan Party where the aggregate value of the property subject to all such order or orders is greater than the Threshold Amount; | |
|  | (xxii) | any of the Loan Parties seeks to, or supports (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Loan Party or by oral argument) any other Person's motion to, (i) disallow in whole or in part any of the Obligations arising under this Agreement or any other Loan Document or (ii) challenge the validity and enforceability of the Liens or security interests granted under any of the Loan Documents or in the applicable Financing Order in favor of the Administrative Agent; | |
|  | (xxiii) | any of the Loan Parties makes any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than those payments in respect of adequate protection permitted pursuant to the terms of the applicable Financing Order and payments | |

|  |  |  |  |
|---|---|---|---|
|  |  | authorized by the Bankruptcy Court in respect of (i) any payments required and/or permitted in the "first day orders" or any subsequent Approved Bankruptcy Court Order or (ii) accrued payroll and related expenses as of the Petition Date; |  |
|  | (xxiv) | an order is entered modifying he adequate protection obligations granted in the applicable Financing Order without the prior written consent of the Administrative Agent or Required Lenders, (ii) an order is entered avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations, (iii) any Loan Party files with the Bankruptcy Court a motion seeking authority to use any cash proceeds of any of the Collateral to the extent prohibited hereunder, without the written consent of the Required Lenders and the Administrative Agent or (iv) any Loan Party files a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code; or |  |
|  | (xxv) | the Restructuring Support Agreement (i) is no longer in effect or (ii) is amended, modified or subject to a waiver, in the case of clause (ii), in a manner adverse to the interests of the Lenders without the consent of the Required Lenders. |  |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi), Local Bankruptcy Rule 4001-2(a)(12) | • | As of 11:59 p.m. prevailing Eastern Time on the date that is 3 days from the Petition Date, the Debtors have filed the Bidding Procedures Motion; | Interim DIP Order Exhibit B |
|  | • | As of 11:59 p.m. prevailing Eastern Time on the date that is 5 days from the Petition Date, the Interim DIP Order has been entered by the Bankruptcy Court; |  |
|  | • | As of 11:59 p.m. prevailing Eastern Time on the date that is 21 days from the Petition Date, the Debtors have filed the Disclosure Statement and the Plan; |  |
|  | • | As of 11:59 p.m. prevailing Eastern Time on the date that is 28 days following the filing of the Bidding Procedures Motion, the Bidding Procedures Order has been entered by the Bankruptcy Court; |  |

| | | |
|---|---|---|
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 29 days from the Petition Date, the Final DIP Order has been entered by the Bankruptcy Court; | |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 51 days from the Petition Date, the Debtors have commenced the Auction, if applicable (as defined in the Bidding Procedures); | |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 60 days from the Petition Date, the Sale Order has been entered by the Bankruptcy Court approving the sale of the Acquired Assets (as defined in the Bidding Procedures), provided that if there is no overbid for the Acquired Assets, then the Sale Order shall be entered no later than 53 days from the Petition Date; | |
| | • As of 11:59 p.m. prevailing Eastern Time on the date that is 60 days from the Petition Date, the Bankruptcy Court has entered the Disclosure Statement Order; | |
| | • As promptly as practicable following June 15, 2024 and in no event later than the Outside Date (as defined in the Bidding Procedures), the Debtors shall have consummated the sale of Acquired Assets; | |
| | • As of the 11:59 p.m. prevailing Eastern Time on the date that is 105 days from the Petition Date, the Bankruptcy Court has entered the Confirmation Order; and | |
| | • As of the 11:59 p.m. prevailing Eastern Time on the date that is 120 days from the Petition Date, the Plan Effective Date has occurred. | |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i), Local Bankruptcy Rule 4001-2(a)(4) | The DIP Financing shall be secured by:<br><br>(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, the proceeds of claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or | DIP    Credit Agreement Article XIII<br><br>Interim   DIP Order<br>¶ 2(j) and 2(k) |

| | | | |
|---|---|---|---|
| | | similar state or municipal law, whether received by judgment, settlement, or otherwise, which DIP Liens shall be junior and subordinated only to the Carve-Out; | |
| | (ii) | pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all DIP Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve-Out; and | |
| | (iii) | pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Secured Party Adequate Protection Liens and senior and priming to (A) the Prepetition Secured Liens and (B) any Liens that are junior to the Prepetition Prior Liens or the Secured Party Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements and shall be junior only to the Prepetition Prior Liens and the Carve-Out. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii), Local Bankruptcy Rule 4001-2(a)(5) and (a)(16) | (i) | Clerk and U.S. Trustee Fees: All unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a). | Interim   DIP Order<br>¶ 6(i) |
| | (ii) | Chapter 7 Trustee: All reasonable fees and expenses up to $30,000 incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code. | |
| | (iii) | Allowed Fees of Professionals Retained by Debtors: Subject to the terms and conditions of the Interim DIP Order, the reasonable unpaid fees, costs and disbursements of professionals retained by the Debtors that are incurred prior to the delivery by the Administrative Agent and/or the Prepetition Collateral Agent of a Carve-Out Trigger Notice, that are allowed by the Bankruptcy Court under sections 327, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals. | |

|  | (iv) | **Allowed Fees of Professionals Retained by Creditors**: Subject to the terms and conditions of the Interim DIP Order, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Committee and any other statutory committee and all reasonable unpaid out-of-pocket expenses of the members of any Committee or other statutory committee, in each case that are incurred prior to the delivery by the Administrative Agent and/or the Prepetition Collateral Agent of a Carve-Out Trigger Notice and in accordance with the Approved Budget and the Budget Covenants, and that are allowed by the Bankruptcy Court under sections 328, 330, or 1103 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals, in an aggregate amount (for both Committees' Members and the Committees' Professionals) not to exceed $250,000; |  |
|  | (v) | **Post-Carve-Out Trigger Notice Cap**: The reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice by the Administrative Agent and/or the Prepetition Collateral Agent, that are included in the Approved Budget for the applicable period and comply with the Budget Covenants and the reasonable unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice by the Administrative Agent and/or the Prepetition Collateral Agent, in each case, that are allowed by the Bankruptcy Court under sections 327, 330 or 363 of the Bankruptcy Code after application of any retainers being held by such professionals, each in an aggregate amount not to exceed $1,000,000. |  |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii), Local Bankruptcy Rule 4001-2(a)(10) |  | Any Committee shall have a maximum of sixty (60) calendar days from the formation of such Committee and, solely if no Committee is formed, with respect to other parties in interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days following the date of entry of the Final Order to investigate and commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, and challenge the findings, the | Interim DIP Order ¶ 5 |

| | Debtors' stipulations, or any other stipulations contained in the DIP Orders. | |
|---|---|---|
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The stipulations and admissions contained in the Interim DIP Order shall be binding upon each Debtor and their estates, and other parties in interest (including the Committee), subject to the Challenge Period. | Interim   DIP Order ¶ 5 |
| **Waivers/ Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv), Local Bankruptcy Rule 4001-2(a)(10) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified pursuant to the terms of the Interim DIP Order and the DIP Loan Documents as necessary to:

(i)     permit the Debtors to grant the Secured Party Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order;

(ii)    authorize the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition Notes Documents and/or this Interim Order;

(iii)   permit each of the DIP Agent, the other DIP Secured Parties, the Prepetition Collateral Agent and the other Prepetition Secured Parties to perform any act authorized under this Interim Order and the DIP Loan Documents; and

(iv)    otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents. | Interim   DIP Order ¶ 14(g) |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower shall indemnify and hold harmless the Administrative Agent and the Lenders in accordance with the terms and conditions of the DIP Credit Agreement, and the Debtors shall indemnify and hold harmless the Prepetition Secured Parties in accordance with the terms and conditions of the Interim DIP Order. | DIP   Credit Agreement §10.05

Interim   DIP Order ¶ 2(g) |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi), Local Bankruptcy Rule 4001-2(a)(6) | The Interim DIP Order does not provide for liens on avoidance actions; however, subject to entry of the Final Order, the DIP Collateral shall include proceeds of avoidance actions. | Interim   DIP Order ¶ 2(j) |

| | | |
|---|---|---|
| **Cross-Collateralization**<br>Local Bankruptcy Rule 4001-2(a)(6) | The Interim DIP Order does not provide for cross-collateralization, other than replacement liens as adequate protection. | Interim DIP Order ¶ 2(g) |
| **Roll-Up**<br>Local Bankruptcy Rule 4001-2(a)(7) | Subject to the entry of the Final Order, $40 millin of the outstanding principal amount of the Prepetition Secured Obligations shall immediately, automatically, and irrevocably be deemed to have been converted into Roll-Up DIP Obligations and, except as otherwise provided in the Final Order and the DIP Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents. The Final Order shall provide that (i) the full amount of the Roll Up DIP Loans will not be required to be repaid in cash on the Maturity Date, but instead shall be treated in any manner acceptable to the holders of Roll Up DIP Loans representing at least two-thirds in amount and more than one-half in number of all Roll Up DIP Loans, and (ii) notwithstanding the foregoing, and unless the Requisite Roll Up DIP Lenders otherwise agree in writing, all Roll Up DIP Obligations shall become due and payable in full in cash on the Maturity Date. | DIP Credit Agreement §2.02<br><br>Interim DIP Order ¶ 2(d) |
| **Provisions Limiting Discretion of Bankruptcy Court, Trustee or Other Parties**<br>Local Bankruptcy Rule 4001-2(a)(8) | None. | None. |
| **Provisions Limiting Lenders' Obligations to Fund Trustee**<br>Local Bankruptcy Rule 4001-2(a)(9) | None. | None. |
| **Provisions Deeming Prepetition Debt to Postposition Debt**<br>Local Bankruptcy Rule 4001-2(a)(i)(E) | Subject to the entry of the Final Order, $40 million of the outstanding principal amount of the Prepetition Secured Obligations shall immediately, automatically, and irrevocably be deemed to have been converted into Roll-Up DIP Obligations. | Interim DIP Order ¶ 2(d) |
| **Non-Consensual Priming Liens**<br>Local Bankruptcy Rule 4001-2(a)(i)(G) | None. | None. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x); Local Bankruptcy Rule 4001-2(a)(i)(C) | Subject to the entry of the Final Order, except to the extent of the Carve Out, as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties and the Prepetition Secured Parties to the payment of the Carve-Out to the extent provided herein) and (ii) the Debtors' use of Cash Collateral pursuant to this | Interim DIP Order ¶ 7 |

| | Interim Order and a Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Secured Parties, the Prepetition Notes Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Agent (in accordance with the Prepetition Notes Documents), (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition Secured Parties, and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Cases or any Successor Cases from or against the Prepetition Secured Parties or their Prepetition Secured Liens on or other interests in any or all of the DIP Collateral, the Prepetition Notes Collateral and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests in the DIP Collateral, the Prepetition Notes Collateral and the Cash Collateral and the other DIP Protections accorded the DIP Secured Parties. | |
|---|---|---|
| **Section 552(b)(1) Waiver** Local Bankruptcy Rule 4001-2(a)(i)(H) | Subject to the entry of the Final Order, in light of the subordination of their Liens and superpriority administrative claims to the Carve-Out and the DIP Liens, each of the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, the "equities of the case" exception shall not apply. | Interim DIP Order ¶ 2(n) |
| **Conditions to Borrowing** Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(2) | The DIP Documents include conditions to closing, as well as conditions for subsequent draws under the DIP Credit Agreement, that are customary and appropriate for similar debtor-in-possession financings of this type. | DIP Credit Agreement Article IV |

## **PREPETITION INDEBTEDNESS**

12. Acorda, its wholly-owned subsidiary, Civitas Therapeutics, Inc., a corporation existing under the laws of Delaware ("**Civitas**"), and the other guarantors party thereto from time to time, are each a party to that certain Indenture, dated as of December 23, 2019 (the "**Prepetition Indenture**"), with Wilmington Trust, National Association, as trustee and collateral agent (in such capacities, the "**Collateral Agent**"). The Prepetition Indenture provides for the issuance of 6.00%

Convertible Senior Secured Notes due 2024 (the "**Prepetition Notes**") to the Holders (as defined in the Prepetition Indenture) (collectively, the "**Prepetition Noteholders**" and, together with the Collateral Agent, the "**Prepetition Secured Parties**").  As of the Petition Date, the Debtors' have outstanding debt obligations in the aggregate principal amount of at least $207.0 million under the Prepetition Indenture.

13.    The obligations (the "**Prepetition Secured Obligations**") under the Prepetition Indenture are guaranteed by Civitas and are secured in accordance with the terms of that certain Security Agreement, dated as of December 23, 2019, between, Acorda, Civitas, the other guarantors from time to time party thereto (collectively, the "**Prepetition Grantors**"), and the Collateral Agent.  Pursuant to the terms of the Prepetition Security Agreement, each Prepetition Grantor granted liens on substantially all of its assets (with certain specified exceptions), including, but not limited to, all equipment, inventory, accounts, instruments (including promissory notes), deposit accounts, chattel paper, general intangibles (including payment intangibles), certain intellectual property, investment property, documents, money, letter of credit rights, books and records and certain other personal property (collectively, the "**Prepetition Collateral**").

## THE DEBTORS' IMMEDIATE NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL

14.    As stated in the First Day Declaration, the Debtors require immediate access to debtor-in-possession financing to ensure (i) sufficient working capital to operate their business and to administer their estates during the Chapter 11 Cases, (ii) the timely payment of administrative expenses to be incurred, (iii) the consummation of the Sale Process, and (iv) a positive message to the Debtors' vendors, suppliers, and customers that these Chapter 11 Cases are sufficiently funded. The Debtors are entering chapter 11 with limited available liquidity, which is significantly below the optimal level required to preserve the value of the Debtors' business operations during the

Chapter 11 Cases.  Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared the Initial DIP Budget outlining the Debtors' postpetition cash need in the initial thirteen weeks of the Chapter 11 Cases. The DIP Financing will provide the Debtors with the liquidity necessary to, among other things, make payroll and satisfy their other working capital and general corporate purposes, including essential payments to vendors and service providers during the Chapter 11 Cases, and effect the Sale Process.

15.     In addition, the Debtors will require access to the Prepetition Collateral, including cash collateral (the "**Cash Collateral**") currently subject to the liens of the Prepetition Secured Parties.   As discussed in greater detail in the First Day Declaration and the Cash Management Motion, the Debtors operate a centralized cash management system.  Without the ability to access such cash, the Debtors will not be able to continue operations during the Chapter 11 Cases, which cessation would detrimentally impact the return to the Debtors' creditors in connection with the implementation of the Sale Process.

## DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

16.     As set forth in detail in the First Day Declaration, the Debtors' businesses have faced serious challenges, in large part due to underperformance compared to business projections and absent a restructuring transaction in chapter 11, the Debtors will not be able to continue to operate their business profitably.  Accordingly, the Debtors began a formal review of strategic alternatives and engaged in constructive dialogue and communications with their key constituents, including the members of the Ad Hoc Noteholder Group.

17.     As discussed in the Sinha Declaration, the Debtors' and their advisors approached thirty-three (33) potential third-party financing sources including firms experienced in direct non-bank lending in similar circumstances.   Due to the Debtors' financial position, financing

arrangements and existing capital structure, as well as the expedited timeline leading up to the Petition Date, the Debtors found limited options to secure an adequate amount of financing. In light of the Company's financial position and leveraged capital structure, unsecured financing would not have been a viable option. Further, any senior financing that does not involve the Prepetition Secured Parties would require non-consensual priming liens. Commencing these Chapter 11 Cases with a priming dispute with a third party and litigation with the Collateral Agent over adequate protection (with the attendant destruction of value) was not a risk the Debtors, in their business judgment, were willing to take. The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.

## RELIEF REQUESTED SHOULD BE GRANTED

### A.  Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment

18.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition

27

financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

19.     Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

20.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances. *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as otherwise);

*In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a

debtor may have to enter into "hard" bargains to acquire funds for its reorganization).   Moreover,

the Court may appropriately take into consideration noneconomic benefits to the Debtors offered

under the proposed postpetition facility.   For example, in *In re ION Media Networks, Inc.*, the

Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the
> Committee, are naturally motivated to obtain financing on the
> best possible terms, a business decision to obtain credit from a
> particular lender is almost never based purely on economic
> terms.   Relevant features of the financing must be evaluated,
> including non-economic elements such as the timing and
> certainty of closing, the impact on creditor constituencies and
> the likelihood of a successful reorganization.   This is
> particularly true in a bankruptcy setting where cooperation
> and established allegiances with creditor groups can be a vital
> part of building support for a restructuring that ultimately may
> lead to a confirmable reorganization plan.   That which helps
> foster consensus may be preferable to a notionally better
> transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

21.    The Debtors' decision to enter into the DIP Facility is an exercise of their sound

business judgment.  As further discussed in the First Day Declaration and the Sinha Declaration,

the DIP Financing was market tested and was the product of extensive and arm's-length

negotiations.  Keeping in mind the advantages and disadvantages of the proposed DIP Financing,

the Debtors ultimately decided that moving forward with the proposed DIP Financing was

appropriate and, in the Debtors' best interests.  Put simply, the DIP Financing represents the only

financing available to the Debtors, and given the Debtors' current cash position, absent access to

the proceeds of the DIP Financing, immediate and irreparable harm to the Debtors' estate would

occur if the DIP Financing were not available.  Thus, in light of the above, the Debtors and their

advisors determined that the DIP Financing was the best path forward under the totality of

circumstances, and the Debtors believe that they have obtained the best financing available under

the circumstances.   Accordingly, the Court should authorize the Debtors' entry into the DIP

Documents as a reasonable exercise of their business judgment.

**B.  Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

22.    The Debtors propose to obtain DIP Financing by providing security interests and

liens as set forth in the DIP Documents and described above.  The Debtors satisfy the requirements

for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or

superpriority debt under certain circumstances.    Specifically, section 364(c) of the Bankruptcy

Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the court,
> after notice and a hearing, may authorize the obtaining of credit or the
> incurring of debt:
>
> > (1) with priority over any or all administrative expenses of the
> > kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not
> > otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is
> > subject to a lien . . . .

11 U.S.C. § 364(c).

23.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need

only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured

or administrative expense basis.  *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice

and hearing, upon a showing that unsecured credit cannot be obtained).  "The statute imposes no

duty to seek credit from every possible lender before concluding that such credit is unavailable."

*Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir.

1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001)

(finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

24.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

25.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section

364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit.  Thus, the Debtors determined that the DIP Facility provided the best opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases.  Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

26.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties support the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

27.     Here, the Prepetition Secured Parties' interests in the Prepetition Collateral are adequately protected.  On account of the priming of their liens the Prepetition Secured Parties are entitled to, among other things, a portion of any proceeds received from sale of the Prepetition Collateral pursuant to the Sale Process, subject to the terms of the DIP Credit Agreement.

28.     Further, the Debtors are not aware of any available financing on equal or better terms from the DIP Lenders absent the granting of first priority liens on the Prepetition Collateral. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

## C.  Interests of Prepetition Secured Parties Are Adequately Protected

29.     Parties with an interest in cash collateral are entitled to adequate protection.  *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See*, e.g., *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (finding that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.  *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); accord *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

30.     The adequate protection package provided to the Prepetition Secured Parties, as described above, appropriately safeguards the Prepetition Secured Parties from the diminution in the value of their interests in the Prepetition Collateral, if any.   The Debtors submit that their

provision of adequate protection to the Prepetition Secured Parties is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**D. Debtors Should be Authorized to Use Cash Collateral**

31.     For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (b)     each entity that has an interest in such cash collateral consents; or
>
> (c)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

32.     Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).   Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See, e.g.,* *In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).   While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr.

D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

33.    As noted above, the Prepetition Secured Parties have or are deemed to have consented to the use of Cash Collateral as at least a majority of the Prepetition Noteholders have directed the Collateral Agent to consent to the use of Cash Collateral, and the Debtors are providing the Prepetition Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects the Prepetition Secured Parties' interests in the Prepetition Collateral. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**E. Debtors' Proposed Repayment of Prepetition Indebtedness Should Be Approved Upon Entry of Final Order**

34.    As set forth above, the DIP Agreement provides that upon entry of the Final DIP Order, the Debtors shall be authorized to "roll-up" principal amounts outstanding under the Prepetition Secured Notes, in an amount equal to the aggregate amount of commitments of New Money DIP Loans as of the Final Order on a cashless two-dollar for one-dollar basis, with such amounts shall automatically be deemed substituted and exchanged for, and converted into an equal aggregate principal amount of Roll-Up DIP Loans.    The DIP Roll Up is a material component of the structure of the DIP Facility and was a condition precedent to the DIP Lenders' commitment to provide the DIP Financing and the Prepetition Noteholders agreement to the use of cash collateral and the priming of their liens.    The Debtors were unable to obtain an offer for debtor-in-possession financing on similar terms from the DIP Lenders that did not provide for the refinancing of certain amounts outstanding under the Prepetition Secured Indenture.

35.     The Debtors have determined that satisfying these prepetition claims as part of the DIP Facility is necessary to obtain access to the liquidity necessary to preserve the value of their business for the benefit of the Debtors' estates.  The DIP Roll Up obligations merely affects the timing, not the amount or certainty, of the Prepetition Secured Noteholders' recovery.  Indeed, all Prepetition Noteholders are being or will be offered the ability to participate in the DIP Financing on a pro rata basis, and therefore are equally able to participate in the Roll-Up DIP Loans.

36.     Additionally, the DIP Roll Up does not materially adversely affect junior creditors. The DIP Roll Up itself does not increase the amount of senior secured debt, and the portion of the Exit Fee due on the DIP Roll Up Loans does not materially incrementally disadvantage unsecured creditors.  Indeed, only obligations under the Prepetition Indenture are part of the DIP Roll Up, and the Prepetition Indenture is the Debtors' senior-most tranches of prepetition funded debt and are already entitled to priority over all other prepetition funded debt.  Moreover, the Debtors currently project that the net proceeds of the Stalking Horse Bid, along with other assets of the Company, will result in a recovery of the Prepetition Noteholders of approximately 66% of the Secured Notes.  Importantly, because the Debtors are seeking the approval of the DIP Roll Up on a final basis only, the DIP Roll Up remains subject to review by a creditors' committee or another party in interest with requisite standing.  Accordingly, the Debtors submit that the Court should approve the Debtors' decision to enter into the DIP Facility, including the DIP Roll Up.

37.     Recognizing exigent circumstances like those described above, courts in this district, as well as elsewhere, have approved repayments of prepetition debt ("roll-ups") funded by the proceeds of debtor-in-possession financing in recent chapter 11 cases.  *See, e.g.*, *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving roll up of $50 million); *In re Aéropostale, Inc.*, No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving roll up of $78

million); *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015)

(approving roll up of $135 million); *In re United Retail Grp, Inc.*, No. 12-10405 (SMB) (Bankr.

S.D.N.Y. Feb. 3, 2012) (approving roll up of $11.5 million); *In re Uno Rest. Holdings Corp.*, No.

10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) (approving roll up of $33.9 million); *In re*

*Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009) (approving roll up of $2.1

billion).

## F.  Carve Out Is Appropriate

38.     The liens granted pursuant to the DIP Facility, replacement liens, and the

superpriority claims of all secured lenders are subject and subordinate to the Carve Out. The Carve

Out contains similar terms to others that have been found to be reasonable and necessary to ensure

that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re*

*Avaya,* Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) [Docket No. 61]; *In re Ames*

*Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del.

Aug. 19, 2016) [Docket No. 130]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y.

May 6, 2016) [Docket No. 99]; *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del.

Nov. 2, 2015) [Docket No. 248]; *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr.

D. Del. Oct. 2, 2014) [Docket No. 54]; *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT)

(Bankr. E.D. Va. Feb. 26, 2010) [Docket No. 66]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No.

10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [Docket No. 43].

39.     Without the Carve-Out, the Debtors' estates may be deprived of possible rights and

powers because the services for which professionals may be paid in these cases is restricted.  *See*

*In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals

representing parties in interest because "[a]bsent such protection, the collective rights and

expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects

against administrative insolvency during the course of these cases by ensuring that assets remain

for the payment of U.S. Trustee fees and professional fees, as well as potential administrative

expenses related to the Debtors' entry into a stalking horse purchase agreement for the sale of

certain of its assets, notwithstanding the grant of superpriority claims and replacement liens as part

of the adequate protection of prepetition secured interests.

**G.  Debtors Should Be Authorized to Pay the Fees Due Under the DIP Documents**

40.     As described herein, the Debtors have agreed, subject to Court approval, to pay

certain fees to the DIP Lenders and the DIP Agent (collectively, the "**DIP Fees**") in exchange for

their providing, agenting, and/or arranging the DIP Facility.    As set forth in the First Day

Declaration and the Sinha Declaration, the terms of the DIP Documents, including the fees

imposed thereunder, constitute the best terms on which the Debtors could obtain the postpetition

financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases.

Moreover, the DIP Fees are customary and usual and in line with DIP Financings of this kind, and

are being paid-in-kind.   The Debtors considered the DIP Fees when determining in their sound

business judgment whether the DIP Documents constituted the best terms on which the Debtors

could obtain sufficient DIP Financing.   The Debtors believe paying these fees in order to obtain

the DIP Financing is in the best interests of the Debtors' estates.   Accordingly, the Court should

authorize the Debtors to pay the DIP Fees.

**H.  DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

41.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e)

42.     Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As described in the First Day Declaration and Sinha Declaration, all negotiations of the DIP Documents with the DIP Lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget (subject to permitted variances).  Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the First Day Declaration.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

## I.  Modification of Automatic Stay Is Warranted

43.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above with respect to the Prepetition Secured Parties, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP

Documents), subject to the ("**Remedies Notice Period**") as set forth in the proposed DIP Orders,

for the DIP Agent and/or DIP Lenders to exercise any remedies available to them; and

(c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to

in the DIP Documents.

44.     Stay modifications of this kind are ordinary and standard features of postpetition

financing facilities and, in the Debtors' business judgment, are appropriate under the present

circumstances.  *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD)

(Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578

(MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Reader's Digest Assoc.*, Case

No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case

No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

## BANKRUPTCY RULE 6003 IS SATISFIED AND REQUEST FOR WAIVER OF STAY

45.     The Debtors further submit that because the relief requested in this Motion is

necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein

and in the First Day Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested

herein should be granted.  Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable
> harm, the court shall not, within 21 days after the filing of the petition, issue an
> order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur
> an obligation regarding property of the estate, including a motion to pay all or part
> of a claim that arose before the filing of the petition . . . .

Fed. R. Bankr. P. 6003.

46.     The Court may grant interim relief in respect of a motion filed pursuant to section

363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid

immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P.

4001(b)(2), (c)(2).  As described herein and in the First Day Declaration and in the Sinha

Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Financing.  The Debtors have an immediate need for access to liquidity to, among other things, finance these Chapter 11 Cases, pursue the Sale Process, maintain important customer and vendor relationships, meet payroll, and satisfy working capital and operational needs during the Chapter 11 Cases, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

47.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g., In re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (finding that relief was necessary to avoid immediate and irreparable harm); *In re SunEdison, Inc.,* Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 9, 2016) (same); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014) (same); *In re United Retail Grp., Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); *In re Sbarro, Inc.*, No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); *In re Insight Health Servs. Holdings Corp.*, No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011).  Accordingly, the Debtors respectfully submit that, because of the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

48.     To successfully implement the foregoing, the Debtors respectfully request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and that the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 4001(a).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As explained above and in the First

Day Declaration, the Debtors submit that ample cause exists to justify finding that the notice

requirements under Bankruptcy Rule 6004(a) have been satisfied and granting a waiver of the stay

imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such notice is required and

such a stay applies.

49.     Accordingly, the relief requested herein is appropriate under the circumstances and

under Bankruptcy Rules 6003 and 6004(h).

## REQUEST FOR A FINAL HEARING

50.     The Court may grant interim relief in respect of a motion filed pursuant to section

363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid

immediate and irreparable harm to the estate pending a final hearing."    Fed. R. Bankr. P.

4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply

the same business judgment standard applicable to other business decisions.   *See In re Ames Dep't*

*Stores*, 115 B.R. at 36.   The Debtors request a date which is no later than thirty-five (35) days after

entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the final

approval of the relief requested in this Motion.

## RESERVATION OF RIGHTS

51.     Nothing contained herein is intended or should be construed as or deemed to

constitute an agreement or admission as to the validity of any claim against the Debtors on any

grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds or an

assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy

Code.  The Debtors expressly reserve their rights to contest any claims related to the DIP Facility

and Prepetition Indenture.  Likewise, if the Court grants the relief sought herein, any payment

made pursuant to the Court's order is not intended to be, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE[4]

52.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the Southern District of New York and all other states in which the Debtors operate; (e) the Securities and Exchange Commission; (f) the United States Food and Drug Administration; (g) counsel to the Ad Hoc Noteholder Group and DIP Lenders, King & Spalding; (h) counsel to the DIP Administrative Agent, King & Spalding; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (j) any other party entitled to notice pursuant to Local Rule 9013-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Signature page follows]*

---

[4] Capitalized terms used in the Notice section but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that this Court enter the interim order substantially in the form annexed hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: April 2, 2024

/s/ Blaire Cahn
John R. Dodd (*pro hac vice* pending)
**BAKER & McKENZIE LLP**
1111 Brickell Avenue, 10th Floor
Miami, FL 33131
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: john.dodd@bakermckenzie.com

and

Blaire Cahn
**BAKER & McKENZIE LLP**
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4875
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

**<u>Exhibit A</u>**

**Interim Order**

**<u>Exhibit B</u>**

**Sinha Declaration**