**Exhibit B**

**Sinha Declaration**

John R. Dodd (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: john.dodd@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4695
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| ACORDA THERAPEUTICS, INC., *et al.,* | Case No. 24-22284 (DSJ) |
| Debtors. [1] | (Joint Administration Requested) |

**DECLARATION OF JAY K. SINHA IN SUPPORT OF THE MOTION OF DEBTORS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

I, Jay K. Sinha, hereby declare under penalty of perjury:

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Acorda Therapeutics, Inc. (1168), Civitas Therapeutics, Inc. (2814), Biotie Therapies, LLC (2149), Biotie Therapies AG (N/A), Neuronex, Inc. (5094), and Acorda Therapeutics Limited (N/A). For the purposes of these chapter 11 cases, the address for the Debtors is: 2 Blue Hill Plaza, 3rd Floor, Pearl River, New York 10965.

1. I am a Partner at Ducera Partners LLC ("Ducera"), an internationally recognized investment banking firm, which maintains its headquarters at 11 Times Square, Floor 36, New York, New York 10036. Ducera is the proposed restructuring investment banker for the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases").

2. I submit this declaration (this "Declaration") in support of the relief requested by the Debtors in the *Motion of Debtors for (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* (the "DIP Motion") filed contemporaneously herewith.[2] I have reviewed the DIP Motion, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the success of the Chapter 11 Cases.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information provided to me by the Debtors' management team, other members of the Ducera team working at my direction, the Debtors' other advisors, and certain creditors' advisors, or (d) my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition.

4. I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors. I am not being compensated for this testimony other than through payments

---

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meaning ascribed to such terms in the DIP Motion.

2

received by Ducera as the Debtors' proposed investment banker; none of those payments are specifically payable on account of this testimony.  If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## **QUALIFICATIONS**

5.      Founded in 2015, Ducera is an independent investment banking advisory firm, which has extensive experience in, among other things, providing leading-edge capital structure and restructuring advice in both in-court and out-of-court situations.  In addition to numerous out-of-court restructuring, financing, and sale assignments, Ducera professionals have served as investment bankers to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of bankruptcy matters.  Ducera provides a broad range of corporate and financial services to its clients, including general corporate advice, mergers, acquisitions, divestitures, corporate restructurings, and private placements.  Ducera provides its services worldwide from four (4) offices located in the United States.

6.      Ducera has more than fifty professionals and is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties in interest involved with financially troubled companies requiring complex financial restructurings, both in and outside of bankruptcy.  Ducera has represented debtors, creditors, and other constituents in some of the largest restructuring cases in the United States, including: *In re Revitalid Pharmaceutical Corp.*, No. 23-11704 (BLS) (Bankr. D. Del. Nov. 15, 2023) [Docket No. 105]; *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 25, 2023) [Docket No. 648]; *In re Diebold Holding Co., LLC*, No. 23-90602 (DRJ) (Bankr. S.D. Tex. July 18, 2023) [Docket No. 266]; *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del. May 15, 2023)

3

[Docket No. 261]; *In re Core Scientific, Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. March 13, 2023) [Docket No. 675]; *In re Endo Int'l plc.*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Oct. 25, 2022) [Docket No. 527]; *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 22, 2021) [Docket No. 230]; *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 16, 2021) [Docket No. 1741]; *In re Superior Energy Servs., Inc.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex. Feb. 2, 2021) [Docket No. 316]; *In re Remington Outdoor Co.*, Case No. 20-81688 (CRJ11) (Bankr. N.D. Ala. Aug. 11, 2020) [Docket No. 283]; *In re Imerys Talc Am., Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. Aug. 7, 2019) [Docket No. 927]; *In re Paniolo Cable Co., LLC*, Case No. 18-01319 (RJF) (Bankr. D. Haw. May 7, 2019) [Docket No. 121]; *In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064 (TLS) (Bankr. D. Neb. Jan. 25, 2019) [Docket No. 185]; *In re Sungevity, Inc.*, Case No. 17-10561 (KG) (Bankr. D. Del. Apr. 10, 2017) [Docket No. 202]; *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Jan. 26, 2018) [Docket No. 1624]; *In re Panda Temple Power, LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. May 25, 2017) [Docket No. 164]; *In re DACCO Transmission Parts (NY), Inc.*, Case No. 16-13245 (MKV) (Bankr. S.D.N.Y. Jan. 17, 2017) [Docket No. 205]; *In re Hercules Offshore, Inc.*, Case No. 16-11385 (CSS) (Bankr. D. Del. Aug. 23, 2016) [Docket No. 334]; *In re Ill. Power Generating Co.*, Case No. 16-36326 (MI) (Bankr. S.D. Tex. Jan. 25, 2017) [Docket No. 169]; and *In re Paragon Offshore plc*, Case No. 16-10386 (JKS) (Bankr. D. Del. May 16, 2017) [Docket No. 1503].

7. I have more than fifteen years of investment banking experience and have worked on a broad range of restructuring advisory assignments across a number of industry sectors. I have advised companies, creditors (or committees of creditors), investors, and financial sponsors across several industries on a range of in-court and out-of-court restructurings, financings, and M&A transactions, in traditional and distressed situations. In connection therewith, I have substantial

4

experience marketing, structuring, evaluating, and negotiating debtor in possession financing facilities, exit financing facilities, and other debt facilities. Prior to joining Ducera, I worked for more than eight (8) years at Citigroup, where I worked as an Analyst in the Leveraged Finance group and then as an Analyst, Associate, and Vice President in the Liability Management group. I received a Bachelor of Science in Business Administration from Boston University, graduating *magna cum laude*.

## **BACKGROUND**

8.  The Debtors retained Ducera in May 2022 to provide investment banking services, including advising the Debtors with respect to restructuring and finance matters. Since Ducera was engaged, and as described herein, Ducera professionals have, among other things, (a) worked closely with the Debtors' management and other professionals on the Debtors' restructuring efforts; (b) become acquainted with the Debtors' business, capital structure, operations, finances, and contractual arrangements; (c) analyzed the Debtors' liquidity and projected cash flows; (d) advised the Debtors in their evaluations of the terms, conditions, and potential impact of various strategic and financing alternatives; and (e) assisted the Debtors in connection with preparations for commencement of these Chapter 11 Cases, including assisting in the Debtors' efforts to procure debtor in possession financing.

9.  Specifically in my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings. I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including comparing iterations of debtor in possession financing proposals.

5

10. Over several weeks, Ducera, under my supervision, along with the Debtors' other professionals, worked cooperatively with the parties to that certain Indenture, dated as of December 23, 2019 (the "Indenture"), by and among Acorda Therapeutics, Inc. ("Acorda"), its wholly-owned subsidiary Civitas Therapeutics, Inc. ("Civitas"), along with any domestic subsidiaries acquired or formed after the date of issuance (the "Guarantors"), and Wilmington Trust, National Association, as trustee and collateral agent (the "Prepetition Agent"). Under the Indenture, the Debtors, issued 6.00% convertible senior secured notes due 2024 ("Secured Notes") (the "Prepetition Noteholders", and together with the Prepetition Agent, the "Prepetition Secured Parties") to exchange information related to the Debtors' need for additional liquidity, temporary covenant relief, and to negotiate the proposed DIP Facility. Discussions with the Prepetition Secured Parties were paramount because the Debtors' only secured debt obligations arise from borrowings under the Indenture.

11. The Secured Notes are secured by a first priority lien on substantially all of the assets of Acorda and the Guarantors, subject to certain exceptions described in the Security Agreement, dated as of December 23, 2019 (as amended, supplemented, or modified from time to time, the "Security Agreement"), between the grantors party thereto and the Prepetition Agent. As of the Petition Date, the Company has an aggregate principal amount of at least $207 million in outstanding debt obligations under the Indenture. Among other things, the Indenture sets forth a payment schedule for principal and interest payments on the Secured Notes and it contains various restrictive financial covenants.

12. I understand that leading up to the commencement of these cases, the Debtors experienced strained liquidity and restricted operational flexibility as a result of their leveraged capital structure. I also understand, based on the analysis performed by Ernst & Young LLP

6

("E&Y"), the Debtors' proposed financial advisor in these Chapter 11 Cases, that the Debtors concluded that absent access to additional financing, the Debtors would likely not have sufficient cash on hand and were likely to miss the next interest payment under the Indenture.

13. Accordingly, the Debtors began exploring comprehensive strategic alternatives to restructure the Debtors' debt obligations and improve their liquidity and overall financial condition and commenced discussions with the Prepetition Secured Parties. In May 2022, Ducera began to advise the Debtors and the Debtors' other professionals in connection with the evaluation of alternatives with respect to their capital structure.

14. Under my supervision, Ducera explored out-of-court resolutions between the Debtors and the Prepetition Secured Parties. Unfortunately, the Prepetition Secured Parties were not interested in any such resolution. Consequently, Ducera solicited proposals from thirty-three (33) potential third-party financing sources (excluding the Prepetition Secured Parties), as described in more detail below. None of these parties were willing to provide financing on an unsecured basis or junior to that of the existing Prepetition Secured Parties due to the amount of existing debt on the Debtors' capital structure. Moreover, the Prepetition Secured Parties did not consent to the priming of their liens by a third-party lender.

## THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS

15. In anticipation of their potential need for debtor in possession financing and the use of cash collateral, the Debtors have, in consultation with the Debtors' advisors, performed a review and analysis of their projected cash needs. Based upon that review and analysis, the Debtors and their advisors determined that the use of cash collateral alone would be insufficient to operate their businesses, and that additional funding was necessary. The Debtors determined, in consultation with the Debtors' advisors, that they are in need of both access to cash collateral and an immediate

7

infusion of liquidity to ensure sufficient working capital to operate their business, pay their employees and vendors, service their customers, and administer their estates during these Chapter 11 Cases.

16. Without prompt access to postpetition financing and cash collateral, the Debtors have determined, in consultation with the Debtors' advisors, that they will be unable to: (a) ensure payments to, among others, employees, third-party vendors and trade creditors, utilities, and taxing authorities, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative expenses to be incurred; (c) provide a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to ensure confidence in the Debtors from, among others, their customers, employees, vendors, and the market generally; (d) make any necessary payments to preserve the Debtors' workforce; and (e) effect the proposed sale of substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code. Immediate access to the DIP Facility and continued access to the cash collateral is therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.

**ALTERNATIVE SOURCES OF FINANCING
ARE NOT AVAILABLE ON BETTER TERMS**

I. **The Marketing Process**

17. Prior to the commencement of these Chapter 11 Cases, on or about May 11, 2022, the Debtors retained Ducera to act as the Debtors' investment banker in connection with, among other things, restructuring matters, including, but not limited to, addressing the Secured Notes, negotiating with the Prepetition Secured Noteholders, and running a marketing process for the Debtors' proposed debtor in possession financing facility.

8

18. The Debtors' ability to access third-party postpetition financing was significantly limited because the Debtors' granted a security interest in substantially all of their assets to secure the obligations under the Indenture, which restricts, as a practical matter, the availability of, and options for, postpetition financing. The Debtors determined, in consultation with the Debtors' advisors, that any restructuring transaction would have to result in either the Debtors' current funded indebtedness being paid off in full or require the requisite consent of existing secured lenders. Moreover, the Debtors believe that any dispute with the Prepetition Secured Parties or perceived uncertainty surrounding the Debtors' ability to fund these Chapter 11 Cases could cause significant turmoil within the Debtors' workforce and the pharmaceutical market, and result in a substantial deterioration of value.

19. The Debtors, with the assistance of Ducera, solicited proposals for third-party debtor in possession financing. Excluding the Prepetition Secured Parties, Ducera reached out to thirty-three (33) potential third-party financing sources to gauge their interest in providing postpetition financing to the Debtors. Of the potential third-party financing sources that Ducera contacted, nine (9) executed confidentiality agreements and received access to various diligence information concerning the Debtors to facilitate an evaluation of funding a debtor in possession financing facility. Of the parties contacted, zero (0) parties submitted binding terms to provide a debtor in possession financing facility. Excluding the Prepetition Secured Parties, the Debtors did not receive any binding proposals, whether for unsecured facilities or secured facilities of any priority, from any potential third-party financing sources. The Debtors failed to receive alternative proposals for debtor in possession financing because, among other reasons, potential lenders likely viewed priming liens as a condition to advancing debtor in possession financing to the Debtors and likely felt that the process to approve a priming facility would be contested by the Prepetition

9

Secured Parties.  As a result, I do not believe that any alternative third-party source of debtor in possession financing is currently available to the Debtors on better terms than the DIP Facility based on the facts and circumstances of the Debtors and these Chapter 11 Cases.

20. Each Prepetition Noteholder under non-disclosure agreement ("NDA") was offered the opportunity to participate in the DIP Facility on the same terms and conditions as every other Prepetition Noteholder that was under NDA.  All Prepetition Noteholders under NDA elected to participate in the DIP Facility and become DIP Lenders and it is the intention for any Prepetition Noteholder that was not previously under NDA be afforded the ability to participate on the same terms,

## II. The DIP Facility Has Been Heavily Negotiated

21. The Debtors and the DIP Lenders engaged in arm's length and good faith negotiations regarding the terms offered by the DIP Lenders.  At the conclusion of this process, the Debtors, in consultation with their advisors, determined that the DIP Lenders offered the most viable and beneficial DIP financing terms available, and the parties were able to come to an agreement on the terms of the DIP Facility.

22. Management and the Debtors' legal and financial advisors (including myself) were actively involved throughout the negotiations with the DIP Lenders for debtor in possession financing, which were conducted at arm's length and in good faith. The terms of the DIP Facility were negotiated over the course of the month leading up to the Petition Date, with the Debtors and their advisors exchanging multiple drafts of a DIP financing term sheet, proposed Interim Order, and ultimately the DIP Credit Agreement.  The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Facility available to the Debtors given the Debtors' lack of

alternative third-party financing. Ultimately, the DIP Lenders were unwilling to lend on terms better than those specifically set forth in the DIP Documents.

### III.     The Terms, Rates, and Fees of the DIP Facility Are Reasonable

23.     Pursuant to the DIP Documents, the proposed DIP Facility will be comprised of senior secured super-priority multi-draw term loans in the aggregate principal amount of up to $60 million, consisting of (i) an aggregate maximum principal amount of $10 million in new money available upon the Bankruptcy Court's entry of an order approving the DIP Facility on an interim basis (the "Interim Order"); (ii) an aggregate maximum principal amount of $10 million in new money available upon the Bankruptcy Court's entry of an order approving the DIP Facility on a final basis (the "Final Order"); and (iii) subject to entry of the Final Order, a "roll up" on a 2:1 cashless basis in the aggregate maximum principal amount of $40 million.

24.     Under the DIP Facility, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. Specifically, unless otherwise agreed by the DIP Lenders, the Debtors have agreed to pay interest at 10.50% per annum, payable in kind on each Interest Payment Date (as defined in the DIP Credit Agreement) (the "Interest Rate"). Upon the occurrence of and during the continuance of an Event of Default (as defined in the DIP Credit Agreement), interest will accrue at an additional 2.00% per annum.

25.     In addition, the Debtors have agreed to pay to the DIP Lenders: (i) a 2.00% Commitment Fee on the $20 million in new money, which shall be paid in kind and capitalized to the balance sheet of Acorda upon the entry of the Final Order; and (ii) a 2.00% Exit Fee on the $60 million in aggregate principal amount, which shall be payable on the earlier of the date of repayment of all or a portion of any Loans and the Maturity Date; and (c) a 2.00% Ticking Fee per annum applicable to the $60 million in aggregate principal amount, which shall be payable

11

monthly in arrears on the last business day of the calendar month commencing April 30, 2024 (collectively, the "DIP Fees").

26. The terms and conditions of the DIP Facility, including, without limitation, the Roll Up, Interest Rate, and DIP Fees, were the subject of arm's length and good-faith negotiations between the Debtors and the DIP Lenders, and were, based on my understanding, required by the DIP Lenders as consideration for the extension of postpetition financing. In addition, the Roll Up was a condition of the Prepetition Noteholders to agree to be primed by such financing.

27. Despite the Debtors' best efforts to negotiate with the DIP Lenders and Prepetition Noteholders to eliminate or reduce the Roll Up from the DIP Facility, the DIP Lenders and Prepetition Noteholders, respectively, were unwilling to provide postpetition financing or consent to being primed without the Roll Up. Nevertheless, the Roll-Up does not materially unfairly prejudice unsecured creditors in these Chapter 11 Cases because the aggregate principal amount of senior secured debt will remain substantially similar, and no intercreditor prejudice will result because all of the Prepetition Noteholders will be eligible to participate in the DIP Facility. Similarly as to the DIP Fees, although the Debtors attempted to negotiate with the DIP Lenders to decrease the amount of such fees, the DIP Lenders insisted that the Debtors agree to pay the fees as a condition to extending the DIP Facility. Thus, notwithstanding the inclusion of the Roll-Up or the various fees, because of the lack of alternative sources of financing and the lack of meaningful prejudice to other creditors resulting from the Roll-Up and DIP Fees, the DIP Facility nonetheless represents the best terms available to the Debtors in the market.

28. Based on my experience and knowledge of similar debtor in possession financings in the market and my analysis of roll ups, interest rates, and fees in comparable debtor in possession financing facilities, and given that the Prepetition Noteholders are undersecured in light of the

Stalking Horse Bid and estimates by the Company currently project that the net proceeds of the Stalking Horse Bid, along with other assets of the Company, will result in a substantially below par recovery for the Prepetition Noteholders on the outstanding amount of the Secured Notes, I believe that the financial terms and conditions of the DIP Facility, including, among others, the Roll UP, Interest Rate, and the DIP Fees are fair, reasonable, and within market given current market conditions, the Debtors' current credit profile, the Debtors' circumstances (including their need for expedited financing), and the Debtors' prepetition capital structure.

IV. **The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable**

29. The DIP Facility contemplates, as a product of arm's-length negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain usual and customary milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement. These milestones were heavily negotiated in good faith with and required by the DIP Lenders as a condition to providing the DIP Facility. Accordingly, I believe the milestones in the DIP Facility are reasonable under the circumstances and necessary for the Debtors to successfully complete these Chapter 11 Cases and maximize value of the Debtors' stakeholders.

**APPROVAL OF THE DIP FINANCING MOTION IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM TO THE DEBTORS' ESTATES**

30. After consulting with the Debtors and their other advisors, reviewing the terms of the DIP Credit Agreement, and consideration of the current facts and circumstances respecting the Debtors (including those described above), I believe that the proposed DIP Financing from the DIP Lenders, as reflected in the DIP Credit Agreement and the Interim Order, (a) is reasonable

and appropriate and (b) provides the most cost-effective and beneficial financing available to the Debtors given the circumstances.

31. Based on the information available to me, and my observations during the course of the negotiations over the DIP Facility, it is my opinion that (a) the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's-length, (b) the DIP Facility is the only financing currently available to the Debtors, and (c) the terms and conditions of the DIP Facility, including, among others, the Interest Rate and the DIP Fees, are required in order for the DIP Lenders to fund the DIP Facility and compare favorably to market.

32. The ability to obtain sufficient working capital and liquidity through the DIP Facility is vital to the preservation and maximization of the value of the Debtors' estates. I believe obtaining postpetition financing, as provided under the DIP Credit Agreement, will minimize disruption of the businesses and operations of the Debtors, and permit the Debtors to meet payroll and other operating expenses, while they move forward expeditiously in their efforts to restructure through these Chapter 11 Cases. Without financing, I believe the Debtors' operations would be compromised, which in turn would severely hamper the ability to preserve and maximize the value of the Debtors' businesses for the benefit of stakeholders.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Date: April 2, 2024

                                                */s/ Jay K. Sinha*
                                                Jay K. Sinha
                                                Partner
                                                Ducera Partners LLC