John R. Dodd (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: john.dodd@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4695
Facsimile: 212-310-1695
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| ACORDA THERAPEUTICS, INC., *et al.*,[1] | Case No. 24-22284 (DSJ) |
| Debtors. | Joint Administration Requested |
| _____/ | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING PAYMENT OF PREPETITION
CLAIMS OF CRITICAL VENDORS, AND (II) GRANTING RELATED RELIEF**

Acorda Therapeutics, Inc. and certain of its affiliates (collectively, the "**Debtors**") in the

above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby file this motion (this

"**Motion**") for entry of an interim order, substantially in the form attached hereto as **Exhibit A**

(the "**Interim Order**"), and a final order, substantially in the form attached hereto as **Exhibit B**

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Acorda Therapeutics, Inc. (1168), Civitas Therapeutics, Inc. (2814), Biotie Therapies, LLC (2149), Biotie Therapies AG (N/A), Neuronex, Inc. (5094), and Acorda Therapeutics Limited (N/A). For the purposes of these chapter 11 cases, the address for the Debtors is: 2 Blue Hill Plaza, 3rd Floor, Pearl River, New York 10965.

(the "**Final Order**," and together with the Interim Order, the "**Proposed Orders**"), granting the relief requested herein.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Michael A. Gesser, Chief Financial Officer, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), filed concurrently herewith.[2]  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

3.      On April 1, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**") with the Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed by the Office of the United States Trustee for

---

[2] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the First Day Declaration.

the Southern District of New York (the "**U.S. Trustee**"), nor has a trustee or examiner been appointed in the Chapter 11 Cases.

4.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to rule 1015(b) of the Bankruptcy Rules.

5.      Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases, are set forth in detail in the First Day Declaration.

A.      **The Critical Vendors**

6.      As described in the First Day Declaration, the Debtors are a biopharmaceutical company that have two main products: (a) AMPYRA® ("**Ampyra**")[3], an extended-release tablet approved by the United States Food and Drug Administration ("**FDA**") that helps improve walking in patients with multiple sclerosis, and (b) INBRIJA® ("**Inbrija**," and together with Ampyra, the "**Products**"), an FDA approved levodopa inhalation powder used for fasting acting relief of Parkinson's symptoms.  The Debtors rely on third-party vendors to provide goods and services that are essential to the Debtors' operations, including the manufacturing and marketing of the Products (the "**Critical Vendors**").[4]  As described in this Motion, the Debtors' Critical Vendors may have undisputed prepetition claims for amounts owed to them by the Debtors as a result of their providing goods and services related to the Debtors' operations (the "**Critical Vendor Claims**").

7.      **Specialty Manufacturers**.  In the ordinary course of their business, the Debtors rely on third parties to (a) manufacture the active pharmaceutical ingredients ("**APIs**") for the

---

[3] Ampyra is marketed and distributed as FAMPYRA® outside of the United States by Biogen International GmbH.

[4] To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors in the ordinary course of their businesses.  Identifying the Critical Vendors now would likely cause all such vendors to demand payment in full.

Products, and (b) manufacture the related components for the Products, including medical devices such as inhalers (collectively, the "**Specialty Manufacturers**"). The Debtors do not have any internal manufacturing capacity and do not take physical possession of the API, manufactured pharmaceuticals, or the medical devices at any point in the supply chain. Rather, the Debtors rely on other third-party manufacturers to manufacture the API into consumable pharmaceuticals, test the pharmaceuticals, package the Product, and distribute the Product to end-users.[5] Any disruption to this supply chain could result in the failure to produce, or a delay in production of, adequate supplies of the components necessary to manufacture the Debtors' Products, delaying or reducing commercial sales, materially harming the Debtors' businesses, and negatively impacting the patients that rely on the Debtors' Products.

8.     The Specialty Manufacturers are sole-source providers and are already familiar with the Debtors' businesses and the above manufacturing processes. Further, in order to ensure the quality of drug products, the FDA carefully monitors a drug manufacturer's compliance with its Current Good Manufacturing Practice ("**CGMP**") regulations. For the Debtors to remain in compliance with the CGMP regulations, each of their manufacturers and suppliers must also be in compliance. The Debtors' current manufacturers and suppliers have each passed the CGMP audit and certification. To replace any of these vendors would require the Debtors to undertake an exhaustive and costly regulatory and review process to ensure the manufacturing facilities and processes of the new prospective vendor were also in compliance with the CGMP regulations. Such process could take anywhere from six to twelve (12) months to complete. In short, the Debtors' business is ill-equipped to switch vendors or suppliers on short notice and faces significant risks to its supply chain if certain prepetition amounts cannot be paid. Due to the

---

[5] For the Inbrija Product, there is an added assembly step in this process, as the Product includes an inhaler device.

regulated nature of the Debtors' business and its relationship with sole-source providers, the Debtors have limited-to-no options for replacing the Specialty Manufacturers.

9.      The Debtors do business with certain of their Specialty Manufacturers without the benefit of contracts and, therefore, these Specialty Manufacturers generally are not obligated to do business with the Debtors or to honor particular trade terms for future orders.  Absent some payment of the prepetition Critical Vendor Claims, these Specialty Manufacturers may cease doing business with the Debtors.  Any failure of a Specialty Manufacturer to provide the necessary Product for delivery to the Debtors' customers likely would create shortages in the Debtors' supply chain and adversely affect the customers' willingness to do business with the Debtors in the future, thereby impacting cash flow, profitability, and the ability of the Debtors to complete the sale of their business.  Accordingly, the Debtors seek authority, in their sole discretion, to pay any prepetition amounts owed to the Specialty Manufacturers that it deems critical on an interim and final basis.

10.     **Marketing Agencies**.  The Debtors engage advertising and creative agencies, some of whom do not have contracts with the Debtors, to perform a range of marketing and promotional activities, including but not limited to: (a) brand strategy development; (b) promotional product campaigns; (c) production of promotional content (digital and physical); and (d) coordination of marketing events (the "**Marketing Agencies**").  The market for developing and marketing pharmaceutical products is highly competitive, and it is essential to the Debtors' business that it maintain its marketing efforts without interruption to preserve the Product brands.  The Marketing Agencies are subject to regulations that govern the sale and promotion of the Products, which vary across jurisdiction and require the Marketing Agencies to have specialized knowledge and experience to navigate these regulations effectively.  As a result, it would be difficult, if not

impossible, to find replacement Marketing Agencies during these Chapter 11 Cases without compromising the Product brands and incurring unnecessary replacement time and cost.  The risk of damage to the Product brands and certainty of additional fees and expenses in seeking a replacement would no doubt outweigh the prepetition amounts owed to these Marketing Agencies.

11.     Because the Debtors do not have contracts with certain Marketing Agencies, if the Debtors fail to pay certain prepetition amounts owed, the Marketing Agencies could (a) cease working on a project and keep all content or work that is not yet completed for a project, or (b) withhold any physical promotional materials used for the staging and hosting of marketing events of the Debtor.  Further, even if the Debtors do have a contract with the Marketing Agencies, certain Marketing Agencies receive a substantial amount (25% or more) of their business from the Debtors, and if they are not paid, would likely be rendered insolvent and unable to continue to provide the Debtors services.  Additionally, the Marketing Agencies have source files with data that may not be compelled even if the Debtors do have contracts with the Marketing Agencies. Accordingly, the Debtors seek authority, in their sole discretion, to pay any prepetition amounts owed to the Marketing Agencies that it deems critical on a final basis.

12.     **Foreign Vendors**.  Although the Debtors believe that many of their foreign suppliers of goods and services (collectively, the "**Foreign Vendors**") may continue to do business with the Debtors after commencement of the Chapter 11 Cases, certain Foreign Vendors may not. In the ordinary course, the Debtors use a limited number of foreign vendors to source essential goods and services required to operate their businesses, primarily in relation to ensuring that the Debtors are in compliance with certain regulatory requirements in Europe so that the Debtors' can sell and market their Products in Europe.

13.     Importantly, the Debtors seek to pay only the Critical Vendor Claims of the Foreign Vendors that to the best of the Debtors' knowledge lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations—particularly the automatic stay.  The Debtors believe that there is a material risk that the Foreign Vendors holding Critical Vendor Claims against the Debtors may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay and engage in conduct that disrupts the Debtors' operations, or simply may be confused by the chapter 11 process, particularly those in countries with liquidation-oriented insolvency procedures.  Notably, Foreign Vendors that believe the automatic stay does not govern their actions may exercise self-help (if permitted under local law), which could include shutting down the Debtors' access to essential goods and services.

14.     Foreign Vendors also may sue the Debtors in a foreign court to recover prepetition amounts owed to them.  If they are successful in obtaining a judgment against the Debtors, the Foreign Vendors may seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withhold vital supplies and services from the Debtors.  Because the Debtors would have limited, if any, effective and timely recourse and no practical ability to remedy this situation (absent payment of amounts sought), their businesses could be irreparably harmed by any such action to the detriment of the Debtors' estates and creditors.

**B.      Identification of Critical Vendors**

15.     To identify vendors to be paid pursuant to the relief requested in this Motion, the Debtors, in consultation with their advisors, closely reviewed their accounts payable and prepetition vendor lists, and consulted with employees most familiar with the Debtors' supply chain to identify those vendors that are most essential to the Debtors' operations.  The criteria considered included:

(a)  whether a vendor is a sole- or limited-source supplier of materials, parts, or other services for use in the Debtors' business;

(b)  whether alternative vendors are available that can provide requisite volumes, specifications, customization, and expedited delivery of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operations without interruption while transitioning business thereto;

(c)  the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

(d)  whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

(e)  whether certain specifications, customization, location, or other relevant characteristics of ongoing operations prevent the Debtors from obtaining goods or services from alternative sources; and

(f)  whether an amount less than the full amount of a vendor's claim could induce continuation of shipments.

## C.    Proposed Terms and Conditions to Payment of Critical Vendor Claims

16.    The Debtors propose that they may, in their sole discretion, condition payment of the Critical Vendor Claims on entry into an agreement between the Debtors and the individual Critical Vendor, under which such Critical Vendor would continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), representing the most favorable trade terms to the Debtors by such Critical Vendor within the period 365 days prior to the Petition Date (the "**Customary Trade Terms**").  The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as defined herein), to the extent the Debtors determine that such trade terms are

necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

17.     The Debtors further propose that in the event the Debtors are making a payment pursuant to this Motion, the Debtors will send a letter, by email or mail, substantially in the form attached hereto as **Exhibit C**, to each of the Critical Vendors to which they are making such payment, along with a copy of the order granting this Motion, including, without limitation the following terms:

(a)     The amount of such Critical Vendor's estimated claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the order granting this Motion and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

(b)     The amount of payment toward the Critical Vendor's estimated claim;

(c)     The Critical Vendor's agreement to be bound by the Customary Trade Terms, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor;

(d)     The Critical Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Critical Vendor postpetition in accordance with such terms;

(e)     The Critical Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "**Lien**"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary action to release such Lien;

(f)     The Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the order granting this Motion and consents to be bound thereby;

(g)     The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation or Bankruptcy Code section 503(b)(9) claims; and

(h)   If a Critical Vendor who has received payment toward a Critical Vendor Claim subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms, any payments received by the Critical Vendor on account of its Critical Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and that such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of setoff or reclamation.

18.   Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "**Trade Agreement**").[6]

19.   The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.  Maintaining normal trade credit terms will enable the Debtors to maintain their market share and maximize the value of their businesses.  Absent the relief requested herein, many of the Debtors' vendors may refuse to do business with the Debtors.

20.   If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority, in their discretion and without further order of the Court but with notice to the affected Critical Vendor (a) to declare such Trade Agreement immediately terminated (if applicable) and (b) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim

---

[6] The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims and shall not constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor.

to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

21.     In the event that the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation.  In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of this order in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any payment toward its Critical Vendor Claim.

## RELIEF REQUESTED

22.     By this Motion, the Debtors seek entry of the Proposed Orders, pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code and Rule 6003 and 6004(h) of the Bankruptcy Rules (i) granting them the authority in their sole discretion to pay all or a portion of their prepetition obligations to certain Critical Vendors, (ii) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing, and (iii) granting related relief.

## BASIS FOR RELIEF

**A.     Section 363 of the Bankruptcy Code Authorizes Payment of Critical Vendor Claims**

23.     Payment of the Critical Vendor Claims is appropriate under Bankruptcy Code section 363(b)(1), which empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under Section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where

a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that there must be a sound business justification to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers); *see also In re Chateaugay Corp.,* 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application).

24.     The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this District have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

25.     The Debtors submit that the requested relief is justified under section 363(b) of the Bankruptcy Code and is in line with the relief granted in many chapter 11 cases. As detailed above,

the Debtors believe that the Critical Vendors provide goods and services that that are vital to the

continued operations of the Debtors' businesses, including (a) manufacturing of APIs for its

Products by Specialty Manufacturers, (b) the continual marketing and promotion of its Products

by Marketing Agencies, and (c) ensuring the Debtors are in compliance with foreign regulations.

The Debtors believe that payment of some or all Critical Vendor Claims owed to Critical Vendors

is thus necessary to preserve operations and maximize the value of the Debtors' assets.  The need

for the flexibility to pay such claims is particularly acute in the period immediately following the

Petition Date, as the Debtors will be focused on stabilizing their businesses.  Critical Vendors may

attempt to assert their considerable leverage and deny provision of goods and services going

forward, suddenly and without notice, in an effort to cripple operations and coerce payment.

Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to

continue to supply goods or services to the Debtors on Customary Trade Terms.  The Critical

Vendors that do not have contracts with the Debtors could cease doing business with the Debtors,

creating shortages in the Debtors' supply chain and compromising the Product brands.

**B.      Payment of Critical Vendor Claims is Also Appropriate under Section 105 of the
         Bankruptcy Code and the Doctrine of Necessity**

26.      Payment of Critical Vendor Claims is also appropriate under section 105(a) of the

Bankruptcy Code, which empowers the Court to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section

105(a) of the Bankruptcy Code, a court "can permit pre-plan payment of a prepetition obligation

when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr.

E.D. Va. 1992); *see also In re Chateaugay Corp.*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987).

27.      The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition

claims, whose payment is critical to the debtor's business, is firmly established under the "doctrine

of necessity," which recognizes the judicial power to authorize a debtor in a chapter 11 case to "pay prepetition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1992) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization."); *see also Miltenberger v. Logansport R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to organization permitted to prevent "stoppage of [crucial] business relations"); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (holding that courts are authorized under section 105(a) to allow immediate payment of prepetition claims of vendors found to be critical to the debtor's reorganization).

28.     The Debtors believe that paying the Critical Vendors is in the best interests of the Debtors' estates and critical to the ongoing operations of the Debtors.  Absent payment of their prepetition claims, the Critical Vendors may refuse to continue to supply goods and services to the Debtors postpetition, and the operations and value of the Debtors' estates may suffer.  The Critical Vendors are sole-source suppliers of the Debtors.  As detailed above, given the various regulations that govern the manufacturing, sale, and promotion of the Debtors Products in the pharmaceutical industry, it would take substantial time and resources to find and onboard replacement vendors, which would outweigh the prepetition claims of the Critical Vendors.  Thus, the requested relief is necessary to avoid immediate and irreparable harm to the Debtors and to the recovery of all creditors.  This irreparable harm will far outweigh the cost of payment to the Critical Vendors.

29.     Similar relief has been granted by courts in this district in other chapter 11 cases. *See, e.g., In re: Troika Media Group, Inc.*, Case No. 23-11969 (Bankr. S.D.N.Y. Jan. 2, 2024) [Docket No. 68]; *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr.

S.D.N.Y. Feb. 24, 2023) [Docket No. 98]; *In re Endo International plc*, Case No. 22-22549 (JLG)

(Bankr. S.D.N.Y. Sept. 30, 2022) [Doc. No. 317]; *In re Aegerion Pharmaceuticals, Inc.*, Case No.

19-11632 (MG) (Bankr. S.D.N.Y. June 27, 2019) [Doc. No. 146]; *In re Synergy Pharmaceuticals*

*Inc.*, Case No. 18-14010 (JLG) (Bankr. S.D.N.Y. Jan. 8, 2019) [Doc. No. 184].

**C.      Applicable Financial Institutions Should Be Authorized to Honor and Process
          Related Checks and Transfers**

30.      The Debtors also request that all applicable banks and other financial institutions

(the "**Banks**") be authorized to (a) receive, process, honor, and pay all checks presented for

payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that

the Debtors request authority to pay in this Motion, regardless of whether the checks were

presented or fund transfer requests were submitted before or after the Petition Date and (b) rely on

the Debtors' designation of any particular check as approved by order of the Court.

<u>**NECESSITY OF IMMEDIATE RELIEF AND WAIVER OF STAY**</u>

31.      The Debtors further submit that because the relief requested in this Motion is

necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein

and in the First Day Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested

herein should be granted.   Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and
> irreparable harm, the court shall not, within 21 days after the filing of the
> petition, issue an order granting the following: . . . (b) a motion to use, sell,
> lease, or otherwise incur an obligation regarding property of the estate,
> including a motion to pay all or part of a claim that arose before the filing
> of the petition . . . .

Fed. R. Bankr. P. 6003.

32.      Payment of the Critical Vendor Claims is necessary to ensure that the Debtors'

operations are not disrupted at this critical juncture.   Accordingly, the Debtors respectfully submit

that, because of the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

33. To successfully implement the foregoing, the Debtors respectfully request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and that the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 4001(a). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As explained above and in the First Day Declaration, the Debtors submit that ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and granting a waiver of the stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such notice is required and such a stay applies.

34. Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

## **RESERVATION OF RIGHTS**

35. Nothing contained herein is intended or should be construed as or deemed to constitute an agreement or admission as to the validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any claims related to the Critical Vendors. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **NOTICE**

36. Notice of this Motion will be provided to (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (c) the Internal Revenue

Service; (d) the United States Attorney's Office for the Southern District of New York and all other states in which the Debtors operate; (e) the Securities and Exchange Commission; (f) the United States Food and Drug Administration; (g) counsel to the Ad Hoc Noteholder Group and DIP Lenders, King & Spalding; (h) counsel to as the DIP Administrative Agent, King & Spalding; (i) the Banks; (j) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (k) any other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

<u>**NO PRIOR REQUEST**</u>

37.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Signature page follows]*

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter interim and final orders, substantially in the forms annexed hereto as **Exhibit A** and **Exhibit B,** respectively, granting the relief requested herein and granting such other and further relief as is just and proper.


Dated: April 2, 2024                     _/s/ Blaire Cahn_____
                                                John R. Dodd (*pro hac vice* pending)
                                                **BAKER & McKENZIE LLP**
                                                1111 Brickell Avenue, 10th Floor
                                                Miami, FL 33131
                                                Telephone: 305-789-8900
                                                Facsimile: 305-789-8953
                                                Email: john.dodd@bakermckenzie.com

                                                and

                                                Blaire Cahn
                                                **BAKER & McKENZIE LLP**
                                                452 Fifth Avenue
                                                New York, NY 10018
                                                Telephone: 212-626-4875
                                                Facsimile: 212-310-1695
                                                Email: blaire.cahn@bakermckenzie.com

                                                *Proposed Counsel for the Debtors*
                                                *and Debtors-in-Possession*

## EXHIBIT A

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 11 |
| ACORDA THERAPEUTICS, INC., *et al.*,[1] | Case No. 24-22284 (DSJ) |
| Debtors. | |
| _____/ | |

### INTERIM ORDER (I) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CRITICAL VENDORS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Acorda Therapeutics, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") for entry of interim and final orders, pursuant to sections pursuant to sections 105(a), 363(b) and 503(b)(9) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (a) granting them the authority in their sole discretion to pay all or a portion of their prepetition obligations to certain Critical Vendors, (b) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing, and (c) and granting related relief, all as more fully described in the Motion; and the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.); and the Court having authority to hear the matters raised in the

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Acorda Therapeutics, Inc. (1168), Civitas Therapeutics, Inc. (2814), Biotie Therapies, LLC (2149), Biotie Therapies AG (N/A), Neuronex, Inc. (5094), and Acorda Therapeutics Limited (N/A). For the purposes of these chapter 11 cases, the address for the Debtors is: 2 Blue Hill Plaza, 3rd Floor, Pearl River, New York 10965.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the First Day Declaration, as applicable.

Motion pursuant to 28 U.S.C. § 157; and the Court having venue pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the requested relief being a core proceeding that the Court can determine pursuant to 28 U.S.C. § 157(b)(2); and due and sufficient notice of the Motion having been given under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion and the First Day Declaration; and a hearing having been held to consider the relief requested in the Motion; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their creditors, their estates and all other parties in interest; and the Court having determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003; and upon the record herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.      The Motion is GRANTED on an interim basis to the extent set forth herein.

2.      The hearing (the "**Final Hearing**") on the Motion shall be held on _____ __, **2024, at __:__ _.m**., prevailing Eastern Time.  Any objections or responses to the relief sought (each, an "**Objection**") shall be filed on or before **__:__ _.m. prevailing Eastern Time on _____, 2024**, and be served on (a) proposed counsel to the Debtors, Baker & McKenzie LLP (Attn: John R. Dodd, 1111 Brickell Avenue, 10th Floor, Miami, Florida 33131 and Blaire Cahn, 452 Fifth Avenue, New York, New York 10018, and); (b) counsel to as the DIP Administrative Agent, King & Spalding (Attn: Geoffrey King, 110 N. Wacker Drive, Suite 3800, Chicago, IL 60606); (c) counsel to the Ad Hoc Noteholder Group and DIP Lenders, King & Spalding (Attn: Matthew Warren and Lindsey Henrikson, 110 N Wacker Drive, Suite 3800, Chicago, Illinois 60606); (d) counsel to the U.S. Trustee (Attn: Tara Tiantian, Brian Masumoto,

and Rachael E. Siegel, Alexander Hamilton Custom House, One Bowling Green, Suite 534, New

York, New York 10004); and (e) counsel to any statutory committee appointed in these Chapter

11 Cases.  In the event no Objections to entry of a final order are timely received, this Court may

enter a final order without need for the Final Hearing.

3.       Pursuant to Bankruptcy Code sections 105(a) and 363(b), the Debtors, in their sole

discretion, are authorized to pay some or all of the Critical Vendor Claims in an aggregate amount

not to exceed $2,000,000 on an interim basis (the "**Critical Vendor Claims Cap**") absent further

order of this Court; *provided, however,* that any Critical Vendor Claims that accepts payment under

this authority agrees to continue to supply goods or services to the Debtors on such Critical

Vendor's Customary Trade Terms for a period following the date of the agreement or on such

other terms and conditions as are acceptable to the Debtors; *provided further, however,* that the

Debtors' inability to agree on Customary Trade Terms shall not preclude them from paying a

Critical Vendor Claim if the Debtors determine, in the reasonable exercise of their business

judgment that such payment is necessary to the Debtors' operations.

4.       In the event the Debtors will exceed the Critical Vendors Claims Cap, the Debtors

shall provide notice to counsel to the Ad Hoc Noteholder Group, counsel to the DIP Administrative

Agent, and the U.S. Trustee regarding their intent to do so (the "**Critical Vendors Claims Cap

Notice**").  Following the provision of the Critical Vendors Claims Cap Notice, the Debtors shall

file with the Court and serve upon all parties entitled to service of the Motion a proposed order

increasing the Critical Vendors Claims Cap (the "**Proposed Critical Vendors Claims Cap

Order**").  If no party objects to the Proposed Critical Vendors Claims Cap Order within three (3)

days after the filing of the Proposed Critical Vendors Claims Cap Order, the Court may enter the

Proposed Critical Vendors Claims Cap Order without a hearing.

5.      The Debtors are authorized, but not directed, to undertake appropriate efforts to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in the reasonable exercise of their business judgment, that such an agreement is necessary to their postpetition operations; *provided, however*, that the Debtors' inability to enter into a Trade Agreement shall not preclude them from paying a Critical Vendor Claim when, in their sole discretion, such payment is necessary to the Debtors' operations.

6.      If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of any payment on account of its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may, with notice to the affected Critical Vendor and on or before the date on which any plan or plans of reorganization are confirmed in the Chapter 11 Cases, declare (a) such Trade Agreement immediately terminated (if applicable), (b) any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and (c) that the Critical Vendor shall immediately return to the Debtors any payment made on account of such Critical Vendor Claim to the extent such payments exceed the postpetition amounts then outstanding to such Critical Vendor, without giving effect to any alleged rights of setoff or recoupment.  Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

7.      Notwithstanding the foregoing, the Debtors may, in their sole discretion, reinstate a Trade Agreement if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the

Critical Vendor of such default or the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

8.      Nothing in this order authorizes the Debtors to accelerate any payments not otherwise due.

9.      The Debtors shall maintain a matrix/schedule of payments made pursuant to this Interim Order, including the following information: (a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment.  The Debtors shall provide a copy of such matrix/schedule to the Court, the U.S. Trustee, counsel to the Ad Hoc Noteholder Group and DIP Lenders, counsel to the DIP Administrative Agent, and any statutory committee appointed in the Chapter 11 Cases every 30 days beginning upon entry of this Interim Order.

10.      All applicable Banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Order whether presented prior to, on or after the Petition Date to the extent the Debtors have good funds standing to their credit with such Banks or other financial institutions.  Such Banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

11.      Nothing in this Order or any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365, and all of the Debtors' rights with respect to such matters are expressly reserved.

12.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative claim.

13.     Nothing in this Order nor the Debtors' payment of claims pursuant to this Interim Order shall be construed as (a) an agreement or admission by the Debtors as to the validity of any claim on any grounds, (b) a waiver or impairment of any Debtors' rights to dispute any claims on any grounds, (c) a promise by the Debtors, to pay any claim or (d) an implication or admission by the Debtors that such claim is payable pursuant to this Interim Order.

14.      Notwithstanding anything to the contrary in this Interim Order, any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under the orders of the Court granted pursuant to the DIP Motion (the "**DIP Orders**"), and shall be subject to any Approved Budget as defined thereunder.  In the event of any inconsistency between the terms of this Interim Order and the DIP Orders, the terms of the DIP Orders shall control.

15.     Under the circumstances of the Chapter 11 Cases, notice of the motion is adequate under Bankruptcy Rule 6004(a).

16.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all actions necessary to implement the relief granted in this Interim Order.

18.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Interim Order.

Dated: _____, 2024
     New York, New York

                    HONORABLE DAVID S. JONES
                    UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| ACORDA THERAPEUTICS, INC., *et al.*,[1] | Case No. 24-22284 (DSJ) |
| Debtors. | |
| _____ / | |

### FINAL ORDER (I) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CRITICAL VENDORS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Acorda Therapeutics, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") for entry of interim and final orders, pursuant to sections pursuant to sections 105(a), 363(b) and 503(b)(9) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), (a) granting them the authority in their sole discretion to pay all or a portion of their prepetition obligations to certain Critical Vendors, (b) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing, and (c) granting related relief, all as more fully described in the Motion; and the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.); and the Court having authority to hear the matters raised in the Motion pursuant to 28 U.S.C. § 157; and the Court having venue pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration of

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Acorda Therapeutics, Inc. (1168), Civitas Therapeutics, Inc. (2814), Biotie Therapies, LLC (2149), Biotie Therapies AG (N/A), Neuronex, Inc. (5094), and Acorda Therapeutics Limited (N/A). For the purposes of these chapter 11 cases, the address for the Debtors is: 2 Blue Hill Plaza, 3rd Floor, Pearl River, New York 10965.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the First Day Declaration, as applicable.

the Motion and the requested relief being a core proceeding that the Court can determine pursuant to 28 U.S.C. § 157(b)(2); and due and sufficient notice of the Motion having been given under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion and the First Day Declaration; and a hearing having been held to consider the relief requested in the Motion; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their creditors, their estates and all other parties in interest; and the Court having determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003; and upon the record herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.      The Motion is GRANTED on a final basis to the extent set forth herein.

2.      Pursuant to Bankruptcy Code sections 105(a) and 363(b), the Debtors, in their sole discretion, are authorized to pay some or all of the Critical Vendor Claims; *provided, however,* that any Critical Vendor that accepts payment under this authority agrees to continue to supply goods or services to the Debtors on such Critical Vendor's Customary Trade Terms for a period following the date of the agreement or on such other terms and conditions as are acceptable to the Debtors; *provided further, however,* that the Debtors' inability to agree on Customary Trade Terms shall not preclude them from paying a Critical Vendor Claim if the Debtors determine, in the reasonable exercise of their business judgment that such payment is necessary to the Debtors' operations.

3.      The Debtors are authorized, but not directed, to undertake appropriate efforts to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in the reasonable exercise of their business judgment, that such an agreement is necessary to their postpetition operations; *provided, however*, that the Debtors' inability to enter into a Trade Agreement shall not preclude

them from paying a Critical Vendor Claim when, in their sole discretion, such payment is necessary to the Debtors' operations.

4.       To the extent any payment on account of any Critical Vendor is in excess of $300,000, the Debtors shall provide notice to counsel to the Ad Hoc Noteholder Group, counsel to the DIP Administrative Agent, and the U.S. Trustee in advance of such payment.  In the event that any party above objects to the proposed payment under this paragraph, such objecting party shall notify counsel for the Debtors as soon as practicable via email of such objection, and thereafter the Debtors may request a hearing before the Court to consider such objection on an expedited basis, subject to the Court's availability.  No payment will be made until the objection is resolved by the Court.

5.       If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of any payment on account of its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may, with notice to the affected Critical Vendor and on or before the date on which any plan or plans of reorganization are confirmed in the Chapter 11 Cases, declare (a) such Trade Agreement immediately terminated (if applicable), (b) any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor, and (c) that the Critical Vendor shall immediately return to the Debtors any payment made on account of such Critical Vendor Claim to the extent such payments exceed the postpetition amounts then outstanding to such Critical Vendor, without giving effect to any alleged rights of setoff or recoupment.  Nothing herein shall constitute a waiver of the Debtors' rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

6.      Notwithstanding the foregoing, the Debtors may, in their sole discretion, reinstate a Trade Agreement if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such default or the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

7.      Nothing in this order authorizes the Debtors to accelerate any payments not otherwise due.

8.      The Debtors shall maintain a matrix/schedule of payments made pursuant to this Final Order, including the following information: (a) the names of the payee; (b) the nature, date and amount of the payment; (c) the category or type of payment as characterized in the Motion; and (d) the Debtor or Debtors that made the payment.  The Debtors shall provide a copy of such matrix/schedule to the Court, the U.S. Trustee, counsel to the Ad Hoc Noteholder Group and DIP Lenders, counsel to the DIP Administrative Agent, and any statutory committee appointed in the Chapter 11 Cases every 30 days beginning upon entry of this Final Order.

9.      All applicable Banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Final Order whether presented prior to, on or after the Petition Date to the extent the Debtors have good funds standing to their credit with such Banks or other financial institutions.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

10.      Nothing in this Final Order or any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory

contract or unexpired lease pursuant to Bankruptcy Code section 365, and all of the Debtors' rights with respect to such matters are expressly reserved.

11.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative claim.

12.     Nothing in this Order nor the Debtors' payment of claims pursuant to this Final Order shall be construed as (a) an agreement or admission by the Debtors as to the validity of any claim on any grounds, (b) a waiver or impairment of any Debtors' rights to dispute any claims on any grounds, (c) a promise by the Debtors, to pay any claim or (d) an implication or admission by the Debtors that such claim is payable pursuant to this Final Order.

13.      Notwithstanding anything to the contrary in this Final Order, any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under the orders of the Court granted pursuant to the DIP Motion (the "**DIP Orders**"), and shall be subject to any Approved Budget as defined thereunder.  In the event of any inconsistency between the terms of this Final Order and the DIP Orders, the terms of the DIP Orders shall control.

14.     Under the circumstances of the Chapter 11 Cases, notice of the motion is adequate under Bankruptcy Rule 6004(a).

15.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

16.     The Debtors are authorized to take all actions necessary to implement the relief granted in this Final Order.

17.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Final Order.

Dated: _____, 2024
  New York, New York    _____
             HONORABLE DAVID S. JONES
             UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT C</u>**

**Proposed Letter**

_____, 2024

**To:   [Critical Vendor]**
      **[Name]**
      **[Address]**

Dear Valued Supplier/Service Provider:

      As you are aware, Acorda Therapeutics, Inc. and certain of its affiliates that are debtors and debtors in possession (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on [●], 2024 (the "**Petition Date**").  On the Petition Date, in recognition of the importance of its relationship with vendors and suppliers and its desire that the Chapter 11 Cases have as little effect on such parties as possible, the Company requested the Bankruptcy Court's approval to pay the prepetition claims of certain critical vendors and suppliers.  On [●], 2024, the Bankruptcy Court entered an interim order (the "**Order**") authorizing the Company, under certain conditions, to pay the prepetition claims, in accordance with the terms of the Order, of certain trade creditors that agree to the terms set forth below and agree to be bound by the terms of the Order.  A copy of the Order is enclosed for your reference.  The Company has asked the Bankruptcy Court to schedule a final hearing and thereafter grant the relief provided in the Order on a final basis.

      Under the Order, in order to receive payment of its prepetition claim, each selected trade creditor must agree to continue to supply goods and/or services to the Company based on "**Customary Trade Terms**." In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs), which were most favorable to the Company and in effect between such trade creditor and the Company on a historical basis for the period within 365 days of the Petition Date, or such other trade terms as mutually agreed to by the Company and such trade creditor.

      For purposes of administering this trade program, as authorized by the Bankruptcy Court and in accordance with the terms of the Order, the Company and **[Name of Trade Vendor]** agree as follows (the "**Agreement**"):

      (a)    The estimated balance of the prepetition trade claim (net of any setoffs, credits or discounts) (the "**Trade Claim**") that the Company will pay to **[Name of Trade Vendor]** is $_____.  Your Trade Claim does not constitute a claim allowed by the Bankruptcy Court in the Bankruptcy Cases, and signing this Trade Agreement does not excuse you from any requirement of filing a proof of claim in the Bankruptcy Cases.

      (b)    The Company shall pay $_____towards the Trade Claim (the "**Payment**").

(c)     **[Name of Trade Vendor]** agrees to supply goods/services to the Company in accordance with the Customary Trade Terms, and the Company agrees to pay **[Name of Trade Vendor]** in accordance with such Customary Trade Terms.  [For purposes of this Agreement, Customary Trade Terms consist of those terms provided for in the agreement attached hereto as **Exhibit A** and/or the following terms and conditions.]

(d)     The open trade balance or credit line that **[Name of Trade Vendor]** will extend to the Company for shipment of postpetition goods/services is $_____.

(e)     In consideration for the Payment, you agree not to file or otherwise assert against the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "**Lien**"), claim for reclamation ("**Reclamation Claim**"), claim under Bankruptcy Code section 503(b)(9) (a "**503(b)(9) Claim**"), or any similar priority claim under the Bankruptcy Code or other statute (a "**Priority Claim**") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim, 503(b)(9) Claim, or Priority Claim, you shall take (at your own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim, 503(b)(9) Claim, or Priority Claim unless your participation in the trade payment program authorized by the Order (the "**Trade Payment Program**") is terminated.

Your execution of this Agreement and return of the same to the Company constitutes an agreement by **[Name of Trade Vendor]** and the Company:

1.     to be bound by the Customary Trade Terms (as modified herein) and, subject to the reservations set forth in the Order, to the amount of the Trade Claim set forth above;

2.     that [**Name of Trade Vendor**] will continue to supply the Company with goods and/or services pursuant to the Customary Trade Terms (as modified herein) and that the Company will pay for such goods and/or services in accordance with the Customary Trade Terms (as modified herein);

3.     that **[Name of Trade Vendor]** has reviewed the terms and provisions of the Order and that it consents to the bound by such terms, except as modified herein;

4.     that **[Name of Trade Vendor]** will not separately seek payment for Liens, Reclamation Claims, 503(b)(9) Claims, Priority Claims, and similar claims outside of the terms of the Order unless its participation in the Trade Payment Program authorized by the Order is terminated;

5.      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtors any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceeds such postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense;

6.      that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtors any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceeds such postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense; and

7.      that if the Company shall be in default under this Agreement, **[Name of Trade Vendor]** shall have no obligation to supply goods and/or services to the Company on Customary Trade Terms (as modified herein) until the Company cures such default and **[Name of Trade Vendor]** shall have the right to terminate this Agreement upon written notice to the Company detailing the Company's defaults hereunder (which the Company shall have the right to dispute) and the Company's failure to cure such default within five (5) business days of such notice, in which event **[Name of Trade Vendor]** may retain all sums paid to it hereunder on account of its Trade Claim.

The Company and **[Name of Trade Vendor]** also hereby agree that any dispute with respect to this Agreement, the Order and/or **[Name of Trade Vendor]**'s participation in the Trade Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, please do no hesitate to contact [Contacts Person] at [email].

Sincerely,

Acorda Therapeutics, Inc.

By: _____
Name:
Title:

Agreed and Accepted by:

**[Name of Vendor]**

By:_____
     Name:
     Title:

Dated: _____, 2024